# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| Al.B., Am.P., An.P., Ar.A., B.L., B.T., E.G., Er.M., F.M., J.L., J.O., J.S., J.T., Ja.A., Je.T., Ji.T., Jo.B., L.N., M.S., Rog.E., Rol.P., R.D., R.I., R.P., V.B., and W.B., <br><br> Plaintiffs, <br><br> v. <br><br> JACOBS SOLUTIONS INC., JACOBS ENGINEERING GROUP INC., CH2M HILL COMPANIES, LTD., CH2M HILL INTERNATIONAL, LTD., and CH2M HILL INTERNATIONAL B.V., <br><br> Defendants. | Case No. 25-cv-3067 <br><br> **FIRST AMENDED COMPLAINT** <br><br> JURY TRIAL DEMANDED |

## I.    NATURE OF THE ACTION

1.    When the 2022 FIFA World Cup was awarded to Qatar in 2010, it kicked off the most ambitious infrastructure-development project in Qatar's history.  To host dozens of games and millions of spectators, the Qatari regime built a new airport, expanded rail infrastructure, and constructed dozens of new hotels.  And the Qatari regime constructed several state-of-the-art stadiums that were designed to keep players, spectators, and media comfortable during scorching, humid days in a place where the temperatures can reach 118 degrees Fahrenheit. Hailed (by some) as a resounding success (for some), the 2022 FIFA World Cup generated billions of dollars in revenue for Qatar's brutal authoritarian dictatorship.

2.      The Qatari regime's World Cup "triumph" was built on a foundation of human trafficking and forced labor.  Qatar's ruling regime realized its dream of hosting the 2022 FIFA World Cup only through untold thousands of migrant workers being subjected to nightmarish conditions.  Construction workers toiled long hours in the desert heat, often without adequate rest, hydration, and nourishment.  Many were routinely forced to work overtime without pay.  Many were forced to live in inhumane, cramped, dirty, and sometimes pest-infested barracks.  Pay was withheld.  Passports were confiscated by the workers' employers, leaving them unable to visit home or find a humane job.  Workers were treated as disposable.  Thousands of migrant workers—including some of the Plaintiffs in this case—suffered severe physical injuries and mental trauma.  At least hundreds more died.  That is why many have referred to human trafficking, forced labor, and related labor abuses during the preparations for the Qatar World Cup as "modern slavery."

3.      In terms of the scale of victims and contemporaneous media condemnation, the 2022 FIFA World Cup involved one of the worst labor-trafficking schemes in recent history.  But this is just the latest episode in Qatar's reprehensible history sponsoring and benefitting from trafficked and forced labor.  Long before the Qatari regime broke ground on new stadiums, it was widely condemned by governments, non-governmental organizations ("NGOs"), journalists, and victims as one of the worst trafficking and forced labor locales on Earth.  Observers across the ideological spectrum routinely and emphatically criticized Qatari conditions under which migrant laborers toiled.  The Qatari

regime's (and Qatari employers') reliance on trafficked and forced labor was plainly visible to anyone who bothered to look.

4.      Against this backdrop, Defendants Jacobs Solutions Inc., Jacobs Engineering Group Inc. (collectively "Jacobs"), and Defendants CH2M Hill Companies, Ltd., CH2M HILL International, Ltd., and CH2M HILL International B.V. (collectively, "CH2M" and, with Jacobs, "Defendants") chose to knowingly participate in—and profit from—ventures that exploited Plaintiffs' labor for construction projects for the 2022 FIFA World Cup.  When they did, Defendants knew that working conditions were unsafe: in an on-the-record interview, a CH2M manager blithely observed that "***his team has estimated that at least 14 people will die while building Qatar's World Cup stadiums***" before joking—about the labor conditions imposed on workers like Plaintiffs—that "***[t]here are quite a few unsafe construction sites . . . I am half expecting bodies to land next to me every time I go past.***" (Emphasis added.)

5.      Plaintiffs were among the thousands of construction workers who were lied to—about the work they would do, the pay they would receive, the inhumane living conditions they would endure, and the fatally dangerous and unsafe conditions they would work in—to build the stadiums and infrastructure for the 2022 FIFA World Cup. Defendants, richly compensated to oversee and manage the construction projects, with and through the companies with which they jointly ventured, abused the Plaintiffs, subjected migrant laborers to these inhumane working and living conditions—and took away their passports to prevent their escape.

3

6.    Because Defendants' joint venturers lied to Plaintiffs about the terms and conditions of their employment and living conditions and confiscated Plaintiffs' passports, Plaintiffs were unable to leave Qatar, address their condition of inhumane and forced labor, or change employers.  They were trapped in Defendants' venture's systematic embrace of, and profits from, the institutionalized trafficked and forced labor omnipresent in Qatar.  Defendants' conduct violated state and federal law, including the Trafficking Victims Protection Reauthorization Act (the "TVPRA").  Defendants trafficked Plaintiffs and forced Plaintiffs to work in violation of 18 U.S.C. § 1589 and 18 U.S.C. § 1590. Defendants, integrally involved in construction preparations for the Qatar World Cup, knowingly benefitted from participation in ventures they knew or should have known relied on trafficked and forced labor.  Defendants are therefore liable pursuant to 18 U.S.C § 1595(a).

## II.    JURISDICTION AND VENUE

7.    Plaintiffs bring their claims in this District because Defendants participated in and knowingly benefitted from the World Cup Construction Venture (as defined below) in Colorado.  Further, to the extent Defendants' other acts were outside the United States, the 2013 amendments to the TVPRA explicitly provide for extraterritorial jurisdiction.  *See* 18 U.S.C. § 1596.  18 U.S.C. § 1596(a) makes clear that Defendants are liable to the extent their conduct was outside of the United States because they chose to remain present in the United States or be nationals of the United States.

8.    Plaintiffs' TVPRA claims accrued after December 23, 2008, the effective date of 18 U.S.C. § 1596.

4

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of citizenship.  All Plaintiffs are foreign nationals as well as citizens and residents of the Philippines, and each of their claims for damages exceeds $75,000.  Defendants are United States corporations and their subsidiaries.

10.     Defendants are nationals of the United States or are present in the United States, irrespective of nationality, providing this Court with extraterritorial and federal-question jurisdiction under 18 U.S.C. § 1596(a) and 28 U.S.C. § 1331.

11.     No foreign government has prosecuted or is prosecuting Defendants for the conduct alleged herein.

12.     Defendants CH2M Hill Companies, Ltd. and CH2M HILL International, Ltd. maintain their corporate headquarters in Colorado.  CH2M HILL International B.V. is incorporated in the Netherlands, and has operations, among other places, in Colorado, the Netherlands, and Qatar.  Each of CH2M Hill Companies, Ltd., CH2M HILL International, Ltd., and CH2M HILL International B.V. does substantial and continuous business within the State of Colorado, by virtue of CH2M's integration throughout its firm, knowingly benefitted in Colorado from the joint venture's exploitation of forced labor, and on information and belief made decisions and took actions in this District in furtherance of the venture that caused or contributed to the Plaintiffs' harms, *see infra* ¶¶ 28–31, so they are subject to both general and specific personal jurisdiction before this Court.

13.     Defendants Jacobs Engineering Group Inc. and Jacobs Solutions Inc. are incorporated in Delaware and have their global headquarters in Texas.  Jacobs at all relevant times maintained corporate offices in Colorado and did and continues to do

5

substantial and continuous business within the State of Colorado, by virtue of Jacobs's integration throughout its firm, and Jacobs and its subsidiaries knowingly benefitted in Colorado from the joint venture's exploitation of forced labor, and on information and belief Jacobs made decisions and took actions in this District in furtherance of the venture that caused the Plaintiffs' harms, *see infra* ¶¶ 28–31, so Jacobs is subject to specific personal jurisdiction before this Court. Though Jacobs Solutions Inc. was incorporated after the Plaintiffs completed their work, it knowingly benefitted from the venture's exploitation of forced labor and has successor liability for Jacobs Engineering Groups earlier conduct.

14.    Plaintiffs' state-law claims arise out of the same case or controversy as their federal-law claims and involve a common nucleus of operative facts.  All injuries Plaintiffs suffered were the result of their being trafficked and subjected to harsh conditions performing forced labor.  Thus, this Court also has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

15.    Under 28 U.S.C. §§ 1391(b)(3) and (c)(2), venue over the Defendants is proper in this District.  Based on subsection (b)(3), venue is proper because this District is one where Defendants are subject to personal jurisdiction.  Further, based on subsection (c)(2), Defendants are deemed to reside in this District because Defendants are subject to personal jurisdiction here.

### III.    THE PARTIES

16.    In August 2022, just before the World Cup 2022 kicked off, Jacobs Engineering Group Inc. became a wholly owned subsidiary of Jacobs Solutions Inc.  This

6

was simply a rebranding of the main parent Jacobs entity, which continued unchanged, as Jacobs Solutions Inc. continues to have the same assets, employees, and contractual counterparties Jacobs Engineering Group Inc. had before the reorganization.

17.     Jacobs is a Fortune 300 company, with over 58,000 employees and annual revenue of over $14 billion.   Jacobs has offices all over the world, including in the Philippines and Qatar.

18.     According to Jacobs, it "provides a full spectrum of professional services including consulting, technical, scientific and project delivery for the government and private sector."

19.     In 2017, Jacobs acquired and made into its wholly owned subsidiary Defendant CH2M (including CH2M Hill Companies, Ltd.'s subsidiaries, including CH2M HILL International, Ltd. and CH2M HILL International B.V.).

20.     CH2M Hill Companies, Ltd. publicly disclosed CH2M HILL International, Ltd. is CH2M's "holding company for operations outside of the United States."

21.     Public sources confirm that CH2M Hill Companies, Ltd. and CH2M HILL International, Ltd. performed CH2M work in Qatar, sometimes but not always via CH2M HILL International B.V.

22.     In 2012 CH2M was hired to be the Programme Management Consultant "to ensure the successful delivery" of the 2022 FIFA World Cup in Qatar by managing the massive construction projects necessary to host the event.   Pursuant to that construction management contract, CH2M was tasked with overseeing coordination with Qatari government agencies—all controlled by the Qatari regime—on large infrastructure

7

projects for the World Cup, including the construction of nine new stadiums and the upgrade of three existing ones. CH2M Hill was also tasked with coordinating with Qatari government agencies and to monitor and provide assurance functions related to the construction of non-competition venues and major infrastructure projects that were needed for the World Cup. The construction and upgrade of these stadiums and related infrastructure is the "World Cup Construction Venture" or "Venture".

23.    CH2M had a unique corporate culture, which it has publicly disclosed was governed by foundational and core values captured in "*The Little Yellow Book*," written in 1978 by the firm's cofounder James Howland.  *The Little Yellow Book* was given to ***all employees worldwide*** on their first day.  CH2M's *The Little Yellow Book* espoused a view, which was integrated across and among all of CH2M's business, regardless of which subsidiary did the work, that CH2M would do what the client wanted, stating explicitly "***[t]he client is king***," as underscored by this image, which *The Little Yellow Book* included:



On information and belief, CH2M's core value of kowtowing to its clients' desires was one

of the reasons the Qatari regime, via the Supreme Committee, hired CH2M to oversee

and manage delivery of the stadiums for the World Cup Construction Venture.

24.     Jacobs acquired CH2M in 2017, and the companies were integrated such

that the two companies and their subsidiaries co-located their offices in Colorado and

Texas.     Jacobs thereafter had offices in Colorado, in and through which Jacobs

employees worked on the World Cup Construction Venture.  Starting in the year after it

acquired CH2M, Jacobs also disclosed publicly that it has offices in Qatar.

25.     After Jacobs acquired CH2M, all of CH2M's subsidiaries became wholly

owned subsidiaries of Jacobs.

9

26.    Public sources confirm that Jacobs performed work in Qatar, sometimes but not always via CH2M HILL International B.V.

27.    CH2M and—starting in 2017—Jacobs managed and supervised construction for the entirety of the World Cup Construction Venture, including all stadiums—including, but not limited to, Al Thumama Stadium, Al Wakrah Stadium, Khalifa Stadium, Al Rayyan Stadium, and Lusail Stadium—and related infrastructure.  In this role, CH2M and Jacobs had significant access to the stadiums, influence over and oversight of the work done at the stadiums, managerial authority, auditing rights, and control over other companies that worked together to construct and deliver the stadiums for the World Cup Construction Venture.

28.    At all relevant times, Defendants practiced integrated one-firm business models such that each entity in the corporate form routinely collaborated with one another.  Jacobs and CH2M and their subsidiaries, through cross-functional teams that ensured that data, analysis, documentation, and the like were all shared seamlessly across and between them, as well as their affiliates, all operated as one.  Consequently, when one Defendant learned a material fact relating to the World Cup Construction Venture, it ordinarily would have and did share such information with the other Defendants.  And when another subsidiary of Jacobs or CH2M learned information, it would and did share such information with the Defendants.

29.    Jacobs's one-firm business model made it inevitable that Jacobs did work in furtherance of the World Cup Construction Venture in Colorado.  Jacobs touts its "One Jacobs" business model, and according to Jacobs, "[o]ur integrated Business

10

Management System (BMS) establishes the 'one Jacobs way' to ensure consistency and efficiency in internal operations and project delivery."[1]  Under Defendants' "One Jacobs" approach, to which Defendants always adhered, Jacobs Solutions Inc., Jacobs Engineering Group Inc., CH2M Hill Companies, Ltd., CH2M Hill International, Ltd., and CH2M HILL International B.V. routinely collaborated with one another and with Jacobs's and CH2M's other subsidiaries.  This integrated work related to the World Cup Construction Venture was done in and through Jacobs's offices in Colorado.  For example:

a.  <u>Major Programs Teamwork in Colorado</u> – Jacobs employees and executives who were members of Jacobs's Major Programs and Urban Environment & Sports groups participated in the Venture, on information and belief while in Jacobs's offices in Colorado.  For example, a U.S.-based dual-hat Jacobs and CH2M executive, Joseph Danko, was the Global Managing Director of CH2M's Urban Environment & Sports Group prior to Jacobs's acquisition of CH2M, and afterwards was Jacobs's Program Director, Sports and Entertainment.  Mr. Danko stated publicly that he worked on the World Cup Construction Venture, and his work there related to "worker welfare standards."  It is reasonable to infer that his work and Jacobs's benefit therefrom was done at least in part in the United States and from and through CH2M's (and then Jacobs's) offices in Colorado.

b.  <u>Global Program Management Group Work in Colorado</u> – The Global Program Management Group was based, prior to Jacobs's acquisition, in Colorado, and still had teammates in Colorado after Jacobs acquired CH2M.  That group met and made decisions related to the World Cup Construction Venture, and therefore participated in the venture, on information and belief, while in Jacobs's offices in Colorado.  For example, Ken Degenhart, a Jacobs and CH2M dual-hatted "program manager" based in Colorado, worked on behalf of Jacobs and CH2M on the World Cup Construction Venture and, on information in belief, did so from Jacobs's offices in Colorado.  Additionally, Jan Walstrom, a CH2M and then Jacobs employee at all relevant times based in Colorado, and currently an officer and director of Defendant CH2M Hill International Ltd., performed global and enterprise-wide "risk management" functions

---

[1]  Jacobs, FY21 ESG Disclosures, https://www.jacobs.com/sites/default/files/2022-04/FY21-ESG-Disclosures.pdf (last accessed Oct. 8, 2023).

11

and, on information and belief, did work in furtherance of the World Cup Construction Venture from Jacobs's offices in Colorado.

c. <u>Global Integrated Delivery Teammates in Colorado</u> – Jacobs has (and had at the time that it was working on the World Cup Construction Venture) a program it calls Global Integrated Delivery ("GID"), through which its Colorado employees, including Mechanical Engineers, Structural Engineers, Digital Delivery Leads, and Environmental Planners "partner[] across the globe" with Jacobs teammates abroad. On information and belief, Jacobs employees in Colorado, as well as Jacobs executives, as part of this GID program, "support[ed] and engag[ed] with" personnel in Qatar and World Cup Construction Venture participants, and therefore participated in the Venture.

d. <u>Global Health and Safety Work in Colorado</u> – Britt Howard, based in Colorado, was an Enterprise Director of Health, Safety, Security, Environment and Quality. He worked for CH2M, and then for Jacobs after Jacobs acquired CH2M, and worked on projects globally. On information and belief Mr. Howard worked on the World Cup Construction Venture on behalf of Jacobs from Colorado.

e. <u>Corporate Communications Work in Colorado</u> – Lorrie Paul Crum, based in Colorado, worked in Jacobs's communications offices to which Jacobs directed any communications regarding violations of its labor Supplier Code of Conduct. On information and belief Ms. Crum worked on the World Cup Construction Venture communications issues on behalf of Jacobs from Colorado.

f. <u>Monitoring of the Labor Supply Chain from Colorado</u> – After it acquired CH2M, Jacobs had employees working on global labor supply-chain management who did work in furtherance Jacobs's pledge not to use forced or trafficked labor, on information and belief, from Jacobs's offices in Colorado. For example, Holly Allen, a human resources specialist based in Colorado for CH2M and then Jacobs (after the acquisition), performed global functions related to employee analytics and, on information and belief, did work in furtherance of the World Cup Construction Venture from Jacobs's offices in Colorado. Further, Taggert Hansen, a CH2M and then Jacobs employee based at all relevant times in Colorado worked on labor and employment issues for CH2M's and then Jacobs's global operations and, on information and belief, did work in furtherance of the World Cup Construction Venture from Jacobs's offices in Colorado. Further still, Chris Mancinelli, a CH2M and then Jacobs employee based at all relevant times in Colorado performed international ethics and compliance investigations and, on information and belief, did work in furtherance of the World Cup Construction Venture from Jacobs's offices in Colorado. Further still, Neal Thurston, while based in Colorado, was a CH2M employee who worked for Jacobs on integrating the two companies after the merger, had responsibilities for worldwide anti-corruption training and tracked international reporting and compliance data, and

thereby on information and belief, did work in furtherance of the World Cup Construction Venture from Jacobs's offices in Colorado.

g. <u>Qatar Personnel Meetings in Colorado or with Colorado Personnel</u> – Executives at CH2M and Jacobs who were integral to Defendants' participation in the World Cup Construction Venture, including but not limited to Rehan Khan, Amer Battikhi, Omur Akay, and Neil Reynolds met and made decisions related to the World Cup Construction Venture, and therefore participated in the Venture, on information and belief while in Jacobs's offices in Colorado.  Each of these individuals, and each other Jacobs direct or indirect employee, who traveled to the United States to perform work in furtherance of the Venture, made representations to the United States in immigration documentation, and those representations made in the United States were acts in furtherance of the Venture.

30.     Before Jacobs acquired CH2M, CH2M and each of its subsidiaries followed a globally-integrated business strategy, such that they each performed work in Colorado in furtherance of the World Cup Construction Venture.  Because CH2M's global headquarters were in Colorado, it is reasonable to infer that CH2M employees, executives, and its subsidiaries, including CH2M HILL International B.V., did work and took direction from CH2M in Colorado.  Brian Shelton, for example, was a CH2M and then Jacobs executive based in Colorado who also served as an officer of CH2M HILL International B.V. both before and after Jacobs acquired CH2M and its subsidiaries, and therefore did work on behalf of CH2M HILL International B.V. related to the World Cup Construction Venture from and through CH2M's and then Jacobs's offices in Colorado. Additionally, CH2M's Center for Project Excellence, based out of Colorado, was meant to ensure uniform and global dissemination of technologies, procedures, project controls, and business methods, across and among all of CH2M's subsidiaries.  CH2M also had an "Ethics Ambassador program," which was designed to "provide[] employees with direct access to local senior leaders" at "every major office and project site" and who provided

the vehicle for a "reliable way to connect our employees in the field to the home office [in Colorado], where ethics policies are set and preventive measures are enforced to ensure compliance."   CH2M also had an internal compliance lead in Denver that oversaw CH2M's subsidiaries' work in foreign locations.   Finally, CH2M utilized what it called "Matrix Organization" which was designed to allow employees to be deployed, regardless of which subsidiary was doing CH2M's work, based on capabilities and geographic expertise, and to freely exchange information and use any available resources throughout the entirety of CH2M's corporate structure.   Each of these programs and employees, as well as each example CH2M employee listed *supra* ¶ 29, ensured that CH2M, prior to the Jacobs's acquisition, did work in furtherance of the World Cup Construction Venture in and from offices in Colorado.   And it is therefore reasonable to infer, therefrom, that Jacobs's employees and executives did work in furtherance of the World Cup Construction Venture in and from Colorado, after Jacobs acquired CH2M and its subsidiaries.   Finally, each CH2M direct or indirect employee who traveled to the United States to perform work in furtherance of the Venture made representations to the United States in immigration documentation, and those representations made in the United States were acts in furtherance of the Venture.

31.    These facts *supra* ¶¶ 26–30, and *infra* ¶ 60, demonstrate it is reasonable to infer that Jacobs and its subsidiaries, including CH2M HILL International, B.V., had interrelated operations, that were centrally controlled, with common management, and with common ownership or control, such that Jacobs should be held liable for the work of its CH2M HILL International, B.V.   For example, Harry Sealy was a CH2M HILL

International, B.V. employee working in Qatar on the World Cup Construction Venture who at all relevant times also worked for Jacobs as a "Global Technology Lead" and communicated using a Jacobs email address. Similarly, the fact that Jacobs executive Brian Shelton, while sitting in Colorado, was a director of CH2M HILL International, B.V. indicates that Jacobs and its subsidiaries mingled operations, employees, and executives, that Jacobs directly controlled each subsidiary, and that CH2M HILL International B.V. carried out some of its operations, including but not limited to, on information and belief, work related to the World Cup Construction Venture, in Colorado.

32.    Further, these facts *supra* ¶¶ 26–31, and *infra* ¶ 60, show that Jacobs exercised a significant degree of control over CH2M Hill Companies, Ltd.'s, CH2M Hill International, Ltd.'s, and CH2M HILL International, B.V.'s, employee and employment, business strategy, and decision-making with regard to their work on the World Cup Construction Venture, such that these Jacobs subsidiaries were doing the work of Jacobs as agents of Jacobs.

33.    Further still, these facts *supra* ¶¶ 26–31, and *infra* ¶ 60, show that Jacobs exercised extensive control over the acts of CH2M Hill Companies, Ltd., CH2M Hill International, Ltd., and CH2M HILL International, B.V. (collectively, the "Subsidiaries"), related to their work and the harms caused to Plaintiffs on the World Cup Construction Venture. On information and belief Jacobs owns all or the majority of the capital stock of the Subsidiaries, Jacobs and the Subsidiaries have common directors or officers, Jacobs finances the Subsidiaries, Jacobs pays the salaries or expenses or losses of the Subsidiaries, the directors and officers of the Subsidiaries take direction from Jacobs, and

15

employees of Jacobs and the subsidiaries make no distinction between Jacobs and the Subsidiaries. For all these reasons, the Subsidiaries were and are merely instrumentalities of Jacobs.

34. At all relevant times, the participants in the World Cup Construction Venture included each of the Defendants, and others that include but are not limited to:

a. Other subsidiaries of Jacobs and CH2M;

b. The Supreme Committee for Delivery & Legacy ("Supreme Committee");

c. *Fédération Internationale de Football Association*, d/b/a FIFA ("FIFA");

d. Ashghal, Qatar's public works authority;

e. Qatar Foundation;

f. Thornton Tomasetti;

g. AECOM;

h. Turner International Middle East;

i. TiME Qatar;

j. Birdair;

k. Taiyo Middle East;

l. HBK Contracting;

m. China Railway Construction Corporation;

n. Foster + Partners;

o. SIX Co.;

p. Porr;

q. Tekfen;

r. Projacs International;

s. VINCI;

t. Tokyo Freight;

u. J.A.K. Construction Builders;

v. Al Jaber Engineering;

w. Imar Trading and Contracting Company;

x. Midmac Company;

y. Habtoor Leighton Group;

z. Electro Mechanical Enterprises Qatar; and

aa. Rabban Readymix.

35.    Plaintiffs are Filipino construction workers who were trafficked to Qatar and whose coerced labor was used for construction project ventures, in which Defendants participated, for the 2022 FIFA World Cup in Qatar, *i.e.*, the World Cup Construction Venture. *See infra* V.E.

### IV.    SOURCING

36.    The factual allegations herein are based on an extensive investigation drawing on a broad array of public and non-public information, including evidence obtained from witnesses with direct and indirect knowledge, public reports and contract data, Defendants' (inclusive of their employees' and agents') admissions, statements and data relating to the other participants in the World Cup Construction Venture, including Qatar Foundation, U.S. government reports published to Congress under statutory directive, U.N. investigative reports, public investigations, reports, and documentaries published by NGOs, photos and videos, Qatari market data and regulations, public statements by U.S., U.N., and Qatari government officials, English- and Arabic-language

17

media reports, scholarly analyses, think tank publications, and Plaintiffs' own recollections.

## V.    FACTS

### A.    The World Cup Construction Venture Engaged in Human Trafficking and Forced Labor.

37.    Qatar's economy relied on millions of migrant workers, comprising the vast majority of its labor force.

38.    Pursuant to the Qatari regime's (and Qatari employers') notorious system called "*kafala*" (sponsorship), migrant workers' visas were tied to their employers, which left workers dependent on their employers for their legal residency and status in the country.

39.    In Qatar, the *kafala* system made migrant workers vulnerable by granting Qatari employers broad and exploitative powers over migrant workers, allowing them to evade accountability for trafficking and forced labor abuses, and leaving workers beholden to debt and in constant fear of retaliation.  The *kafala* system also made workers depend on their employers not just for their jobs but also for housing and food.

40.    The Qatari regime's (and Qatari employers') *kafala* system was described in 2022 by the widely-followed soccer publication *Tifo Football*—in relation to the World Cup construction projects—as a form of "economic apartheid."  James Montague, author of numerous books and articles about soccer in the Middle East, explained in 2022,

> [t]here has perhaps **never been a more controversial World Cup host. Qatar has been rightfully criticised** for its human rights record, how it won the World Cup bid and especially its treatment of migrant workers. In 100 years from now, humans will look back at kafala [] in . . . Qatar . . . **as one**

18

*of the great economic crimes of the twenty-first century*. (Emphasis added.)

41.    Zahra Babar, Associate Director for Research of Georgetown University's Center for International and Regional Studies, noted the *direct causal relationship* between the World Cup Construction Venture and horrific trafficking and labor abuses inflicted on migrant workers:

> *From the initial stages*, human rights and migrants' rights practitioners *drew a direct causal link* between the awarding of the World Cup hosting rights to Qatar and the expansion of difficult, *if not unendurable, working and living conditions for migrant workers*. (Emphasis added.)

42.    It was not until August 2020 that the Qatari regime introduced a law that ended the requirement for migrant workers to obtain their employer's permission to change jobs.  Until late 2020, to change jobs before the end of their contract, each migrant worker would have had to obtain a "No Objection Certificate" from their employer.

43.    Earlier in 2020, the Qatari regime ended its requirement that migrant workers obtain an "Exit Permit" to leave Qatar.  Before 2020, such a permit was required to depart Qatar.

44.    Prior to August 2020, the minimum wage in Qatar was only QR750, or approximately $210, per month.  2020 "reforms" required new minimum wage and food and housing allowances, designed to combat Qatari employers' widely known practice of forcing migrant workers in Qatar to live and work in inhumane conditions.  The new minimum wage plus food and housing allowance requires payment of QR1,800, or approximately $500, per month.

19

45.     The Qatari regime's 2020 "reforms" purportedly sought to effectively dismantle the Qatari regime's (and Qatari employers') *kafala* sponsorship system, which provided the basis for exploitation of forced labor throughout Qatar.  But even after these Qatari regime "reforms," there remained restrictions on leaving Qatar.  For example, many workers could not return home until the end of their two-year contract unless they were willing to both lose their jobs and pay for their way home.  In some instances, departing prior to two years of service required repaying the "finder's fee" that had been paid to the Filipino employment agencies or required that Plaintiffs pay the full cost to travel home, in contravention of what was promised during their recruitment.

46.     Prior to these "reforms," which still have not been fully implemented, migrant workers' physical movement and freedom were controlled by their employers.

47.     James Montague (the widely published soccer scholar) publicly reported in 2022 that "how these new laws were implemented meant that ***little changed on the ground*** for many workers" (emphasis added) as change related to employers' absolute rights over migrant labor has been slow to be implemented.

48.     Additionally, and distinct from the *kafala* system, Qatari employers and labor supply companies frequently delayed, withheld, or arbitrarily deducted migrant workers' wages and/or overtime, or otherwise violated their contracts with migrant workers with impunity; they also frequently forced migrant workers to risk their safety, forced migrant workers to work through the night, sometimes as long as 36 hours straight, and forced migrant workers to live (when housing was provided) in inhumanely crowded, unsafe, and unsanitary conditions.

20

49.    Additionally, and distinct from the Qatari regime's (and Qatari employers') *kafala* system, Qatari employers and labor supply companies had a commonly known practice of confiscating workers' passports, and then using possession of the passports to restrict workers' physical movement.   By confiscating workers' passports, the companies prevented the workers from returning to their home countries until their contracts expired and restricted workers' ability to change employers in Qatar.

50.    Qatari employers frequently forced migrant workers to work despite this treatment, and therefore exploited forced labor, by (a) taking migrant workers' passports from them; (b) imposing substantial debts—typically, by requiring the migrant worker to pay for the worker's own "recruitment fee," which they must pay off over time as they work; (c) denying migrant workers permission to return home unless they pay sums they cannot afford; and/or (d) threatening legal prosecutions.   Qatar's construction industry was notorious for these types of exploitations of migrant labor, and Defendants knew or should have known that the World Cup Construction Venture would engaged in these types of exploitation.

51.    In 2012, just as construction for the 2022 FIFA World Cup was set to begin, the acclaimed non-governmental organization Human Rights Watch published a landmark report entitled ***Building a Better World Cup: Protecting Migrant Workers in Qatar Ahead of FIFA 2022*** ("2012 HRW Report") documenting pervasive employer exploitation and abuse of workers in Qatar's construction industry.   Defendants knew or should have known of the abuses detailed in the 2012 HRW Report and were on notice of the exploitative forced labor conditions detailed herein by 2012 when it was published.

21

52.    That year, Qatari Labor Undersecretary Hussein al-Mulla pledged that the government would replace the Qatari regime's (and Qatari employers') widely criticized *kafala* sponsorship system with a system requiring contracts between the employer and the worker.  Those "reforms" have not been fully implemented.

53.    The World Cup Construction Venture relied upon the Qatari regime's (and Qatari employers') *kafala* system in its construction contracts, and specifically for its subcontracted labor, and Defendants knew or should have known.

54.    In addition to the foregoing, all the examples that follow, *generally* V.C, demonstrate that the World Cup Construction Venture relied upon the trafficked and forced labor of Plaintiffs, as well as untold thousands of others.

**B.    Defendants Participated in the World Cup Construction Venture.**

55.    In 2010, the Qatari regime won the bid to host the 2022 FIFA World Cup.  It did so through the payment of massive bribes to a host of actors.  *See infra* ¶¶ 72, 99, 105.

56.    The Qatari regime then assigned the Supreme Committee with direct responsibility for building competition venues.  This included responsibility for building the proposed stadiums and training sites, as well as responsibility for coordinating and monitoring non-competition venues required by FIFA, major infrastructure improvements, such as to the New Doha International Airport and the proposed nationwide metro network, and building road infrastructure for all these stadia and facilities as well as major expressways, ring roads, and highways throughout the area of Qatar in between the stadia. Although some of these non-stadium infrastructure projects were to be delivered

22

by other Qatari public entities—such as Ashghal, the Qatari public works authority—the Supreme Committee was nevertheless responsible for the overall project management plan for the entire Venture and for coordinating and monitoring these related infrastructure projects.

57.    In February 2012, the Qatari regime, through the Supreme Committee, hired CH2M to oversee and manage delivery of the World Cup Construction Venture. CH2M was paid to act on the Supreme Committee's behalf—and therefore, on the Qatari regime's behalf—to oversee construction of all stadiums and to monitor and provide assurance and support for the construction of related infrastructure[2] for the 2022 FIFA World Cup.

58.    Pursuant to the contracts entered into by all contractors and subcontractors in the World Cup Construction Venture, including but not limited to the companies that directly employed Plaintiffs, CH2M's (and eventually Jacobs's) responsibility was to oversee and manage the Venture.  CH2M (and eventually Jacobs) thereby participated in the World Cup Construction Venture by, among other things, assisting, supporting, managing, overseeing, auditing, and facilitating it.

---

[2]    References throughout this complaint to Venture "infrastructure" necessarily includes substantial road, expressway, and highway projects. That part of the Venture was diverse and wide-ranging, and includes stadium access roads at each stadium site, the Al Khor North Road, the Al Khor Link Road, the Al Khor Expressway, several roads around Al Rayyan, the Al Wakrah F Ring Road, the Al Wakrah EW Corridor, the Al Wakrah Bypass, the Al Wakrah Main Road, several roads around Khalifa, the Lusail Expressway, Lusail External Roads, the Orbital Highway (also known as the Al Majd Road) and connecting roads, as well as other major roads within central Doha such as the Al Bustan roads.

59.     As overseer and manager of the World Cup Construction Venture, CH2M (and eventually Jacobs) was responsible for ensuring that proper labor standards and practices were followed by contractors and subcontractors in the Venture.

60.     After acquiring CH2M in 2017, Jacobs admitted it was responsible for overseeing and managing the delivery—and therefore participated in by assisting, supporting, and/or facilitating—of the entire World Cup Construction Venture.   For example:

a.  In 2018, Steven Demetriou, then Chairman and CEO of Jacobs Engineering Group, publicly stated that "we consider the acquisition of CH2M an opportunity to enhance our human rights program even further," "Jacobs recognizes the significance of CH2M's leadership on human rights and has already begun working to harmonize the companies' programs," and "[w]e are currently in the process of updating Jacobs' Code of Conduct and Supplier Code of Conduct to provide an integrated policy framework for our combined company."

b.  During an earnings call in 2018, Mr. Demetriou said, in relevant part, "we got super excited about 2019 and beyond because by that time, we'll have had the time to really leverage the revenue synergies that we've been talking about," and "the iconic programs that we've talked about several times really showed in some of the Middle East activities they have working on . . . [like] the Qatar World Cup 2022, and now being able to put these capabilities together, and I just gave you just a small sampling of what excites us that's going to cut across all three of our new lines of business as it relates to growth."

c.  In its 2021 publication entitled *FY21 Jacobs Climate Risk Assessment*, Jacobs stated in relevant part that Jacobs had "developed specific climate models for the locations of the FIFA World Cup Qatar 2022."

d.  In February 2022, Jacobs announced in a press release that it had "brought extensive project and program management consultancy experience from major programs around the world including . . . the FIFA World Cup Qatar 2022."

e.  In March 2022, Jacobs stated in a publicly available document that Jacobs "[is] a world-leader in running major program delivery, partnering with our clients to oversee the execution of mega projects [including] FIFA World Cup venues in Qatar."

24

f.  In December 2022, Jacobs stated publicly that Jacobs was the "delivery partner" for the World Cup Construction Venture, and had been so for "the last decade":



In response to Jacobs's corporate post, in the comments under it, Omur Akay, who was CH2M's Executive Program Director for the World Cup Construction Venture, confirmed Jacobs's participation in the Venture: "I solute [sic] the [CH2M] team that set the initial management program then ***successfully carried over by great people under Jacobs management***."

g.   In another Jacobs promotional material, Jacobs stated in relevant part "Jacobs leveraged its experience delivering successful major programs including the . . . ongoing FIFA World Cup Qatar 2022 . . . ."

h.   Jacobs's website, currently accessible (last accessed September 26, 2023) at https://www.jacobs.com/locations, states in relevant part that it "deliver[ed] whole-system solutions" for the World Cup:

> Our visionary team in Qatar provides environmental, industrial and advanced technology, urban development, water and nuclear services. With a history of delivering whole-system solutions, they solve complex problems that include environmental, social and economic sustainability as an integral part of their approach. The FIFA World Cup 2022™, Doha Metro, and **Doha South Sewage Infrastructure Program** are three examples of such programs that require an integrated approach to deliver the vision.

i.   Former and current Jacobs employees, including but not limited to Rehan Khan, Phillip Shaw, Mohammed Razzaq, and Sebastian Lourdusmay, publicly hold themselves out as having worked on the World Cup Construction Venture on behalf of Jacobs.  For example, Mr. Khan's profile on LinkedIn states that he is based in the United States, has been a Vice President and Country Director for Jacobs since December 2017, and was during that time the Executive Program Director for the Qatar 2022 FIFA World Cup Programme.  Mr. Khan worked for CH2M prior to Jacobs's acquisition of CH2M, and was CH2M's Country Director & Executive Programme Director for the World Cup until Jacobs acquired CH2M.  Further, Mr. Shaw's LinkedIn profile states that he was a "health and safety" manager for the FIFA World Cup 2022 project for Jacobs, starting in 2017.

j.   Former CH2M employees Sheila Icaro, Fahmi Abul Feilat, Dinisio Aldrin Bantaculo, and Miro Imsirovic publicly hold themselves out as having been employed directly by CH2M in Qatar working on the World Cup Construction Venture.  Ms. Icaro discloses she worked for CH2M Hill International BV as an "HR Generalist" tasked with being "Administrator and On-boarding and Mobilisation Lead on major projects in Qatar" including the "Qatar 2022 FIFA World Cup."  Abul Feilat was employed from 2019 to 2021 by "CH2M Hill International BV" on "World cup 2022 program" as a "Project Management Specialist."  From 2013 to 2015, Bantaculo discloses he worked for CH2M Hill International BV as "PMC Planning & Scheduling Engineer for Qatar 2022 FIFA World Cup Programme."  Mr. Imsirovic publicly discloses that he worked for

26

CH2M in Doha since 2011 and worked on expressways, the Al Wakrah Bypass, the Ring Road, and Lusail infrastructure, and lists as his responsibilities at that time ""[s]upervis[ing] actual progress of work" and "coordinat[ing] the work of contractors."

61. A former Jacobs employee has also confirmed Jacobs participated in the World Cup Construction Venture, and described exactly how that participation worked, at least as regards the work they did. They worked on the ground in Qatar and served as the Precinct Health, Safety, and Environment Manager for Jacobs's client, the Supreme Committee, at Al Thumama Stadium. This former Jacobs employee disclosed, *inter alia*, that:

a. The former Jacobs employee worked at Al Thumama stadium on behalf of Jacobs from 2017 (the year that Jacobs acquired CH2M) until 2021;

b. "Tekfen-***Al Jaber Engineering Joint Venture***"—the venture on which the former Jacobs employee worked, specifically notable because Al Jaber Engineering was the direct employer to almost one-third of the Plaintiffs named in this Complaint—"ha[d] been awarded the contract by the Qatar Supreme Committee for Delivery and Legacy [] for the turnkey delivery of the engineering and construction work" for the Al Thumama Stadium;

c. The former Jacobs employee's responsibilities included directly overseeing subcontractors' contract compliance: The employee "[w]ork[ed] on [Jacobs's] client's behalf to ***ensure all [environment, health, and safety] activities [were] carried out by the CSC and contractor in accordance with the contract*** . . .;

d. The former Jacobs employee's work included making regular site visits and inspections, including *weekly* "safety tours";

e. Jacobs's role in the Venture was to monitor, direct, and control the labor supply chain, including at Al Jaber Engineering, because the former employee was tasked with "ensur[ing] all" health, safety, and environment "expectations" and health, safety, and environment "culture" were "***implemented*** as per regulatory and client requirement" and "***advise[d] the supply chain on corrective actions***" as they "***monitor[ed]***" the Venture's ***"contractor's compliance*** with Construction phase health and safety Plan"; and

f. Jacobs's role in the Venture was to oversee and monitor everything—and the former Jacobs employee's job was in part to "[e]nsur[e] policy, objectives, targets and standards [were] measured, and recorded to ensure that the highest possible health

and safety standards [were] maintained *in line with* client procedures, [and] *contract requirements*."

The reasonable inference, therefrom, is that Jacobs had similar employees at each of the stadium construction projects included in the World Cup Construction Venture, and held positions monitoring and controlling the subcontractors that employed each Plaintiff in this Complaint.

62.    As to the non-competition venues and related infrastructure, the Programme Management Contract provides that CH2M Hill would perform coordination and monitoring functions with other entities (such as the public works agency Ashghal) responsible for the delivery of those projects and would work with the Supreme Committee to recommend corrective action to ensure that those infrastructure projects would be delivered in accordance with FIFA requirements. Ashghal and other agencies employed contractors such as Habtoor Leighton Group in order to deliver Venture projects such as the major road infrastructure needed for the tournament.

63.    CH2M, and then also Jacobs after it acquired CH2M, therefore had continuous business relationships with the other companies in the World Cup Construction Venture, including those that directly employed Plaintiffs, and through those continuous business relationships Defendants facilitated successful operation of the World Cup Construction Venture.

### C. Defendants Knew or Should Have Known the World Cup Construction Venture Engaged in Human Trafficking and Forced Labor.

64.    Defendants knew or should have known that the World Cup Construction Venture employed migrant laborers pursuant to the then-prevalent Qatari *kafala* system,

commonly known Qatar construction industry practices, and widely known public and governmental reports.

65.    At all relevant times it was widely known in the United States, Europe, Qatar, and the Philippines, all of which comprised locations where Defendants conducted business, that the Qatar construction industry relies and relied upon trafficked and forced labor, that the World Cup Construction Venture used trafficked and forced labor in a way that was not materially different from how it was otherwise customary in Qatar, and that Filipinos—in particular—were one of the groups most at risk to be trafficked and subjected to forced labor by Qatari employers in Qatar.

66.    Defendants knew or should have known that the World Cup Construction Venture would and did exploit trafficked and forced labor of Filipino laborers like Plaintiffs. Specifically, Defendants knew or should have known that workers would be lied to about the terms and conditions of their employment and living conditions; that workers' passports would be and were retained; that workers would be forced to work inhumane and unsafe hours, sometimes without compensation; and that workers would be and were forced to live in unsafe and unsanitary conditions.

67.    Defendants knew these widely understood facts, as well as the other local-Qatar-knowledge-based allegations in this Complaint, in part through their Qatar-focused and/or Qatar-deployed employees' and local agents' local knowledge.  Defendants had hundreds of employees in Qatar.  Defendants each relied in part on Qatar-knowledgeable employees (including their in-house corporate security and intelligence personnel, *see infra* V.C.3) and local agents in Qatar to keep them abreast of Qatari market conditions

29

and knowledgeable regarding the true nature of the Qatari regime's (and Qatari employers') notorious sponsorship of human trafficking and forced labor in the Qatari construction industry and the World Cup Construction Venture. Generally, Defendants' Qatar-knowledgeable employees and agents spoke fluent English and often proficient and/or fluent Arabic, had relationships with people in the Qatari locations in which the Venture conducted business, and were well-informed about local conditions. These agents (who were subject to Defendants' control and whose knowledge is imputed to Defendants) knew that the World Cup Construction Venture engaged in systematic human trafficking and that any commercial actor who participated in it would necessarily benefit from trafficked and forced labor, including the abuses Plaintiffs allege.

68. As set forth below, from the beginning, and then time and again throughout the entirety of the duration of Defendants' participation in the World Cup Construction Venture, Defendants knew or should have known about the trafficking and forced labor that would and did occur, including that such misconduct was likely occurring with respect to the Venture's employment of Plaintiffs.

### 1. Public Reports Published by the U.S. Government, Non-Governmental Organizations, Media, and Documentarians

69. Defendants knew or should have known about the extreme trafficking and forced labor risks related to their participation in the World Cup Construction Venture because public reports alerted Defendants to such risks before they began participating in the Venture (while they were deciding whether to participate) and then afterwards throughout the period in which they participated in the Venture. Reports supporting an inference of Defendants' knowledge are legion, and included, but were not limited to,

widely publicized reports authored by the United States, respected NGOs, mainstream

media outlets, and documentarians.

70.     **U.S. Government reports** alerted Defendants that they were participating

in a trafficking venture and, at a minimum, support an inference of Defendants'

knowledge. Such reports included, but were not limited to:

a. U.S. Department of Justice. In 2008, the U.S. Department of Justice published a report that alerted Defendants that "[a] significant number of Filipino men and women who migrate abroad for work are subjected to conditions of involuntary servitude in . . . Qatar." At the time, the United States placed Qatar on the "Tier 3" list of governments making little effort to address modern slavery.

b. U.S. Department of State. On June 20, 2014, the Department of State published its statutorily mandated report, *Trafficking in Persons Report 2014*, which classified Qatar as a "Tier 2 Watch List" country because it did "not fully comply with the . . . minimum standards" of the TVPRA. This report alerted Defendants that "Qatar [was] a destination country for men and women subjected to forced labor. . . . Approximately 1.2 million men and women . . . voluntarily migrate[d] to Qatar to work . . . primarily in the construction, oil and gas, service, and transportation industries . . . but many subsequently face[d] forced labor." Thereafter, Qatar remained a "Tier 2 Watch List" country in 2015 and 2016.

71.     **NGO reports** alerted Defendants that they were participating in a trafficking

venture and, at a minimum, support an inference of Defendants' knowledge, and such

NGOs sometimes even directly contacted Defendants. Examples included, but were not

limited to:

a. Human Rights Watch. In 2012, the year CH2M was appointed to oversee delivery of facilities and infrastructure for the 2022 FIFA World Cup, Human Rights Watch sent letters to the Supreme Committee **and CH2M** regarding slave labor in Qatar's construction industry. CH2M responded at that time that it understood the risk and would have a "zero-tolerance policy for the use of forced labor or other human trafficking practices." In June 2012, Human Rights Watch published the 2012 HRW Report, *see infra* ¶ 51, which alerted Defendants that "the deeply problematic working conditions of migrant workers throughout the country mean that realizing Qatar's World Cup vision may depend on their abuse and exploitation unless adequate measures are taken to address the human rights problems widespread in the

construction industry in Qatar."  The 2012 HRW Report also documented exorbitant fees required to obtain jobs, which led to debt servitude, unsafe and unhealthy working conditions, overcrowded, unsanitary, and inhumane living conditions, passport confiscations, and delayed, reduced, or denied pay.  The 2012 HRW Report concluded that many of these construction workers are "very likely to be in conditions of forced labor, as defined by international law."

b. Amnesty International.  In 2013, Amnesty International released a report entitled ***The Dark Side of Migration: Spotlight on Qatar's Construction Sector Ahead of the World Cup***, which concluded that migrant workers are subject to forced labor or modern slavery and exploited throughout the construction industry hierarchy, including abuses by subcontractors and multinational corporations overseeing the World Cup Construction Venture.

c. International Trade Union Confederation.  In 2014, Sharan Burrow of the International Trade Union Confederation testified, before a European Parliament hearing regarding migrant slave labor, that companies who "are bidding for the billion dollar infrastructure developments in Qatar" should be held "to account" for doing so.

d. Verité.  In 2017, the year that Jacobs acquired CH2M and thus assumed responsibility for the World Cup Construction Venture, Verité, "a global NGO with a mission to ensure that people around the world work under safe, fair, and legal conditions," published a 355-page report, ***Strengthening Protections Against Trafficking in Persons in Federal and Corporate Supply Chains: Research on Risk in 43 Commodities Worldwide***.  In the section entitled "Labor Abuse in Construction Facilities for the World Cup," the report stated that "[a]n investigation into the working conditions in Qatar during preparations for the 2022 FIFA World Cup has found evidence of severe abuse of migrant laborers and indicators of human trafficking."  The report detailed evidence of withheld pay and passports to restrict workers from leaving, unsafe worksites, inhumane living conditions, and debt servitude with usurious interest rates.

72.    **Media reports** alerted Defendants that they were participating in a trafficking venture and, at a minimum, support an inference of Defendants' knowledge, and such reports sometimes even directly referenced Defendants.  Examples include, but are not limited to:

a. *Equal Times*.  In December 2012, *Equal Times*, a "global news and opinion website focusing on labour [and] human rights," published a "Special Report" entitled ***Qatar: Grand Ambitions, Wretched Lives***, which alerted Defendants by including a collection of articles about Qatar's history of exploiting migrant workers and Qatar's

*kafala* system.  *Equal Times* warned that the construction companies building stadiums and infrastructure for the 2022 FIFA World Cup claimed to be committed to social responsibility but "***in practice these companies do little to ensure human and labour rights for migrant workers, especially within their supply chains***." (Emphasis added.)

b. *The Guardian*.  Reports by the *Guardian* regularly alerted Defendants to the anti-trafficking risks attendant to their services.  In December 2012, the *Guardian* published the first of many articles regarding the exploitation of migrant laborers working in Qatar on the World Cup Construction Venture.  Later in 2013, the *Guardian* published an article entitled ***No Respite for Qatar's Migrant Workers, International Trade Union Finds***, which reported that a delegation from the International Trade Union Confederation found there had been no improvement in living and working conditions for migrant workers working on the World Cup Construction Venture, detailed employers' practice of withholding salaries and passports to prevent workers from leaving the country, and quoted a trade union official to say "***International companies should be on notice*** about the reputational risk of doing business in Qatar without respect for workers' rights." (Emphasis added.)  Also in 2013, the *Guardian* published another article (entitled ***Qatar's World Cup "Slaves"***), which found "[e]vidence of forced labour on a huge World Cup infrastructure project" and detailed labor abuses, confiscated passports, inhumane living conditions, and debt servitude, and warned that the migrant laborers coming to Qatar to help build the World Cup facilities were uniquely vulnerable to exploitation.  In 2014, the *Guardian* published another lengthy investigative report, headlined ***Modern-Day Slavery - Qatar World Cup: Migrants Wait a Year to Be Paid for Building Offices***.  The *Guardian*'s series of reports was entitled ***Modern-Day Slavery in Focus: Qatar***.

c. *The Economist*.  In 2013, the *Economist* published a report about migrant laborers readying Qatar for the World Cup, which detailed exorbitant recruitment fees, unfair labor practices, and the problems with exploitation related to Qatar's *kafala* system.  The *Economist* concluded that many workers could be classified as "victims of trafficking."

d. *New York Times*.  In 2015, the *New York Times* published a report that also explicitly alerted Defendants by calling out CH2M's then participation in labor abuses related to the World Cup construction projects.  Specifically, the *Times* reported that there had been "[s]crutiny" regarding "labor abuses involving foreign laborers, including during construction in Qatar for the 2022 FIFA World Cup. . . . American construction firms, including CH2M . . . manage or oversee those projects. . . . [A]n official of Amnesty International testifying at a Senate subcommittee hearing on the FIFA corruption scandal said [CH2M] had an obligation to address the conditions faced by such workers, which reports have described as akin to indentured servitude."

e. *Vox*.  In 2015, *Vox* published an article entitled ***The World Cup's Biggest Issue: Modern Slavery and Dead Workers***, which said in relevant part "FIFA officials ***must have known*** that giving hosting rights to Qatar would have ***directly and undeniably meant funneling money to one of the most horrific construction sectors in the world***."  (Emphasis added).  The article discussed how, even though "[w]orking conditions are . . . horrendous," construction workers could not change jobs because their employers hold their passports.  Indeed, the construction workers working on the World Cup Construction Venture were reported to be "***prevented from leaving the company or the country***" and "***forced to work in impossibly hot weather and conditions that virtually guarantee some will die***."  (Emphasis added).  The report also noted "[s]ome numbers suggest a direct link between the death toll and the World Cup," and concluded "FIFA chose to give the World Cup to Qatar.  That means it owns the migrant worker program."

f. *Wall Street Journal*.  In 2015, the *Wall Street Journal* published an article entitled ***Qatar Called to Publish World Cup Worker Death Figures***, which discussed the "renewed allegations of labor abuse" as the "latest controversy to mar Qatar's plans to host" the World Cup.  Citing a representative from the International Trade Union Confederation, the article noted "up to 500 construction workers a year could die due to limited access to health services and poor working and living conditions that might prompt heat-related illnesses, stress-induced heart attacks and work-related falls and injuries."  And the article noted that "rights officials" have "called on the Qatari government to address the allegations of abuse" endured by "migrant workers."

g. *Fox News*.  In 2016, *Fox News* published an article entitled ***Critics Call Foul as Qatar's 2022 World Cup City Built With "Slavery."***  Addressing the construction of World Cup infrastructure in Qatar, including Lusail Stadium, *Fox News* reported that Qatar's "migrant workforce faces deadly conditions, miserable accommodations and low wages."  Quoting a representative from the International Trade Union Confederation, the article stated that "'[c]onditions in camps are simply inhuman.'"  "'FIFA,'" according to that same person, "'is ***content for the World Cup to be built on modern slavery***.'"  (Emphasis added.)

73.     On top of the above, the media also reported about the corruption scandal related to Qatar winning the bid to host the World Cup, and detailed one of the greatest corruption scandals in recent world history.  The corruption scandal is yet another reason Defendants knew or should have known that the World Cup Construction Venture would and did engage in trafficked and forced labor.  Indeed, media articles *made the connection*.  For example, *Vox* reported in 2015 that while "Swiss prosecutors" had

recently "begun an investigation into possible corruption in the bidding process that awarded Qatar the 2022 World Cup," "*one scandal involving the Qatar games [was] already obvious: the widespread and vast abuse of migrant workers*." (Emphasis added.) Similarly, *CNN* reported in 2014 that "new allegations" of corruption in the hosting-bid process came after "a slew of negative reports surrounding Qatar's hosting of the 2022 World Cup finals," including "[a]llegations of migrant worker abuse under the so-called kafala system of sponsorship, which has been heavily criticized by international human rights groups."

74.    Media reports, at the time, also regularly described the practices at the World Cup Construction Venture as "slavery." Examples of such reporting include, but are not limited to:

a. *The Guardian*. In 2013, the *Guardian* reported—in an article entitled *Revealed: Qatar's World Cup "Slaves"*—that migrant workers in Qatar "face[d] exploitation and abuses that amount[ed] to *modern-day slavery*." (Emphasis added.)

b. *USA Today*. In 2015, *USA Today* published an article—entitled *FIFA Must Pull Cup Out of Qatar*—reporting that, "[a]s for migrant workers, the kafala sponsorship system is *just a fancy term for slavery*." (Emphasis added.)

c. *Huffington Post*. In 2016, *Huffington Post* reported—in an article entitled *Report Tells FIFA To Protect Human Rights Or Move World Cup From Qatar*—that "Amnesty International recently interviewed more than 200 migrant workers to document human rights abuses at these construction sites. The global human rights group criticized FIFA for not pressuring Qatar to implement promised reforms, leaving intact a labor system that other groups have likened to *'modern slavery.'*" (Emphasis added.)

d. *Ottawa Citizen*. In 2016, the *Ottawa Citizen* reported, in an article entitled *Qatar, 2022: Where We'll Play Sports in the Place Built by Slaves*: "The 2022 World Cup is *driving more demand for slavery*. Many migrants killed by the job, many more living squalidly, no one meaningfully protected from being forced to stay somewhere against their will." (Emphasis added.)

35

e. *CNN International*. In 2016, CNN reported that "Qatar actually commissioned a report by an international law firm **about two years ago**, which said very clearly that the kafala system, or the sponsorship system can facilitate and drive **modern-day slavery**." (Emphasis added.)

75. **Television Reports and Documentaries** also alerted Defendants— through stark videos and photos—that they were participating in a trafficking venture and support an inference of Defendants' knowledge. Several prominent news outlets, investigative journalists, and non-governmental organizations released detailed news segments and published documentary videos that addressed the squalid conditions in which migrant construction workers in Qatar lived, highlighting labor abuses related to the World Cup Construction Venture. A non-exhaustive list of such reports follows:

| Broadcaster / Program | Title of Segment About Labor Abuses in Qatar and Trafficking and Forced Labor by World Cup Construction Venture | Year |
|---|---|---|
| International Trade Union Confederation | **Hidden Faces of the Gulf Miracle** <br><br> https://tinyurl.com/mrxuw5mp (last accessed October 11, 2023) | 2011 |
| The *Guardian* / *Guardian* Online | **Qatar World Cup 2022: Migrant Workers Forced to Work for No Pay** <br><br> https://tinyurl.com/6jddprue (last accessed October 11, 2023) | 2013 |
| HBO / Last Week Tonight (with John Oliver) | **FIFA and the World Cup** <br><br> https://tinyurl.com/389shwcc (last accessed October 11, 2023) | 2014 |
| ESPN / E:60 | **Qatar's World Cup** <br><br> https://tinyurl.com/3sy66dtt (last accessed October 11, 2023) | 2014 |
| The *Guardian* / *Guardian* Online | **Qatar World Cup: Migrants Wait a Year to be Paid for Building Offices** | 2014 |

| Broadcaster / Program | Title of Segment About Labor Abuses in Qatar and Trafficking and Forced Labor by World Cup Construction Venture | Year |
|---|---|---|
| | https://tinyurl.com/3kd8c3e5 (last accessed October 11, 2023) | |
| BBC / BBC News | ***"Forced Labour" at Qatar World Cup Site***<br><br>https://tinyurl.com/bdertvsn (last accessed October 11, 2023) | 2016 |
| Amnesty International | ***Investigating Conditions in Qatar Migrant Camps***<br><br>https://tinyurl.com/43cz8ebk (last accessed October 11, 2023) | 2016 |

76.     Such video coverage spanned the political spectrum.  For example, MSNBC's *All In With Chris Hayes* broadcast a piece entitled **FIFA Corruption Scandal** in 2015, https://tinyurl.com/46xd6vpy (last accessed October 11, 2023), which stated in relevant part that "[t]he situation is extraordinarily grim in Qatar where ***migrant workers are building World Cup stadiums in slave-labor conditions, with hundreds, perhaps thousands, dying in the process***."  Similarly, in a segment titled **FIFA Sponsors Voice Concerns in Wake of Corruption Scandal**, which aired in 2015, https://tinyurl.com/3sxn4tz2 (last accessed October 11, 2023), *Fox News* observed: "[l]ook at the Qatar World Cup.  Hundreds of immigrant workers have died building World Cup stadiums there."

77.     Moreover, news outlets, investigative journalists, and non-governmental organizations published (and republished) imagery that revealing the squalid and inhumane conditions of migrant construction workers' lives in Qatar, such as the following examples:

37

a. Sleeping quarters for migrant workers during World Cup Construction Venture (*Guardian*, July 2014):[3]



---

[3] This video can be seen on the *Guardian*'s website where it hosts its news item entitled "Qatar World Cup worker: 'I want to go home but I don't have any money,'" (July 28, 2014) ("Qatar World Cup Video"), *available at* https://tinyurl.com/43ww2njy (last accessed October 11, 2023).

b.  Restrooms provided to migrant workers during World Cup Construction Venture
(*Guardian*, Qatar World Cup Video, July 2014):



c.  Group kitchen provided to migrant workers during World Cup Construction Venture
(*Guardian*, Qatar World Cup Video, July 2014):



d. Group bathing area for migrant workers during World Cup Construction Venture (*Guardian*, Qatar World Cup Video, July 2014):



e. Toilet-stall bathing area for migrant workers during World Cup Construction Venture (*Guardian*, Qatar World Cup Video, July 2014):



f.  Toilet-stall bathing area for migrant workers during World Cup Construction Venture (*Guardian*, Qatar World Cup Video, July 2014):



g.  Housing for migrant workers during World Cup Construction Venture (Amnesty Int'l, March 2016):



41

h. Successful attempt to shut down interview, by World Cup Construction Venture participant, when interviewee was asked about the Venture's use of migrant labor to build the stadiums (*Guardian*, Qatar World Cup Video, July 2014):



78.    Defendants knew the sum and substance of each publicly available U.S. government, NGO, media, and documentary report referenced throughout this Complaint for at least four reasons.  *First*, media outlets in the United States, Europe, the Middle East, and Asia routinely published, and republished, such reports, which on information and belief Defendants' U.S. and overseas employees and agents regularly reviewed in the normal course of work for Defendants (and whose resulting knowledge is imputed to Defendants).  *Second*, on information and belief, Defendants' internal corporate security and intelligence departments, *see infra* V.C.3, ordinarily monitored, and recirculated, such public reports in the normal course of their work for Defendants, ensuring that Defendants knew, or should have known, of such reports.  Indeed, mass collection and analysis of open source data like government, NGO, and media reports are core functions of

corporate security and intelligence functions at large, data-driven, multi-national corporations like Defendants. *Third*, on information and belief Defendants' due-diligence operations alerted them to these reports, *see infra* V.C.4. *Fourth*, on information and belief, Defendants were at times asked to comment on such stories pre- or post-publication, which further alerted Defendants to the human trafficking and forced labor risks associated with the World Cup Construction Venture.

### 2. Google and Wikipedia

79.    Defendants also knew or should have known that they were participating in a trafficking venture because two of the most widely used, free, and generally accurate research tools online alerted Defendants that their participation in the World Cup Construction Venture benefited from the trafficking and forced labor of persons like Plaintiffs: (1) Google; and (2) Wikipedia.

80.    **Google** products alerted Defendants that they were participating in a trafficking venture and, at a minimum, support an inference of Defendants' knowledge. On information and belief, Defendants' (inclusive of their employees' and agents') use of Google products alerted Defendants to the relevant trafficking risks in two ways.

81.    *First*, on information and belief, one or more of Defendants' officers, directors, managers, employees, and/or agents who worked for Defendants in connection with the World Cup Construction Venture conducted searches on Google's proprietary search engine relating to human trafficking and forced labor in Qatar and/or human trafficking and forced labor by any participant in the Venture (*i.e.*, they "Googled" it). In so doing, Defendants were inundated with credible reports, including on information and

43

belief many of such reports referenced herein, confirming that employers in Qatar widely, and systematically, engaged in trafficking and forced labor, and that migrants employed by the Venture were victims of trafficking and forced labor.

82.    *Second*, on information and belief, one or more of Defendants' officers, directors, managers, employees, and/or agents who worked for Defendants in connection with the World Cup Construction Venture used Google's "Notification" feature—in which a person can identify any word or phrase and automatically receive a Google-generated email containing a link to any article that pings on such word or phrase after the person signs up—to receive automatically generated emails from Google (a "Google Alert") relating to words like "Jacobs Engineering," "Qatar," "World Cup," and/or "human trafficking."[4]  Each person who acted for Defendants and signed up for such Google Alerts was likely inundated with credible media reports, including on information and belief many of the reports referenced herein, confirming that employers in Qatar widely and systematically engaged in trafficking and forced labor, and that migrant workers employed by the Venture were victims of human trafficking and forced labor.  That is because Google's artificial intelligence-based algorithms captured each public report identified by Plaintiffs in this Complaint; accordingly, it is likely Google emailed the link to many such public reports to Defendants' personnel as a "Google Alert."

---

[4] Plaintiffs' belief is based upon common practices in every white-collar industry, in which professionals routinely set up "Google Alerts" on items relating to their work.  Given Defendants' scale, general industry practices, and the intense public focus on the World Cup Construction Venture, it would be implausible that not even one of Defendants' officers, directors, managers, employees, and/or agents who worked for Defendants in connection with the World Cup Construction Venture ever set up Google Alerts to help them do their jobs.

44

83. **Wikipedia** also alerted Defendants that they were participating in a trafficking venture and, at a minimum, support an inference of Defendants' knowledge. Such Wikipedia pages included, but were not limited to:

a. The contemporaneous version of the "2022 FIFA World Cup" Wikipedia page prominently noted that Qatar has been "the subject of *intense criticism* because of the way it has handled many of the construction projects; *hundreds of workers have died* since the country was awarded the competition in 2010." Wikipedia, "2022 FIFA World Cup" (Jul. 9, 2014) (*available at* https://tinyurl.com/bp9w28h6) (emphasis added). The page's "Concerns and controversies" subsection noted one investigation found that "many workers are denied food and water, have their identity papers taken away from them, and . . . are not paid on time or at all, *making some of them in effect slaves*." *Id.* (emphasis added).

b. The contemporaneous version of the "Human rights" subsection of the "Qatar" Wikipedia page stated: "Qatar is a destination for men . . . who migrate willingly, but are *subsequently trafficked into involuntary servitude* as domestic workers and labourers." Wikipedia, "Qatar" (Oct. 4, 2011) (*available at* https://tinyurl.com/ywxxc5kf) (emphasis added). "The most common offence was forcing workers to accept worse contract terms than those under which they were recruited. Other offences include bonded labour, withholding of pay, restrictions on movement, arbitrary detention, and physical, mental, and sexual abuse." *Id.* Citing the U.S. State Department's *Trafficking in Persons Report*, the Wikipedia page continued: "men and women who are lured into Qatar by promises of high wages are often forced into underpaid labour" and "laws against forced labour are rarely enforced." *Id.*

c. The contemporaneous version of the "Kafala system" Wikipedia page included a "Qatar" subsection that explained: "[m]ost of the workers" in Qatar's workforce "labor under near-feudal conditions that Human Rights Watch has likened to 'forced labor.'" Wikipedia, "Kafala system" (Apr. 15, 2014) (*available at* https://tinyurl.com/yc2jfsrr). Qatar was, according to the General Secretary of the International Trade Union Confederation, "'fundamentally'" a "'*slave state[]*.'" *Id.* (emphasis added).

84. On information and belief, Defendants' agents and employees reviewed these, and similar, Wikipedia entries relating to the World Cup Construction Venture and the pervasiveness of human trafficking and forced labor by Qatari employers throughout Qatar. Plaintiffs' belief is based upon the ubiquity of Wikipedia, which rivals essentially

45

only Google as one of the world's most widely used, and relatively accurate, online research tools.    In his book, *How the Internet Happened*, author Brian McCullough explained:

> What confounded everyone who learned of the success of Wikipedia was that it actually worked! … It turned out that the "infinite monkey theorem" about giving enough monkeys typewriters and eventually producing Shakespeare was not exactly fanciful. Enough self-interested strangers could achieve a fair degree of accuracy on a wide range of topics. In 2006, there were 45,000 active editors of the English-language version of Wikipedia alone.
>
> And Wikipedia had unique advantages that the web made possible. In the coming years, as any news or historical event occurred, Wikipedia contributors would post an up-to-the-minute factual summation of these events, and then amend the entries to reflect changing circumstances or new information. Wikipedia was often accurate and authoritative in near-real time, and it had the infinite space and resources of the Internet to play with, so it could serve what became known as the "long-tail" of content. … No other encyclopedia in history was capable of that sort of breadth of topics.
>
> Wikipedia was a modern miracle and soon became one of the most trafficked websites in the world … [as] an open-source counterweight to the proprietary "answer engine" that is Google.

### 3.  Defendants' Corporate Security and Intelligence Functions

85.    Defendants also knew or should have known that they were participating in a trafficking venture because Defendants' internal corporate security and intelligence functions alerted Defendants that their participation in the World Cup Construction Venture benefited from the trafficking and forced labor of persons like Plaintiffs.

86.    Defendants' operation of substantial, highly sophisticated, corporate security and intelligence functions[5] ensured that Defendants knew, or should have known, about trafficking by Qatari employers in Qatar, by the Venture, and against Filipinos—migrant laborers like Plaintiffs.  Indeed, Jacobs regularly claimed that its purpose-built "intelligence" functions provided state-of-the-art visibility into open source and internal data alike in a manner that gave Defendants, and their clients, like the World Cup Construction Venture, a significant competitive advantage.  The same corporate security and intelligence functions from which Defendants derived competitive advantages also alerted them to the trafficking because, in both instances, such functions supplied Defendants with relevant, specific, and potentially actionable data.

### 4.  Defendants' Industry-Standard Due Diligence

87.    Defendants also knew or should have known that they were participating in a trafficking venture because, on information and belief, Defendants conducted industry-standard due diligence, which alerted Defendants to the risks.  On information and belief, such diligence included, but was not limited to: (1) review of the reports described above; (2) preparation and review of due diligence materials (*e.g.*, summaries and emails) prepared by Defendants and/or Defendants' consultants or agents; and (3) discussions

---

[5] For example, Jacobs touts: "If you're in the Intelligence Community or Department of Defense, you can count on Jacobs to provide operations and analysis services for your classified missions, systems and facilities designed to collect, analyze, process and use products of various intelligence sources. In addition to our flight operations support contracts, we also develop and integrate collection and analysis systems and techniques to support strategic and tactical intelligence systems, networks and facilities."  Jacobs, *Cyber & Intelligence Solutions*, https://www.jacobs.com/cyber-intelligence-solutions (last accessed Oct. 5, 2023).

47

with persons who were knowledgeable about prevailing construction practices in Qatar and prevailing labor practices in the Philippines, both of which would be a relevant consideration for any companies, like Defendants, that were considering participating in the World Cup Construction Venture.

88.    Plaintiffs' due diligence allegations apply with equal force to CH2M's decision to participate in the Venture, originally, as well as Jacobs's diligence of CH2M before acquiring CH2M.  For example, in 2017, Steven Demetriou, Chairman of the Board, CEO, and President of Jacobs Engineering Group Inc. assured its shareholders during an earning call, among other things:

a.  "We [*i.e.*, Jacobs] conducted extensive due diligence across CH2M's business, including a deep focus on their project portfolio and their project delivery capabilities and toolsets."

b.  Jacobs "ha[d] jointly [] developed" "cost synergy opportunities" "with CH2M leaders during the due diligence" of Jacobs's acquisition of CH2M.

c.  "[W]e [*i.e.*, Jacobs] developed a strategy and took a step back and identified where we see where capital is going to be spent globally and where we bring the capabilities to match up on that global capital spend, but we match that up with a separate process to really understand where we're making money, where we're not, by customer, by geography, by office.  And therefore, we do believe we now have a much more systematic system that starts with the pursuit process and going after a business that is going to deliver our stated goals of margin improvement, organic growth and create shareholder value.  As we now put that together with CH2M's system, which again, we're very excited about the fact that our due diligence revealed that they have very similar culture and initiatives."

89.    Relatedly, Defendants publicly disclosed that they received counsel from the law firm Gibson, Dunn & Crutcher LLP.  That firm's client alerts alerted Defendants that the World Cup Construction Venture may have used trafficking and forced labor of migrant workers like Plaintiffs.  One such alert from February 2015, entitled, "Webcast:

48

FCPA Trends in the Emerging Markets of Asia, the Middle East, and Africa," included a page entitled "Middle East Case Study: Qatar and the World Cup," which explained "***[i]n addition to the allegations of corruption, Qatar is facing increased scrutiny over allegations concerning the treatment of workers building the stadia to be used***." (Emphasis added.)  On information and belief, Jacobs reviewed that presentation from its legal counsel before it acquired CH2M and participated in the Venture.

90.    At a minimum, Defendants' industry-standard due diligence supports an inference of Defendants' knowledge of the trafficking and forced labor abuses committed by the World Cup Construction Venture in which they participated.  Given the nature and extent of the public reports described throughout this Complaint it would not have been possible for Defendants to "clear" the trafficking and forced labor risks in the normal course of the due diligence they conducted.

**5.  Defendants' State-of-the-Art Artificial Intelligence and Big Data**

91.    Defendants also knew or should have known that they were participating in a trafficking venture because Defendants' state-of-the-art artificial intelligence, machine learning, and big data expertise alerted Defendants that their participation in the World Cup Construction Venture benefited from the trafficking and forced labor of persons like Plaintiffs.

92.    Defendants routinely touted the competitive advantages they derived from Jacobs's cutting-edge artificial intelligence, machine learning, and big data solutions, and specifically observed how such technologies made Jacobs far more aware of its commercial surroundings (and therefore better able to generate profits) than nearly every

49

other company worldwide.  For example, during a Jacobs earnings call in 2019, a Vice

President of Jacobs Connected Enterprise, Heather Wishart-Smith, assured

shareholders, among other things, that:

> The components of [Jacobs's digital approach] have been around for quite some time. What makes them **so significant now is the full integration of components like the Internet of Things, artificial intelligence and data analytics**.  What makes them so significant for Jacobs is to have not just the digital capability in order to bring this transformative solution but to have all of the clients that we currently have . . . who have trusted us for decades to now be able to bring the solution in.
>
> The market is poised for explosive growth, and Jacobs is positioned with the technical skills and the clients to capitalize on that growth.  Jacobs is different because we have the combined strength and capabilities of both [engineering, management and consulting lines of business] . . . and have digital capability and domain expertise, which then creates opportunities and value that go far beyond just . . . [what] I've just described with you. …
>
> **All around the world, [Jacobs's segments] are working together** to develop and provide new innovative smart city solutions, not just to our traditional clients, but we're attracting new clients along the way.  **And that is exactly what makes Jacobs a company like no other**.  With our digital capability and our deep domain expertise and with the combined capabilities of [Jacobs's engineering, management, consulting, and digital segments], we are winning more, earning more and creating substantial value for our clients, for our employees and for our investors.  (Emphasis added.)

93.    On information and belief, Defendants deployed the same, or substantially

similar, artificial intelligence, machine learning, and big data capabilities, functions,

personnel, and processes when Defendants participated in the World Cup Construction

Venture, which would have made them know that the Venture used trafficked and forced

labor.

### 6. Qatar Foundation's Notorious Role, Reputation, and History

94.    Defendants also knew or should have known that they were participating in a trafficking venture because Qatar Foundation's notorious role, reputation, and history also alerted Defendants that their participation in the World Cup Construction Venture benefited from the trafficking and forced labor of persons like Plaintiffs, and ensured that Defendants should have detected, and did detect, abuses and forced labor relating to the Venture.

95.    Qatar Foundation was controlled by the Qatari regime.  It was chaired by Sheikha Moza bint Nasser Al-Missned, the Qatari emir's influential mother, and the CEO was Sheikha Hind bint Hamad Al Thani, the emir's sister.  According to the U.S. State Department's 2022 Country Report, Qatar Foundation housed "[s]everal quasi-governmental organizations" that "rarely criticized" the government.  As such, Qatar Foundation was was widely recognized as a regime mouthpiece whose role is to do the bidding of the regime.  According to public reporting by *The Daily Beast* in 2017, Qatar Foundation was "seen in the emirate as a state-within-the-state," and its "budget is considerable although opaque and remains unpublished."  Further, Hussain Abdul-Hussain and David Adesnik, of the Foundation for Defense of Democracies, reported in 2022 that "Qatar Foundation and the government in Doha cultivate bigotry throughout" Qatar by, *inter alia*, promoting and broadcasting the views of "violent extremists."

96.    Defendants knew that due to their participation in the Venture, they were closely intertwined with Qatar Foundation, which openly and notoriously helped play a

51

public leadership role in the Venture.  Indeed, Qatar Foundation touted its role on its website:

> Throughout the 12-year buildup to the FIFA World Cup Qatar 2022™, and the four spectacular weeks of the tournament itself, Qatar Foundation (QF) was at the heart of a nationwide effort to deliver amazing.
>
> As a key supporter of the first FIFA World Cup™ in the Middle East, QF channeled its expertise, its values, its platforms, and its people into the preparations for the tournament, the welcome it would offer to people throughout the world…and the legacy it will create.

97.    Defendants were aware of the World Cup Construction Venture's inextricable linkage to Qatar Foundation due to public reporting.  For example, an article published by *The Daily Beast* in 2017, and entitled ***Qatar's Foundation for Hypocrisy***, reported that "[o]ne of the most ambitious stadiums Qatar is building for the controversial 2022 World Cup competition is in the [Qatar Foundation]'s Education City."

98.    Due to Defendants' interaction with and work with Qatar Foundation, Defendants knew Qatar Foundation served as the Qatari regime's notorious "reputation washing" front that was purpose-built to enable the regime's priorities, including its

support for endemic trafficking of migrant workers, like Plaintiffs, by Qatari employers under Qatar's *kafala* system, which provided the economic foundation for the Qatari regime's dictatorship.   For example, in 2013, the *Economist*'s flagship due diligence publication, the *Economist Intelligence Unit*, reported (headline: ***The Middle East's Migrant Workers: Forget About Rights***) as follows:

> ***Attempts to improve the lot of migrants working in the Middle East are unlikely to make much difference***[.]
>
> ***"Our workers are treated worst in the Gulf," says Walden Bello, a Filipino parliamentarian, referring to those of his countrymen who seek their fortune abroad.*** … Many pay up to $3,000 to recruitment agencies, only to find themselves working long hours for a pittance and with no time off in jobs that often differ vastly from the ones they signed up for back home. Mistreatment, including the sexual sort, is relatively common. ***The International Labour Organisation (ILO), a UN body, reckons that 600,000 workers in the region can be classed as victims of trafficking.***
>
> ***This is the sort of bad press Qatar wants to avoid in the run-up to the 2022 football World Cup, as it imports more workers to build stadiums for the tournament using a labour force already 94% foreign. The Qatar Foundation, an organisation founded by the emir, has drawn up rules for foreign workers.*** …
>
> Sarah Leah Whitson of Human Rights Watch, a New York-based lobby, says the Qatar Foundation code is a model that could spark regional change. ***But she worries that the regulations--which have not been enshrined in Qatari law--will not be put into practice. …*** A Domestic Workers Convention adopted by the ILO in 2011 has found little support in the region. ***Cruelty towards foreign workers … remains widespread.***
>
> ***The migrant workers' lot is unlikely to improve until the reform of the kafala system, whereby workers are beholden to the employers who sponsored their visas.*** The system blocks domestic competition for overseas workers in the Gulf countries. …
>
> ***Rulers of the Gulf states, where workforces are made up of low-paid foreigners, are loth to change the system, since it ensures cheap labour.*** Eyeing unrest elsewhere in the region, they are wary of upsetting locals. ***The migrants' suffering is not about to end.***   (Emphases added.)

99.    From 2013 until at least 2020, Qatar confirmed Ms. Whitson's, and Human Rights Watch's, skepticism in the above quote:  The Qatari regime made no meaningful changes to Qatar's *kafala* system and, consequently, Qatar Foundation's role was merely to reputation wash for the World Cup Construction Venture.  Similarly, in accordance with Defendants' pervasive corporate policy and general theme and subservience to the Supreme Committee and the Qatari regime, *supra* ¶ 23 ("the client is king" to whom you must bow down), Defendants kowtowed to the Qatari regime and assisted it as it refused to reform, slowed reform, did not implement reforms, and obfuscated regarding the need for reform or failures to do so.  The labor abuses detailed in this Complaint continued in part due to Defendants' subservience to their client, even after any purported "reforms."

100.   In 2014, the *Guardian*, published a lengthy investigative report headlined ***Modern-Day Slavery – Qatar World Cup: Migrants Wait a Year to Be Paid for Building Offices***, *supra* ¶ 71(b), and stated in relevant part:

> Migrant workers who built luxury offices used by Qatar's 2022 football World Cup organisers have told the Guardian they ***have not been paid for more than a year and are now working illegally from cockroach-infested lodgings***. . . .
>
> The project, a Guardian investigation shows, was directly commissioned by the Qatar government and the workers' plight is ***set to raise fresh doubts over the autocratic emirate's commitment to labour rights as construction starts this year on five new stadiums for the World Cup.***
>
> ***The offices, which cost £2.5m to fit, feature expensive etched glass, handmade Italian furniture, and even a heated executive toilet, project sources said. Yet some of the workers have not been paid, despite complaining to the Qatari authorities months ago and being owed wages as modest as £6 a day.***

*By the end of this year, several hundred thousand extra migrant workers from some of the world's poorest countries are scheduled to have travelled to Qatar to build World Cup facilities and infrastructure. The acceleration in the building programme comes amid international concern over a rising death toll among migrant workers and the use of forced labour. . . .*

The migrants are squeezed seven to a room, sleeping on thin, dirty mattresses on the floor and on bunk beds, in breach of Qatar's own labour standards. They live in constant fear of imprisonment because they have been left without paperwork after the contractor on the project, Lee Trading and Contracting, collapsed. They say they are now being exploited on wages as low as 50p an hour. . . .

Qatar's World Cup organising committee confirmed that it had been granted use of temporary offices on the floors fitted out by the unpaid workers. …

*Jim Murphy, the shadow international development secretary, said the revelation added to the pressure on the World Cup organising committee after . "They work out of this building, but so far they can't even deliver justice for the men who toiled at their own HQ," he said.*

*Sharan Burrow, secretary general of the International Trade Union Confederation, said the workers' treatment was criminal. "It is an appalling abuse of fundamental rights, yet there is no concern from the Qatar government unless they are found out," she said. "In any other country you could prosecute this behaviour." . . .*

Contracts show the project was commissioned by Katara Projects, a Qatar government organisation under the auspices of the office of the then heir apparent, Sheikh Tamim bin Hamad al-Thani, who is now the emir. He also heads the supreme committee, the World Cup organising body. The committee is spending at least £4bn building new stadiums for the tournament, which has become mired in allegations of bribery, while there is disbelief at the prospect of playing the tournament in Qatar's 50C [*i.e.*, 122 degrees Fahrenheit] summer heat. …

*The problems at the Tower of Football workers are not isolated, despite Qatar's pledges to monitor salary payments and abolish the kafala sponsorship system, which stops migrant workers changing job or leaving Qatar without their employer's consent. In 2012 and 2013, 70 labourers from India, Nepal and Sri Lanka died from falls or strikes by objects, 144 died in traffic accidents and 56 killed themselves, the government's own figures show. Dozens more young*

*migrant workers die mysteriously in their sleep from suspected heart attacks every summer.*

The *Guardian* discovered **more projects where salaries had not been paid**. They included a desert camp of 65 workers who had not been paid for several months, were sleeping eight to a room, and were living with dirty drinking water, filthy, unplumbed toilets and no showers.

Another group said they were being paid only sporadically, that there was sometimes no water in their housing and no electricity to power air conditioning.

*This month, the Qatar Foundation, a state body, published a report examining trafficking, debt bondage and forced labour among migrant workers. It identified practices that contravene International Labour Organisation conventions on forced labour and UN anti-trafficking protocols, "widespread" non-payment of wages and bribery and extortion among recruitment agents and employers. . . .*

"We know there is much more to do," said Abdullah al-Khulaifi, Qatar's minister of labour and social affairs in a statement detailing progress on labour law reforms. "But we are making definite progress and are determined to build momentum."

101. Abdullah al-Khulaifi's statement above was a lie, the cover for which was provided by Qatar Foundation. Qatari regime officials made similar statements every year between 2013 and 2020, typically in contexts in which Qatar Foundation was also referenced, like here. And, of course, that was the point all along: A front (which provides "cover") only works if one claims to oppose the thing that they are engaging in, *i.e.*, one lies. Otherwise, it would not provide "cover" to the regime's sponsorship of trafficking and forced labor under Qatar's *kafala* system in the first instance. Similarly, the fact that Qatar Foundation regularly published reports confirming that trafficking was widespread was a

56

feature, not a bug, of Qatar Foundation's role as a front.[6]    Given Defendants'

sophistication, including their employment of security and intelligence professionals,

Defendants understood that the practices described in articles like those published by the

*Guardian* could not be reconciled with Qatar Foundation's declarations unless one

concluded that the latter was, in fact, a front rather than an organization dedicated to

combatting trafficking.

102.    The same 2014 *Guardian* report also contained a link to a 14-minute short

film documentary by the *Guardian*'s journalists,[7] which supported the conclusion that

thousands of migrant laborers who worked on the World Cup Construction Venture likely

died as a result of their work on the Venture because the Venture's migrant laborers from

India and Nepal alone accounted for 882 reported deaths during the Venture during the

2012–2013 period alone.    On information and belief, the Venture's participants

pervasively underreported the numbers of deaths, substantial injuries, and physical,

including sexual, assaults that were committed against migrant laborers trafficked by and

for the Venture and its participants.

103.    The same *Guardian* documentary video report provided substantial video

and photographic evidence of the pervasive trafficking and labor abuses perpetrated

---

[6] Given that the its purpose was to simply persuade gullible audiences that the Qatari regime was trying to improve conditions for laborers (when it was not), Qatar Foundation had no choice but to regularly issue reports observing the obvious—that trafficking was endemic in Qatar—so that Qatar Foundation could then say that it was credible and people could trust it when it claimed to be fighting trafficking.    In this way, Qatar Foundation was like a corrupt political leader who claimed to be cracking down on bribery when, in reality, he was simply leveling corruption charges against his competitors in the bribery marketplace so his own economic needs would be satisfied.

[7] *See* Qatar World Cup Video, *available at* https://tinyurl.com/y9hcmc8k.

against migrant laborers who worked on the World Cup Construction Venture, like Plaintiffs. *See supra* ¶ 76 (images of labor abuses captured from *Guardian* Qatar World Cup Video). Summing up the inhumane and unlawful working and living conditions under which migrant laborers, like Plaintiffs, were trafficked by the Venture and its participants, the *Guardian* concluded that the Qatari regime, the Venture, and Venture participants had treated, and continued to treat, migrant laborers working on the Venture as "***just another disposable commodity***." (Emphasis added.) This comports with reporting regarding an Amnesty International investigation which concluded "World Cup workers [were] 'treated like cattle.'"

104.    In 2014, Human Rights Watch publicly called out Qatar Foundation for serving, in effect, as a fig leaf for the Qatari regime's (and Qatari employers') ongoing refusal to do anything meaningful that would prevent laborers, like Plaintiffs, from being trafficked in connection with the World Cup Construction Venture:

> The Qatar Supreme Committee, the body charged with delivering the Gulf state's 2022 World Cup, this morning released its Workers' Welfare Standards. In this detailed 50-page document, the committee outlines how it intends to ensure the basic rights of foreign migrant workers involved in select projects related to the construction of stadiums and associated infrastructure. ***(Another quasi-governmental body, the Qatar Foundation, released a similar set of standards in April 2013.)***
>
> These … efforts … do not go nearly far enough in a country with such a dismal record on workers' rights. …
>
> ***[I]t would be credulous to regard this as a long-term solution to very serious problems in Qatar and the rest of the Gulf. The new standards don't ensure a worker's rights to change employers, leave the country, or bargain collectively for better pay and conditions.*** And the standards will impact only a small fraction of migrant workers in Qatar, excluding even some of those serving the World Cup, such as the construction workers building the hotels where fans will stay, or the taxi drivers who will shuttle

tourists around the capital, Doha. ***The standards don't alter the fact that, more than three years after Qatar won the bid to host the 2022 World Cup, Qatar's legal and regulatory framework still facilitates the trafficking and forced labor of migrant workers.***

***Qatar's labor system needs a major overhaul, not a minor makeover. Reform should be led by the relevant government authorities, not the World Cup delivery committee***, and it should address all migrant workers in the country, not just those who will build futuristic stadiums.

105. Defendants also knew, or should have known, of a litany of contemporaneous reports that alleged that Qatar Foundation, and its associated charities, had directly funded HAMAS, Hezbollah, al-Qaeda, and other notorious trafficking ventures (and terrorist groups), which were known for engaging in significant and systematic human trafficking, including when Defendants worked closely with Qatar Foundation, which alerted Defendants that Qatar Foundation was not a legitimate charity, but instead a front that enabled human trafficking.

106.   For example, the *Australian Review* publicly reported in 2012 that "Qatar Foundation" had "attracted [] negative headlines due to allegations that the non-profit organisation had provided funding to terrorists."  Similarly, in 2015, Shurat HaDin Israeli Law Center, an Israeli NGO dedicated to fighting extremism in the Middle East, launched a media campaign, including a detailed press release, that publicly "called on FC Barcelona to suspend ties with the Qatar Foundation on the grounds that it [was] 'immoral to receive funding from a country that supports terrorist groups,'" during which Nitsana Darshan-Leitner, the NGO's president, warned anyone adjacent to Qatar Foundation, like Defendants, that "[w]e know that Qatar [through Qatar Foundation] has … funded … groups like Islamic State, Al-Qaeda and Hamas."  And in 2017, Israeli attorney Louis Garb

59

publicly observed that "Qatar" was "a vicious, terror-supporting dictatorship" such that "Qatar, through Hamas and Hezbollah, support[ed] terror worldwide" and "also use[d] slave labor to build the stadiums needed to indulge the megalomania of its rulers who, through bribery, won the opportunity to host the next World Cup."

107.    Defendants knew that HAMAS was a notorious trafficker, which further contextualized their awareness of the role of Qatar Foundation.  In 2007, for example, *Deutsche Presse Agentur* (*i.e.*, the German Press Agency), publicly reported that Dutch researchers had concluded that "the militant Palestinian Hamas movement" financed itself, in substantial part, through the "[l]arge sums of money" HAMAS received "from the money [that] originate[d] from … human trafficking."  Similarly, in 2014—while Qatar Foundation was ramping up its support for HAMAS—numerous sources in Israeli media confirmed HAMAS's bedrock reliance on trafficking, like when *Israel National News* reported that, "Palestinian Authority … Chairman Mahmoud Abbas's Fatah … exposed that Hamas is running a human trafficking network."[8]

108.    Defendants knew that Hezbollah was a notorious trafficker, which further contextualized their awareness of the role of Qatar Foundation.  In 2017, for example,

---

[8] More generally, Defendants' knowledge that Qatar Foundation was in the business of directly supporting groups that committed systematic violence like trafficking humans, beheading hostages, and detonating car bombs, also alerted Defendants that Qatar Foundation was **not a legitimate charity**.  When Defendants collaborated with Qatar Foundation, they were not partnering with a legitimate charitable institution—they were partnering with a notorious front that the Qatari regime used to funnel money to its violent, human trafficker allies like HAMAS, Hezbollah, al-Qaeda, and ISIS, among the many notorious hostage-taking trafficking ventures/terrorist groups with which the regime was aligned.

Representative Ann Wagner and Dr. David Asher, of the Foundation for Defense of

Democracies, had the following exchange regarding Hezbollah's human trafficking:

> WAGNER: Dr. Asher … We also know that Hezbollah generates revenue
> from … human trafficking in the Americas.  Can you please discuss
> ***Hezbollah's involvement in human trafficking in Lebanon, Syria,
> globally***?
>
> ASHER: … I'm aware of one of the top tier targets, we call them super
> facilitators. We actually had a thing called Iran-Hezbollah Super Facilitators
> Initiative targeting key functional financiers for the Hezbollah-Iran network
> globally. And I'm aware of one very significant case of Syrian children being
> trafficked all the way into West Africa by this [Hezbollah] individual.  And it
> was a very painful case for us because the U.S. government was well aware
> of it and we did nothing. And it still haunts me that these poor children, and
> they were like young girls and boys were sent to a heinous country in West
> Country probably to their death ***because the guy in charge seemed to
> like torturing children***.  So, that is one case.  He was definitely a Hezbollah
> senior functional official … (Emphasis added.)

109.    Defendants knew that al-Qaeda and ISIS—which were part of the same

organization until 2014, and followed the same general approach with respect to

trafficking—were notorious traffickers, which further contextualized their awareness of the

role of Qatar Foundation.  Indeed, slavery was literally written into ISIS's founding charter.

Per a *CNN* headline in 2014: "***ISIS: Enslaving, Having Sex With 'Unbelieving' Women,

Girls Is OK***."

110.    Defendants' knowledge that Qatar Foundation was directly involved in

aiding notorious trafficking ventures (and terrorist groups) like HAMAS, Hezbollah, al-

Qaeda, and ISIS confirms that Defendants knew, or should have known, that Qatar

Foundation supported human trafficking in Qatar.  These groups that Qatar Foundation

supported were notoriously engaged in human trafficking and forced labor, including, but

not limited to, by engaging in hostage-taking and ransoms, forced labor and services, and sex trafficking.

111.    Due to all these red flags about Qatar Foundation, Defendants knew that Qatar Foundation was, and is, best understood as a reputation washing front designed to enable trafficking, including in relation to the World Cup Construction Venture, rather than serving as a legitimate charitable foundation.  Defendants knew of Qatar Foundation's true nature for at least three reasons.  *First*, media reports, including but not limited to the *Economist*'s reporting, alerted Defendants to this reality.  *Second*, the contexts in which Defendants operated made such conclusion obvious, *e.g.*, the ineluctable conclusion that Qatar Foundation's anti-trafficking words were lip service designed to provide cover for continued trafficking given the Qatari regime's absolute power and control over the country and Qatar Foundation.  *Third*, Defendants' corporate security and intelligence personnel also knew such facts to be true because such understanding of Qatar Foundation was widespread throughout the Middle East, and was of the nature that Defendants' monitoring processes would have gathered sufficient data to alert them to Qatar Foundation's true nature.

112.    For all these reasons, Defendants' work with Qatar Foundation made them know, or they should have known, that the World Cup Construction Venture engaged in human trafficking and forced labor.

### 7.  Defendants' Venture-Related Policies and Procedures

113.    Jacobs's and CH2M's compliance with their stated policies and procedures also alerted Defendants to the anti-trafficking risks, and should have detected, and did

detect, labor abuses and forced labor, relating to the World Cup Construction Venture in which they participated.  Jacobs represents that its employees "do things right," "always act with integrity," "tak[e] responsibility for our work," and "stay[] focused on safety."  To that end, Jacobs says it has "taken a variety of actions to verify the absence of modern slavery in [its] supply chain."  As described below, Defendants' policies and procedures alerted Defendants to the anti-trafficking risks they faced:

a.  Supplier Code of Conduct.  Jacobs has a "Supplier Code of Conduct," through which Jacobs claims that it demands its suppliers, and Jacobs's suppliers' suppliers, to "[c]omply with applicable laws concerning . . . forced labor, human trafficking, working hours, . . . [and] fair wages."  Pursuant to the Supplier Code of Conduct, Jacobs claims that it "*regularly conduct[s] audits and thoroughly investigates possible non-compliance*" therewith.  Jacobs also uses a "human rights prequalification questionnaire" to screen suppliers.  (Emphasis added.)

b.  Internal Reporting.  Jacobs says that it encourages its "employees, suppliers and stakeholders to speak up, without retribution, about any concerns regarding human rights and modern slavery in [its] operations or supply chain" and pledges to "investigat[e] reports in an appropriately robust and timely manner."  Jacobs employees in Colorado, on information and belief, performed work related to auditing and investigating forced labor and human trafficking issues related to the World Cup Construction Venture.

c.  Supply Chain Mapping and Risk Assessments.  Jacobs represents that it "*conduct[s] due diligence* to avoid complicity in human rights abuses."  For example, Jacobs "periodically conduct[s] global supply chain mapping and human rights risk assessment, . . . sometimes with the support of third-party consultants," and identifies "highest risk areas for human rights and *modern slavery exposure, with a particular emphasis on geography, service type and operational context*."  (Emphasis added.)  Jacobs employees in Colorado, on information and belief, performed work related to labor supply-chain mapping and human rights risk assessment related to the World Cup Construction Venture.

d.  Post-Execution Due Diligence.  Jacobs also knew of the abuses because it purportedly "conduct[s] ongoing due diligence of suppliers based on international indices, *media searches* and other indicators of supplier risk."  (Emphasis added.)  Jacobs employees in Colorado, on information and belief, performed work related to due diligence related to forced labor and human trafficking issues related to the World Cup Construction Venture.

e. <u>Post-Execution Audits</u>.    Jacobs recently stated that it "***conducted worker accommodation and employment practices audits*** of suppliers employing foreign migrant workers in a high-risk geography," "identif[ied] areas for improvement," and "***engaged with suppliers to implement corrective actions***."  (Emphasis added.)

Via each of these acts, Jacobs knew or should have known that there was trafficked and forced labor throughout the World Cup Construction Venture.

114.    Before beginning work on the World Cup Construction Venture, CH2M disclosed in its 2011 Sustainability Report that it similarly, as a matter of policy and procedure, takes actions that alerted it (or should have alerted it) that there was trafficked and forced labor in the Venture.  CH2M stated in relevant part that it:

> ***monitors engagement*** of suppliers, contractors, and labor brokers ***who are from or use labor from countries identified by the United Nations and the U.S. State Department as high risk for human rights abuses, including, but not limited to, the use of forced or child labor***.  ***We have identified the Middle East***, central and southwest Asia, and certain countries in Central Europe as ***areas with higher risk of human rights and trafficking in labor violations***.   Therefore, we have developed ***special protocols to screen our labor brokers and vet our contractors and suppliers*** to reduce our risks of inadvertently enabling human rights violations or child or ***forced labor situations***.  (Emphasis added.)

115.    For these reasons, Defendants knew or should have known, due to their own execution of their purported policies and procedures, that the Venture relied upon trafficked and forced labor.

### 8.  Defendants' Roles in the World Cup Construction Venture

116.    Defendants' specific roles in the World Cup Construction Venture also alerted Defendants to the anti-trafficking risks, and ensured that Defendants should have detected, and did detect, labor abuses and forced labor, relating to the Venture in which they participated.    Defendants, as managers and overseers of the entire World Cup

Construction Venture, had the right to assign tasks to other venture participants in the World Cup Construction Venture, and were able to control the means and details by which the other Venture participants in the World Cup Construction Venture performed their work in furtherance of the Venture.  Defendants' management, oversight, and ability to control how other venture participants worked on the World Cup Construction Venture included the ability to prevent Defendants' venture partners (including Plaintiffs' employers) from exploiting forced or trafficked labor.

117.    For example, in 2013, a spokesperson for CH2M asserted where CH2M, in its role as manager and overseer of the development of the stadiums in the World Cup Construction Venture, had "control, we take the strongest possible action to protect migrant labor," and where they were in a supervisory role, when there are "safety issues," "we take action, working with our clients to investigate and respond in an appropriate manner."

118.    That same spokesperson publicly stated that CH2M "ensure[s] that appropriate terms and conditions are properly placed in the procurement documents of our clients.  In cases where we have a supervisory role over a contractor, we apply our health and safety guidelines."

119.    Jacqueline Hinman, then CEO of CH2M, publicly confirmed in November 2016 that due to the "serious concerns about worker welfare," CH2M actively

> worked with clients Qatar 2022 [World Cup] . . . to improve standards for employment, safety, and worker accommodations. . . . ***we strengthened supply-chain qualification requirements for procurement and contractor selection with an inspection regime for enforcement***. . . . We see this as a valuable program-management tool to empower workers and ***ensure these welfare standards are being met***.

65

120.    CH2M, and then Jacobs after it acquired CH2M, purportedly took actions to ensure labor welfare, per its contractual duty and its representations that it was doing so, and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants.  CH2M, and then Jacobs after it acquired CH2M, thereby knew or should have known of and could have prevented or influenced Plaintiffs' inhumane and exploited conditions.

121.    CH2M, and then Jacobs after it acquired CH2M, claimed to ensure proper terms and conditions, and health and safety guidelines were in place and followed by the other Venture participants in the World Cup Construction Venture, including but not limited to Plaintiffs' employers, per its contractual duty and its representations that it was doing so, and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants.  CH2M, and then Jacobs after it acquired CH2M, thereby knew or should have known of and could have prevented or influenced Plaintiffs' inhumane and exploited conditions.

122.    A CH2M spokesperson also touted that CH2M, in its role as overseer and manager of the World Cup Construction Venture, would "lead by example" to "significantly improve the treatment of workers" by setting "standards" for things such as ethical recruitment, employment standards, and health and safety, "establishing an inspection and enforcement regimen" including "audits at multiple levels within the organization and

66

periodic workers inspections," and managing "contractor selection" to "establish a procurement approach that verifies contractor worker welfare."

123.    CH2M, and then Jacobs after it acquired CH2M, took on the role of inspecting Plaintiffs' worksites and living conditions, per its contractual duty and its representations that it was doing so, and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants.  CH2M, and then Jacobs after it acquired CH2M, thereby knew or should have known of and could have prevented or influenced Plaintiffs' inhumane and exploited conditions.

124.    CH2M, and then Jacobs after it acquired CH2M, was responsible for setting standards for ethical recruitment, employment standards, and workers' health and safety, per its contractual duty and its representations that it was doing so, and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants. CH2M, and then Jacobs after it acquired CH2M, thereby knew or should have known of and could have prevented or influenced Plaintiffs' inhumane and exploited conditions.

125.    CH2M, and then Jacobs after it acquired CH2M, audited at multiple levels within the organization and conducted periodic inspections of work and living sites, per its contractual duty and its representations that it was doing so, and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants.

CH2M, and then Jacobs after it acquired CH2M, thereby knew or should have known of and could have prevented or influenced Plaintiffs' inhumane and exploited conditions.

126.    During the entirety of the World Cup Construction Venture, CH2M (and then Jacobs after it acquired CH2M) had policies of evaluating subcontractors' worker welfare policies, which required it to regularly visit worksites.  As such, CH2M (and then Jacobs after it acquired CH2M) had a practice of "screen[ing] before engaging a supplier, and monitor[ing] during the work phase."  As part of this practice, CH2M (and then Jacobs after it acquired CH2M) engaged with the entities who directly employed construction laborers.  Given their policies and screening practices, Defendants knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants.  CH2M, and then Jacobs after it acquired CH2M, thereby knew or should have known of and could have prevented or influenced Plaintiffs' inhumane and exploited conditions.

127.    CH2M, and then Jacobs after it acquired CH2M, managed contractor selection to establish a procurement approach that verified contractor worker welfare, per its contractual duty and its representations that it was doing so, and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants. CH2M, and then Jacobs after it acquired CH2M, thereby knew or should have known of and could have prevented or influenced Plaintiffs' inhumane and exploited conditions.

128.    CH2M, and then Jacobs after it acquired CH2M, with the role as overseer and manager of the entire World Cup Construction Venture, was responsible for

"ensur[ing] that appropriate terms and conditions [were] properly placed in the procurement documents" of the Venture participants and used "strategic procurement and performance monitoring as additional means to address labor standards issues."  As such, CH2M, and then Jacobs after it acquired CH2M, had direct control over the terms and conditions of workers' employment and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants.  CH2M, and then Jacobs after it acquired CH2M, thereby knew or should have known of and could have prevented or influenced Plaintiffs' inhumane and exploited conditions.

129.    For all these reasons, as overseer and manager of the World Cup Construction Venture, CH2M and Jacobs were frequently involved in the day-to-day aspects of each stadium construction project.

130.    By way of example, Jacobs employee Mr. Shaw's LinkedIn page details that he worked with another health and safety professional from Jacobs, Sajith Sathyan, to improve safety conditions at a particular worksite.  Additionally, another CH2M worker, Ali Marcotte, served as a Program Management Consultant and Performance Manager for the World Cup Construction Venture, and publicly listed her responsibilities as including "conceiv[ing] and implement[ing] a performance management system for contractual execution across the [Venture] supply chain," which entailed, among other things, "schedule, budget, sustainability, [health and safety] and worker welfare through contractual terms and conditions for all [] suppliers," and "performance monitoring requirements."  Another former Jacobs employee publicly touted the work they did for

Jacobs on the Al Thumama Stadium, in direct interaction with Al Jaber Engineering, in a role that required weekly site visits and safety tours, with the responsibility of ensuring contract compliance and that health and safety standards were obeyed and implemented. By virtue of this evident direct participation in the Venture, *see generally supra* V.B, Defendants knew or should have known that the World Cup Construction Venture was engaging, throughout, including but not limited to by Plaintiffs' direct employers, in human trafficking and forced labor.

131.    Because Defendants were managing performance of the other participants in the World Cup Construction Venture, Defendants by virtue of their participation in the Venture knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants.

132.    Because Defendants were exerting management across the entire World Cup Construction Venture supply chain to purportedly ensure worker welfare, Defendants knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants.

133.    Because Defendants had control over contractual terms and conditions for all suppliers in the World Cup Construction Venture, Defendants knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants.

70

134.    Due to their role as overseeing and managing the World Cup Construction Venture, Defendants were positioned to learn, and in fact did learn once the Venture was formed, about the Venture's use of forced and trafficked labor and, with full knowledge of the forced and trafficked labor, chose to financially benefit by continuing to do business with the partners in the Venture (including but not limited to Plaintiffs' direct employers) and participate in the Venture.

135.    Due to their role as overseeing and managing the World Cup Construction Venture, Defendants were positioned to learn, and in fact did learn once the Venture was formed, about the Venture's exploitation of Plaintiffs by confiscating workers' passports upon their arrival and refusing to return the passports until conclusion of the worker's contractual term, as a way to

a.  control and limit Plaintiffs' movements while in Qatar, to preclude a search for new employment, and to preclude Plaintiffs' return to the Philippines;

b.  ensure they were forced to endure unsafe, unsanitary, and exploitative living conditions, including but not limited to the provision of unsanitary or insufficient food and forced living in crowded conditions;

c.  ensure Plaintiffs were forced to endure unsafe and exploitative working conditions, such as forced work for extremely long hours, working in inhumane conditions such as without sufficient water; and

d.  not providing fair or promised compensation, including for overtime.

Fully knowing these facts, Defendants chose to continue to do business with the partners in the Venture (including but not limited to Plaintiffs' direct employers) and financially benefit by participating in the World Cup Construction Venture.

136.    Due to their role as overseeing and managing the World Cup Construction Venture, Defendants were positioned to learn, and in fact did learn once the Venture was

71

formed, about the Venture's exploitation of Plaintiffs, including lies told to Plaintiffs regarding working and living conditions, and pay, to induce them to agree to travel to Qatar and work for Venture.  Fully knowing these facts, Defendants chose to financially benefit by continuing to do business with the partners in the Venture (including but not limited to Plaintiffs' direct employers)and participate in the World Cup Construction Venture.

137.    Without discovery the terms of the contracts between and among the different joint venture partners for the World Cup Construction Venture are not knowable, but publicly available information indicates CH2M (and then Jacobs once it acquired CH2M) had direct control or the right to control each joint venturer's conduct vis-à-vis the construction workers, including but not limited to Plaintiffs' direct employers, and exerted that control through auditing, oversight, inspections, and mandated policies and procedures.

### 9.  Defendants' Venture-Related Course of Dealings

138.    Defendants' course of dealings—including those of their partners, *e.g.*, the Supreme Committee and FIFA—also alerted Defendants that they were participating in a trafficking and forced labor venture and provides further direct evidence that Defendants knew of these abuses in the World Cup Construction Venture in which they participated. Plaintiffs are aware of at least four instances when such course of dealings confirms that Defendants knew or should have known that Plaintiffs were being trafficked by the World Cup Construction Venture in which Defendants participated.  The examples below are not exhaustive; they reflect what Plaintiffs have been able to piece together without

72

discovery.  The full details of Defendants' course of dealings (and knowledge gained by the course of dealings of the other participants in the Venture, with whom Defendants communicated) rest within Defendants' sole control.  Discovery will likely uncover many other similar instances when such course of dealings demonstrate that Defendants knew or should have known of the trafficking and forced labor throughout the Venture.

139.    *First*, CH2M knew of *kafala* and the terrible conditions of the working environment in Qatar.  in 2013, CH2M's Assurance Director admitted that CH2M knew that working conditions were unsafe.  He was quoted to say that "***his team has estimated that at least 14 people will die while building Qatar's World Cup stadiums***," and "***[t]here are quite a few unsafe construction sites . . . I am half expecting bodies to land next to me every time I go past.***" (Emphasis added.)  Although that admission was controversial at the time, in fact, CH2M dramatically underestimated the number of World Cup 2022 construction worker deaths, and some estimates put the number of such workers' deaths in the thousands.  Defendants thus knew or should have known that the World Cup Construction Venture mistreated migrant workers in the ways discussed *supra* ¶¶ 48–50.

140.    *Second*, in 2013, FIFA acknowledged that "fair working conditions [for migrant workers] with a lasting effect must be introduced quickly in Qatar."  However, the Qatari regime would not begin implementing those "reforms" until 2020; even after, ongoing labor practices continued to violate the TVPRA.

141.    *Third*, in 2015, VINCI, a construction company working on the Al Rayyan Stadium and Precinct project for the World Cup, and thus a part of the World Cup

73

Construction Venture Defendants participated in, admitted to confiscating passports after a related public accusation.

142.    *Fourth*, in 2015, CH2M, via CH2M HILL International B.V., entered into a memorandum of understanding with the State of Qatar (*i.e.,* the Qatari regime), the Supreme Committee, and Qatar Foundation, to access and provide technology assistance called "Better Connections" in the "residential compounds" of the migrant workers.  One public report noted:

> ***The programme is expected to cover expatriate workers from*** India, ***The Philippines***, Nepal, Sri Lanka, Pakistan, Bangladesh, Ethiopia, Thailand, Vietnam and Ghana. ictQATAR also inked MoUs with the Supreme Committee for Delivery & Legacy (SC), Qatar Foundation (QF) and CH2M HILL International BV (CH2M) which work on the most iconic infrastructure projects in the country.  (Emphasis added.)

Via this program, CH2M had access to and thus witnessed the inhumane living conditions the trafficked and forced laborers endured.  CH2M, as a whole, and via CH2M Hill Companies, Ltd. in its 2016 Sustainability and Corporate Citizenship Report, took responsibility for and credit for the "Better Connections" program in Qatar, showing how CH2M as a whole was involved:

> We won the award ***with our partner***, Qatar's Ministry of Information and Communications Technology (ictQatar), in recognition for ***our leadership on ictQatar's Better Connections Program***. . . . the program provides Internet access and technology training to low-income migrant construction workers, so they may stay in touch with their families and loved ones back home.  The Better Connections Program ***has set up and equipped 100 new ictQatar facilities at worker accommodations, reaching thousands of migrant workers across Qatar***.  ***Other Better Connections partners include the Supreme Committee for Delivery & Legacy (our 2022 FIFA World Cup Qatar client)***, Qatar's National Human Rights Committee, Qatar Foundation, and Microsoft Qatar.  (Emphasis added.)

74

**D.    Defendants Knowingly Benefitted from Participation in the World Cup Construction Venture.**

143.    Defendants entered into a contract to oversee and manage the World Cup Construction Venture.  The value and total scope of the World Cup contract to Defendants is not known at this time.  On information and belief, Defendants realized, at least, more than $50 million dollars in profit from their participation in the Venture, because it is not plausible that Defendants received less than $5 million per year in net profit given the scale of the Venture.  Discovery is likely to reveal Defendants earned far more, likely hundreds of millions of dollars more.

144.    Each Defendant knowingly benefitted from the World Cup Construction Venture in Colorado.  For example, the Supreme Committee paid  money to CH2M, and then Jacobs after it acquired CH2M, for Defendants' work as participants in the World Cup Construction Venture, and those funds flowed to CH2M's and Jacobs's offices in Colorado.  Money paid to Jacobs also flowed to its offices in Texas.

145.    Each of Defendants' and Defendants' employees' public announcements regarding the World Cup Construction Venture confirm not only that they participated in the Venture (and each social media post is, in and of itself, participation in the Venture, at times from within this District), but also that Defendants knowingly received benefits in the United States in the form of the publicity and notoriety of being involved in such a high-profile international project.  Examples of this participation and knowing benefit include:

75

a. Jacobs's main corporate Facebook page, titled Jacobs Solutions Inc., adopted and incorporated posts from CH2M's prior Facebook page, including a February 9, 2012 post, with a picture of CH2M's then-CEO Jacqueline Hinman signing the contract to participate in the World Cup Construction Venture.  Jacobs Solutions Inc. participated



in the Venture by posting this:

b.  Jacobs's corporate Twitter account appears to have adopted posts from CH2M's prior Twitter account, including a post from February 9, 2012:



Jacobs @JacobsConnects · Feb 9, 2012
CEO Lee McIntire: We're proud to contribute our global PM experience to help deliver the 2022 **FIFA** World Cup in Qatar cot.ag/xkphNp

c.  At the time of the opening ceremony for the World Cup, Jacobs's main corporate accounts on both Facebook and LinkedIn took responsibility for working on the World Cup Construction Venture for the entire decade during which Plaintiffs were harmed as alleged herein.

d.  Jacobs's Program Director for Sports and Entertainment, Joseph Danko, was based in the U.S. and publicly touted while in the United States that he was proud to have worked on the World Cup Construction Venture, including on its "worker welfare standards."  In April 2022, Mr. Danko also publicly stated via LinkedIn "I am honored to be part of the 'One Team' created with the Supreme Committee for Delivery & Legacy."

e.  Rehan Khan, Jacobs's Qatar Country Director and Executive Program Manager for the World Cup, posted on LinkedIn in April 2022, after a Qatar visit from Jacobs executives including U.S.-based Joseph Danko and Patrick Hill, that "[i]t was a great success having ***Jacobs employees meet with their leadership***."  Mr. Danko, who worked on the World Cup Construction Venture, both before and after Jacobs acquired CH2M, and from the United States, responded to Mr. Khan's post by saying "[m]y appreciation goes out to the exemplary leadership of the Supreme Committee . . . Having been fortunate enough to be there from the very beginning this moment was amazing for me."

f.  In late 2022 or early 2023, Mr. Danko publicly commented on Ali Marcotte's LinkedIn post that Ms. Marcotte, who was formerly a CH2M employee managing performance standards and contract compliance throughout the World Cup Construction Venture supply chain, was "such a strong contributor to ***our 'One Team' with the [Supreme Committee] to make this possible***."

146.  Each Defendant also benefitted from Plaintiffs' trafficked and forced labor. Trafficking Plaintiffs and Plaintiffs' forced labor allowed all participants in the World Cup Construction Venture, including Defendants, to benefit from an inadequately

77

compensated, captive workforce, working excessive hours, with inadequate allowances for food and cheap, substandard, overcrowded, and unsanitary housing. Plaintiffs' forced labor allowed Defendants and their Venture partners to complete World Cup construction projects more quickly and cheaply than would have been possible without Plaintiffs' forced labor. Defendants benefited thereby.

### E.    Each Plaintiff Was a Victim of Trafficking by the Venture.

147.    Each Plaintiff was a victim of trafficking by the Venture. Below, Plaintiffs set forth each Plaintiff's allegations as to both that individual Plaintiff's injuries, as well as the pattern and practice demonstrated by all the Plaintiffs—and the allegations of all the Plaintiffs further corroborate the allegations of each individual Plaintiff. Accordingly, all Plaintiffs' allegations below are relevant to each Plaintiff's individual allegations.

148.    Plaintiff Al.B. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2018, and specifically on the construction of the Al Wakrah Road project, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport immediately upon arrival, precluding him from leaving the country or his job until the end of his contract. This caused him to feel anxious and nervous. After signing a two-year contract in the Philippines, he was compelled upon arrival to sign a new contract with an indefinite term. He was forced to work through exhaustion, with days starting at 3:00 AM to catch a 5:00 AM bus, and returning around 7:00 PM. During major construction phases, he worked five straight days without returning

78

to accommodations, allowed to sleep in a hut on the jobsite. He was not paid for all his overtime and his salary was systemically underpaid. He was forced to live in crowded and inhumane living conditions, at times in rooms infested with bedbugs. The food provided was unsafe and inadequate. The drinking water had bacteria in it that caused him amoebiasis, which caused an emergency room visit and which required over a month of hospital treatment. At the end of his employment, he was not allowed to leave immediately but was forced to remain for two additional months without work or salary.

149. Plaintiff Am.P. worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2014-2018, and specifically on the construction of the Al Wakrah road infrastructure leading to the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Construction Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel nervous as he lacked identification in a foreign country, and he was once detained by police because he did not have his documents, and his visa had expired without being properly renewed by the company. He was deceived about his contract terms, having signed a two-year contract in the Philippines but being forced to sign an "indefinite" contract upon arrival in Qatar. He was not paid what he was promised. He was forced to work extremely long days, beginning at 4:30 AM and often not returning to his accommodation until 8:00 or 9:00 PM, including mandatory overtime. He was forced to

79

live in crowded and inhumane living conditions, first with six workers packed into a dirty room infested with bedbugs. When he attempted to resign, the company repeatedly refused. When they finally allowed him to go home, he had to pay for his own airfare.

150. Plaintiff An.P. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2017-2019, and specifically on the construction of the Al Wakrah Road project, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport immediately upon arrival, precluding him from leaving the country or his job until the end of his contract. This caused him great fear and anxiety. After signing a two-year contract in the Philippines, he was compelled upon arrival to sign a new contract with an "indefinite" term. He was forced to work through exhaustion, on most days working 15 to 18 hours straight, and at times 24 hours straight. He was not paid for all his overtime. He chose not to renew his contract, and then was forced to remain in the accommodation for more than two months before being allowed to leave.

151. Plaintiff Ar.A. worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2015-2018, and specifically on the construction of the road infrastructure for the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Construction Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country

80

or his job until the end of his contract. This caused him to feel stressed and powerless to object. He was deceived about his contract terms; after signing a two-year contract in the Philippines, he was forced to sign a five-year contract upon arrival in Qatar, which he did out of fear of being sent home with no money to pay for his expenses. He was not fully compensated for overtime work, despite being required to work those hours. He was forced to live in crowded and inhumane living conditions, with eight workers sharing a small room with four double-deck beds, no storage space for belongings, and infestations of bedbugs that prevented him from sleeping. The food provided was of poor quality, repetitive, and sometimes improperly cooked. When he attempted to resign, he was forced to pay 5,000 Philippine Pesos and then made to wait an additional three months before being allowed to leave, during which time he received no work or pay. He had to pay for his own airfare home.

152. Plaintiff B.L. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2016-2018, and specifically on the construction of the Al Wakrah Road project, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport immediately upon arrival, precluding him from leaving the country or his job until the end of his contract. This made him extremely anxious. After signing a two-year contract in the Philippines, he was compelled upon arrival to sign a new contract with an "indefinite" term. He was forced to work through exhaustion, forced to provide two hours of unpaid overtime daily, and sometimes working through the night

to meet urgent deadlines. He was forced to live in crowded and inhumane living conditions, relocated multiple times, at times to rooms infested with bedbugs and lacking air conditioning. The food provided was extremely poor quality, repetitive, undercooked, and at times spoiled. He was forced to purchase his own drinking water as the only free water from the tap was unsafe, causing stomach problems for many coworkers. He chose not to renew his two-year contract, but was forced to remain in the accommodation for more than a month without work or pay before being allowed to leave.

153.   Plaintiff B.T. worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2016-2019, and specifically on the construction of the Al Wakrah road infrastructure leading to the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Construction Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel anxious as he lacked identification in a foreign country. He was forced to work eleven-hour days including two hours of overtime daily and was not compensated for his frequent overtime beyond the initial two hours. He was also required to work on Fridays, which were supposed to be rest days. For more than a year, the company failed to renew his residency permit, leaving him with only a temporary ID that restricted his movement and caused him additional fear, having no valid identification. He was forced to live in crowded and inhumane living conditions, with six to eight workers packed into rooms

82

designed for two people, and beds infested with bedbugs. When he attempted to resign due to these conditions, the company refused his resignation, and then six months later terminated him without explanation and forced him to remain in Qatar for over a month without work or pay.

154.    Plaintiff E.G. worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2015-2018, and specifically on the construction of the road infrastructure leading to the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Construction Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel scared, especially as a newcomer in a foreign country without proper identification. He was deceived about his contract terms, having signed a two-year contract in the Philippines but being forced to sign a five-year contract upon arrival in Qatar. He was not paid what he was promised, experienced frequent salary delays, and was regularly denied full compensation for his overtime work despite working four hours of overtime daily. He was forced to live in crowded and inhumane living conditions, with four workers packed into rooms designed for only two people, with beds infested with bedbugs and inadequate cooling systems that made sleeping difficult. The food provided was unsanitary, repetitive, and sometimes insufficient, leading to worker strikes. When he attempted to resign, he was not allowed to leave immediately and was forced to wait in

Qatar for three months without pay before being permitted to return home. The company also withheld his gratuity pay despite his three years of service.

155.    Plaintiff Er.M. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2019, and specifically on the construction of the Al Wakrah Road project, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This made him feel anxious and uneasy, constantly nervous being in a foreign country without identification, and his family worried about him not having travel documents. On one occasion when he left the compound, he was stopped by police and detained for three hours under suspicion of being in the country illegally, because he did not have identification. He was deceived about his contract terms; after signing a two-year contract in the Philippines, he was compelled upon arrival to sign a new five-year contract with no explanation, feeling he had no choice as he had borrowed money to apply for the job. He was not paid what he was promised. He was forced to work through extreme exhaustion, sometimes working 48 hours straight with barely any sleep, and was routinely undercompensated for overtime work. His normal daily routine began at 3:00 AM to be in line by 4:30 AM for a 5:00 AM bus, returning to the accommodation around 8:00 PM. He was subjected to life-threatening working conditions, including being required to free dive into water two meters above his head to seal pipe leaks without breathing apparatus or

84

oxygen tanks. He was forced to live in crowded and inhumane living conditions with three other workers, with severe bedbug infestations and broken toilets. The food provided was poor quality, and the provided water was dirty and caused stomach problems.

156.    Plaintiff F.M. worked a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2019, and specifically on the construction of the Al Wakrah Road project, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel trapped and nervous, wondering how he could leave Qatar if there was an emergency back in the Philippines. He was deceived about his contract terms - after signing a two-year contract in the Philippines, he was immediately compelled upon arrival to sign a new contract for five years, feeling he had no choice. He was forced to work through exhaustion, waking at 3:00 AM to catch a 5:00 AM bus, and returning to the accommodation around 7:00 or 8:00 PM. He was systematically underpaid and was not compensated for all his overtime work. He was forced to live in crowded and inhumane living conditions, sharing small rooms, infested with bedbugs, with three other workers. The food provided was poor quality, repetitive, tasteless, and often undercooked. He had to purchase his own drinking water as the provided water was dirty. When he tried to leave Qatar, he was forced to wait three additional months in the accommodation without pay before returning to the Philippines. He had to purchase his own plane ticket home.

157.    Plaintiff J.L. worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2014-2016, and specifically on the construction of the road infrastructure for the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Construction Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He was deceived about his contract terms; after signing a two-year contract in the Philippines, he was forced to sign a five-year contract upon arrival in Qatar. He was also deceived about his salary, which was reduced from the promised 1500QR/month to 1000QR/month with little explanation. He was not paid for all his overtime work, and he was forced at times to work up to 14 hours straight. He was denied sick leave and was subject to a "no work, no pay" policy that forced him to work even when ill. He was forced to live in crowded and inhumane living conditions, first in container vans in the desert with six workers per container, and later in cramped accommodations with four workers per room, both locations infested with bedbugs. The food provided in the mess hall was repetitive, poorly cooked, and sometimes unsafe to eat, with chicken that smelled bad and contained blood. When he tried to resign, he was forced to wait for two months before being allowed to return home, during which time he received no pay. He had to pay for his own airfare home.

158.    Plaintiff J.O. worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2015-2017, and specifically on the

86

construction of the Al Wakrah road infrastructure leading to the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Construction Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel nervous and afraid, particularly about his ability to leave Qatar in case of an emergency in the Philippines. He was deceived about his contract terms, having signed a two-year contract in the Philippines but being forced to sign an "indefinite" contract upon arrival in Qatar. He was not paid what he was promised. While working as a welder, he suffered a severe workplace injury when a glass shard penetrated his eye due to substandard safety equipment provided by the company. The injury required surgery and left him permanently blind in one eye. Despite this serious injury, the company refused to pay for his medicines and follow-up appointments, forced him to return to work after only one week, and enforced a "no work, no pay" policy during his recovery, docking his pay for the time when he was out for surgery and recovery. The injury has permanently disabled him from working as a welder, his technical profession, forcing him to take lower-paying jobs since his return to the Philippines. The food provided was unsanitary, repetitive, and often improperly cooked, and workers were required to purchase their own drinking water. After he was terminated without explanation in January 2017, he was denied access to the mess hall and had to rely on colleagues and church members for food while waiting a month for his repatriation to the Philippines.

159. Plaintiff J.S. worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2014-2018, and specifically on the construction of the Al Wakrah road infrastructure leading to the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Construction Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel confused and scared, as it was his only form of identification in a foreign country. He was forced to work through exhaustion, with mandatory overtime that was not fully compensated due to the company's policy of capping overtime pay at two hours regardless of actual hours worked. His salary of 1,500 riyals per month was frequently delayed, sometimes for more than a month, impacting his ability to send money to his family. He was forced to live in crowded and inhumane living conditions, with six people packed into rooms designed for two, and beds infested with bedbugs. The air conditioning was frequently non-functional due to broken power generators, causing extreme discomfort in Qatar's heat. The food provided was unsanitary, and repetitive. When he attempted to resign, he was not allowed to leave immediately and was forced to remain in Qatar for three months without work or pay. He ultimately had to pay for his own return ticket to the Philippines and was denied his end-of-contract benefits.

160. Plaintiff J.T. worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2016-2020, and specifically on the

construction of the Al Wakrah road infrastructure leading to the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Construction Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him concern as it left him without formal identification. He was required to work excessive hours, waking at 3:00 AM to catch a 5:00 AM bus for a workday that officially began at 7:00 AM and typically included 4-5 hours of mandatory overtime for which he received no compensation, often not returning to his accommodation until midnight. He was forced to live in crowded and inhumane living conditions, with four workers packed into a small room infested with bedbugs. The food provided was repetitive and unsanitary, and the drinking water was contaminated with insect larvae, which caused him to develop diarrhea and dehydration severe enough to require medical attention. After completing his contract, he was forced to wait three months without pay before being allowed to return to the Philippines.

161. Plaintiff Ja.A. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2016-2019, and specifically on the construction of highways leading to the World Cup stadiums, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport immediately upon arrival, precluding

him from leaving the country or his job until the end of his contract. This caused him and his family to feel nervous. He was deceived about his contract terms; he signed a two-year contract in the Philippines but was compelled upon arrival to sign a new contract with no end date, but he felt he had no choice to accept it. He was forced to work through exhaustion, with days starting at 3:00 AM to leave by 5:00 AM and returning around 8:00 PM. He was not paid for all his overtime, and his salary was systemically underpaid. He was forced to live in crowded and inhumane living conditions, relocated five times to different accommodations, each time sharing small rooms with three others all infested with bedbugs and with broken bathroom fixtures. The food provided was inadequate and repetitive. He was forced to purchase his own drinking water because the filter on the provided water was never replaced. He suffered a high blood pressure episode on the worksite, but it was not treated properly, so he had to go to another hospital at his own expense. After he was terminated, he was forced to remain in Qatar for two additional months without salary, and he had to purchase his own plane ticket home.

162. Plaintiff Je.T. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2020, and specifically on the construction of the Al Wakrah Road project, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel helpless and anxious, and he was too afraid to leave the compound or worksite

for fear of police inspection without identification. He was deceived about his contract terms - after signing a two-year contract in the Philippines, he was immediately forced upon arrival to sign a new contract for an "indefinite" period with no explanation provided. His promised salary of 1,500 QAR per month was reduced to 1,100 QAR without explanation. He was forced to work through exhaustion and to provide two hours of unpaid overtime daily, and on occasions was required to work 24-hour shifts. He suffered a catastrophic workplace injury when a one-ton metal plate fell on him, resulting in 14 fractured ribs. The company coerced him into signing a document falsely stating he was working voluntarily, so it could avoid liability for his accident, then hid him in the accommodation without proper medical care to avoid further investigation, forcing him to rely on security guards and roommates for basic needs while immobilized. He was forced to live in crowded and inhumane living conditions, initially with four workers per room, with persistent bedbug infestations and periods without functioning air conditioning. The food provided was unsanitary and inadequate. When he attempted to leave after recovering from his injuries, he was initially denied permission to return to the Philippines.

163.    Plaintiff Ji.T. worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2016-2018, and specifically on the construction of the road infrastructure for the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Construction Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country

91

or his job until the end of his contract. This caused him to feel afraid and worried about his status in Qatar. He was deceived about his contract terms; after signing a two-year contract in the Philippines, he was forced to sign a five-year contract upon arrival in Qatar, which he did despite his hesitation because he felt he had no choice. He was forced to work through exhaustion, with days beginning at 4:00 AM to catch a 5:00 AM bus, working from 6:00 AM to 6:00 PM plus three hours of overtime daily, not returning to his accommodation until around 9:00 PM, leaving him barely any time to sleep. He worked every day but was not paid for all his work. He was not paid for all his overtime work. He was not paid what he was promised and his salary was frequently delayed, preventing him from sending money home and forcing his family to borrow money from neighbors for daily needs. He was provided poor quality, repetitive food that was undercooked, tasteless, and often had a foul smell, while the drinking water provided caused stomach issues. When he became ill with a fever, he received no medicine and was subject to a "no work, no pay" policy, forcing him to buy his own medicine. He was forced to live in cramped, filthy accommodations with four people to a room, with beds infested with bedbugs. When his father died, his employer refused to allow him to return home for the funeral, and then when he tried to resign, he was not allowed to leave in time to attend the funeral.

164. Plaintiff Jo.B. worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2016-2019, and specifically on the construction of the road infrastructure for the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Construction Venture which exploited his

labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel shocked and nervous, but he complied out of fear of repercussions. He was deceived about his contract terms; after signing a two-year contract in the Philippines, he was forced to sign a five-year contract upon arrival in Qatar. He was also deceived about his compensation, as he never received the promised 300-riyal food allowance that was part of his original contract. He was forced to work through exhaustion, often working 13-hour shifts and sometimes until early morning on urgent projects while still being required to report for work the following morning. He was not paid for all his overtime work. He was forced to consume repetitive, poorly prepared food that was often undercooked, had a strong odor, and caused health concerns among workers. He was forced to live in a room infested with cockroaches and bedbugs. After receiving a termination notice, he was not allowed to leave for three months, during which time he received no pay, was denied access to the mess hall, and had to beg for food from coworkers. Unable to send money to his family in the Philippines, he remained trapped in this situation because the company withheld both his passport and final pay until his departure. He had to pay for his own airfare to return home.

165. Plaintiff L.N. worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2016-2019, and specifically on the construction of the road infrastructure for the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Construction Venture which exploited his

labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel extremely anxiety. He was deceived about his contract terms; after signing a two-year contract in the Philippines, he was forced to sign a five-year contract upon arrival in Qatar. He was forced to work through exhaustion, with workdays beginning at 4:00 AM to catch a 5:00 AM bus to begin work at 6:00 AM until 4:00 PM, not returning to his accommodation until around 5:00 PM. He was routinely required to work overtime, including through the night for urgent tasks, but was not fully compensated for all overtime hours worked. He was forced to live in crowded and inhumane living conditions, and transferred from one living location to another, first in a cramped freight container van in the desert with four workers and bedbug infestations, and later in overcrowded rooms in Labor City. The food provided was repetitive, undercooked, smelly, and poorly prepared, forcing him to purchase his own food. After sustaining a work injury to his eye that required three days of hospital treatment, he was denied sick leave and had his pay docked under a "no work, no pay" policy despite contractual provisions for sick leave. After attempting to resign, he was denied the ability to leave until receiving a termination notice, and even then was forced to wait two additional months without work or pay before being allowed to return home.

166.   Plaintiff M.S. worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2016-2018, and specifically on the construction of the road infrastructure for the Al Wakrah Stadium. Defendants participated

94

in and knowingly benefitted from the World Cup Construction Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel nervous and concerned about his status. He was deceived about his contract terms; after signing a two-year contract in the Philippines, he was forced to sign an indefinite contract upon arrival in Qatar, and he received less pay than he was promised. He was forced to work through exhaustion, with days beginning at 4:00 AM to catch a 5:00 AM bus, working from 6:00 AM to 4:00 PM plus two additional hours of overtime daily, not returning to his accommodation until 6:00-7:00 PM. He was not paid for all the hours he worked and his salary was often delayed, forcing his family in the Philippines to borrow money to survive. He was provided poor quality, repetitive, and undercooked food. He suffered frequent diarrhea from the food and poor water quality, and when injured by a falling object, received inadequate medical care, being given only one day off before being required to return to work. He was forced to live in crowded and inhumane conditions, with four workers sharing a small room in the desert and later in Labor City, with beds infested with bedbugs that disrupted his sleep. After resigning, he was not allowed to leave for more than two months, during which time he received no pay and had to pay for his own return airfare to the Philippines.

167.    Plaintiff Rog.E. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2019, and specifically on the

construction of highways leading to the World Cup stadiums, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport immediately upon arrival in Qatar, precluding him from leaving the country or his job until the end of his contract. This caused him to feel deeply anxious, worried and nervous about how he might return home in case of emergency, with the company offering no explanation for the seizure. He was deceived about his contract terms. For example, after signing a two-year contract in the Philippines, he was compelled upon arrival to sign a new contract with an "indefinite" term. He was forced to work through exhaustion, waking at 3:30 AM to line up by 4:30 AM for the bus, and not returning until 9:00 PM. He was not paid fully for his overtime, and his salary was systematically underpaid. He was forced to live in crowded and inhumane living conditions, with four workers crammed into small rooms infested with bedbugs and lacking basic cleanliness. The food provided was inadequate and repetitive. He was forced to purchase his own drinking water as the provided tap water's filters were never changed. The company's "no work, no pay" policy compelled him to work through flu and gout with visible foot swelling, paying for his own hospital transportation and medical expenses without company assistance. After he was terminated, he was forced to remain in Qatar for five months without income before being allowed to return to the Philippines.

168.    Plaintiff Rol.P. worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2015-2019, and specifically on the construction of the road infrastructure for the Al Wakrah Stadium. Defendants participated

in and knowingly benefitted from the World Cup Construction Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel very nervous and scared about his inability to leave in case of emergency. He was deceived about his contract terms; after signing a two-year contract in the Philippines, he was forced to sign a five-year contract upon arrival in Qatar, and he was not paid what he was promised. He was forced to work through exhaustion, routinely working 12-hour shifts, and was not paid in full for his overtime work. Because he was unable to send money to support his family in the Philippines, he suffered severe anxiety and depression. He was forced to live in crowded and inhumane living conditions, with four workers sharing small rooms, being relocated several times, with bedding infested with bedbugs and sheets that were only changed once in three and a half years. The food provided was repetitive, undercooked, had a strong odor, and sometimes caused allergic reactions; drinking water was contaminated with cockroaches due to dirty filters, forcing him to purchase his own. When he tried to resign, he was forced to wait for two months with no work and no pay. In the final two weeks before his departure, he was denied access to the mess hall and had to beg for food. He was then forced to pay for his return airfare home.

169.    Plaintiff R.D. worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2014-2019, and specifically on the construction of roads for the Al Wakrah Stadium. Defendants participated in and

97

knowingly benefitted from the World Cup Construction Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He was deceived about his contract terms; after signing a two-year contract in the Philippines, he was forced to sign an "indefinite" contract upon arrival in Qatar. He was forced to work through exhaustion, with days beginning at 2:00-3:00 AM to catch a 4:30 AM bus, working from 6:00 AM to 5:00 PM plus two additional hours of overtime daily, returning to his accommodation around 8:00 PM. He was not paid what he was promised, he was not fully compensated for his overtime work, and his regular pay was frequently delayed by up to two months. He was forced to live in crowded and inhumane living conditions, being moved between seven different accommodations during his employment, all characterized by overcrowding, with up to 10 workers per room, with filth and bedbug infestations. One accommodation was located in a remote desert area requiring a 90-minute walk to reach transportation. The food provided was unsanitary, undercooked, repetitive, and often inedible, with poor-quality ingredients. The drinking water was unpalatable and required him to purchase his own. When he resigned, he was forced to remain without work or pay for two months while his resignation was processed, and had to pay for his own flight home.

170.    Plaintiff R.I. worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2015-2017, and specifically on the construction of the Al Wakrah road infrastructure leading to the Al Wakrah Stadium. Defendants

participated in and knowingly benefitted from the World Cup Construction Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel fear as he would not be able to identify himself with the authorities. He was deceived about his contract terms, having signed a two-year contract in the Philippines but being forced to sign a five-year contract upon arrival in Qatar. He was not paid what he was promised. He was forced to work exhausting hours, waking at 4:00 AM for workdays that typically lasted until 7:00 PM, including 2-3 hours of mandatory overtime for which he received no compensation. He was forced to work even when ill due to the company's "no work, no pay" policy. He was forced to live in crowded and inhumane living conditions, with four workers packed into a dirty room with bedbugs and poor lighting. The food provided was repetitive, unsanitary, and often improperly cooked, with undercooked bloody chicken frequently served. When he decided to resign, he was not allowed to leave immediately and was forced to remain in Qatar for three months without work or pay before being allowed to return to the Philippines. He received only one month's delayed salary and no benefits, and had to use his own money to purchase his return ticket.

171.  Plaintiff R.P. worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2015-2020, and specifically on the construction of the Al Wakrah road infrastructure leading to the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Construction

Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He was deceived about his contract terms, having signed a two-year contract in the Philippines but being forced to sign an "indefinite" contract upon arrival in Qatar. He was forced to live in crowded and inhumane living conditions, first with eight workers packed into a room with double-deck beds infested with bedbugs and no storage for personal belongings, then later with four workers in a room designed for two people. The food provided was unsanitary, repetitive, and often spoiled, with workers sometimes being served chicken that was rotten and had blood in it. After receiving a notice of termination, he was forced to remain in Qatar for six months without work or pay before being allowed to return to the Philippines.

172.    Plaintiff V.B. worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2014-2016, and specifically on the construction of the Lusail Stadium and Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Construction Venture which exploited his labor. His direct employer was Midmac Contracting Company. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to become anxious about his inability to leave in case of emergency, and when he asked for his passport back, he

100

was refused. His workdays began at 2:00 AM to transport workers to the job site by 4:00 AM, followed by his "official" work shift from 6:00 AM to 5:00 PM, returning to his accommodation around 7:00 PM. He was not paid for the early morning hours transporting workers, despite this being a required part of his duties. He was forced to work through exhaustion, once working for 48 hours straight. He was not fully compensated for his overtime work and experienced salary delays of up to a month. He was provided food that was "almost inedible," poorly prepared, often raw, repetitive, and sometimes containing blood. He was denied sick leave, required to work even when ill, and witnessed retribution against workers who complained about conditions.

173. Plaintiff W.B. worked as a construction worker on the World Cup Construction Venture during his time in Qatar from 2015-2019, and specifically on the construction of roads for the Al Wakrah Stadium. Defendants participated in and knowingly benefitted from the World Cup Construction Venture which exploited his labor. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel scared and nervous, but he felt he had no choice but to comply. He was deceived about his contract duration, as he had signed a two-year contract in the Philippines but was forced to sign a five-year contract upon arrival in Qatar. He was forced to work through exhaustion, with workdays beginning at 4:00 AM to prepare for a 4:45 AM bus to reach the worksite by 6:00 AM. He routinely worked until 6:00 PM, and when required to work overtime, until 10:00 PM, arriving back

101

at his accommodation at 11:45 PM. He sometimes worked for 24 hours straight to complete urgent tasks. He was not compensated for much of his overtime work. He was forced to live in crowded and inhumane living conditions, with four workers crammed into small, unclean rooms infested with bedbugs. He was moved between accommodations three times, each with similarly poor conditions. The food provided was unsanitary, poorly cooked, often smelly, and repetitive. When his employment was terminated, he was forced to remain in Qatar for three months without work or pay before finally being allowed to return to the Philippines and received only partial end-of-tenure benefits.

174.    To the extent any of Plaintiffs' claims would otherwise be untimely, the wrongful conduct of Defendants and other Venture participants prevented Plaintiffs from asserting those claims in a timely manner.  While they were in Qatar, the removal of their passports, as well as the Qatar regime's support for the trafficking and labor abuses suffered by migrant workers, made it impossible for Plaintiffs to vindicate their legal rights. After they returned to the Philippines, Plaintiffs could not reasonably have identified that Defendants were liable for their injuries, including because Defendants concealed their knowledge of, and profit from, the human trafficking that formed the backbone of the World Cup Construction Venture.

**COUNT 1**
**TRAFFICKED AND FORCED LABOR**
**TVPRA, 18 U.S.C. §§ 1589, 1590, and 1595**

175.    Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully set forth herein.

176. The World Cup Construction Venture engaged in trafficked and forced labor.

177. Defendants' construction ventures obtained Plaintiffs' and others' labor by means of abuse and/or threatened abuse of law or legal process by misrepresenting the terms and conditions of their employment in Qatar, confiscating Plaintiffs' passports, telling Plaintiffs they could not leave and must endure the conditions imposed upon them, imposing debt bondage by requiring Plaintiffs to pay for their own "recruitment fee" or telling Plaintiffs they would be responsible for the cost of returning to the Philippines, denying Plaintiffs permission to return home unless they paid sums they could not afford, and/or threatening legal prosecutions.

178. Defendants' construction ventures obtained the labor of Plaintiffs and others by means of a scheme, plan, or pattern of acts intended to cause Plaintiffs to believe that if they did not work they would be subjected to serious harm, including but not limited to, by confiscating Plaintiffs' passports, imposing debt bondage by requiring Plaintiffs to pay for their own "recruitment fee" or telling Plaintiffs they would be responsible for the cost of returning to the Philippines, denying Plaintiffs permission to return home unless they paid sums they could not afford, and/or threatening legal prosecutions.

179. Plaintiffs were forced, by Plaintiffs' direct employers who were venture partners with Defendants, to work in extreme and dangerous conditions, many hours more than they would have otherwise, and for lengths of time they otherwise would not have, and to live in inhumane, unsafe, and unhealthy conditions, due to the fact that they

103

were not in possession of their passports and were made to believe they had no other choice.

180.    Defendants' venture partners, including but not limited to Plaintiffs' direct employers, lied to Plaintiffs about the conditions Plaintiffs would live in and the terms of Plaintiffs' working conditions and compensation, and this fraud caused Plaintiffs to agree to go to Qatar and be lured into conditions of forced labor for the benefit of the World Cup Construction Venture.

181.    Each Plaintiff worked for the World Cup Construction Venture by providing construction labor for one or more of the projects included therein, such as one or more of Al Thumama Stadium, Al Wakrah Stadium, Khalifa Stadium, Al Rayyan Stadium, and/or Lusail Stadium, and related infrastructure.

182.    Each Plaintiff was subjected to abusive practices by his employer(s) (who each were participants with Defendants in the World Cup Construction Venture), including by having his passport confiscated, not being able to leave Qatar and/or change employers in Qatar, being forced to work inhumane hours, being forced to live and work in unsafe and unsanitary conditions, and/or being underpaid or denied or delayed payments.

183.    Plaintiffs were therefore victims of trafficked and forced labor under 18 U.S.C. § 1589 and 18 U.S.C. § 1590, triggering Defendants' liability under U.S.C. § 1589 and 18 U.S.C. § 1595.

184.    Defendants participated in the World Cup Construction Venture.  Indeed, Defendants signed a contract to oversee and manage construction of all the facilities and

infrastructure for the World Cup, including but not limited to Al Thumama Stadium, Al Wakrah Stadium, Khalifa Stadium, Al Rayyan Stadium, and Lusail Stadium.

185.    Defendants knew or should have known, or recklessly disregarded that, the World Cup Construction Venture engaged in trafficked and forced labor in light of the prevalence of Qatar's *kafala* system; the norms of the construction industry in Qatar; public reporting, government reports, and non-profit reports; notices provided directly to Defendants; Defendants' internal processes and procedures; Google and Wikipedia; Defendants' role as overseer and manager (with rights to, and contractual responsibilities for, inspecting, auditing, and overseeing employment practices); Qatar Foundation's role; Defendants' due diligence; Defendants' corporate security and intelligence functions; Defendants' artificial intelligence technology; Defendants' interactions with other Venture participants; and via Defendants' agents and employees in Qatar and in the Philippines.

186.    Defendants knowingly benefitted in the United States from their participation in the World Cup Construction Venture.  They received, at a minimum, $5 million dollars each year they participated in the Venture, and likely much more. Defendants profited thereby.

187.    Defendants are therefore liable to Plaintiffs for damages and attorneys' fees under 18 U.S.C. § 1595(a).

### COUNT 2
### RESTITUTION
### TVPRA, 18 U.S.C. § 1593

188.    Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully set forth herein.

105

189.    Plaintiffs are victims of Defendants' offenses under the TVPRA.

190.    Plaintiffs are therefore entitled to the greater of the full amount of the gross income or value to Defendants of Plaintiffs' labor or the value of Plaintiffs' labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act.

## VI.    JURY TRIAL

191.    Plaintiffs demand trial by jury on all issues so triable.

## VII.    PRAYER FOR RELIEF

192.    WHEREFORE, Plaintiffs pray this Court will enter an Order:

(a)    Entering judgment in favor of Plaintiffs on all counts of the Complaint;

(b)    Awarding each of the Plaintiffs monetary damages, subject to proof and in an amount to be determined at trial, including but not limited to restitution, fees and costs paid, debts incurred, and wages promised but not paid;

(c)    Awarding each of the Plaintiffs consequential damages;

(d)    Awarding each of the Plaintiffs damages for mental anguish and pain and suffering Plaintiffs experienced as a result of being forced to labor against their will, in inhumane conditions, and at risk of injury and death;

(e)    Awarding each of the Plaintiffs punitive and exemplary damages for their federal-law claims;

(f)    Awarding Plaintiffs any and all other damages allowed by law

according to proof to be determined at trial;

(g)    Awarding Plaintiffs reasonable attorneys' fees and costs; and

(h)    Granting such other relief as the Court deems just and equitable.


Respectfully submitted this 20th day of April, 2026,

/s/ Eli J. Kay-Oliphant
Eli J. Kay-Oliphant
eli.kay-oliphant@sparacinopllc.com
Ryan R. Sparacino
ryan.sparacino@sparacinopllc.com
Matthew J. Fisher
matt.fisher@sparacinopllc.com
Sparacino PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530

Sean Grimsley, Atty. Reg. #36422
sgrimsley@olsongrimsley.com
Jason Murray, Atty. Reg. #43652
jmurray@olsongrimsley.com
Eric Olson, Atty Reg. #36414
eolson@olsongrimsley.com
Samara Hoose, Atty Reg. #57375
shoose@olsongrimsley.com
Meredith Wheeler, Atty Reg. #56352
mwheeler@olsongrimsley.com
Olson Grimsley Kawanabe Hinchcliff & Murray LLC
700 17th Street, Suite 1600
Denver, CO 80202
Tel: (303) 535-9151

Counsel for Plaintiffs