**UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO**

AL.B., AM.P., AN.P., AR.A., B.L., B.T., E.G.,
ER.M., F.M., J.L., J.O., J.S., J.T., JA.A.,
JE.T., JI.T., JO.B., L.N., M.S., ROG.E.,
ROL.P., R.D., R.I., R.P., V.B., and W.B.,

                       Plaintiffs,

      v.

JACOBS SOLUTIONS INC., JACOBS
ENGINEERING GROUP INC., CH2M HILL
COMPANIES, LTD., CH2M HILL
INTERNATIONAL, LTD., and CH2M HILL
INTERNATIONAL B.V.,

                       Defendants.

Case No. 1:25-cv-03067-RMR-CYC

**ORAL ARGUMENT REQUESTED**

**<u>DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT</u>**

Habib Nasrullah
Frederick R. Yarger
Danyaal Waheed
WHEELER TRIGG O'DONNELL LLP
370 17th Street
Suite 4500
Denver, CO 80202-5647
303-244-1800

Maura Kathleen Monaghan
Mark W. Friedman
William H. Taft V
James P. Schaefer
Justin R. Rassi
Lisa W. Lachowicz
Ardis Strong
Alessandra G. Masciandaro
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
212-909-6000
*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 4

NAMED DEFENDANTS ............................................................................................. 9

ARGUMENT ............................................................................................................. 10

    I.    PLAINTIFFS LACK ARTICLE III STANDING ................................................. 10

        A.    Plaintiffs' Alleged Injuries Were Caused by the Independent Actions of Third Parties Not Before This Court ...................................... 11

        B.    The Highway Plaintiffs Independently Lack Standing ........................... 12

        C.    Plaintiffs' Alleged Venture Liability Theory Is Incompatible with Article III ............................................................................................. 14

    II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE TVPRA ...................... 16

        A.    Plaintiffs Seek an Impermissibly Extraterritorial Application of the TVPRA ................................................................................................. 16

            1.    The TVPRA's Private Right of Action Does Not Apply Extraterritorially ............................................................................... 16

            2.    Plaintiffs Do Not Seek a Domestic Application of Section 1595 ................................................................................................ 22

        B.    Plaintiffs Fail to Plead the Elements of a TVPRA Claim ....................... 25

            1.    Plaintiffs Do Not Plead a Predicate TVPRA Violation Under Sections 1589 or 1590 ................................................................... 25

            2.    Plaintiffs Do Not Plead "Participation in a Venture" ....................... 27

                a.    Plaintiffs Have Not Alleged a "Venture" ................................ 27

                 b.    Plaintiffs Have Not Alleged Defendants' "Participation" in Any Venture .......................................................................... 32

i

3.      Plaintiffs Do Not Plead Defendants' Knowledge of TVPRA
Violations....................................................................... 36

4.      Plaintiffs Do Not Plead a Knowing Benefit Received by
Defendants.................................................................. 40

C.   Plaintiffs Cannot Assert a Claim Under Section 1593 .......................... 42

III.    THE COURT LACKS PERSONAL JURISDICTION OVER THE
JACOBS ENTITIES AND CHBV ............................................................ 43

A.   The Court Lacks General Jurisdiction over the Non-Colorado
Defendants................................................................... 44

B.   The Court Lacks Specific Jurisdiction over the Non-Colorado
Defendants................................................................... 45

CONCLUSION ....................................................................... 49

## TABLE OF AUTHORITIES

**Cases**

*A.A. v. Omnicom Grp., Inc.*, No. 25-CV-3389, 2026 WL 504904 (S.D.N.Y.
Feb. 24, 2026).................................................................................. 36

*A.D. v. Choice Hotels Int'l, Inc.*, 2023 WL 3004547 (M.D. Fla. Apr. 19,
2023)................................................................................................ 33

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412 (2023)................................ 24

*Aguero v. Esnoz*, 2024 WL 519.786 (E.D. Cal. Feb. 9, 2024)...................................... 38

*Al.C. v. Jacobs Sols. Inc.*, No. 1:25-CV-00274-CYC-RMR, 2026 WL
860434 (D. Colo. Mar. 30, 2026) ........................................... 2, 29, 35, 49

*Al.C. v. Jacobs Sols. Inc.*, No. 25-CV-00274-RMR-CYC, 2026 WL
1150278 (D. Colo. Feb. 17, 2026), *report and recommendation
adopted in part, rejected in part sub nom.*, *Al.C. v. Jacobs Sols. Inc.*,
2026 WL 860434 (D. Colo. Mar. 30, 2026) ....................................... 48, 49

*Allen v. Wright*, 468 U.S. 737 (1984)......................................................... 11, 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................. 26

*Bennett v. Spear*, 520 U.S. 154 (1997) ....................................................... 11

*Benton v. Cameco Corp.*, 375 F.3d 1070 (10th Cir. 2004) .................................... 47

*Birse v. CenturyLink, Inc.*, 2019 WL 9467530 (D. Colo. Oct. 23, 2019)........................ 6

*Bistline v. Parker*, 918 F.3d 849 (10th Cir. 2019) ....................................*passim*

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255 (2017) ........................ 47

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)........................................... 12

*Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264 (10th Cir. 2023) ........................... 6

*Coppinger v. Schantag*, 2006 WL 38946 (D. Md. Jan. 5, 2006) ................................. 1

*Coubaly v. Cargill Inc.*, 144 F.4th 343 (D.C. Cir. 2025) ...................................... 11, 29

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) ................................................. 44

*Dental Dynamics, LLC v. Jolly Dental Grp.*, 946 F.3d 1223 (10th Cir. 2020)................. 45

*Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021) ................................. 28, 34

*Doe 1 v. Apple Inc.*, 96 F.4th at 409-12......................................................... 15, 28, 35

*Doe 4 v. Red Roof Inns, Inc.*, 2020 WL 1872336 (N.D. Ga. Apr. 13, 2020),
     *aff'd sub nom. Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir.
     2021)................................................................................................................. 39

*Doe I v. Apple Inc.*, 2021 WL 5774224 (D.D.C. Nov. 2, 2021), *aff'd*, 96
     F.4th 403 (D.C. Cir. 2024)....................................................................*passim*

*Doe v. MG Freesites, Ltd*, 2024 WL 5339485 (N.D. Ala. Dec. 19, 2024) ...................... 17

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063 (10th Cir.
     2008)................................................................................................................. 43

*F.C. v. Jacobs Sols. Inc.* 790 F. Supp. 3d 1158 (D. Colo. 2025) ..........................*passim*

*First Horizon Merch. Servs., Inc. v. Wellspring Cap. Mgmt., LLC*, 166 P.3d
     166 (Colo. App. 2007)....................................................................................... 48

*Fleites v. MindGeek S.A.R.L.*, 801 F. Supp. 3d 1011 (C.D. Cal. 2025) ........................ 34

*Frontier Station, Inc. v. Kloiber Real Est. Holdings, LLC*, 2019 WL
     4643683 (D. Colo. Aug. 12, 2019) ........................................................................ 46

*Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025)................................................. 48, 49

*G.G. v. Salesforce.com, Inc.*, 76 F.4th 544 (7th Cir. 2023).................................... 33, 41

*Gabbidon v. Wilson*, 2023 WL 2520732 (S.D.W. Va. Mar. 14, 2023).......................... 42

*GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381 (10th
     Cir. 1997) ............................................................................................................ 4

*Gilbert v. U.S. Olympic Comm.*, 2019 WL 1058194 (D. Colo. Mar. 6, 2019) ................ 27

*Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112 (D. Colo. 2019)....................... 27

*Gilbert v. USA Taekwondo, Inc.*, 2020 WL 2800748 (D. Colo. May 29,
     2020).................................................................................................................. 41

*Griffith v. SSC Pueblo Belmont Operating Co.*, 381 P.3d 308 (Colo. 2016) ................ 48

iv

*Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217 (10th Cir. 2008) ...................... 11

*Hood v. Am. Auto Care, LLC*, 21 F.4th 1216 (10th Cir. 2021) ................................ 43, 44

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) ....................................................... 43

*IT Portfolio, Inc. v. NER Data Corp.*, 2018 WL 3055767 (D. Colo. May 17,
2018) ........................................................................................................................... 46

*J.L. v. Best W. Int'l, Inc.*, 521 F. Supp. 3d 1048 (D. Colo. 2021) ................................... 38

*Jesner v. Arab Bank, PLC*, 584 U.S. 241 (2018) ................................................. 21, 22, 42

*Jobe v. BNSF Ry. Co.*, 2024 WL 474405 (D. Colo. Jan. 30, 2024) *R&R
adopted*, 2024 WL 982667 (D. Colo. Feb. 16, 2024) ............................................... 47

*Kasting v. Am. Fam. Mut. Ins. Co.*, 196 F.R.D. 595 (D. Kan. 2000) ............................... 1

*KBR, Inc. v. United States ex rel. Carter*, 575 U.S. 650 (2015) ..................................... 20

*Kennedy v. Mountainside Pizza, Inc.*, 2020 WL 4454897 (D. Colo. May 14,
2020) *R&R adopted*, 2020 WL 4448771 (D. Colo. Aug. 3, 2020) ........................... 47

*Kiobel v. Royal Dutch Petrol. Co.*, 569 U.S. 108 (2013) ................................................ 24

*L.H. v. Marriott Int'l, Inc.*, 604 F. Supp. 3d 1346 (S.D. Fla. 2022) ................................ 29

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ....................................................... 10, 15

*Lun v. Milwaukee Elec. Tool Corp.*, 2025 WL 3443536 (E.D. Wis. Dec. 1,
2025) ..................................................................................................................... 17, 23

*Lundstrom v. Choice Hotels Int'l, Inc.*, 2021 WL 5579117 (D. Colo. Nov.
30, 2021) ..................................................................................................................... 37

*Macias v. Monterrey Concrete LLC*, 2020 WL 5638710 (E.D. Va. Sept. 21,
2020) ........................................................................................................................... 25

*Melea, Ltd. v. Jawer SA*, 511 F.3d 1060 (10th Cir. 2007) ....................................... 43, 46

*Mia v. Kimberly-Clark Corp.*, 2025 WL 752564 (D.D.C. Mar. 10, 2025) ..... 17, 19, 37, 39

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) .......................................... 20

*Murthy v. Missouri*, 603 U.S. 43 (2024) ........................................................... 10, 11, 13

v

*Nestlé USA Inc. v. Doe*, 593 U.S. 628 (2021) ................................................................ 25

*Nova Health Sys. v. Gandy*, 416 F.3d 1149 (10th Cir. 2005) ........................................ 11

*Owino v. CoreCivic, Inc.*, 2018 WL 2193644 (S.D. Cal. May 14, 2018)........................ 42

*Pavlovich v. Gaiman*, 2025 WL 2819372 (W.D. Wisc. Oct. 3, 2025)............................ 18

*Ratha v. Phatthana Seafood Co.,* 35 F.4th 1159 (9th Cir. 2022)................................. 37

*Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017) .................................................... 27, 33

*Riggs v. Hull*, 2016 WL 742923 (W.D. Ky. Feb. 23, 2016) ........................................... 42

*RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325 (2016)................................*passim*

*Roe v. Howard* 917 F.3d 229 (4th Cir. 2019).................................................................. 19

*Roman v. Tyco Simplex Grinnell*, 2017 WL 2427251 (M.D. Fla. June 5,
2017)......................................................................................................................... 26

*S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147 (E.D.N.Y. 2020) .................... 37, 38

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) ....................................... 11, 15

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ........................................................... 18

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ............................................................... 14

*Toretto v. Donnelley Fin. Sols., Inc.*, 523 F. Supp. 3d 464 (S.D.N.Y. 2021) ................. 13

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021).................................................. 14, 15

*Twitter Inc. v. Taamneh*, 598 U.S. 471 (2023)........................................................ 14, 15

*United States ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162
(D. Md. 2019)............................................................................................................ 42

*United States v. Collins*, 859 F.3d 1207 (10th Cir. 2017) ............................................ 20

*United States v. Jicarilla Apache Nation*, 564 U.S. 162 (2011) ................................... 27

*United States v. Martinez*, 812 F.3d 1200 (10th Cir. 2015) ......................................... 42

*Walden v. Fiore*, 571 U.S. 277 (2014)........................................................................... 47

*Warth v. Seldin*, 422 U.S. 490 (1975)........................................................................... 11

*WildEarth Guardians v. Extraction Oil & Gas, Inc.*, 457 F. Supp. 3d 936 (D. Colo. 2020) ................................................................................................ 26

*Williams v. Sisolak,* 2022 WL 2819842 (D. Nev. July 18, 2022) .................................... 12

**Statutes**

18 U.S.C. § 1585 ...................................................................................... 18, 19

18 U.S.C. § 1589 ............................................................ 25, 26, 27, 36 38

18 U.S.C. § 1590 ..................................................................... 25, 26, 36

18 U.S.C. § 1592 ........................................................................................ 27

18 U.S.C. § 1593 ........................................................................................ 42

18 U.S.C. § 1595 .............................................................. 17, 18, 25, 36

18 U.S.C. § 1596 ........................................................................ 20, 21, 22

18 U.S.C. § 3271 ........................................................................................ 20

18 U.S.C. §§ 3664 ...................................................................................... 42

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Ch. 96 ............................................................................................. 18, 23

Trafficking Victims Protection Reauthorization Act ("TVPRA"), Pub. L. No. 108–193, 117 Stat. 2875 (2003) ....................................................... *passim*

**Other Authorities**

154 Cong. Rec. S10388-03, 2008 WL 4425748 (Oct. 1, 2008) ................................... 21

154 Cong. Rec. S10936-01, 2008 WL 5191148 (Dec. 11, 2008) ................................ 21

*Black's Law Dictionary* 1591 (8th ed. 2004) ................................................. 28

Fed. R. Civ. P. 9(b) .................................................................................. 26

## PRELIMINARY STATEMENT

This is the third in a series of actions in this District arising from the same underlying allegations. Each is brought by Filipino plaintiffs seeking to impose liability on U.S. and Dutch companies for alleged forced labor committed in Qatar by foreign third parties during stadium construction for the 2022 FIFA World Cup. Each is brought under Section 1595 of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), which has no extraterritorial reach. And each suffers from the same threshold defects.

This third case presents those defects in their starkest form. Plaintiffs' theory of liability hinges on a single alleged relationship: a Programme Management Consultant contract ("PMC Contract") ███████████████████████████ ███████████████████████████████████████ Plaintiffs contend that this contract placed Defendants at the center of World Cup stadium construction. But with just one exception (Plaintiff V.B.), Plaintiffs admit they never worked on World Cup stadium construction. Instead, ***25 of 26 Plaintiffs*** allege they worked on road infrastructure projects performed by independent contractors retained by a different Qatari government entity—Ashghal, Qatar's Public Works Authority (the "Highway Plaintiffs").[1] The First Amended Complaint ("FAC") does not allege any contractual,

---

[1] On January 29, 2026, Plaintiffs' counsel informed Defendants that Plaintiff R.I. has been deceased since September 2025. Plaintiffs' counsel therefore lacked authority to submit an amended complaint on his behalf on April 20, 2026. *Kasting v. Am. Fam. Mut. Ins. Co.*, 196 F.R.D. 595, 597–98 (D. Kan. 2000) (affirming ruling that "counsel for the deceased plaintiff[] lacked authority to file motions on behalf of the plaintiff or to seek relief from the court on behalf of plaintiff after plaintiff's death"); *Coppinger v. Schantag*, 2006 WL 38946, at *1 (D. Md. Jan. 5, 2006) ("counsel's authority to act on

1

operational, or supervisory relationship between Defendants and Ashghal or those road projects.

The Court's recent decision in the second case addressed materially similar allegations and identified the same defect:  the absence of any plausible connection between Defendants and the road infrastructure projects performed by contractors of Ashghal.  *Al.C. v. Jacobs Sols. Inc.*, No. 1:25-CV-00274-CYC-RMR, 2026 WL 860434, at *3-4 (D. Colo. Mar. 30, 2026).  Plaintiffs here were on notice of that deficiency and moved to amend.  The FAC fails to cure it.

Instead, Plaintiffs attempt to avoid the problem by redefining the alleged "venture." The FAC now abandons any meaningful connection to World Cup stadium construction and expands the "venture" to encompass broad categories of infrastructure and public works across Qatar in the decade leading up to the World Cup.  That does not cure the defect.  It expands it.  An incoherent venture without discernible limits is not cognizable under the TVPRA.

Moreover, the FAC still does not plausibly allege "participation."  Plaintiffs rely on generalized assertions that "CH2M" coordinated or monitored unspecified "infrastructure projects"  and  could  consult  with  the  Supreme  Committee  to  make  nonbinding

---

behalf of a client ceases if the client dies").  Accordingly, Plaintiff R.I.'s claims should be dismissed.

Separately, Plaintiff G.A.'s claims should be dismissed with prejudice. Plaintiffs have removed all allegations concerning G.A. from the FAC and struck him from the caption. Plaintiffs' counsel further represented that G.A. likely does not intend to proceed, but could not confirm before this motion was filed.

2

recommendations to other Qatari government agencies.  No contractual privity is alleged between the Defendants, the Supreme Committee, and Ashghal or Habtoor.  The chain of privity the Court found sufficient—Defendants to the Supreme Committee to its subcontractors—breaks when applied to the Highway Plaintiffs.  The FAC also does not allege that any Defendant performed tailored services for, exercised control over, or had any involvement in the specific road projects on which the Highway Plaintiffs allegedly worked.

In addition, the FAC does not tie any Defendant to any particular Plaintiff, any particular road project, or any alleged act of forced labor.  That omission, too, remains uncorrected.

These defects are dispositive.  No venture.  No participation.  And no standing. For the Highway Plaintiffs, the alleged causal chain—Defendants to the Supreme Committee, to independent sovereign entity Ashghal, to Habtoor, to the Highway Plaintiffs—is precisely the kind of attenuated, speculative theory Article III forbids.  For remaining Plaintiff V.B., the FAC likewise fails to plausibly allege a causal connection between any Defendant's conduct and his alleged injuries.

And even if the Highway Plaintiffs had pleaded a highway-based venture with the requisite specificity, all the Plaintiffs' claims would still fail for additional, independent reasons.  Plaintiffs seek an impermissibly extraterritorial application of the TVPRA.  They do not plausibly allege the elements of a TVPRA claim.  And this Court lacks personal jurisdiction over the three non-Colorado Defendants.

For all of these reasons, the First Amended Complaint should be dismissed with

3

prejudice.

## **STATEMENT OF FACTS**

According to the FAC, Qatar "constructed several state-of-the-art stadiums," including the Al Rayyan, Lusail, Al Khalifa, Al Wakrah, and Al Thumama Stadiums for the 2022 World Cup (the "Stadiums"). FAC ¶¶ 1, 148-73, 181. Qatar assigned the Supreme Committee responsibility for delivering these Stadiums. *Id.* ¶ 56. The Supreme Committee engaged contractors, who in turn retained subcontractors to perform the Stadium construction work. *Id.* ¶¶ 58, 61(b). And the subcontractors then hired thousands of migrant construction workers—including Plaintiff V.B.—who allege they were recruited in their home countries by unidentified persons and forced to labor by their employers in Qatar. *Id.* ¶¶ 5, 172.

The FAC's allegations against Defendants still depend on the February 8, 2012, PMC Contract

[2]

---

[2]  The FAC repeatedly relies on and purports to characterize the PMC Contract, and their "venture" theory hinges on CHBV's contractual role in World Cup stadium construction. *See, e.g.*, FAC ¶¶ 22, 57, 62, 120, 184. The Contract is therefore properly considered at the Rule 12(b)(6) stage as a document incorporated by reference and integral to the Complaint—particularly where Plaintiffs' counsel have received it from Defendants pursuant to the terms of a Protective Order in *F.C. v. Jacobs* and subsequently referred to the PMC Contract in oral argument and written submissions to the court in that matter. Movant's Appx., p. 35, 38 – *F.C.* Joint Discovery Submission; Movant's Appx., p. 61:7-25, 76:4-19 – Transcript of *F.C.* Discovery Conference; *see, e.g.*, *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (courts may consider an "indisputably authentic copy" of a document if the "document is referred to in the complaint and is central to the plaintiff's claim"). At this stage, the PMC Contract's text provides the context necessary for evaluating the sufficiency of Plaintiffs' pleadings, and nothing more. Should the Court conclude the Highway Plaintiffs have stated a claim, any

Plaintiffs allege that, under the PMC Contract, CHBV was engaged to "oversee and manage delivery of the World Cup Construction Venture." FAC ¶ 57.

The contract has not changed, and yet by expanding the alleged scope of the World Cup Venture, Plaintiffs contrive to vastly expand CHBV's engagement.

The FAC asserts in general terms that "CH2M"[3] was hired by the Supreme Committee to oversee, manage, and control all those involved in World Cup stadium construction, including (paradoxically) its own client, the Supreme Committee, and all of the Supreme Committee's contractors and subcontractors. FAC ¶ 116 (CH2M "had the right to assign tasks to other venture participants in the World Cup Construction Venture, and [was] able to control the means and details by which the other Venture participants . . . performed their work."). The FAC also asserts that Defendants supported CHBV's work under the PMC Contract from overseas, and benefitted financially from the Stadiums being built "more quickly and cheaply than would have been possible without Plaintiffs' forced labor." *Id.* ¶¶ 144-46.

---

assessment of whether the disputed facts establish—or negate—TVPRA elements would be premature without discovery. Under these circumstances, this motion should not be converted into a motion for summary judgment.

[3] Plaintiffs define "CH2M" to include all three CH2M entities and fail to allege which CH2M entity, if any, was allegedly hired as a "Programme Management Consultant" by, or contracted with, the Supreme Committee. FAC ¶¶ 4, 22. CH2M was acquired by Jacobs Engineering Group Inc. in 2017. *Id.* ¶ 19.

At the same time, the FAC does not allege that Defendants built the Stadiums, performed construction work, hired contractors or subcontractors, employed any workers, or ever interacted with Plaintiffs even once.  Nor does it identify any act by any Defendant directing, encouraging, or facilitating the alleged harms perpetrated by contractors, subcontractors, recruiters, or labor supply companies.  Nor does the FAC plausibly allege that the Defendants shared any profits or risks with stadium construction subcontractors or other supposed "venture" participants, or that Defendants had an incentive to keep labor costs low.  And Plaintiffs cannot identify any specific action or inaction by any Defendant that caused or contributed to their alleged injuries.

Instead, when describing the work Defendants performed, the FAC's allegations confirm that—far from engaging in trafficking—Defendants sought to promote worker safety and deter improper labor practices within their scope of responsibility.  Perversely, the FAC points to Defendants' alleged advice to the Supreme Committee on how "to improve standards for employment, safety, and worker accommodations" to justify holding Defendants responsible for the alleged mistreatment of workers by third parties.  *Id.* ¶ 119; *see also* Movant's Appx., p. 15-16 –  ESPN Article (cited at FAC ¶¶ 118, 122).[4]

Although the FAC focuses heavily on stadium construction, only one of the 26 Plaintiffs alleges that he worked on a stadium project.  FAC ¶ 172.

---

[4]   In addition to the factual allegations in the FAC, the Court may consider documents the FAC "references," *Birse v. CenturyLink, Inc.*, 2019 WL 9467530, at *4 (D. Colo. Oct. 23, 2019), and also indisputably authentic documents that are "central to the complaint." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023). Copies of such documents are attached to the accompanying Declaration of Justin R. Rassi. Movant's Appx., p. 9 – Declaration of Justin R. Rassi.

6

The remaining 25 Highway Plaintiffs allege only that they worked on road infrastructure projects.  According to the FAC, the Highway Plaintiffs were employed by Habtoor, which was a contractor allegedly retained by Ashghal to deliver road infrastructure.  FAC ¶ 62.  The FAC does not allege that either Defendants or the Supreme Committee employed the Highway Plaintiffs, contracted with Habtoor, or contracted with Ashghal.

In fact, the FAC makes scant reference to Habtoor and Ashghal at all.  The FAC mentions Habtoor just twice outside of the unamended Plaintiff-specific paragraphs:  once in the conclusory list of purported venture participants and once in the assertion that "Ashghal and other agencies"—the FAC does not say precisely who—hired Habtoor. FAC ¶¶ 34, 62.  Ashghal is mentioned only four times, with no factual detail about how it operated or what work it allegedly performed.  FAC ¶¶ 34, 56, 62.  And the FAC describes the "diverse and wide-ranging" roadworks in extraordinarily vague terms, referencing "substantial road, highways, expressway, and highway projects," including "major expressways, ring roads, and highways throughout the area of Qatar."  FAC ¶¶ 56, 57 n.2.

The one thing the FAC does make clear is that Ashghal—not the Supreme Committee and not any Defendant—was allegedly responsible for delivering the road infrastructure project(s) on which the Highway Plaintiffs allegedly worked.  FAC ¶¶ 56, 62. Plaintiffs attempt to muddy that distinction by alleging that the Supreme Committee was responsible for "coordinating and monitoring" all infrastructure "related" to the World Cup. FAC ¶ 56.  In turn, the FAC alleges CHBV was "paid to act on the Supreme Committee's behalf" under the PMC Contract to perform unspecified "coordination and monitoring

7

functions" and "work with the Supreme Committee to recommend corrective action" for infrastructure projects that other Qatari government agencies had the responsibility to deliver.  FAC ¶¶ 22, 57, 62.  But those new allegations are both generalized and untethered to any specific road project, action, Highway Plaintiff, or Defendant.



The FAC contains no specific allegations that the Supreme Committee or any Defendant in fact monitored or provided particular coordination functions, assurance or support to the road infrastructure projects, that any specific recommendations were made to Ashghal, or whether Ashghal responded to or ignored any such recommendations.

With respect to all Plaintiffs, the FAC contains virtually no specific factual allegations supporting Plaintiffs' claims that they were trafficked to Qatar and forced to labor.  The FAC relies on the same (unaltered) boilerplate paragraphs that hardly vary from plaintiff-to-plaintiff and devotes almost no space to *these specific Plaintiffs'* experiences in Qatar.  FAC ¶¶ 148-73.  Plaintiffs for the most part do not identify the

8

specific individuals or entities who allegedly recruited them, misrepresented employment terms, or committed other alleged acts of coercion.  The FAC provides no explanation for Plaintiffs' failure to allege even the most basic facts about *their own experiences*.

Instead, the FAC relies on generalized public reports concerning labor conditions in Qatar and the *kafala* labor law system, much of which is about the experiences of *different* migrant laborers from *different* countries, working on *different* projects.  For example, the FAC relies heavily on allegations about workers who are "like Plaintiffs," but are not actually plaintiffs in this litigation, *see, e.g.*, *id.* ¶¶ 4, 66, 79, 85-86, 89, 91, 94, 98, 103-04, and features video stills of *other* migrant workers, *id.* ¶ 77.  To sensationalize their claims, Plaintiffs name-check terrorist groups like "al-Qaeda and ISIS," who are not alleged to have any connection to the Plaintiffs, the Defendants, or the construction of the Stadiums.  *Id.* ¶¶ 105-111.

The FAC likewise attempts to use these generic news reports and related Google and Wikipedia pages to infer that Defendants knew or should have known that these specific Plaintiffs were in fact forced to labor on specific construction sites.  *Id.* ¶¶ 79-84. But the FAC nowhere specifically alleges that Defendants were notified of, or otherwise aware of, any specific instance of forced labor during construction of the Stadiums or the unspecified roadways, much less any instance involving these Plaintiffs.

## **NAMED DEFENDANTS**

Plaintiffs name as Defendants CHBV, CH2M HILL Companies, Ltd., CH2M HILL International, Ltd., Jacobs Engineering Group Inc. ("Jacobs Engineering"), and Jacobs Solutions Inc. ("Jacobs Solutions").  Of these five companies, only CH2M HILL

Companies, Ltd., and CH2M HILL International, Ltd., are headquartered in Colorado. FAC ¶ 12. CHBV is incorporated in the Netherlands. *Id.* Plaintiffs allege that Jacobs Engineering acquired CH2M in 2017, *id.* ¶ 19, after some Plaintiffs' work tenures concluded, *id.* ¶¶ 157, 172. Both Jacobs entities are incorporated in Delaware and headquartered in Texas, and Jacobs Solutions was incorporated ***after*** Plaintiffs completed their work, *id.* ¶ 13, on March 4, 2022, Movant's Appx., p. 19 – Jacobs Solutions Entity Details.

## ARGUMENT

### I.     PLAINTIFFS LACK ARTICLE III STANDING

Plaintiffs lack Article III standing because their alleged injuries are not fairly traceable to these Defendants. That defect is most pronounced for the 25 Highway Plaintiffs, whose claims depend entirely on the independent actions of Ashghal and Habtoor, entities with no alleged relationship to Defendants. But it applies to all Plaintiffs. The FAC itself attributes Plaintiffs' alleged injuries to independent third parties not before this Court, many of whom are unidentified and none of whom are alleged to be controlled by Defendants.

Article III requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up); *see Murthy v. Missouri*, 603 U.S. 43, 57 (2024) ("[I]t is a bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the

10

court." (internal quotation marks omitted)). That requirement is not satisfied where liability depends on "speculative inferences" about how independent actors might have behaved. *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156-57 (10th Cir. 2005) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45 (1976)); *see also Allen v. Wright*, 468 U.S. 737, 759 (1984) (plaintiffs lacked standing where the "links in the chain of causation" involved "numerous third parties" and their "independent decisions"); *cf. Coubaly v. Cargill Inc.*, 144 F.4th 343, 348-50 (D.C. Cir. 2025) (plaintiffs failed to demonstrate traceability for TVPRA claim where there was no plausible direct line from defendants' actions to plaintiffs' injuries).

### A.    Plaintiffs' Alleged Injuries Were Caused by the Independent Actions of Third Parties Not Before This Court

Plaintiffs' alleged injuries stem entirely from the conduct of foreign third parties, not Defendants. The FAC identifies those categories of alleged bad actors: subcontractors, recruiters, labor supply companies, and others, many unnamed. But the FAC does not allege that Defendants directly caused Plaintiffs' injuries. Because one or more third parties were "the direct cause of [the] plaintiff[s'] harm," it is "substantially more difficult" for Plaintiffs to show that "the asserted injury was the consequence of the defendants' actions." *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008) (quoting *Warth v. Seldin*, 422 U.S. 490, 505 (1975)).

Here, where third parties are the alleged "direct cause" of harm, Plaintiffs must allege facts establishing that, "by determinative or coercive effect upon the action of someone else," Defendants indirectly caused the injury that the third parties directly inflicted. *Bennett v. Spear*, 520 U.S. 154, 169 (1997); *see Murthy*, 603 U.S. at 61 (holding

11

that the plaintiff must show "that a particular defendant pressured a particular" third party on a specific subject *and* that third party then injured the plaintiff in response to the particular pressure).   Courts, including in TVPRA cases, are "reluctant to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013); *see also Williams v. Sisolak,* 2022 WL 2819842, at *4 (D. Nev. July 18, 2022) (dismissing TVPRA claim alleging that Nevada facilitated sex-trafficking by legalizing prostitution where the "independent decisions" of numerous third parties significantly impacted plaintiffs' injuries).

The FAC alleges the opposite.  Plaintiffs allege that Defendants **failed to control** the bad actors who worked on Stadium construction and thus supposedly failed to **prevent** Plaintiffs' injuries.  Plaintiffs contend that "Defendants could have prevented or influenced Plaintiffs' inhumane and exploited conditions."  FAC ¶¶ 120-21, 123-28.  That contention confirms the absence of traceability.  On Plaintiffs' own allegations, the same injuries would have occurred regardless of Defendants' conduct or whether CHBV had been engaged as a consultant by the Supreme Committee.

### B.    The Highway Plaintiffs Independently Lack Standing

The Highway Plaintiffs' claims fail for an additional, independent reason:  their theory depends entirely on independent sovereign actors outside any alleged relationship with Defendants.

In *F.C. v. Jacobs Sols. Inc.*, the Court found traceability based on a contractual chain:  plaintiffs' employers were allegedly subcontractors contractually linked to the Supreme Committee, and CHBV allegedly had authority to supervise and manage that

work pursuant to the PMC Contract with the Supreme Committee.  *See* 790 F. Supp. 3d 1158, 1173–74 (D. Colo. 2025).  That alleged contractual nexus supplied the causal link.

That link is absent here.  The Highway Plaintiffs allege they worked for Habtoor, a contractor of Ashghal or possibly "other agencies," not the Supreme Committee.  FAC ¶ 62.  Plaintiffs do not allege any contractual relationship between Defendants and either Ashghal or Habtoor.  They do not allege that Defendants had authority to manage or supervise Ashghal's or Habtoor's work.  And they do not allege that Ashghal or Habtoor were obligated to follow any recommendations.  █████████████████████████

*Toretto*, which the *F.C.* Court relied upon for its standing analysis, underscores the Highway Plaintiffs' lack of standing.  *See F.C.*, 790 F. Supp. 3d at 1173.  There, traceability existed because the defendant had a "direct contractual relationship" with the third party, had "the authority to supervise" the third party, and both the defendant and third party "advertised themselves as partners."  *Toretto v. Donnelley Fin. Sols., Inc.*, 523 F. Supp. 3d 464, 469, 474 (S.D.N.Y. 2021).  None of those features is alleged here.  Without them, there is no basis to attribute the conduct of Ashghal or Habtoor to Defendants.

Instead, Plaintiffs rely on a lengthy chain of speculation:  Defendants may have made nonbinding recommendations to the Supreme Committee; the Supreme Committee might have conveyed them to Ashghal; Ashghal might have acted on them; Ashghal might have directed Habtoor (if it even contracted with Habtoor); and Habtoor employed the Highway Plaintiffs.  That is not traceability.  It is impermissible conjecture.  *See Murthy*, 603 U.S. at 57–58 (expressing disapproval of standing based on "guesswork as to how independent decisionmakers will exercise their judgment").  Accepting Plaintiffs' theory

13

would permit any worker on any infrastructure project in Qatar based on generalized allegations of "coordination."  Article III does not allow that result and the Highway Plaintiffs thus lack standing.

**C.    Plaintiffs' Alleged Venture Liability Theory Is Incompatible with Article III**

Plaintiffs cannot escape the constitutional demands of traceability by alleging a boundless "venture" liability theory under the TVPRA.  As the Supreme Court has explained, it "is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016).  "Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021).

Plaintiffs' standing theory bears no "'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts."  *TransUnion*, 594 U.S. at 424.  While an "exact duplicate" is not required, a standing theory loses its "close relationship" to a historical analog where it lacks an element "essential to liability."  *Id.* at 424, 434 (holding that harm from unpublished inaccurate information does not bear a close relationship to the traditional harm of defamation because publishing is "essential to liability").  Here, every potential historical analog has an essential element ***requiring*** either intent for the wrongful conduct to occur or intent to participate in the wrongful conduct.  *See Twitter Inc. v. Taamneh*, 598 U.S. 471, 489-91 (2023) (aiding and abetting requires "truly culpable conduct" where the defendant "wishes to bring about [the primary

14

violation]" and assists or participates in the primary violation); *id.* at 489-90 (conspiracy requires an "agreement with the primary wrongdoer to commit wrongful acts").

A broad construction of the TVPRA that providing "particularized services" to a venture may constitute "participation in a venture"—without any requirement that the defendant assisted or facilitated the underlying primary violation—is wrong. *F.C.*, 790 F. Supp. 3d at 1188-91. It is also irrelevant to the question of standing in this case given Plaintiffs' failure to plausibly allege that Defendants "participated in a venture" under that standard. *See infra*, § II.B.2. But even if the broad "particularized services" construction were correct, it would fail to satisfy the irreducible constitutional minimum for Article III standing because it lacks the elements from common-law aiding and abetting and similar modes of liability that are "essential to liability." *TransUnion*, 594 U.S. at 424, 434.

To state an aiding and abetting claim, a plaintiff must allege facts establishing that the defendants "knowingly and substantially assisted in the principal violation." *Apple*, 96 F.4th at 411.[5] But Plaintiffs nowhere allege that Defendants encouraged or "substantially

---

[5]    The *Apple* court held that plaintiffs in that case failed to state a TVPRA claim, instead of correctly finding that those plaintiffs also lacked Article III standing. But even the *Apple* court's generous view of the causal connection required under Article III would not save Plaintiffs' claims here because Plaintiffs allege that their injuries are the result of the independent actions of third parties not before the Court. *Compare Doe 1 v. Apple Inc.*, 96 F.4th at 409-12, *with Lujan*, 504 U.S. at 560 (holding that injury should not be "the result of the independent action of some third party not before the court") (cleaned up); *Allen*, 468 U.S. at 759 (holding that plaintiffs failed to show standing where "numerous third parties" made "independent decisions [that] may not collectively have a significant effect" on plaintiffs); and *Simon*, 426 U.S. at 44-45 (holding that respondents failed to show standing where "speculative inferences [were] necessary to connect their injury to the challenged actions" and that "indirectness of injury" made it "substantially more difficult to meet the minimum requirement[s] of Art. III").

assisted" the Employers, recruiters, or others to engage in trafficking or forced labor—the principal violations here. Plaintiffs do not allege that Defendants took actions even to indirectly *harm* them. Instead, they only allege that Defendants should somehow have done more to *help* them, without explaining what else could have been done. The Constitution requires more.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE TVPRA

### A.    Plaintiffs Seek an Impermissibly Extraterritorial Application of the TVPRA

Plaintiffs' TVPRA claims are barred by the presumption against extraterritoriality, which instructs that, "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016). In applying that presumption, the Supreme Court has adopted a two-step framework that asks (1) "whether the presumption against extraterritoriality has been rebutted" and, if not, (2) "whether the case involves a domestic application of the statute." *Id.* at 337. Applied here, Plaintiffs' claims are impermissibly extraterritorial and must be dismissed.

#### 1.    The TVPRA's Private Right of Action Does Not Apply Extraterritorially

The FAC must be dismissed because the TVPRA does not contain "a clear, affirmative indication" that Section 1595's private right of action "applies extraterritorially." *RJR Nabisco*, 579 U.S. at 337.

The private right of action in Section 1595 contains **no indication at all**—much less a clear, affirmative one—that it applies extraterritorially.  On its face, Section 1595 says absolutely nothing about extraterritorial application.  The statute simply provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).  It is thus missing the type of "explicit foreign-oriented language" courts have previously found necessary to rebut the presumption.  *RJR Nabisco*, 579 U.S. at 353 n.12; *Doe I v. Apple Inc.*, 2021 WL 5774224, at *14 (D.D.C. Nov. 2, 2021) (holding that Section 1595 "does nothing to rebut the presumption that it applies only domestically"), *aff'd*, 96 F.4th 403 (D.C. Cir. 2024); *Doe v. MG Freesites, Ltd*, 2024 WL 5339485, at *18 (N.D. Ala. Dec. 19, 2024) ("Nothing in Section 1595 states that it applies abroad."); *Mia v. Kimberly-Clark Corp.*, 2025 WL 752564, *7 (D.D.C. Mar. 10, 2025) (noting "the lack of any textual indicia that § 1595 applies extraterritorially"); *Lun v. Milwaukee Elec. Tool Corp.*, 2025 WL 3443536, at *10–14 (E.D. Wis. Dec. 1, 2025) (finding "Section 1595 does not apply extraterritorially").

Section 1595 is functionally identical to the private right of action in the Racketeer Influenced and Corrupt Organizations Act ("RICO") that the Supreme Court held "does not indicate extraterritorial application."[6]  *RJR Nabisco*, 579 U.S. at 350; *see also*

---

[6]    *Compare* 18 U.S.C. § 1595(a) ("An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator . . . in an appropriate district court of the United States and may recover damages and reasonable attorneys

17

*Pavlovich v. Gaiman*, 2025 WL 2819372, at *8 (W.D. Wisc. Oct. 3, 2025) ("[T]he structure of [RICO and the TVPRA] appear[] to be the same, suggesting that *RJR Nabisco* is controlling."). It contains no "clear, affirmative indication" that it applies extraterritorially. Hence it is presumed ***not*** to apply extraterritorially.

The fact that certain of the TVPRA's ***substantive*** provisions by their terms apply extraterritorially—just like RICO's predicate offenses do—does not indicate that the ***private right of action*** applies abroad as well. *See, e.g.*, 18 U.S.C. § 1585 (criminalizing "on any foreign shore seiz[ing] any person with intent to make that person a slave"). As the Supreme Court explained in *RJR Nabisco*, the "presumption against extraterritoriality must be applied separately to substantive prohibitions and [their] private right of action," and must be overcome as to both. 579 U.S. at 350. These separate inquiries are necessary because creating "a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion." *Id.* at 346 (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004)). A private right of action thus "creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct." *Id.* at 346-47. Those concerns are front and center in this case, which accuses the State of Qatar—a key U.S. ally in the Middle East—of facilitating and profiting from forced labor.

---

fees.") *with id.* § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.").

The few courts that have concluded that the TVPRA's cause of action applies extraterritorially have failed to abide by *RJR Nabisco*'s command to conduct such an "separate[]" analysis of the statutory private right of action. *Id.* at 350. In *RJR Nabisco*, the Supreme Court expressly rejected the argument that the extraterritorial application of predicate offenses entails the extraterritorial application of a private right of action premised on these offenses. *Id.* at 350 ("It is not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign countries."). Yet in finding that Section 1595 applies abroad, the Fourth Circuit in *Roe v. Howard* claimed it was "[o]f crucial importance, [that] § 1595 directly incorporates predicate offenses" which apply extraterritorially. 917 F.3d 229, 242 (4th Cir. 2019).[7] The court in *F.C. v. Jacobs Sols. Inc.* likewise "erroneously" relied on the incorporation of extraterritorial predicates in deciding that the TVPRA's private right of action has some limited extraterritorial application. 790 F. Supp. 3d at 1180(commencing its analysis of Section 1595 with a discussion of the extraterritorial predicates); *Mia*, 2025 WL 752564, at *7.

Indeed, the fact that certain criminal provisions in the TVPRA expressly apply extraterritorially—the justification seized on by the *Howard* court—only confirms that Section 1595 cannot be read to have extraterritorial application. *See, e.g.*, 18 U.S.C.

---

[7]  In any event, the Fourth Circuit's opinion in *Howard* is inapposite, as the relevant violations all occurred in the "special maritime and territorial jurisdiction of the United States," either on the property of the United States Embassy in Yemen or "land appurtenant" thereto. *Roe*, 917 F.3d at 235-37. Whether the TVPRA extends to U.S. embassy property abroad is a different question from whether the TVPRA applies generally throughout the State of Qatar.

§ 1585; 18 U.S.C. § 3271(a) (criminalizing trafficking "outside the United States" committed by persons "employed by or accompanying the Federal Government"). "[W]hen a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010).

Plaintiffs cannot save their TVPRA claim by invoking Section 1596 to rebut the presumption for Section 1595. Section 1596 applies only to certain extraterritorial ***criminal*** offenses. Section 1596 reflects a judgment by Congress not to give extraterritorial effect to the private right of action, but to permit federal prosecution of trafficking crimes in specified circumstances where the alleged criminal offender is "present" in the United States.[8] Section 1596 by its terms applies only to "any offense" "under section 1581, 1583, 1584, 1589, 1590, or 1591"—and conspicuously omits the civil remedy in Section 1595.

An "offense" is a term of art that, in Title 18 of the U.S. Code, refers exclusively to violations of criminal law and thus cannot be read in Section 1596 to expand Section 1595's reach globally. *KBR, Inc. v. United States ex rel. Carter*, 575 U.S. 650, 659 (2015) ("[W]hile the term 'offense' is sometimes used [to refer to civil violations], that is not how the word is used in Title 18."); *United States v. Collins*, 859 F.3d 1207, 1213-14 (10th Cir. 2017) ("The term 'offense' traditionally refers to crimes."). The rest of

---

[8]   Even under Plaintiffs' reading, Section 1596 does not reach Defendant CHBV, which is neither a U.S. national nor a person "present in" the United States. *See* Movant's Appx., p. 5-6 (¶ 5-13) – Declaration of Sally Miles.

Section 1596, which refers to "offender[s]" and "prosecution[s]" of "offense[s]," reinforces that it is "focused on criminal, not civil, applications." *Apple*, 2021 WL 5774224, at *15 (D.D.C.). Hence, by its plain terms, Section 1596 applies only to extraterritorial activity that the Department of Justice, after weighing U.S. foreign policy considerations, determines is worthy of criminal prosecution.

The legislative history of Section 1596, to the extent relevant, confirms that Section 1596 is limited to criminal prosecutions and does not apply to the private right of action under Section 1595. Both Senator Durbin, who introduced the legislation, and Senator Leahy, chairman of the Judiciary Committee, explained that the provision was intended to permit the ***prosecution*** of certain crimes that had been committed abroad. *See, e.g.*, 154 Cong. Rec. S10388-03, at 10389, 2008 WL 4425748 (Oct. 1, 2008) (Sen. Leahy) ("This legislation would permit the Department of Justice to prosecute offenders of trafficking crimes abroad if they are present in the United States and punish human traffickers who attempt to seek refuge in this country."); 154 Cong. Rec. S10936-01, at 10937, 2008 WL 5191148 (Dec. 11, 2008) (Sen. Durbin) (The TVPRA "will allow Federal prosecutors to investigate and prosecute traffickers found in the United States even if their trafficking crimes were committed abroad.").

There were good reasons for Congress not to empower foreign plaintiffs to sue U.S. companies for injuries in foreign countries, and the Supreme Court has repeatedly cited such policy concerns. In *RJR Nabisco*, the Court emphasized the unique problems associated with "extending a *private right of action* to foreign injuries," including the "danger of international friction." *RJR Nabisco*, 579 U.S. at 348, 353. In *Jesner*, the Court

21

likewise refused to extend liability under the Alien Tort Statute to foreign corporations, recognizing the risks of discouraging U.S. companies from investing "in developing economies where the host government might have a history of alleged human-rights violations" and deterring the "corporate investment that contributes to the economic development that so often is an essential foundation for human rights."  *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 269-70 (2018) (plurality op.).  Nothing in Section 1595 indicates Congress considered and ignored these considerations.

The Courts that endorsed some extraterritorial application of Section 1595 have had to distort the statute beyond recognition to do so.  The court in *F.C. v. Jacobs Sols. Inc.* had to resort to a novel, atextual interpretation of Section 1595 requiring plaintiffs to prove elements of criminal liability against civil defendants so as not to "endow[] [civil plaintiffs] with greater powers to police the world's violations of the TVPRA than federal prosecutors."  790 F. Supp. 3d at 1184.  But that approach was only necessary because the *F.C. v. Jacobs Sols. Inc.* court had already misapplied *Nabisco* and misinterpreted Section 1596.  This Court can avoid the need to engage in such gymnastics by applying the text of Section 1595 of the TVPRA as it is written, with no extraterritorial application for civil claims.

### 2.    Plaintiffs Do Not Seek a Domestic Application of Section 1595

Plaintiffs' claims are purely extraterritorial because Plaintiffs allege they were trafficked from the Philippines to Qatar, forced to labor in Qatar, and suffered their alleged harms entirely outside the United States.  *E.g.*, FAC ¶¶ 148-73.  Plaintiffs cannot escape the fact that these are wholly foreign claims with fact-free allegations that Defendants

22

"participated in and knowingly benefitted from" the supposed Venture in the United States. *Id.* ¶ 7. The claims are indisputably Qatar-centric. Indeed, the word "Qatar" and its derivatives occur no fewer than 400 times in the FAC.

Whether a claim is domestic or extraterritorial is assessed by looking at the focus of congressional concern embodied by Section 1595. *RJR Nabisco*, 579 U.S. at 336-37. The focus of Section 1595, like the focus of the civil remedy in *RJR Nabisco*, is the harm or injury that the private right of action seeks to redress. *Id.* at 354 ("Section 1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to business or property and does not allow recovery for foreign injuries."). Plaintiffs cannot dispute that they have alleged no domestic injury in this case; they never entered the United States and allegedly suffered injuries exclusively in Qatar. FAC ¶¶ 148-73. And even if the focus of Section 1595 includes the conduct that violated the predicate offenses, Plaintiffs still seek an impermissibly extraterritorial application of the statute, as the alleged trafficking and forced labor occurred entirely outside of the United States. *See Apple*, 2021 WL 5774224, at *16 (D.D.C.) (Section 1595's focus is on plaintiffs' "injuries, along with the underlying TVPRA violations that they allege"); *Lun*, 2025 WL 3443536, at *15 (dismissing TVPRA beneficiary liability claim based on forced labor conduct in China because "the focus of Section 1595 is conduct occurring outside the United States"). To that end, the court in *F.C. v. Jacobs Sols. Inc.* recognized that a Section 1595 claim premised on a violation of a predicate trafficking offense was impermissibly foreign where "the injuries from the alleged trafficking were felt in Qatar." 790 F. Supp. 3d at 1185.

Because there are zero allegations of *any* relevant domestic conduct, Plaintiffs'

claims are plainly extraterritorial.   *See Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 419 (2023) ("Of course, if all the conduct regarding the violations took place outside the United States, then courts do not need to determine the statute's focus at all.") (citation modified).   Plaintiffs' conclusory assertions that Defendants participated in a sprawling World Cup Construction Venture are all about Qatar.   Plaintiffs assert that Defendants were engaged by the Qatari Supreme Committee to "oversee[] coordination with Qatari government agencies" on infrastructure projects *in Qatar* and that they oversaw and monitored the Supreme Committee's contractors and subcontractors as they built the stadiums *in Qatar*.  *E.g.*, FAC ¶¶ 22, 61.  Plaintiffs' focus is obviously Qatar.

Plaintiffs' only response is to point to the type of U.S. ties that any other company headquartered in the United States would have, and that cannot make their claims domestic.   *See Kiobel v. Royal Dutch Petrol. Co.*, 569 U.S. 108, 125 (2013) ("it would reach too far to say that mere corporate presence suffices" to make a claim domestic). For example, Plaintiffs' conclusory assertions that money must have "flowed" from the Supreme Committee "to CH2M's and Jacobs's offices in Colorado" and that Defendants presumably posted about the World Cup project on social media "from within this District" are just other ways of saying they are U.S. companies.  FAC ¶¶ 144-45.  Plaintiffs do not allege that the Supreme Committee paid any of the Defendants in the United States, nor do they trace any funds into the United States.  And despite all of Plaintiffs' "information and belief" allegations that Defendants' employees worked on the Qatar World Cup from Colorado, *id.* ¶¶ 29-30, 113, Plaintiffs cannot identify *a single relevant action* that Defendants supposedly took in the United States.   Plaintiffs' allegations (*see id.*) of

24

"general corporate activity—like decisionmaking—cannot alone establish domestic application." *Nestlé USA Inc. v. Doe*, 593 U.S. 628, 634 (2021).

### B.    Plaintiffs Fail to Plead the Elements of a TVPRA Claim

To state a claim under Section 1595, Plaintiffs must plausibly allege that each Defendant "knowingly benefit[ted]" "financially or by receiving anything of value from participation in a venture which [they] knew or should have known has engaged in an act in violation of" a TVPRA predicate offense.  18 U.S.C. § 1595(a); *see Bistline v. Parker*, 918 F.3d 849, 871 (10th Cir. 2019).  The FAC does not plead those elements.  Plaintiffs do not plausibly allege a predicate TVPRA violation, a cognizable venture, Defendants' participation in that venture, Defendants' knowledge, or any knowing benefit.

### 1.    Plaintiffs Do Not Plead a Predicate TVPRA Violation Under Sections 1589 or 1590

Plaintiffs assert that certain migrant workers in Qatar suffered truly deplorable treatment.  The FAC cites a wide variety of public sources describing those conditions. *See, e.g.*, FAC ¶¶ 2, 69-77.  But the FAC fails to plead with specificity that these Plaintiffs were trafficked or forced to labor in violation of Sections 1589 or 1590.

The FAC relies on boilerplate allegations that barely vary from Plaintiff to Plaintiff. FAC ¶¶ 148–73.  Those allegations are insufficient to put Defendants on notice of the claims against them and allow them to investigate the alleged wrongdoing.  *See Macias v. Monterrey Concrete LLC*, 2020 WL 5638710, at *10 (E.D. Va. Sept. 21, 2020) (FAC must allege "each Plaintiff was subjected to a level of coercion that is redressable under the TVPA.").  Plaintiffs allege—largely in the passive voice—that they were lied to, underpaid, threatened, or had passports confiscated.  FAC ¶¶ 148-73.  But they generally

do not identify who made the alleged lie or misrepresentations, what was promised, who confiscated passports, who issued threats, or how those acts forced them to labor within the meaning of the statute.  *See, e.g.*, *id.* ¶¶ 148-173.  That is far from enough.  Plaintiffs cannot plead violations of Sections 1589 and 1590 without identifying which individuals or entities violated the statute.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565 n.10 (2007) (A pleading that "mentioned no specific time, place, or person" failed to "give[] the notice required by Rule 8."); *Roman v. Tyco Simplex Grinnell*, 2017 WL 2427251, at *5 (M.D. Fla. June 5, 2017) (dismissing Section 1589 claim where plaintiff failed to allege "who threatened him, how he was threatened, and for what purpose"); *cf.* Fed. R. Civ. P. 9(b) (In alleging fraud, plaintiffs must "state with particularity the circumstances constituting fraud.").

Plaintiffs try to solve that problem by alleging that "[v]enture participants, including but not limited to, on information and belief, his direct employer, confiscated [each Plaintiff's] passport."  FAC ¶¶ 148-73.  That threadbare allegation "on information and belief" is repeated verbatim for each of the 26 Plaintiffs.  It does not identify the actor.  It does not identify the circumstances.  And given Plaintiffs' boundless definition of the alleged "venture," *infra* § II.B.2.a, it does not give Defendants fair notice of the alleged violation.  *See WildEarth Guardians v. Extraction Oil & Gas, Inc.*, 457 F. Supp. 3d 936, 961 (D. Colo. 2020) ("information and belief" allegations are appropriate for issues "peculiarly within the knowledge of the defendants").

To the extent that Plaintiffs' hang their forced labor claim on passport confiscation, the TVPRA's statutory structure makes clear that passport confiscation alone does not

26

violate Section 1589. Congress separately criminalized taking a passport with intent to violate Section 1589 and imposed a lesser penalty. 18 U.S.C. § 1592(a)(2). Treating passport confiscation itself as a Section 1589 violation would collapse that statutory distinction. *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) (Courts are "hesitant" to interpret a statutory provision in a way that "renders superfluous another portion" of the law.).

### 2.    Plaintiffs Do Not Plead "Participation in a Venture"

Plaintiffs do not allege that Defendants themselves trafficked anyone or forced anyone to labor. They instead rely on a theory of venture liability. That theory fails in two respects. Plaintiffs do not plead a cognizable "venture." And they do not plead Defendants' "participation in" one.

### a.    Plaintiffs Have Not Alleged a "Venture"

A TVPRA venture under Section 1595 requires a qualifying association "in fact." *Bistline*, 918 F.3d at 873. The FAC does not plead one.

In *Bistline*, the association "in fact" was direct, clear, and immediate. Warren Jeffs' lawyers designed a legal strategy "*expressly* for the purpose of facilitating" his criminal conduct, and they received benefits from the forced labor scheme when that labor was used to pay their legal fees or was exchanged directly for legal services. *Id.* at 873-76. Other cases finding a "venture" involved similarly concrete and proximate joint undertakings. *See, e.g.*, *Ricchio v. McLean*, 853 F.3d 553, 555-57 (1st Cir. 2017) (hotel operator formed a venture with sex trafficker where he "enthusiastically" confirmed his intent to reinstate their sex trafficking business by high-fiving the trafficker); *Gilbert v. U.S.*

*Olympic Comm.*, 423 F. Supp. 3d 1112, 1134, 1138 (D. Colo. 2019) (U.S. Olympic Committee and USA Taekwondo, Inc. formed a venture with an athlete where, as per the description in *Gilbert v. U.S. Olympic Comm.*, 2019 WL 1058194, at *15 (D. Colo. Mar. 6, 2019), both sides assumed risk in their joint enterprise because the institutions invested in the athlete, and the athlete took the risk of competing).  This case does not because the alleged venture is incoherent and, consequently, overbroad.

Plaintiffs do not plead a coherent venture.  Plaintiffs do not allege that Defendants shared risks or profits with Plaintiffs' employers, which some courts have found indicative of a venture.  *See Black's Law Dictionary* 1591 (8th ed. 2004) (defining "venture" as "[a]n undertaking that involves risk; esp., a speculative commercial enterprise"); *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724-27 (11th Cir. 2021) (holding that plaintiffs had not alleged that hotel franchisors formed a venture with sex traffickers where "they do nothing to show that the franchisors participated in a common undertaking involving risk or profit"); *Apple*, 96 F.4th at 415-16 (D.C. Cir.).  They do not allege a joint enterprise with any recruiter, labor supplier, subcontractor, Ashghal, or Habtoor.  They do not even identify all alleged primary offenders.[9]  They instead label a vast collection of entities and individuals

---

[9]     Plaintiffs only allege on "information and belief" that they were harmed by "venture participants," including but "not limited to" Habtoor and Midmac.  But that is a legal conclusion that is insufficient to sustain their claim.  *See Apple*, 2021 WL 5774224, at *11 (D.D.C.) ("[W]hether Defendants are in a venture is a legal conclusion that the Court need not accept as true.").  Without an identifiable primary offender, Defendants simply cannot be "equally liable" by virtue of their "participation in a 'venture' with the primary offender[s]."  *Bistline*, 918 F.3d at 871, 874.

as "venture participants."  That is a legal conclusion, not a factual allegation.  *See Iqbal*, 556 U.S. at 678; *Doe I v. Apple Inc.*, 2021 WL 5774224, at *11.

Rather than clarify the scope of the venture, the amendments to the FAC further erode the venture's coherence, especially for the Highway Plaintiffs.  The FAC does not identify which projects are in the venture, which are out, or how the Highway Plaintiffs' roadwork fits within it.  The FAC effectively just adds Ashghal and Habtoor to the non-exclusive list of venture participants.  *See* FAC ¶ 34.  That cannot be the "more" the Court in *Al.C.* was looking for when it dismissed the Highway Plaintiffs in that case.  *Al.C. v. Jacobs Sols. Inc.*, 2026 WL 860434, at *4.  The Original Complaint at least **attempted** to tether the "venture" to "[t]he construction and upgrade of these twelve stadiums and related infrastructure" pursuant to CHBV's PMC Contract with the Supreme Committee. Dkt. No. 1, ¶ 22.  That limit was critical to the *F.C.* court's holding on "venture."  *F.C.*, 790 F. Supp. 3d at 1190 ("[D]efinitionally, the plaintiffs have limited their alleged venture to the construction and upgrade of twelve stadiums in preparation for the World Cup[.]").

The FAC now abandons that limit, resulting in an overbroad venture that expands to "the construction of non-competition venues and major infrastructure projects that were needed for the World Cup," as well as "substantial road, expressway, and highway projects."  FAC, ¶¶ 22, 57 n.2.  Plaintiffs' sweeping new venture cannot sustain any TVPRA claim.  *Coubaly v. Cargill Inc.*, 144 F.4th 343, 348 (D.C. Cir. 2025) ("The Plaintiffs' first mistake is their failure to clearly—or even coherently—define the 'venture' in which the Importers allegedly participated."); *L.H. v. Marriott Int'l, Inc.*, 604 F. Supp. 3d 1346, 1360 (S.D. Fla. 2022) (dismissing TVPRA claims that were "long on unsupported and

29

sweeping generalizations but short on actual, particularized facts" showing "any kind of *common* undertaking").

Plaintiffs cite as evidence regarding the "Venture" sources referring to construction projects with no connection to the Stadiums or related infrastructure projects.  *See e.g.*, FAC ¶¶ 72(b), 75, 77(a) (citing video depicting an office building), 100 (citing a *Guardian* article regarding an office building).  Plaintiffs describe an unidentified individual in a *Guardian* video as a "Venture participant," despite the fact that he appears to be a Qatari soccer coach.  *Id.* ¶ 77(h).  Plaintiffs include airports and the "proposed nationwide metro network" in the "venture," as well as 11 road projects ███████████████████ ████████ and whose relevance or connection to the World Cup stadiums is unexplained. FAC ¶¶ 22, 56, 57 n.2.  A "venture" including office buildings, soccer coaches, airports, and a random assortment of roads does not cohere.

Plaintiffs attempt to justify that expansion by reference to the PMC Contract.  That theory proves too much.



████████████████████████ The TVPRA does not reach that far.  Just as "a 'global supply

chain' is not a venture," neither is a national economy.  *See Doe I v. Apple Inc.*, 2021 WL 5774224, at *10.  There simply is no meaningful association in fact in so broad a venture. *See Bistline*, 918 F.3d at 873.

Beyond the "venture's" overbreadth and incoherence, the PMC Contract forecloses any "venture" that includes the Highway Plaintiffs, Habtoor, and Ashghal.  ███

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████  ████████████████████████████████

███████████  █████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████████████  ██████████████████████████████████████

████  ████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████.  The FAC attempts to collapse that distinction.  But the PMC Contract does not permit it.

Nor does a "venture" inclusive of the Highway Plaintiffs boast the contractual nexus this Court required in *F.C.*  There, the Court relied on the contractual allegations that Defendants and the Supreme Committee managed stadium construction, including that

31

"all contracts for the World Cup stadium builders acknowledged CH2M and Jacobs Engineering's oversight role." *F.C.*, 790 F. Supp. 3d at 1186–87. No such allegations exist here.

Here, Plaintiffs do not explicitly allege Ashghal and Habtoor had a contractual relationship. Plaintiffs are deliberately vague and say only "Ashghal and other agencies employed contractors such as Habtoor Leighton Group." FAC ¶ 62. Plaintiffs also do not allege that Habtoor's contract with Ashghal, if any, "acknowledged [Defendants'] oversight role." And, critically, Plaintiffs do not allege any contractual or commercial relationship— direct or indirect—between Defendants and Ashghal, Habtoor, or any entity working on road work. They rely instead on vague assertions that "CH2M Hill" could "recommend corrective action" to other Qatari government agencies. FAC, ¶ 62. That is not analogous to the contract-based management role alleged in *F.C. See F.C.,* 790 F. Supp. 3d at 1189. Without an alleged contractual or operational nexus, there is no venture linking Defendants to the Highway Plaintiffs, Habtoor, or Ashghal.

Plaintiffs have abandoned any coherent venture theory. What remains is an undefined and overbroad construct that is inconsistent with Tenth Circuit jurisprudence and does not plausibly link Defendants to the forced labor allegedly experienced by Plaintiffs, especially the Highway Plaintiffs. That is insufficient as a matter of law.

**b.    Plaintiffs Have Not Alleged Defendants' "Participation" in Any Venture**

Plaintiffs also fail to plead "participation." Participation requires active and intentional involvement in a venture. In *Bistline*, defendants participated by "constructing a scheme for the purpose of enabling" the primary wrongdoer's crimes. 918 F.3d at 874–

32

76.  In *Ricchio*, participation was based on an affirmative agreement to continue a forced labor scheme with a trafficker.  853 F.3d at 555–57.  And in *Salesforce*, participation was plausibly alleged where the defendant allegedly provided tailored, ongoing operational support directly to Backpage, an alleged perpetrator of TVPRA sex trafficking.  *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 559–60 (7th Cir. 2023).  Participation does not mean proximity to alleged wrongdoing.  And it does not include advisory work aimed at improving labor practices.

Plaintiffs allege nothing comparable here.  Plaintiffs do not allege that Defendants assisted, supported, or facilitated any trafficking or forced labor.  They do not allege a continuous business relationship with any alleged perpetrator.  They do not allege an agreement—explicit or tacit—with any recruiter, subcontractor, Ashghal, or Habtoor.  ███
████████████████████████████████████████  does not establish participation in any venture with third parties further down the chain or in Ashghal's separate alleged chain of contracts for its separate road infrastructure projects.  And it certainly does not establish participation by the other Defendants who were not parties to the PMC Contract.

All the FAC alleges is that "CH2M" advised the Supreme Committee on worker welfare standards and monitored implementation of those standards on projects the Supreme Committee was responsible for delivering.  FAC ¶¶ 61, 119–27.  Those allegations describe efforts to ***improve*** labor conditions and ***combat*** forced labor—not to facilitate or enable it.  The TVPRA does not transform such conduct into participation.  *See A.D. v. Choice Hotels Int'l, Inc.*, 2023 WL 3004547, at *4 (M.D. Fla. Apr. 19, 2023)

33

(Allegations that hotel franchisor did "not fight hard enough to keep these traffickers from using the hotel" or took "ineffective steps to curtail the traffickers" did not establish participation.).

Recent cases make clear that more is required to state a TVPRA claim.  In *Red Roof*, the Eleventh Circuit held that hotel franchisors did not participate in a trafficking venture merely because they benefitted from room rentals and allegedly observed trafficking indicators.  21 F.4th at 727.  And in *Fleites*, the court dismissed TVPRA claims where Visa's alleged conduct amounted to passive facilitation (at most) and efforts to mitigate the alleged trafficking problem.  *Fleites v. MindGeek S.A.R.L.*, 801 F. Supp. 3d 1011, 10127 (C.D. Cal. 2025).

The "participation" pleading defect is even starker for the Highway Plaintiffs.  The FAC contains no project-specific or Plaintiff-specific allegations tying any Defendant to the Ashghal-Habtoor road projects.  Plaintiffs do not identify a single communication, directive, inspection, or recommendation connected to those projects.  They do not explain what "coordination" or "monitoring" meant in practice.  They do not allege any relationship—contractual or otherwise—between Defendants and Ashghal or Habtoor.  Plaintiffs refer generically to "CH2M," but do not allege what each individual Defendant did on the highway project.  And they cite a LinkedIn profile for an individual, Miro Imsirovic, who did not work for any Defendant, but instead Halcrow CH2M—an entity that appears nowhere in the FAC.  Movant's Appx., p. 25 – Imsirovic LinkedIn.[10]  None of this

---

[10]    Plaintiffs directly quote from Mr. Imsirovic's resume on LinkedIn.  *Compare* FAC ¶ 60(j) *with* Movant's Appx., p. 29 – Imsirovic LinkedIn.  As with the PMC Contract,

34

is a plausible basis to allege participation.

Even accepting the Plaintiffs' conclusory allegations at face value, the limited advisory role attributed to CHBV with respect to the highway projects does not constitute "participation." Plaintiffs must allege more than an "arms-length transaction" even under the most expansive tests courts have applied for participation in a venture. *Al.C. v. Jacobs Sols. Inc.*, 2026 WL 860434, at *4. Even the "ability to perform a 'third-party audit'" without an accompanying contractual duty does not qualify as participation. *See F.C.*, 790 F. Supp. 3d at 1190.

The FAC does not meet that standard. Plaintiffs vaguely assert that "CH2M" could "coordinate," "monitor," and "recommend" action on highway construction projects throughout Qatar and seek to imply the same contractual relationship between CHBV and both the Highway Plaintiffs and Plaintiff V.B. ██████████████████

████████████████████████████████████

Nor do Plaintiffs allege that Ashghal "commission[ed]" CHBV "to monitor and control their [highway] builders" under the PMC Contract. *See id.* In so broad a venture, the lack of contractual relationship and control is fatal to a finding of participation. *Doe 1 v. Apple Inc.*, 96 F.4th 403, 416 (D.C. Cir. 2024). And even if CHBV did provide advisory recommendations regarding (as opposed to directly manage and control) infrastructure projects, these services were provided to the Supreme Committee (CHBV's client) and not the independent government agencies who did not request, commission, or contract

---

this resume is incorporated by reference and integral to the claims that Defendants participated in the expanded venture.

for such services.  FAC, ¶ 62; ███████████████████████████████████████████ .

And even if this Court were to adopt the *F.C.* participation standard for the single Plaintiff that claims to have worked on a stadium, V.B., the FAC's highway-related allegations stand in sharp contrast to the (still insufficient) stadium-related allegations in *F.C.*    There, the plaintiffs alleged that CHBV provided "customized" construction management services tied to specific stadium projects.  790 F. Supp. 3d at 1189.  The same was true in the *Omnicom* litigation, where the Court emphasized "active, targeted, and continuous support."  *A.A. v. Omnicom Grp., Inc.*, No. 25-CV-3389, 2026 WL 504904, at *12 (S.D.N.Y. Feb. 24, 2026) ("Only those who provided active, targeted, and continuous support . . . can be said to have participated in [the venture]").  No such allegations exist here.  There are no tailored services tied to any road project.  That omission is dispositive.

Plaintiffs were required to allege that these Defendants participated in a venture that engaged in forced labor.  They have not done so.  The FAC offers only generalized contract language, conclusory labels, and isolated references to non-parties.  That is insufficient as a matter of law.

### 3.    Plaintiffs Do Not Plead Defendants' Knowledge of TVPRA Violations

Plaintiffs do not plausibly allege that any of the Defendants "should have known," much less "knew or acted in reckless disregard," of the alleged fact that the Employers and unnamed recruiters "engaged in an act in violation of" Sections 1589 and 1590 with respect to these Plaintiffs.  18 U.S.C. § 1595(a).

The FAC relies on public information and news reports on the *kafala* system, and

Qatari construction industry practices to establish that Defendants were on sufficient notice of TVPRA violations to be held liable.  *See, e.g.*, FAC ¶¶ 51, 70(a)-(b), 71(a), 73. The FAC likewise relies on the universal availability of Google and Wikipedia to assert that Defendants (apparently along with every other modern business in the world) knew or should have known of labor conditions in the Qatari construction industry or at World Cup construction sites.  FAC ¶¶ 79-84.  However, general knowledge is not enough. Allegations that Defendants were on notice of forced or trafficked labor in the Qatari construction industry generally, or even at the Stadiums, are not sufficient to establish that Defendants had the requisite knowledge of TVPRA violations as to these particular Plaintiffs.  *See, e.g.*, *Ratha v. Phatthana Seafood Co.,* 35 F.4th 1159, 1177 (9th Cir. 2022) ("Sweeping generalities about the Thai shrimp industry are too attenuated to support an inference that [defendant] knew or should have known of the specifically alleged TVPRA violations."); *Lundstrom v. Choice Hotels Int'l, Inc.*, 2021 WL 5579117, at *8 (D. Colo. Nov. 30, 2021) (Allegations that "defendant was on notice about the prevalence of sex trafficking generally at its hotels and in the hotel industry" are "not sufficient to show that defendant should have known about what happened to plaintiff."); *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020) (refusing to impose liability "simply because [hotel franchisors] were generally aware that sex trafficking sometimes occurred on their franchisees' properties"); *Mia*, 2025 WL752564, at *4-6 ("As numerous courts have held, it is not enough to allege that a defendant knew or should have known of labor abuses in a particular country or industry '*generally*.'").

The FAC does not include *any* factual allegations that Defendants either knew or

37

should have known of the alleged TVPRA violations by the unnamed "venture participants" **with respect to these 26 Plaintiffs**, which is the operative standard under the TVPRA. *J.L. v. Best W. Int'l, Inc.*, 521 F. Supp. 3d 1048, 1064 (D. Colo. 2021) (holding that "[g]eneral knowledge of commercial sex activity at hotels across the United States" was insufficient to show franchisor defendant "should have known about what happened **to this plaintiff**.") (emphasis added).  For example, Plaintiffs rely heavily on statements by supposed "venture participants" FIFA and VINCI, even though the FAC does not allege that either was an Employer or had any other connection to Plaintiffs.  *Id.* ¶¶ 140-41.  Plaintiffs' stadium-specific allegations are likewise insufficiently particular to put Defendants on notice of alleged violations.  As compared to general industry knowledge, which is not enough, courts have found sufficient "allegations about specific reports to a particular defendant or specific observations by that defendant's employees or agents." *Aguero v. Esnoz*, 2024 WL 519.786, at *4 (E.D. Cal. Feb. 9, 2024).  Plaintiffs do not allege such specific reports or observations.  And Plaintiffs certainly do not allege facts sufficient to satisfy the heightened standard of knowledge required for perpetrator liability—actual knowledge or "reckless disregard"—set forth in Section 1589(b).  *SJ v. Choice Hotels Int'l*, 473 F. Supp. 3d 147, 153 (E.D.N.Y. 2020) (noting that the knowledge required for civil liability under Section 1595 is less than that required for criminal prosecutions given "the inherent differences between civil and criminal liability").

Although Plaintiffs assert that CH2M was required to visit worksites, *id.* ¶ 126, they do not explain how such visits would reveal that "venture participants" were supposedly violating the TVPRA by "misrepresenting the terms and conditions of [Plaintiffs']

employment in Qatar" or through the other alleged misconduct, *id.* ¶¶ 177-78.  Similarly, Plaintiffs' conclusory allegations that CH2M had "access to and thus witnessed the inhumane living conditions the trafficked and forced laborers endured" are contradicted by the very reporting that Plaintiffs cite.  *Id.* ¶ 142.  The report says that CH2M was involved with the "Better Connections" program that provided workers with internet access and training, but it does not indicate that CH2M itself installed the technology or provided training and instead identifies third parties who did so.  Movant's Appx., p. 22-23 – Gulf Times Article (cited at FAC ¶ 142).  Plaintiffs' only other allegations that CH2M "took on the role of inspecting" Plaintiffs' living quarters, *see* FAC ¶¶ 123, 125, are insufficient to allege defendants possessed knowledge under a "knew or should have known" standard. *Doe 4 v. Red Roof Inns, Inc.*, 2020 WL 1872336, at *3 (N.D. Ga. Apr. 13, 2020), *aff'd sub nom. Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021) ("The fact a franchisor may conduct inspections of a franchised property by itself is insufficient to impart knowledge of trafficking activity upon a franchisor or that a franchisor should have known of such trafficking activity."); *cf. Mia*, 2025 WL 752564, at *5 (finding that audits were insufficient to put defendants on notice of violations if the "true conditions" were concealed from the auditors).

In any event, these claims are irrelevant to 25 of the 26 plaintiffs in this case.  Even if this Court finds knowledge of stadium violations premised on these allegations, the FAC contains no claims that Defendants conducted inspections or had access to the worksites of the Highway Plaintiffs.  Plaintiffs only allege "coordination" on the road projects and completely fail to explain what this "coordination" looked like in practice.  *See supra*

Section II.B.2.b. ███████████████████████████████████████████

███████████████    ███████████████████████   Plaintiffs' attempt to impose

knowledge of highway project violations based on conclusory contractual allegations

regarding attenuated and unspecified "coordination" fails.

### 4.    Plaintiffs Do Not Plead a Knowing Benefit Received by Defendants

The FAC fares no better in its attempt to adequately plead this final statutory

requirement with conclusory assertions that "each Defendant knowingly benefitted from"

the "Venture" financially and "in the form" of "publicity and notoriety."   FAC ¶¶ 144-45.

Plaintiffs concede that "the Supreme Committee"—not the subcontractors who built the

Stadiums and interacted with Plaintiffs—"paid money to CH2M," and they do not allege

that Defendants stood to benefit in any way—either directly or indirectly—from the alleged

TVPRA violations.  *Id.* ¶ 144.  Although Plaintiffs claim that their "forced labor" allowed

"Defendants" to complete the Stadiums "more quickly and cheaply" than would have

otherwise been possible, they do not explain how CH2M, a consultant that did not itself

construct the Stadiums or engage the contractors or subcontractors, benefitted from

cheaper or faster construction.  *Id.* ¶ 146.  This issue is particularly pertinent for the 25

Highway Plaintiffs who worked on projects allegedly managed by the independent

government entity Ashghal.  The FAC does not make clear how Defendants benefited

from work performed for a Qatari state agency separate from the one Defendants

purportedly contracted with, especially since the Supreme Committee, not Ashghal,

allegedly paid Defendants for their work.

The requisite "close connection between the benefit received, the knowledge of

the benefit, and the improper conduct" is utterly lacking here. *Gilbert v. USA Taekwondo, Inc.*, 2020 WL 2800748, at *6 (D. Colo. May 29, 2020). Even the *Salesforce* court, after expansively describing the "knowing benefit" prong, nevertheless relied on the close connection established by direct contract payments from Backpage (the perpetrator) to Salesforce (the beneficiary), which had almost entirely been derived from trafficking revenues. 76 F.4th at 550, n.2, 565. The remote relationship between Defendants and the unidentified perpetrators of Plaintiffs' forced labor in this matter is a far cry from the "close connection" courts in this district and across the nation have required for satisfaction of this prong.

In any event, Plaintiffs' claim that "[e]ach Defendant also benefitted from Plaintiffs' trafficked and forced labor" is irreconcilable with Plaintiffs' allegation that Defendants had a contractual duty to "to ensure labor welfare" and "set[] standards for ethical recruitment, employment standards, and workers' health and safety." FAC ¶¶ 120, 124. If Defendants had such a contractual duty, then Plaintiffs' purported trafficking and forced labor would in fact have harmed Defendants' profits in the form of possible contractual non-payment. *Id.* at ¶ 143. Likewise, it is implausible that Defendants would have benefitted with respect to their "publicity and notoriety" from the disclosure of forced labor on a project they were involved with, especially given Defendants' well-publicized emphasis on worker welfare and safety that Plaintiffs themselves have acknowledged. *E.g., id.* ¶¶ 60(a), 117-19. To hold that Defendants knowingly benefitted from forced labor when Plaintiffs themselves assert Defendants had financial and reputational interests in limiting forced labor, would do violence to the statute and deter American companies from consulting on worker

41

welfare abroad due to exposure to potential TVPRA claims.  *Cf. Jesner* 584 U.S., at 269-70 (plurality op.) (adopting narrow construction of statute in context where expansive application would deter U.S. companies from doing business abroad).

### C.    Plaintiffs Cannot Assert a Claim Under Section 1593

Although Plaintiffs purport to assert a separate claim under Section 1593, FAC ¶¶ 188-90, they again conflate criminal provisions of the TVPRA with the more limited private right of action.  Section 1593 concerns restitution following a criminal conviction and does not create an additional cause of action.  *See Gabbidon v. Wilson*, 2023 WL 2520732, at *1 (S.D.W. Va. Mar. 14, 2023) (Section 1593 does "not provide an individual cause of action").[11]  Section 1593(b)(2) mandates a procedure that is possible only after a conviction by requiring that any restitution order "be issued and enforced in accordance with section 3664."  Section 3664 requires the court, among other things, to "order the probation officer" to include certain information in the presentence report, and the defendant to list her assets.  18 U.S.C. §§ 3664(a), (d)(3); *see United States v. Martinez*, 812 F.3d 1200, 1205 (10th Cir. 2015) (holding Section 3664's procedure is mandatory).  The statutory text therefore does in fact "suggest[] that restitution applies solely to criminal cases," and courts that apply Section 1593 in exclusively civil prosecutions have failed to grapple with the textual reference to Section 3664.  *United States ex rel. Fadlalla v.*

---

[11]    *See also Riggs v. Hull*, 2016 WL 742923, at *2 (W.D. Ky. Feb. 23, 2016) ("Under 18 U.S.C. § 1593(a), . . . [r]estitution is not a claim for relief; it is a remedy."); *Owino v. CoreCivic, Inc.*, 2018 WL 2193644, at *13 n.7 (S.D. Cal. May 14, 2018) (Section 1593 "applies '*only* to cases in which a defendant has been convicted of a[ criminal] offense under the [TVPRA].'").

*DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 201 (D. Md. 2019) (making no reference to Section 3664); *F.C.*, 790 F. Supp. 3d at 1194 (same).  Because Section 1593 can only be applied following a criminal conviction, Plaintiffs cannot assert a separate cause of action under it.

## III.    THE COURT LACKS PERSONAL JURISDICTION OVER THE JACOBS ENTITIES AND CHBV

This Court lacks personal jurisdiction over Jacobs Engineering and Jacobs Solutions—which are both headquartered in Texas—and CHBV, a Dutch company (collectively, the "Non-Colorado Defendants").  Plaintiffs' jurisdictional allegations, on their face, fail to establish minimum contacts between ***these Defendants***, ***this controversy***, and ***this forum***.

The Due Process Clause requires a non-resident defendant to have "'certain minimum contacts' with the forum State to assure 'that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  *Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1221 (10th Cir. 2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  A court may thus exercise "general jurisdiction over any claims against defendants who are essentially at home there," and specific jurisdiction only where there is "an affiliation between the forum and the underlying controversy."  *Id.* (cleaned up).  On a motion to dismiss, it is Plaintiffs' burden to make "a *prima facie* showing of personal jurisdiction," and courts take Plaintiffs' allegations as true only if they are "plausible, non-conclusory, and non-speculative," *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008), and are "not contradicted by the defendant's affidavits," *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1065 (10th Cir. 2007).  Despite their attempts to

43

meet that burden, Plaintiffs cannot get around the fact that the Non-Colorado Defendants

lack the requisite connection to Colorado.

A.    The Court Lacks General Jurisdiction over the Non-Colorado Defendants

Plaintiffs do not (and cannot) allege that the Non-Colorado Defendants are

"essentially at home" in Colorado, as is required to exercise general jurisdiction. *Daimler*

*AG v. Bauman*, 571 U.S. 117, 122 (2014). The paradigmatic examples of general

jurisdiction are "the place of incorporation and principal place of business." *Id.* at 137;

*see also Hood*, 21 F.4th at 1221. The Jacobs entities are incorporated in Delaware and

headquartered in Texas, FAC ¶ 13, where they have their principal places of business,

Movant's Appx., p. 2 (¶¶ 3, 7-8) – Declaration of Amy Lanctot. Indeed, Plaintiffs concede

that the Jacobs entities are not subject to general jurisdiction in Colorado by alleging only

that they are subject to specific personal jurisdiction. FAC ¶ 13. CHBV likewise is not at

home in Colorado, nor anywhere else in the United States, because it is incorporated in

the Netherlands, FAC ¶ 12, and has no employees, operations, place of business,

subsidiaries, or real property in the United States, Movant's Appx., p. 5-6 (¶¶ 5-13) –

Declaration of Sally Miles. Plaintiffs' allegation that Brian Shelton was a CHBV officer or

director (Plaintiffs seem to use the terms interchangeably) while he was based in

Colorado plainly does not render CHBV at home there. FAC ¶¶ 30-31; *see also* Movant's

Appx., p. 5 (¶ 6) – Declaration of Sally Miles (Shelton was "never an officer or employee

of CHBV"). And Plaintiffs' assertion that CHBV is subject to general jurisdiction because

it "does substantial and continuous business" in Colorado, FAC ¶ 12, is directly contrary

to the Supreme Court's holding in *Daimler* and borders on frivolous. *See* 571 U.S. at 138

44

(exercising general jurisdiction everywhere that a corporation engages in "substantial"
and "continuous" business would be "unacceptably grasping" (quotation marks omitted)).

**B.    The Court Lacks Specific Jurisdiction over the Non-Colorado Defendants**

Plaintiffs' allegations fail to establish any substantial connection between Plaintiffs'
claims and activity directed at or occurring in Colorado, much less that Plaintiffs' claims
arose "out of the defendant's forum-related activities" in Colorado.  *Dental Dynamics,
LLC v. Jolly Dental Grp.*, 946 F.3d 1223, 1229 (10th Cir. 2020).  Rather, Plaintiffs' suit
arises out of or relates to Defendants' alleged inaction ***in Qatar***, and not the Non-Colorado
Defendants' general ties to their Colorado affiliates.  If the FAC's unparticularized
allegations were sufficient to establish jurisdiction, then every large company would be
subject to specific jurisdiction wherever it—or its subsidiaries or parent—has an office.
That is not the law.

The FAC asserts in conclusory fashion that both CHBV and Jacobs, "on
information and belief," "made decisions and took actions in this District in furtherance of
the venture," FAC ¶¶ 12-13, 29-31, but Plaintiffs do not identify ***a single decision or
action*** that was actually made or taken in Colorado by those specific Defendants as
consultants for the Supreme Committee.  Nor could they.  As Plaintiffs elsewhere
concede, Jacobs Solutions was not even incorporated until after the Plaintiffs completed
their work.[12]  FAC ¶ 13.  Jacobs Engineering did not acquire the CH2M entities until a

---

[12]   Plaintiffs' suggestion that Jacobs Solutions has "successor liability" for Jacobs
Engineering is irrelevant (because there is no personal jurisdiction over Jacobs
Engineering either) and unsupported by any legal authority.  FAC ¶¶ 13, 16.  Jacobs
Solutions did not acquire Jacobs Engineering's assets and liabilities, and Jacobs

quarter of the Plaintiffs had completed their work.  Movant's Appx., p. 2 (¶ 4) – Declaration

of Amy Lanctot.  And "CHBV has no officers, employees, agents or other representatives

in Colorado, does not maintain an office in Colorado, is not licensed to do business in

Colorado, does not own property in Colorado, and has no agent for service of process in

Colorado." *F.C.*, 790 F. Supp. 3d at 1178.  As Defendants' affidavits confirm, CHBV "does

not do any business in Colorado," never received payment in the United States, and the

PM Consultant's work was performed in Qatar.    Movant's Appx., p. 5 (¶¶ 7, 9) –

Declaration of Sally Miles; Movant's Appx., p. 7-8 (¶¶ 3-5) – Declaration of Keoki Sears.

These affidavits would trump Plaintiffs' factual allegations if the two were inconsistent, but

Plaintiffs' FAC does not even contradict those facts.  *Melea*, 511 F.3d at 1065.  Plaintiffs

have merely identified Jacobs Engineering personnel and a lone CHBV director whose

LinkedIn profiles suggest they worked in Colorado *or* worked on the World Cup project,

and they just speculate that some of them might have worked on the project while in

Colorado.  FAC ¶¶ 29-31.  The FAC offers no basis to conclude that they did both at the

same time.  *Id*.

---

Engineering continues to exist as a subsidiary of Jacobs Solutions, such that there was no "merger of the two corporations" and Jacobs Solutions cannot be "a mere continuation" of Jacobs Engineering.  *IT Portfolio, Inc. v. NER Data Corp.*, 2018 WL 3055767, at *5 (D. Colo. May 17, 2018); *see also Frontier Station, Inc. v. Kloiber Real Est. Holdings, LLC*, 2019 WL 4643683, at *3 (D. Colo. Aug. 12, 2019) ("The insurmountable problem with Frontier's successor entity theory is that" the supposed successor "existed before the Transfer Agreement and still exists."); Movant's Appx., p. 20 – Jacobs Engineering Entity Details; Movant's Appx., p. 2 (¶¶ 5-6) – Declaration of Amy Lanctot.  To suggest otherwise would "read[] the law through rose-colored glasses," as another court in this district noted earlier this year while dismissing Jacobs Solutions Inc.  *F.C.*, 790 F. Supp. 3d at 1178.

Plaintiffs have at most asserted general and incidental connections between the forum and CHBV and Jacobs Engineering that are unrelated to their claims.  *See id.* ¶ 31 (alleging that CHBV "carried out some of its operations" in Colorado); *id.* ¶ 13 (claiming Jacobs did "substantial and continuous" business in Colorado).  The Supreme Court is clear that "a defendant's general connections with the forum are not enough."  *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 264 (2017) (holding that "the strength of the requisite connection between the forum and the specific claims at issue" is not relaxed by "forum contacts that are unrelated to those claims"); *see also Jobe v. BNSF Ry. Co.*, 2024 WL 474405, at *6 (D. Colo. Jan. 30, 2024) (no personal jurisdiction where "Plaintiff was injured in Wyoming, not the forum" and the defendants' contacts "in Colorado" were not "directly tied to the core issue of this lawsuit"), *R&R adopted*, 2024 WL 982667 (D. Colo. Feb. 16, 2024).  Recognizing that there is no basis for exercising personal jurisdiction over CHBV or Jacobs Engineering in Colorado, Plaintiffs try to blur the lines between the Non-Colorado Defendants and the Colorado-headquartered CH2M entities.  *See* FAC ¶¶ 13, 28-33.  But Plaintiffs must establish jurisdiction "as to each defendant."  *Bristol-Myers*, 582 U.S. at 268; *see also Walden v. Fiore*, 571 U.S. 277, 286 (2014) ("a defendant's relationship with" other entities, "standing alone, is an insufficient basis for jurisdiction").  Each Defendant "has a separate corporate existence" and must be "treated separately from" each other where Plaintiffs have not alleged any facts "justifying disregard of the corporate entity."  *Kennedy v. Mountainside Pizza, Inc.*, 2020 WL 4454897, at *6 (D. Colo. May 14, 2020) (quoting *Benton v. Cameco Corp.*, 375 F.3d 1070, 1081 (10th Cir. 2004)), *R&R adopted*, 2020 WL 4448771 (D. Colo. Aug. 3, 2020).

Plaintiffs fall far short of demonstrating that the Non-Colorado Defendants' existence as separate corporations is "merely a fiction" that is used "to perpetrate a fraud or defeat a rightful claim," as they must in order to warrant the "extraordinary remedy" of piercing the corporate veil. *Griffith v. SSC Pueblo Belmont Operating Co.*, 381 P.3d 308, 313 (Colo. 2016). For example, with respect to CHBV, Plaintiffs identify only a single director, whom they claim was also an executive of another CH2M entity, and allege generally that "CH2M and each of its subsidiaries followed a globally-integrated business strategy." FAC ¶¶ 30-31; Movant's Appx., p. 5 (¶ 6) – Declaration of Sally Miles. Plaintiffs' general and conclusory assertions that Jacobs Engineering "finances the [CH2M] subsidiaries," exercises "control" over them, shares unspecified "common directors or officers" with them, or practiced "integrated one-firm business models" that included the operations of the Colorado-headquartered CH2M entities, are similarly deficient. FAC ¶¶ 28-33. The FAC is entirely devoid of the requisite factual allegations ***showing*** that Jacobs Engineering and its subsidiaries disregarded corporate formalities. *See First Horizon Merch. Servs., Inc. v. Wellspring Cap. Mgmt., LLC*, 166 P.3d 166, 177 (Colo. App. 2007) (plaintiffs cannot establish jurisdiction with "nothing more than conclusory allegations to support the theories of agency [or] alter ego"); *cf.* Movant's Appx., p. 5 (¶ 5) – Declaration of Sally Miles (CHBV has independent board of directors and maintains corporate formalities).

The Supreme Court's decision in *Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025), does not "change the analysis." *Al.C. v. Jacobs Sols. Inc.*, No. 25-CV-00274-RMR-CYC, 2026 WL 1150278, at *2 (D. Colo. Feb. 17, 2026), *report and recommendation*

48

*adopted in part, rejected in part sub nom.*, *Al.C. v. Jacobs Sols. Inc.*, 2026 WL 860434 (D. Colo. Mar. 30, 2026).  In *Al.C.*, as in *F.C.*, *inter alia*, plaintiffs' insufficient jurisdictional allegations pertained only to Colorado.  This Court recognized the finding of insufficient contacts with Colorado "compel[led] the same conclusion about the sufficiency of its contacts with the United States as a whole." *Id.*  The same is true here.  Plaintiffs have not altered the jurisdictional sections of their complaint to address the Court's holding on *Fuld*.  Dkt. No. 48-1, ¶¶ 7–15.  Nor have they specifically referenced either Jacobs entity or CHBV in any amendment to the FAC.  *Fuld* has no relevance, and this Court must dismiss Jacobs Engineering, Jacobs Solutions, and CHBV for a lack of personal jurisdiction.

## CONCLUSION

For all of these reasons, the Court should dismiss the First Amended Complaint with prejudice.

Dated:                              May 4, 2026

New York, New York         DEBEVOISE & PLIMPTON LLP


                                    /s/    William H. Taft V

                                    Maura Kathleen Monaghan
                                    Mark W. Friedman
                                    William H. Taft V
                                    James P. Schaefer
                                    Justin R. Rassi
                                    Lisa W. Lachowicz
                                    Ardis Strong
                                    Alessandra G. Masciandaro
                                    DEBEVOISE & PLIMPTON LLP
                                    66 Hudson Boulevard

49

New York, NY 10001
Telephone: (212) 909-6000
mkmonaghan@debevoise.com
mwfriedman@debevoise.com
whtaft@debevoise.com
jpschaefer@debevoise.com
jrassi@debevoise.com
lwang@debevoise.com
astrong@debevoise.com
amasciandaro@debevoise.com

Habib Nasrullah
Frederick R. Yarger
Danyaal Waheed
WHEELER TRIGG O'DONNELL LLP
370 17th Street
Suite 4500
Denver, CO 80202-5647
Telephone: 303-244-1800
nasrullah@wtotrial.com
yarger@wtotrial.com
waheed@wtotrial.com

*Attorneys for Defendants*

**CERITIFCATE OF SERVICE**

I hereby certify that on May 4, 2026, the foregoing was served via e-mail on:

Sean Grimsley
Eric Olson
Jason Murray
Abigail Hinchcliff
Isabel Broer
Samara Hoose
Meredith Wheeler
Noah Nix
Bianca Miyata
OLSON GRIMSLEY KAWANABE HINCHCLIFF & MURRAY LLC
700 17th Street, Suite 1600
Denver, CO 80202
Telephone: (303) 535-9151
eolson@olsongrimsley.com
sgrimsley@olsongrimsley.com
jmurray@olsongrimsley.com
ahinchcliff@olsongrimsley.com
ibroer@olsongrimsley.com
shoose@olsongrimsley.com
mwheeler@olsongrimsley.com
nnix@olsongrimsley.com
bmiyata@olsongrimsley.com

Eli J. Kay-Oliphant
Ryan R. Sparacino
Anthony Asuncion
SPARACINO PLLC
1920 L Street NW, Suite 835
Washington, D.C. 20036
Telephone: (202) 629-3530
eli.kay-oliphant@sparacinopllc.com
matt.fisher@sparacinopllc.com
anthony.asuncion@sparacinopllc.com

*Attorneys for Plaintiffs*

*s/ Justin R. Rassi*
Justin R. Rassi

*Attorney for Defendants*
