UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

| | |
|---|---|
| AL.B., AM.P., AN.P., AR.A., B.L., B.T., E.G., ER.M., F.M., G.A., J.L., J.O., J.S., J.T., JA.A., JE.T., JI.T., JO.B., L.N., M.S., ROG.E., ROL.P., R.D., R.I., R.P., V.B., and W.B.,<br><br>Plaintiffs,<br><br>v.<br><br>JACOBS SOLUTIONS INC., JACOBS ENGINEERING GROUP INC., CH2M HILL COMPANIES, LTD., CH2M HILL INTERNATIONAL, LTD., and CH2M HILL INTERNATIONAL B.V.,<br><br>Defendants. | Case No. 1:25-cv-03067-RMR-CYC |

## DECLARATION OF AMY LANCTOT IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

I, Amy Lanctot, declare as follows:

1.     I am the Associate General Counsel for Jacobs Engineering Group Inc., and I work and reside in Dallas, Texas. In my capacity as Associate General Counsel, I am familiar with the corporate structure of Jacobs Engineering Group Inc. ("Jacobs Engineering") and Jacobs Solutions, Inc. ("Jacobs Solutions") and the business they conduct. With respect to all other matters, my knowledge is based on my review of corporate books and records maintained in the ordinary course of business.

2.     The following information is true to the best of my knowledge for the entire time period covered in the First Amended Complaint and presently.

3.     Jacobs Engineering and Jacobs Solutions are both incorporated in Delaware and headquartered in Dallas, Texas.

4.     In December 2017, Jacobs Engineering acquired CH2M Hill Companies Ltd.

5.     Jacobs Solutions was incorporated on March 4, 2022.

6.     In August 2022, Jacobs Engineering and Jacobs Solutions underwent a corporate reorganization to adopt a new holding company structure.  Jacobs Solutions became a holding company and acquired 100% of Jacobs Engineering's stock.  Jacobs Engineering remains a wholly-owned subsidiary of Jacobs Solutions today and regular operating activities are conducted by Jacobs Engineering rather than Jacobs Solutions.  Jacobs Solutions did not acquire Jacobs Engineering's assets and liabilities.

7.     Jacobs Engineering provides a full spectrum of professional services including consulting, technical, engineering, scientific and project delivery for the government and private sector.  The officers of Jacobs Engineering direct, control, and coordinate the corporation's activities from its headquarters in Dallas.

8.     Jacobs Solutions is a holding company.  The officers of Jacobs Solutions direct, control, and coordinate the corporation's activities from its headquarters in Dallas.

\*     \*     \*

2

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of April 2026.

Dallas, Texas
Place of Execution

Amy Lanctot

3

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

---

AL.B., AM.P., AN.P., AR.A., B.L., B.T., E.G.,
ER.M., F.M., G.A., J.L., J.O., J.S., J.T., JA.A.,
JE.T., JI.T., JO.B., L.N., M.S., ROG.E.,
ROL.P., R.D., R.I., R.P., V.B., and W.B.,

Plaintiffs,

v.

JACOBS SOLUTIONS INC., JACOBS            Case No. 1:25-cv-03067-RMR-CYC
ENGINEERING GROUP INC., CH2M HILL
COMPANIES, LTD., CH2M HILL
INTERNATIONAL, LTD., and CH2M HILL
INTERNATIONAL B.V.,

Defendants.

---

**DECLARATION OF SALLY MILES IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

I, Sally Miles, declare as follows:

1.      I am a Member of the Board of Directors for CH2M HILL International B.V.

("CH2M B.V."), and I work and reside in the United Kingdom. In my capacity as Director, I am

familiar with the corporate structure of CH2M B.V. and the business it conducts. With respect to

all other matters, my knowledge is based on my review of corporate books and records

maintained in the ordinary course of business.

2.      The following information is true to the best of my knowledge for, unless

otherwise noted, the entire time period covered in the First Amended Complaint and presently.

3.      CH2M B.V. is a Dutch *besloten vennootschap* (a type of closely held corporation) formed in the Netherlands and maintains its registered address at Stadsplateau 7, 3521 AZ Utrecht, Netherlands.

4.      CH2M B.V. is an indirect subsidiary of CH2M HILL Companies, Ltd. and CH2M HILL International, Ltd.

5.      CH2M B.V. has its own board of directors (the "Board") independent of its corporate parent and related companies.  One director is required to be a citizen of the Netherlands.  The Board's in-person meetings are held in Europe.  CH2M B.V. maintains its own corporate records, including minutes of Board meetings.

6.      Brian Shelton was a Member of the Board of Directors of CH2M B.V. from December 2016 to May 2019.  Mr. Shelton was never an officer or employee of CH2M B.V.

7.      CH2M B.V. was the Programme Management Consultant ("PM Consultant") to the Supreme Committee for Delivery & Legacy ("Supreme Committee"), a Qatari government agency, in connection with the 2022 FIFA World Cup Qatar.  CH2M B.V. registered as a branch in Qatar to perform its work as PM Consultant, performed its work as PM Consultant in Qatar, and received payment for its work as PM Consultant to the Supreme Committee outside the United States.

8.      CH2M B.V. does not have any subsidiaries in the United States.

9.      CH2M B.V. is not licensed or registered to conduct business in the United States and does not do any business in Colorado or anywhere else in the United States.

2

10.    CH2M B.V. does not employ any officers, employees, agents, or other representatives in the United States for the purpose of transacting business there.

11.    CH2M B.V. does not maintain any office, place of business, or mailing address in the United States.

12.    CH2M B.V. does not own, use, or possess any real property in the United States.

13.    CH2M B.V. has not appointed an agent for service of process in the United States.

*    *    *

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29 day of   April   2026.

Jacobs, London Cottons centre

Place of Execution                                      Sally Miles

3

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

AL.B., AM.P., AN.P., AR.A., B.L., B.T., E.G.,
ER.M., F.M., G.A., J.L., J.O., J.S., J.T., JA.A.,
JE.T., JI.T., JO.B., L.N., M.S., ROG.E.,
ROL.P., R.D., R.I., R.P., V.B., and W.B.,

Plaintiffs,

v.

JACOBS SOLUTIONS INC., JACOBS
ENGINEERING GROUP INC., CH2M HILL
COMPANIES, LTD., CH2M HILL
INTERNATIONAL, LTD., and CH2M HILL
INTERNATIONAL B.V.,

Defendants.

Case No. 1:25-cv-03067-RMR-CYC

## DECLARATION OF STANFORD KEOKI SEARS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

I, Stanford Keoki Sears, declare as follows:

1. I currently work and reside in Seattle, Washington. I have personal knowledge of the information in paragraphs 2 to 5 below based on my work experience described therein.

2. I started working for CH2M Hill International Ltd. ("CH2M Hill") in or around 1997. At that time, I worked and resided in Palo Alto, California.

3. In early 2012, I was seconded to CH2M Hill International B.V. ("CH2M B.V.") to work as Deputy Programme Director, Technical & Logistics in connection with CH2M B.V.'s work as Programme Management Consultant ("PM Consultant") for the Supreme Committee for

Delivery & Legacy regarding the FIFA World Cup Qatar 2022.  I moved to Doha, Qatar to perform my work.

4.     In late 2013, I became the Deputy Programme Director, Operations & Integration in connection with CH2M's work as PM Consultant for the Supreme Committee for Delivery & Legacy.  I remained in this role until October 2014.

5.     CH2M B.V. directed my work during my secondment.  Throughout my time working for CH2M B.V., I lived in Qatar and performed my work in Qatar.  The CH2M B.V. personnel I worked with as Deputy Programme Director, including Executive Program Director Rehan Khan, likewise performed their work in Qatar.

*     *     *

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30 day of ___April___ 2026.

Seattle, Washington
_____

Place of Execution

Stanford Keoki Sears

2

**UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO**

| | |
|---|---|
| AL.B., AM.P., AN.P., AR.A., B.L., B.T., E.G., ER.M., F.M., J.L., J.O., J.S., J.T., JA.A., JE.T., JI.T., JO.B., L.N., M.S., ROG.E., ROL.P., R.D., R.I., R.P., V.B., and W.B., <br><br> Plaintiffs, <br><br> v. <br><br> JACOBS SOLUTIONS INC., JACOBS ENGINEERING GROUP INC., CH2M HILL COMPANIES, LTD., CH2M HILL INTERNATIONAL, LTD., and CH2M HILL INTERNATIONAL B.V., <br><br><br> Defendants. | Case No. 1:25-cv-03067-RMR-CYC |

**DECLARATION OF JUSTIN R. RASSI IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

I, Justin Richard Rassi, declare as follows:

1.      I am an attorney at the law firm Debevoise & Plimpton LLP, counsel for

Defendants Jacobs Solutions Inc., Jacobs Engineering Group Inc., CH2M HILL

Companies, Ltd., CH2M HILL International, Ltd., and CH2M HILL International B.V.

("CHBV," and collectively, the "Defendants").  I am duly admitted to practice before this

Court.

2.      I submit this declaration on personal knowledge and on the record of this

litigation, in support of the Defendants' Motion to Dismiss Plaintiffs' First Amended

Complaint.

3.      Attached hereto as <u>Defendants' Exhibit 4.1</u> is a true and correct copy of an article published by ESPN, written by Jeff MacGregor, dated October 1, 2013, and entitled "Human rights issue raised in Qatar," as cited in the First Amended Complaint ("FAC," Dkt. 51) at paragraphs 117-118, 122 ("ESPN Article"). This article is also available at https://www.espn.com/espn/story/_/id/9753901/human-rights-concerns-raised-qatarworld- cup.

4.      Attached hereto as <u>Defendants' Exhibit 4.2</u> is a true and correct copy of the Delaware Department of State's Entity Details record for Jacobs Solutions Inc. ("Jacobs Solutions Entity Details").  This record can also be accessed at https://icis.corp.delaware.gov/eCorp/EntitySearch/NameSearch.aspx, by searching for "Jacobs Solutions Inc."

5.      Attached hereto as <u>Defendants' Exhibit 4.3</u> is a true and correct copy of the Delaware Department of State's Entity Details record for Jacobs Engineering Group Inc. ("Jacobs Engineering Entity Details").  This record can also be accessed at https://icis.corp.delaware.gov/eCorp/EntitySearch/NameSearch.aspx, by searching for "Jacobs Engineering Group Inc."

6.      Attached hereto as <u>Defendants' Exhibit 4.4</u> is a true and correct copy of an article published by the Gulf Times, dated October 26, 2020, and entitled "'Better Connections Programme' to cover 10,000 workers," as cited in the FAC at paragraph 142 ("*Gulf Times* Article").  This article is also available at https://www.gulf-times.com/story/423138/better-connections-programme-to-cover-10000-workers.

2

7.    Attached hereto as <u>Defendants' Exhibit 4.5</u> is a true and correct copy of Mr. Miro Imsirovic's LinkedIn Profile and the publicly available resumé posted thereon as captured on May 4, 2026.  The second page of this resumé is directly quoted in paragraph 60(j) of the FAC.

8.    Attached hereto as <u>Defendants' Exhibit 4.6</u> is a true and correct copy of the Parties' Joint Statement on Disputed Discovery Issues dated November 13, 2025 in the case *F.C. v. Jacobs Sols. Inc.*, Case No. 1:23-cv-02660-RMR-CYC.

9.    Attached hereto as <u>Defendants' Exhibit 4.7</u> is a true and correct copy of the transcript from the November 19, 2025 Discovery Conference in the case *F.C. v. Jacobs Sols. Inc.*, Case No. 1:23-cv-02660-RMR-CYC as docketed at ECF No. 101.

10.    Attached hereto as <u>Defendants' Exhibit 4.8</u> is a true and correct copy of the Services Agreement for a Programme Management Consultant between the Supreme Committee for Qatar 2022 and Defendant CHBV (the "PMC Contract").  The PMC Contract is referred to throughout the FAC, including at paragraphs 22, 57, 62, 120, and 184, and is available to Plaintiffs' counsel pursuant to the terms of a Protective Order (Dkt. 83) in *F.C. v. Jacobs Sols. Inc.*, Case No. 1:23-cv-02660-RMR-CYC.

\*    \*    \*

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York on this 4th day of May 2026.

/s/ _____

Justin R. Rassi

3

# Human rights issue raised in Qatar

 **Jeff MacGregor**
Oct 1, 2013, 12:26 PM ET

 Share



Workers in Qatar are reportedly not receiving water or pay and passports are being confiscated. Reuters/Fadi Al-Assaad

The World Cup is not worth a single human life.

This week's column isn't too complicated. The World Cup, the biggest sporting event on the planet, is not worth the cost of a single human life. Simple. Last week's series in The Guardian about working conditions in Qatar, host of the 2022 World Cup, warns not of one death, but of hundreds.

According to The Guardian report: *"Dozens of Nepalese migrant labourers have died in Qatar in recent weeks and thousands more are enduring appalling labour abuses, a Guardian investigation has found, raising serious questions about Qatar's preparations to host the 2022 World Cup. This summer, Nepalese workers died at a rate of almost one a day in Qatar, many of them young men who had sudden heart attacks. The investigation found evidence to suggest that thousands of Nepalese, who make up the*

*single largest group of labourers in Qatar, face exploitation and abuses that amount to modern-day slavery, as defined by the International Labour Organisation, during a building binge paving the way for 2022."*

Read more about it here. And here. And here. And here. The Guardian also reported:

*"Qatar's construction frenzy ahead of the 2022 World Cup is on course to cost the lives of at least 4,000 migrant workers before a ball is kicked, the International Trade Union Confederation (ITUC) has claimed. The group has been scrutinising builders' deaths in the Gulf emirate for the past two years and said that at least half a million extra workers from countries including Nepal, India and Sri Lanka are expected to flood in to complete stadiums, hotels and infrastructure in time for the World Cup kickoff. The annual death toll among those working on building sites could rise to 600 a year -- almost a dozen a week -- unless the Doha government makes urgent reforms, it says."*

There are more than 1.2 million migrant workers in Qatar, a nation of only 225,000 citizens. Per capita it is one of the richest countries on Earth, but its reliance on *kafala* -- a form of sponsored employment with historical roots in adoption law -- means that vulnerable foreign laborers are often exploited and abused. Passports confiscated, wages unpaid, unfed and stacked in bunkhouses like cordwood; at its worst it's a kind of indentured servitude. Links to the most recent Human Rights Watch reports out of Qatar are here, and here and here. And while Qatar's own labor laws ban bad practice, nothing much has changed. It's a slow-motion factory collapse.

I won't pretend to know Qatar any better than you do. It is a mystery even as you're standing in it. Like my friend Charlie Pierce, I've been there, and I've seen the money and the ambition and the construction sites blazing night and day, the cranes nodding and turning, the buildings rising out of nothing, the immaculate highways empty and razor-straight into the dunes, the guards and snipers at the seaside embassies and the workers covered in dust everywhere on the buses, staring, the heat rising and the unspoken panic to get it all done, to make a modern country out of a 12th century desert, before the oil wells run dry.



The U.S. company that will begin World Cup construction in Qatar hopes to lead by example, a company spokesperson says.
Reuters/Fadi Al-Assaad

Bahrain, Qatar, Dubai, Abu Dhabi, the Emirates -- the Persian Gulf wants to compete for the great international games. But our great international games are no longer just an occasion for corruption; they are corruption itself. The World Cup, the Olympics, Formula One -- international sports are a brand of racketeering, a trillion-dollar shakedown, a global con. The graft is written right into the charter: Pay up or pound sand. For every city or state or country bidding up these events there's a premium to pay on top of the price of the event itself. To say nothing of the costs everyone tries so hard to hide. Can you imagine the mountain of money it took to bring the World Cup to Qatar? That it remains an ally and a pivotal U.S. military asset in the region makes everything more complicated.

The contract to manage the immense building program for that 2022 World Cup went to an American company, CH2M Hill. Based in Colorado, it recently absorbed another global construction operation, Halcrow. The firm now faces not only the concrete challenge of construction but also a struggle against ingrained Qatari labor practice. And the prospect of a decade-long public relations nightmare.

It is important to note here that the CH2M Hill construction phase of World Cup infrastructure has not yet begun.

But the moral, ethical and practical implications of a contract like this -- do you take the lucrative job and fight for change? Or do you refuse the job as an act of conscience, and by

doing so inadvertently protect the status quo? -- are nearly incalculable.

Boycott? Or work for justice from the inside? Or just close your eyes and cash the check?

This past weekend I exchanged emails with John Corsi, CH2M Hill's vice president, media and public relations.

**Having worked extensively in the Gulf, and in Qatar, was CH2M Hill / Halcrow aware of longstanding human rights issues surrounding the kafala sponsorship system and foreign workers before bidding on the 2022 World Cup contracts?**

*"As a global company with a long-history of successful projects completed with integrity and with ethical business practices, we take issues of workers welfare, whether our employees or not, and on any project, very seriously.*

*"Our work in the region in the past decade has been primarily in program management or as technical consultants. Throughout our roles, we ensure that appropriate terms and conditions are properly placed in the procurement documents of our clients. In cases where we have a supervisory role over a contractor, we apply our health and safety guidelines.*

*"With regards to our role on Qatar 2022 FIFA World Cup Program, from the start, we have been working to support our client's commitment to have the Qatar 2022 FIFA World Cup program drive positive change and continuous development in a number of areas in Qatar including the welfare of workers in construction.*

*"Our Qatar 2022 client has issued a Workers' Welfare Charter that documents a set of worker welfare standards to be enforced for all contractors and subcontractors. ( Please see this link on recent developments. (Secretary General Hassan Al Thawadi's comments at the Clinton Global Initiative press conference on 9/26. http://new.livestream.com/CGI/CGI2013pressconferences)"*

**How was it prepared to deal with them?**

*"We believe we have a positive role to play everywhere we operate and conduct business in promoting worker welfare, health and safety, environmental protection, security and sustainability.*

*"Drawing on experience from other major projects in the region and international best practice,CH2M HILL is committed to supporting our clients with strategies on equality and inclusion, employment skills and health and well being, among other things.*

*"Our clients select and engage us for our expertise not only relating to project delivery and technology but also for our sensitivity and experience in areas relating to the application of international standards and best practices for promoting positive progress in these areas.*

*"At the same time we realize that CH2M HILL does not operate in a vacuum but rather within and among a network of various entities all of whom have a stake and responsibility to ensure appropriate behaviors and positive outcomes. CH2M HILL routinely works with clients and proactively reaches out to non-governmental agencies, advocacy groups and other interested parties to identify where alone and together we can make positive contributions to raising standards and apply best practices."*

**Despite Qatar's many assurance to the contrary -- especially since winning its World Cup Bid -- its enforcement of its own labor laws remains lax. As project manager for that World Cup, what can CH2M Hill/ Halcrow do to bring Qatar to compliance with its own labor laws regarding the treatment of foreign workers?**

*"We believe the best way to improve labor law compliance in Qatar is to lead by example. We are supporting our Qatar 2022 client in developing an approach to Worker Welfare and labor law compliance for the Qatar 2022 program that we believe will significantly improve the treatment of workers in the construction sector. This approach considers the following three areas:*

*• **Standards**. a set of worker's standards consistent with the Worker's Charter, published earlier this year, that will cover ethical recruitment, employment standards, accommodations, employee disputes and health and safety.*

*• **Inspections**. establishing an inspection and enforcement regimen which includes a Workers induction program, regular welfare audits at multiple levels within the organization and periodic workers inspections*

*• **Contractor selection**. establishing a procurement approach that verifies contractor worker welfare past performance through the Ministry of Labor and other regulatory agencies as part of the tender prequalification phase. Contractor worker welfare*

*performance is evaluated as part of the tender scoring and contractors failing to achieve the worker welfare standards will be removed from future tender consideration. We believe that this approach will improve standards, ensure greater inspection and promote compliance."*

**Following last year's report from Human Rights Watch detailing remedies for the abuse of those migrant workers, what concrete steps have CH2M Hill / Halcrow taken to improve conditions on their behalf? (I.e., pressuring or replacing subcontractors.)**

*"CH2M HILL has supported our Qatar2022 client in its outreach to Human Rights Watch and other human rights and health and safety organizations to seek solutions. We consider these to be valuable alliances in identifying best practices."*

**Does an American company doing global business bear an ethical or moral obligation superseding local law? Should an American company, even when employing foreign workers, be held to a higher standard?**

*"Our Target Zero Policy requires that we place the safety and health of our employees and the protection of the environment at the forefront of our business. This Target Zero Policy, and our recognized Ethics program, both aim to increase awareness among our employees to ensure that all participants on any program or project treat worker safety and ethical business practices as a top priority. We remain committed to protecting all workers on any program and to improve awareness of human rights violations, regardless of the location of the project.*

*"Our Qatar 2022 client has spoken publicly about Qatar's commitment for the Qatar 2022 FIFA World Cup program to be an agent for positive change on the status of worker welfare in the country, and we are committed to providing the support needed to our client in this regard.*

*"As an American company, we are proud to work with a client that is fully committed to bringing our expertise to bear on driving positive and sustainable changes to health and safety standards for workers in Qatar."*

Our correspondence, including a statement in response to the Guardian articles, with personal details redacted is here.

To the extent that our games are meant to symbolize the best and worst in us all, these certainly will, perhaps more perfectly than we intend. Our humanity will be measured in every dimension of glory and squalor. We need to hold international sanctioning bodies like FIFA responsible for what they do, and we need to hold broadcasters and sponsors and the media and the contractors and the governments and ourselves accountable for what we make of the world.

No game is worth a single human life. Simple.

HOME

## Entity Details

### THIS IS NOT A STATEMENT OF GOOD STANDING

| | | | |
|---|---|---|---|
| File Number: | 6655558 | Incorporation Date / Formation Date: | 3/4/2022 (mm/dd/yyyy) |
| Entity Name: | JACOBS SOLUTIONS INC. | | |
| Entity Kind: | Corporation | Entity Type: | General |
| Residency: | Domestic | State: | DELAWARE |

### REGISTERED AGENT INFORMATION

| | | | |
|---|---|---|---|
| Name: | THE CORPORATION TRUST COMPANY | | |
| Address: | CORPORATION TRUST CENTER 1209 ORANGE ST | | |
| City: | WILMINGTON | County: | New Castle |
| State: | DE | Postal Code: | 19801 |
| Phone: | 302-658-7581 | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

Submit

HOME

### Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | | |
|---|---|---|---|
| File Number: | 2114321 | Incorporation Date / Formation Date: | 1/8/1987 (mm/dd/yyyy) |
| Entity Name: | JACOBS ENGINEERING GROUP INC. | | |
| Entity Kind: | Corporation | Entity Type: | General |
| Residency: | Domestic | State: | DELAWARE |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | THE CORPORATION TRUST COMPANY | | |
| Address: | CORPORATION TRUST CENTER 1209 ORANGE ST | | |
| City: | WILMINGTON | County: | New Castle |
| State: | DE | Postal Code: | 19801 |
| Phone: | 302-658-7581 | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

[ Submit ]

 

# GULF TIMES

Sunday, August 17, 2025

SIGN IN | SUBSCRIBE

**QATAR / QATAR**

# `Better Connections Programme' to cover 10,000 workers

PUBLISHED ON JANUARY 13, 2015 | 09:37 PM





(From Left) Microsoft Qatar Country Manager Naim Yazbeck, ictQatar Digital Society Department Executive Director Reem al-Mansouri, RAF CEO Dr Mohamed Salah Ibrahim Rota Executive Director Essa al-Mannai at the signing ceremony. Picture: Jayan Orma

By Ramesh Mathew/Staff Reporter

In a move aimed at boosting the morale of the country's

expatriate workers, the Ministry of Information and Communication Technology (ictQATAR)  signed four memoranda of understanding (MoUs) to not only increase their ICT awareness but also help them stay in regular contact with their families and friends back home.

Qatari institutions, entities and local contracting firms are partners in the `Better Connections Programme,' under which low-skilled migrant workers will have free access to ICT tools and Internet in their residential compounds.

As per the MoU, digital services would be made available to the workers in Arabic, English, Hindi, Nepalese and Bengali in their accommodations.

The MoU partners hope the services would reach no less than 10,000 workers spread over 25 compounds in the initial months.

At the signing ceremony, the officials explained that the initiative would help bridge the digital gap that existed at some levels in the country, which is said to have more than 80% internet penetration.

As per the agreement, Sheikh Thani bin Abdullah Al-Thani Humanitarian Services (RAF) would source, prepare and donate computers for the programme while Reach out to Asia (Rota) will deploy its volunteers to train the unskilled workers to avail of the digital services.

The programme is expected to cover expatriate workers from India, The Philippines, Nepal, Sri Lanka, Pakistan, Bangladesh, Ethiopia, Thailand, Vietnam and Ghana.

ictQATAR also inked MoUs with the Supreme Committee for Delivery & Legacy (SC), Qatar Foundation (QF) and CH2M HILL International BV (CH2M) which work on the most

iconic infrastructure projects in the country.

Through the MoUs, these institutions will seek to include provisions with their contractors to provide ICT facilities for migrant workers where ICT can support their needs, provide connectivity to ensure a technically feasible Internet access and help contractors implement the Better Connections Programme.

Microsoft Qatar will co-ordinate between all stakeholders, provide information to migrant workers and their employers through the programme and provide e-learning content to support basic ICT skills training of migrant workers.

Microsoft Qatar's contribution will be in the form of software donation, where it will donate 1000 free Windows OS and Office licenses to RAF under the Microsoft Software Donation Programme.

Representatives of five of the country's large contractors, namely Bin Omran Contracting, HBK, J & P, L&T and China Harbour Engineering Company were signatories to the MoU. Initially services would be made available in the accommodations of their workers, it is understood.

**RELATED STORY**



Summer STEM programme to conclude this week

**Page Vault**

| | |
|---|---|
| Document title: | Miro Imsirovic \| LinkedIn |
| Capture URL: | https://www.linkedin.com/in/miro-imsirovic-95566a104/ |
| Page loaded at (UTC): | Mon, 04 May 2026 16:47:21 GMT |
| Capture timestamp (UTC): | Mon, 04 May 2026 16:49:26 GMT |
| Capture tool: | 10.80.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) @page-vault/browser/10.80.0 Chrome/144.0.7559.236 Safari/537.36 |
| Operating system: | Linux (Node 24.14.0) |
| PDF length: | 4 |
| Capture ID: | qXsYCx9EJRTjKMEzPYr3BC |
| Display Name: | cjlauzau |







## Education

**V gimnazija- Zagreb, ETF/FER Zagreb**
Mr.Sc., Electrical and Nuclear Power Engineering

Grade: A

## Licenses & certifications

**MMUP/ Qatar- chartered Consultant Eng.- grade A/1**
MMUP Doha; Qatar
Issued Jun 2016

## Projects (7)

**Lusail City Infrastructure Development-DOHA QATAR**

Jan 2011 – Present

Complex and demanding utilities infrastructure project. As senior resident consultant responsible for all phases of
… more

**DVP- UAE Branch of Dalekovod Projekt Zagreb**

2008 – Present

Area Manager

Show all →

## Skills (23)

**Construction Management**

Endorsed by 2 colleagues at Halcrow

15 endorsements

**Commissioning**

Endorsed by 2 colleagues at Halcrow

16 endorsements

Show all →

## Languages (4)

**Croatian**
Native or bilingual proficiency

**English**
Full professional proficiency

Show all →

**Ye Eun Yang** · 3rd+
Teacher @ NEW HYDE PARK-GARDEN CITY PARK UNION FREE SCHOOL …
Connect

**Kamau Newman** · 3rd+
Assistant Manager at AT&T looking for transition into the Finance Field.
Connect

**T. Latrice Carmichael, EMPP** · 3rd+
Government Affairs, Senior Analyst (Insurance)…
Connect

Show all →

You might like
Pages for you

**Remote Jobs**
Internet Publishing
207,711 followers
Follow

**Remote Work**
Software Development
1,413,688 followers
Follow

Show all →

Promoted ···

**Dozens of Jira templates**
Templates, workflows, and automations help you tackle projects of any size.

**Upgrade Your Resume**
Make every word count with Grammarly's AI writing help.

**Travel, Dining, Cash Back**
Explore American Express Card options today. Terms apply. Learn More.

# MIRO IMSIROVIC

Doha, Qatar • +974.55882497  • miroims59@gmail.com

## CAREER OBJECTIVE

A seasoned and qualified engineer with rich experience of 30+ years in handling multi-disciplinary projects, from design to commissioning, managing multinational teams of engineers, consultancy and supervision of complex infrastructure power systems, design, installation, construction of roads, tunnels, information technology and monitoring systems. Proven proficiency in preparation of bid papers, scrutiny and approval of shop drawings and material specifications, technical and commercial bid evaluation of thermal power stations, substations of transformers and electrical switchgear, overhead transmission lines, expressway and motorway projects, various pumping stations and connected networks. Presently seeking a challenging senior level assignment with a globally reputed organization to accelerate company's business growth rate by contributing to design with optimum technical specifications and commercially attractive packages for various projects.

## SKILLS

- EMP Design, Construction, Consultancy
- Commissioning, Charge Handover, Title Changeover
- Site Supervision, Project Coordination, Coordination with Authorities
- EMP Testing, Inspection, Design Review
- Shop Drawing, Bill of Materials, Material Specification
- Power Distribution, Power Transmission, Cabling, Pumping Stations (RPS, SW, IR, DC and similar), tunnel systems, power, lighting FA/FD; SCADA; ITS
- Buildings Electrical and HV/LV/ELV systems; lighting; general and small power supply; CCTV; access control; FA and FF; HVAC power supply and control; ventilation, bus duct feeders; protection and control; BMS/BDS and various SCADA integrations
- Inspection, Design Shop Drawing Review, Drawings Approval
- Contract Management, Pre commissioning, Commissioning
- Leadership, Communication, Teamwork
- Analytical Ability, Problem Solving, Decision Making
- HSE Certifications, Electrical Safety, Licensing Requirements, grade A chartered with MUPDA Doha- Qatar
- MS Office, MS Projects, AutoCAD

## PROFESSIONAL EXPERIENCE

### Resident Engineer M&E, September 2016 – Present
Halcrow-CH2M (Doha, Qatar)

Key Projects to Credit:
- PWA-Doha Expressway – West-East Corridor P010 and P 011- G Ring Road and P015- Wakrah Bypass – Total Projects Value: USD 2.2billion

Key Responsibilities:
- Provide consultancy and supervision for the site MEP/utilities work to ensure that the site is made ready before commencement of the project work as per schedule.
- Review design work, check calculations, verify bill of materials and specifications to ensure that they meet the desired specifications of the project, before approval for overall.
- The scope consists of all stages from design up to the final commissioning and handing over of 7000nos of street lighting poles (5;12;20 and 30m), 46 nos. of 11/0.4kV substations inclusive over 200km of 11 and 0.4kV cabling network and total of 26nos. of various voltage level(220;132 and 66kV) cable diversions. Tunnel MEP and PS systems; ITS in tunnel and open road; tunnel FD/FA; lighting, ventilation, power and small power, ITS, SCADA, etc.
- Supervise actual progress of work, coordinate the work of contractors, engineers, all agencies involved in the project and resolve technical issues.
- Prepare pre commissioning, testing and commissioning activities with allocation of responsibilities of contractors, suppliers, engineers and time schedules.
- Lead a multinational team of two engineers and two inspectors by providing technical guidance and clarifications necessary from time to time and coordinate their activities.
- Attend regular project review meetings with contractors, project management team, and client to resolve issues affecting the progress of project work and initiating proactive actions required to keep the project on track and within budget.
- Coordinate with all authorities, prepare precise and accurate periodic reports, advise and check all drawings and design calculations, their revisions so that they meet the project specifications and standards.
- Liaise with commissioning team and third party consultants for final commissioning of the project after completion of all testing activities to check whether operational and performance parameters set in the beginning are met for handing over to the client.

# MIRO IMSIROVIC

Doha, Qatar • +974.55882497 • miroims59@gmail.com

### Senior Resident Engineer – EMP/Utilities, Jan 2011 – August 2016
### Halcrow CH2M (Doha, Qatar)

Key Projects to Credit:
- Lusail CP 1 & CP 2 Preliminary Infrastructure Project – Lusail Development – Client: Qatari Diar – Total Project Value – 1.5 billion dollars – Already completed the following :-
- Five nos. 66/11 KV substations energized and commissioned
- Two nos. of SW pumping station energized and commissioned. Five PS (SW; IR;RPS) under final commissioning to the authorities(Ashghal; Kahramaa)
- Forty nos. 11 /0/415 KV substations energized and commissioned
- Over 200 kilometers of 66 KV and 400 kilometers of 11 KV underground and utility tunnel cable laying work, over and above, several kilometers of cable work in utility tunnel and substation primary side completed
- Over 100 kilometers of low voltage, extra low voltage and telephone network cables for general LV supply, lighting circuits, CCTV, access control, ventilation and HVAC supply and monitoring, FA/FF systems, CMS, traffic systems and communication systems completed.
- Several supervisory control and data acquisition systems, distribution management systems, control and communication control systems installed.
- Qatar General Electricity and Water Corporation (KAHRAMAA) – Upgrading of the communication signals in National Control Centre, Distribution Control Centre, including integration and commissioning.
- Preparation of NOSP A/B with check lists for extra high voltage power systems.
- Buildings Electrical and HV/LV/ELV systems; lighting; general and small power supply; CCTV; access control; FA and FF; HVAC power supply and control; ventilation, bus duct feeders; protection and control; BMS/BDS and various SCADA integrations

Key Responsibilities:
- Provide consultancy and supervision for preliminary site preparatory work to ensure that the site is made ready before commencement of the project work as per schedule.
- Review design work, check calculations, verify bill of materials and specifications to ensure that they meet the desired specifications of the project, before approval.
- Supervise actual progress of work, coordinate the work of contractors, engineers, all agencies involved in the project and resolve technical issues.
- Prepare pre commissioning, testing and commissioning activities with allocation of responsibilities of contractors, suppliers, engineers and time schedules.
- Lead a multinational team of seven engineers and three inspectors by providing technical guidance and clarifications necessary from time to time and coordinate their activities.
- Attend regular project review meetings with contractors, project management team, and client to resolve issues affecting the progress of project work and initiating proactive actions required to keep the project on track and within budget.
- Participate in steering committee meetings along with the client to take decisions on major issues related to design, drawing, project specifications, equipment selection etc.
- Coordinate with all authorities, prepare periodic reports, advise and check all drawings and design calculations, their revisions so that they meet the project specifications and standards.
- Witness factory acceptance testing and type testing of all critical equipment to ensure that they meet standard requirements and codes.
- Liaise with commissioning team and third party consultants for final commissioning of the project after completion of all testing activities to check whether operational and performance parameters set in the beginning are met for handing over to the client.

### Area Manager – Middle East Region, Sep 2008 – Jan 2011
### DVP Projects (Abu Dhabi, UAE)

Key Projects to Credit:
- Qatar Power Transmission System expansion – Phase 9 – Substations and overhead transmission line
- Package S7 & S8 – New construction, refurbishment, expansion of transformer substations
- Study of new 132 KV GIS Switchyard and OCGT 120 MVA Gas Turbine Generation facilities

Key Responsibilities:
- Provided technical, organizational and financial services for all prospective contracts in the Middle East region to prepare and submit comprehensive proposals for electric power transmission projects to the clients.
- Supervised engineering design, scrutiny and approval of drawings, bill of materials, including specifications, consultancy and execution of construction of electrical power transmission projects, including overhead lines, transformer stations of various voltages.

# MIRO IMSIROVIC

Doha, Qatar • +974.55882497 • miroims59@gmail.com

- Reviewed and approved detailed system design for new power transmission system, substations as well as for refurbishment projects.
- Guided the team in preparation of bids for packages for new construction, refurbishment, and expansion of transformer substations with technical and commercial analysis.
- Prepared technical bid paper for Ras Al Khaimah authorities for study of 132 KV GIS switchyard and 120 MVA gas turbine generation facilities.
- Evaluated technical tenders for Qatar power transmission system, substations, overhead power transmission line to submit technical evaluation report.
- Carried out technical and commercial analysis of the offers received for various substations for various transformer voltage levels to recommend for approval.
- Scrutinized contractor's test specification proposals, both at the manufacturer's factory premises as well as at project site as well for end to end testing for the complete system for approval.

**Utilities- Electrical Works Manager**, Aug 2006 – Aug 2008
Konstruktor Engineering (Doha, Qatar)

Key Projects to Credit:
- PWA-Doha Expressway – Package 3 – Project Value: USD 210 million

Key Responsibilities:
- Developed business relationship with various clients by understanding their specifications, quality control systems, switchyard procedures and technical requirements.close coordination with authorities QCDD; ASHGHAL as a client and Kahramaa
- Prepared comprehensive subcontractor agreements for electrical extra high voltage, high voltage, and medium voltage cable laying, and cabling for street lighting, telephone cable, intelligent transportation system -ITS and design with installation of street lighting.
- Scrutinized design documents, method statements, bill of materials, material specifications and if required, revised and approved the revised version.
- Liaised with various subcontractors working at site, supervising consultant and client to resolve coordination issues and ensure completion of project as per schedule.
- Studied shop drawings prepared by manufacturers and contractors, advised necessary modifications to meet project specifications, if required and approved the same.
- Coordinated subcontractors' project work schedule, monitored progress for time schedule and approved phase wise payment on payment certificates as per agreement in the contract.

**Senior Electrical Engineer** – Project Coordinator, Aug 2004 – Aug 2006
Pyhrn Walter Motorway Gmbh (Starbag, Dywidag, Walterbau, Croatia)

Key Projects to Credit:
- AZM Motorway, Zagreb – Project Value USD 420 Million Dollar

Key Responsibilities:
- Reviewed main and detailed design, recommended appropriate changes to meet project specifications and international standards.
- Supervised preparation of tender documents to ensure that all technical specifications, inspection and test requirements were adequately covered and specified.
- Supervised the work of electrical power subcontractors for design and building of eleven road and tunnel distribution substation and evaluated their work with monthly interim payments.
- Designed and procured materials and equipment for complete power grid and networked construction, reconstruction and extension of systems.
- Evaluated the offers received from the subcontractors to verify whether the specifications of equipment and installation work met the specifications before approval.
- Supervised and coordinated the work of several foreign and domestic subcontractors to ensure proper coordination amongst them.
- Ensured integration of all traffic signaling, electrical sub systems, general power supply on high and low voltages, HVAC system, Ethernet, LAN communication network, toll collection systems, lighting, sounding, fire detection, sounding and radio system, fire detection, emergency and hydrant surveillance system for proper working.
- Implemented centralized control system of all the above systems and established system of regular maintenance of the above systems from the project stage.

# MIRO IMSIROVIC

Doha, Qatar • +974.55882497 • miroims59@gmail.com

- Liaised with client and main supervising consultant on day to day basis for smooth progress of project to full satisfaction of the client.
- Coordinated and supervised testing, final commissioning and handling over of the project with proper documentation to the client.
- EPC of all tunnels and Buildings Electrical Services and HV/LV/ELV power systems; lighting; general and small power supply; CCTV; access control; FA and FF; HVAC power supply and control; ventilation, bus duct feeders; protection and control; BMS/BDS and various SCADA integrations, FF hydrant network pumping stations
-

### Senior Electrical Engineer, May 2001 – Jul 2004
Louis Berger Group Inc./ HLL International Inc. (Zagreb, Croatia)

Key Projects to Credit:
- Major rehabilitation projects of electrical systems in the war affected areas of Croatia – Project Cost: USD 10 million.

Key Responsibilities:
- Executed rehabilitation projects of low and medium voltage power transmission networks of 10 KV, 35 KV and 110 KV voltages.
- Undertook refurbishing and repair of 6 transformer stations of 10 KV, 35 KV, 110 KV and 10 transformers of 10 KV, 20 KV & 35 KV.
- Coordinated preparation of design and drawings, scrutinized and reviewed the same for corrections and modifications before approval.
- Evaluated tenders received for the projects, sought revision after verification and approved the technically acceptable lowest tender.
- Reviewed technical specifications and standards, other terms and conditions included in the contract documents and recommended award of the contract to the lowest bidder meeting the specifications.
- Supervised procurement activities to ensure that the materials of right specifications were being procured and carried out field inspection and testing.
- Liaised with all suppliers, various subcontractors and authorities for resolving technical problems to ensure timely completion of project.

### Professor & Education Consultant, Sep 1994 – April 2001
Samobor Zagreb University (Croatia)

Key Responsibilities:
- Provided lessons to students on practical applications of electrical appliances in industry to augment their theoretical knowledge.
- Trained students on how to design electrical systems and various applications of materials in electrical engineering fields, along with their specifications and properties.
- Taught students on high voltage, medium and low voltage electrical switchgears and networks, power plants and automation of power distribution.
- Covered subjects like process control through microprocessors, modeling of asynchronous and synchronous motors, generators and their industrial applications.

## PREVIOUS ASSIGNMENTS

- ### Electrical Engineering Coordinator, Jan 1992 to Aug 1994 (2 Years 8 Months):
- Monter Electro Company, Zagreb, Croatia

Responsibilities.
- participating in design and BOQ preparation,
- supervision of works and assets for the Building Electrical and Telecomm works on Presidential Palace Annex 1, Agrokor Business Center, National Library, Rehabilitation of Hotel International and National Hospital.
- coordination of activities between various suppliers and vendors as well with concerned authorities

# MIRO IMSIROVIC

Doha, Qatar • +974.55882497 • miroims59@gmail.com

- supervision of works at reconstruction of 35/20/10 kV S/S – Bobovica and construction of new 220/35/20/10 kV S/S – Ernestinovo 1
- preparation of specifications for procurement of equipment
- preparation of cost estimations and project schedules
- inspection of installations to ensure compliance with contract requirements
- Management of human, material and financial recourses on several projects.
- Coordinating the works on Buildings Electrical and HV/LV/ELV systems; lighting; general and small power supply; CCTV; access control; FA and FF; HVAC power supply and control; ventilation, bus duct feeders; protection and control; BMS/BDS and various SCADA integrations
-

- **Design Engineer** Sep 1987 to Dec 1992 (5 Years 4 Months):
- Koncar Engineering Company, Zagreb, Croatia
-

Preparation of comprehensive designs of the various MV 3,3/6,6kV systems in Thermal Power Plants

- ○ Design up to installation of MV/LV power supply subsystems switchgears with protection, telecomm and SCADA control and monitoring in thermal power plants
- ○ Preparation of software assisted comprehensive designs of the various open yard switching grids of 33, 66, 132 and 220 kV    . FAT preparation and conduction
- ○ Inspection of specified equipment at manufacturer's production facilities
- ○ Ensuring compliance with BS and other engineering standard. Regular meetings with consultant EPL-Brighton, UK

Nov 1982 to July 1987 (4 Years 9 Months): Electrical Assistant Engineer / Procurement Agent, ASDEM, D.O.O, Zagreb, Croatia

## EDUCATION

University of Zagreb, Zagreb, Croatia
Master's Degree in Nuclear Power Engineering (July1987); Grade:

University of Zagreb, Zagreb, Croatia
Master's Degree in Electrical Engineering (January 1987); Grade:

## PROFESSIONAL DEVELOPMENT

MEMBERSHIPS:
- Nov 2000: Member, (Croatian University of Teachers Association)
- Apr 1999: Chartered Electrical Engineer, (Croatian Chamber of Electrical Engineers)
- Jun 1989: Member, (Croatian Chamber of Engineers)
- Jun 2016: MMUP-MUPDA- Grade A-Chartered Eng. License- Qatar Consultancy Engineering Registration Card Reg. No. 12538

# MIRO IMSIROVIC

Doha, Qatar • +974.55882497 • miroims59@gmail.com

## PERSONAL INFORMATION

- Citizenship: Croatia
- Date of Birth: 18/02/1959
- Marital Status: Single
- Language: Fluent in Croatian, English, French, German, Serbian and Bosnian

November 13, 2025

**BY EMAIL**

Hon. Cyrus Y. Chung
United States Magistrate Judge
Byron G. Rogers United States Courthouse C254
Courtroom C205
(303) 335-2761
Chung_Chambers@cod.uscourts.gov

Re:    **Parties' Joint Statement on Disputed Discovery Issues**
       *F.C., et al. v. Jacobs Engineering Group, Inc., et al.*, **Case No. 1:23-cv-02660-RMR-CYC**

Dear Judge Chung:

Plaintiffs and Defendants in the above-captioned action (collectively, the "Parties") jointly submit this letter in advance of the Parties' November 19, 2025 hearing before the Court pursuant the Court's September 9, 2025 Order. (*See* ECF No. 88.)

I.    CONFERRAL UNDER D.C. COLO.L.CIVR 7.1(A)

The parties conferred in good faith via a series of emails, letters, and videoconference calls between August 8, 2025, and November 11, 2025, and have been unable to come to a resolution as to the discovery disputes referenced herein.

II.    PLAINTIFFS' LIST OF ISSUES FOR THE COURT

    A.    **Defendants' Obligation to Produce Documents Related to the Entire Alleged Venture**

    *Plaintiffs' Position*

A number of Plaintiffs' document requests and interrogatories seek discovery related to the "Qatar World Cup Construction Projects," which the requests define as "any building or construction project carried out in Qatar in connection with the 2022 Fédération Internationale de Football Association ("FIFA") World Cup[.]" *See e.g.* Ex. 3, Pls.' First Requests for Production of Documents at 2. Defendants refuse to answer these requests to the extent they seek information on

World Cup projects outside of the stadiums themselves. But documents relating to other projects in the Venture (including training sites and non-stadium infrastructure projects) are directly relevant to Plaintiffs' claims.

The Amended Complaint defines the "Venture" to include not only the World Cup stadiums, but also "related infrastructure." *Id*. ¶ 22.  This Court defined the "Venture" the same way. ECF No. 69, MTD Order at 31 (venture involved CH2M "coordinating twelve stadium projects *and related infrastructure*" (emphasis added)). And some Plaintiffs were subject to forced labor on these non-stadium portions of the Venture, as the Amended Complaint itself pleads. *See* ECF No. 52, Amended Complaint at ¶¶ 207 (alleging that "[e]ach Plaintiff worked for the World Cup Construction Venture by providing construction labor for one or more of the projects included therein, such as one or more of Al Thumama Stadium, Al Wakrah Stadium, Khalifa Stadium, Al Rayyan Stadium, and/or Lusail Stadium, *and related infrastructure*" (emphasis added)); ¶ 5 ("Plaintiffs  were among the thousands of construction workers who were lied to . . . to build the stadiums *and infrastructure* for the 2022 FIFA World Cup" (emphasis added)). There is thus no basis to claim that this case is limited to the stadiums.[1]

Defendants claim the Amended Complaint must be amended before Plaintiffs can include allegations about forced labor on non-stadium projects. That is wrong. As explained, the Amended Complaint itself pleads that some Plaintiffs were subject to forced labor on the related infrastructure portion of the Venture. Yet prior to discovery it was not clear to Plaintiffs what specific infrastructure projects were covered by Defendants' contract. On September 18, 2025, Defendants produced the Programme Management Contract for the Venture, which identified all of the specific projects (such as stadiums and training sites) for which CHBV had direct execution responsibility as well as additional projects (certain infrastructure programs) over which CHBV had oversight and monitoring responsibility. See Ex. 25, Programme Management Contract at 124. Based on that disclosure, Plaintiffs will be supplementing their interrogatory response on November 14, 2025 to disclose the particular non-stadium Venture projects that each Plaintiff was subject to forced labor on, in addition to their work on the stadiums. This is not an improper "amendment," but merely a fleshing out of Plaintiffs' claims based on additional discovery. *See Arora v. Nav Consulting Inc.*, 2023 WL 12153165 at *2 (N.D. Ill. 2023) ("A plaintiff need not set out all of the pertinent facts that support his claims in the complaint... [Plaintiff] can rely on the additional information revealed through discovery at summary judgment or trial without needing to include this information in an amended pleading.") (internal citation omitted); *Mahdy v. Cearley*, 2014 WL 12791277 at *6 (D.N.M. 2014) (noting that "[a]s all lawsuits progress, additional facts become available to the parties and the issues sometimes evolve" and holding that there was no

---

[1] Defendants claim that Plaintiffs' definition of the Venture has been "evolving" and imply that Plaintiffs are only belatedly seeking documents related to the non-stadium portions of the Venture. That is wrong. The Amended Complaint includes related infrastructure, and Plaintiffs' first discovery requests served on July 22, 2025 sought information about these non-stadium projects. Plaintiffs first learned that Defendants were refusing to produce this discovery when they received Defendants' first discovery responses on August 21, 2025, and Plaintiffs raised the issue in a discovery letter the very next day. *See* Ex. 13, Plaintiffs' Letter of Aug. 22, 2025, at 1.

reason to amend the complaint "to add facts that can be addressed as needed in discovery and motion practice as the case moves along.").

Even if Plaintiffs had only worked on the stadiums, Defendants' involvement with non-stadium aspects of the Venture shows their "participation" in the Venture and knowledge of forced labor conditions in the Venture, which are both elements of Plaintiffs' TVPRA claims. See ECF No. 52, Amended Complaint at 210-11. If Defendants participated in, or knew of forced labor on, *any* part of this Venture, those facts help prove Plaintiffs' claims. Indeed, even Defendants' knowledge of forced labor conditions on non-World Cup projects in Qatar would tend to support the conclusion that Defendants should have known of forced labor in the Venture. *See* ECF No. 69, Memorandum Opinion and Order at 43-44 (knowledge of slavery in Qatar is relevant even if not specific to the Venture because "general knowledge of TVPRA violations still often informs the knowledge analysis") (internal citation omitted). Because the Venture includes the non-stadium projects, documents pertaining to those projects help prove both participation and knowledge.

### *Defendants' Position*

The Court should reject Plaintiffs' sprawling and ever-evolving definition of "venture," and their eleventh-hour attempt to amend their pleadings without the required leave of Court by way of a belated "supplement[al] … interrogatory response."

According to Plaintiffs, "the Complaint defines the 'Venture' to include not only the World Cup stadiums, but also 'related infrastructure'" (*supra*, at 2). While the Complaint alleges very generally that the Plaintiffs worked on stadiums and "related infrastructure," ECF No. 52, Amended Complaint ¶¶ 5, 207, *none* of the Plaintiffs actually identifies by name any "related infrastructure" project. They allege *only* that they worked on five of the twelve contemplated stadium projects. *Id.* ¶¶ 147–199; ECF No. 69, MTD Order at 3. On that basis, Defendants agreed to produce documents concerning the five stadiums where Plaintiffs claim to have worked and, as a further accommodation, agreed to expand that search to cover all twelve stadium projects. Ex. 16, Defs.' Letter of Aug. 29, 2025, at 2. Discovery on that basis has been proceeding for several months, with Defendants in the process of reviewing over 230,000 potentially responsive documents with an aim of reaching substantial completion by end of year.

Plaintiffs request now to go far beyond that scope—demanding that Defendants produce documents concerning "*any* building or construction project carried out in Qatar in connection with the 2022 . . . World Cup" (*supra* at 2, emphasis added)—a patently unreasonable enlargement of Defendants' discovery burden and timeline. Nothing in the Amended Complaint or this Court's decision justifies expanding discovery based on such an open-ended and unbounded definition of an unalleged "venture." The construction works associated with the 2022 World Cup were a massive undertaking by hundreds of third-party contractors and sub-contractors, none of whom were hired or controlled by Defendants or their affiliate CHBV. Defendants should not be compelled to search for, collect, and review all manner of documents concerning projects where no Plaintiff allegedly labored and Defendants had no role.

To bolster their request for sprawling discovery, Plaintiffs assert that they will "supplement" their interrogatory responses to identify the infrastructure projects on which certain Plaintiffs now claim to have worked after all. Plaintiffs claim that they could not have provided this information until after Defendants produced the Programme Management Contract on September 18, 2025.

That excuse does not withstand scrutiny. Plaintiffs' knowledge of the projects on which they allegedly labored does not turn on the contents of the Programme Management Contract. Moreover, if their complaint actually alleged, as they now claim, a "venture" that includes "related infrastructure" projects, then there is no excuse for their failure to identify all such projects in their Complaint. Not a *single* "infrastructure project" was identified, whether in the original Complaint of October 2023, or the Amended Complaint of March 2024. The idea that Plaintiffs require the Contract to be reminded of the projects on which they allegedly labored is implausible on its face; Plaintiffs have their own memory and employment records, some of which have been produced to Defendants. At most, Defendants' production of the Contract in September 2025 might have revealed a handful of projects that were inadvertently omitted from the Complaint. But that does not explain why Plaintiffs have waited nearly *two months* after the Contract was produced to confirm the infrastructure projects on which they allegedly worked—nor does it explain why that confirmation will not come until November 14, 2025, the day after this Joint Submission will be filed.

For the avoidance of doubt, Defendants' position is that "supplementation" of Plaintiffs' interrogatory responses does not affect an amendment of the Complaint, which does not allege forced labor on any infrastructure projects. And, because Defendants oppose any such amendment, leave of Court is required. Fed. R. Civ. P. 15(a)(2). Plaintiffs cite to inapposite cases concerning amendment to account for the discovery of new facts—a far cry from Plaintiffs' failure here to allege their own employment history. *See Las Vegas Ice & Cold Storage co. v. Far West Bank*, 893 F.2d 1182, 1184 (upholding denial of motion to amend on grounds that amendment "was untimely and would substantially broaden the issues for trial, and that the factual basis for the claim was known to the plaintiff at the time the complaint was filed"); *Johnson v. Reyna*, 2021 WL 849770 (D. Colo. Jan. 25, 2021), at *2 (denying motion to amend to the extent it included allegations of events occurring before the complaint). The scope of discovery should be tied to the operative complaint; in this case, where the operative pleading contains no specificity regarding Plaintiffs' purported work on non-stadium projects (including what they worked on, who employed them, or when the work was performed), discovery should be limited to the stadium projects.

Plaintiffs' fallback argument—that discovery on unrelated Qatari projects might show that Defendants "should have known of forced labor in the Venture"—is equally misplaced. That theory ignores that Defendants have agreed to search for and produce nonprivileged documents with respect to Plaintiffs' RFPs 8–12, concerning: (*i*) allegations of forced labor in Qatar generally; and (*ii*) company policies relating to human trafficking and forced labor generally. Ex. 16, Defs.' Letter of Aug. 29, 2025, at 3. Plaintiffs thus already have discovery capable of addressing any "general knowledge" theory the Court previously discussed. *See* ECF No. 69, MTD Order at 43–44 (noting that "general knowledge of TVPRA violations" may inform the analysis but would not in and of itself establish actual knowledge or reckless disregard).

4

The Court should reject Plaintiffs' attempt to recast their allegations and disregard the Court's prior limits by seeking discovery into projects far beyond those at issue. Plaintiffs' proposal would convert a dispute about specific stadium projects into a wide-ranging audit of every major construction project in Qatar, imposing a massive and unjustified burden on Defendants. That burden already falls almost entirely on Defendants as Plaintiffs possess minimal employment-related documents and appear to have preserved even fewer.

> **B.      Document Production and Responses Related to Defendants' Participation in the Alleged Venture (Plaintiffs' RFP Nos. 2 and 3, Plaintiffs' Interrogatory No. 2)**

### *Plaintiffs' Position*

Defendants have provided deficient responses to several of Plaintiffs' discovery requests (RFP Nos. 2 and 3, and Interrogatory No. 2) that are directly relevant to Defendants' "participation" in the venture for purposes of TVPRA liability.

Plaintiffs' Interrogatory No. 2 asks for a detailed description of the responsibility that Defendants and their Affiliates had on the World Cup Construction Projects. Defendants have stated only that their wholly owned subsidiary, CHBV, contracted to act as a programme management consultant. This response is deficient. First, the response does not lay out all of CHBV's various responsibilities on the project. Second, Defendant CH2M Hill, Ltd. was a contractual guarantor for the World Cup Construction Projects, and the contract provides that various employees of Defendants would provide consulting and expertise on the project. Defendants' employees billed time on the project. *See* Ex. 27, Parent Company Guarantee at 197-8; Ex. 25, Programme Management Contract at 144, 158-60. The notion that Defendants had no responsibilities on the project is demonstrably false, and the allocation of responsibility between Defendants and CHBV is directly relevant to their participation in the Venture. Plaintiffs request the Court order Defendants to respond to Interrogatory No. 2 in full.

Plaintiffs' RFP Nos. 2 and 3 seek documents related to Defendants' participation in the World Cup construction projects and Defendants' communications with Qatari entities related to those projects. Defendants refuse to produce all such documents, instead claiming that only certain limited categories of documents (such as those directly addressing labor issues) are relevant. But any participation by Defendants in the venture (whether directly related to labor issues or not) helps establish the "participation" element of the TVPRA claim.

Plaintiffs' request is reasonably targeted to highly contested issues regarding the U.S. Defendants' participation in the venture. To minimize any burden, Plaintiffs have already agreed to limit the production of documents from CHBV to certain limited issues (such as bidding, contract negotiation, and worker welfare). But the remaining U.S. Defendants have tried to place all the blame for venture participation onto CHBV. Plaintiffs are thus entitled to refute Defendants' claim that their only involvement was as contractual guarantor for the project. Defendants' document production indicates that U.S.-based employees were involved in public relations, accounting, design, and executive management for the Venture, among other areas. Because a central dispute

in this case is the extent to which Defendants participated in the Venture, Plaintiffs are entitled to *all* documents related to the U.S. Defendants' participation in the World Cup Construction Projects and all of Defendants' communications with Qatari entities related to those projects.

If Defendants' representation is accurate, and they had no responsibility in connection with the World Cup Construction Projects, then it should not be at all burdensome for Defendants to respond to Plaintiffs' RFP Nos. 2 and 3 without limitation. And if they possess a large volume of documents relating to their own work in connection with the Venture, then that material should be produced because it proves Plaintiffs' claims. Plaintiffs are entitled to refute Defendants' claim that the sole involvement of the U.S. entity was as contractual guarantor for the project.

### *Defendants' Position*

The Court should deny these requests. Plaintiffs misstate the broad scope of their Interrogatory and RFPs and the nature of Defendants' responses to date.

First, Plaintiffs' Interrogatory No. 2 seeks information about Defendants' and their affiliates' project roles that is already fully reflected in documents Defendants have produced, including the Programme Management Contract, the Parent Company Guarantee, and other related contract documents. Plaintiffs' own submission confirms as much by citing to those very documents. Moreover, Defendants have agreed to search for and produce relevant and nonprivileged documents "describing contractual obligations of Defendants related to the [Project] as well as any documented statements of Defendants related to their role in the [Project]." Ex. 5, Defs.' R&Os to Pls.' First Set of RFPs (Partial Set), at 13 (RFP No. 7).

Because the relevant contracts and records have been, or will be, produced and speak for themselves, no narrative interrogatory response is required. *See* Fed. R. Civ. P. 33(d) (describing option to produce business records in lieu of answering interrogatory); *Daiflon, Inc. v. Allied Chem. Corp.*, 534 F.2d 221, 226 (10th Cir. 1976) (party not required to provide narrative response where relevant records were already produced); *Aptive Env't, LLC v. Town of Castle Rock, Colo.*, 2017 WL 11487106, at *2-*3 (D. Colo. Dec. 22, 2017) (party may respond to interrogatory by referring to records where "the burden of deriving or ascertaining the answer will be substantially the same for either party") (quoting Fed. R. Civ. P. 33(d)).

Second, Plaintiffs' RFPs 2 and 3 improperly demand "any and all" of Defendants' Project documents and communications with the Supreme Committee over an eleven-year period, regardless of topic. Plaintiffs now contend that this sweeping discovery is necessary to establish the U.S. Defendants' own alleged "participation" in the supposed "venture," apart from CHBV. But that theory ignores the record. The Programme Management Contract and Parent Company Guarantee—already produced—set out the respective responsibilities of CHBV and the limited, guarantor obligations of its parent. Those documents confirm that CHBV alone served as the Programme Management Consultant and performed the work in Qatar. Plaintiffs cannot conflate CHBV's day-to-day project performance with alleged "participation" in a forced labor venture by its U.S. affiliates. Requiring production of every engineering file, design plan, or minute scheduling email generated during CHBV's decade-long engagement—none of which concern

6

Plaintiffs' alleged forced labor—would not illuminate the U.S. Defendants' role and would impose an enormous and unjustified burden.

Moreover, Defendants have already agreed to produce documents concerning the four categories Plaintiffs themselves identified as relevant:  bidding, contract negotiation, the financial aspect of CHBV's involvement, and labor/worker issues.  Ex. 14, Defs.' Letter of Aug. 27, 2025, at 4; Ex. 15, Pls.' Letter of Aug. 28, 2025, at 2; Ex. 16, Defs.' Letter of Aug. 29, 2025, at 2.  That scope captures all material relevant to Plaintiffs' theory of alleged "participation" and to Defendants' alleged knowledge of worker conditions.  Plaintiffs have no legitimate need or interest in documents beyond these agreed topics and cannot justify the burden on Defendants of searching for and producing *all* documents relating to the project generated over the course of more than a decade.

Finally, Plaintiffs' logic is backwards.  The fact that Defendants had no operational role in the World Cup construction projects does not somehow make limitless discovery proper.  The absence of such a role makes the requests irrelevant, not easy.  Rule 26 does not require a party to prove a negative by searching for and producing every document conceivably "related" to a decade-long infrastructure program on which it had no contractual duties.  Plaintiffs' suggestion that producing voluminous, irrelevant material would somehow "prove their case" underscores the circularity of their argument:  If Defendants lack responsibility, then there is no relevant discovery to produce; if they had such responsibility, it is reflected in the contracts already produced.  Burden under Rule 26 turns on proportionality to the issues in the case, not on Plaintiffs' speculation that a particular quantity of documents (irrespective of their subject matter) equals culpability.  The Court should therefore deny Plaintiffs' motion to compel any broader discovery.

### C.    Spoliation

#### *Plaintiffs' Position*

Plaintiffs seek a 30(b)(6) deposition to investigate spoliation issues that have arisen during the pendency of this suit. Defendants claim the bulk of the documents related to the World Cup Construction Venture are stored on a server in Qatar that is purportedly inaccessible to them.  *See* Ex. 5, Defendants' R&Os to Plaintiffs' First Set of Requests for Production (Partial Set) at ¶ 31. Defendants further represent that employee data access was terminated as individuals left the project, with a full decommissioning in 2024 (*after* these Plaintiffs filed their complaint in 2023). *See* Ex. 12, Defs.' Letter of Aug. 8, 2025, at 1. This timeline makes clear that Defendants *had access* to this data well after this lawsuit was filed and failed to take appropriate steps to preserve such access.  Plaintiffs seek an order that this 30(b)(6) deposition on spoliation not preclude Plaintiffs from taking a later 30(b)(6) deposition on the merits.

Plaintiffs have repeatedly asked Defendants for details about the nature of the documents on this server, their access to those documents, and what steps they have taken to restore access. *See* Ex. 17, Pls.' Letter of Sept. 24, 2025, at 4; Ex. 19, Pls.' Letter of Oct. 6, 2025, at 1-2, Ex.22, Pls.' Letter of Oct. 22, 2025,  at 2-3. But Defendants have repeatedly refused to answer many of these questions during the parties' conferrals.  For example, Defendants have repeatedly refused to

answer what steps, if any, they took to preserve access to the documents during the pendency of this lawsuit and what steps they have made to restore access. *See* Ex. 20, Defs.' Letter of Oct. 13, 2025, Ex. 23, Defs.' Letter of Nov. 4, 2024.

Defendants assert that the information on these servers is no longer in their possession, custody, or control.  That is beside the point.  If during the pendency of this lawsuit the documents *once were* within their possession, custody, or control, and Defendants failed to preserve such access after this lawsuit was filed, that raises serious questions of spoliation. Public posts from Defendants' employees and the Programme Management Contract state that Defendants used a SharePoint platform, a joint mobile application, and numerous shared software platforms to upload and access information over the course of the project.  *See Molo Design, Ltd., v. Chanel, Inc.*, 2022 WL 2135497 at \*1 (S.D.N.Y. 2022) (holding that "to the extent that [Defendant parent company's] documents are part of 'SharePoint,' Microsoft Team channels, or other network folders to which Defendant has access, those documents have been or must be produced if they are responsive to Plaintiff's requests.").  Defendants' own representations to Plaintiffs state that data access was not fully decommissioned until 2024, and this action was filed on October 12, 2023.[2]

Because Defendants have not been forthcoming about the nature of their access to these platforms, Plaintiffs are seeking a 30(b)(6) deposition about the spoliation issue: which documents and platforms Defendants had access to, when access terminated, and what steps Defendants took to meet their obligation to preserve their access to documents. *See* Ex. 24, Pls.'. 30(b)(6) Deposition Notice.

This deposition should not count against the total number of depositions allocated in this case, nor should it substitute for a 30(b)(6) deposition on the merits, because it would not be necessary but for Defendants' failure to preserve their access to key documents in this case.

### *Defendants' Position*

Defendants deny Plaintiffs' unsubstantiated accusations of spoliation but have agreed to tender a witness for a 30(b)(6) deposition.  The Parties' only dispute is whether that deposition should count against the Plaintiffs' (*i*) agreed limit on total number of depositions; and (*ii*) time allowance for 30(b)(6) depositions in particular.  As Plaintiffs have not served any other deposition notices, it is unclear whether that dispute will ever prove significant.  The Court should dismiss this unripe request.

---

[2] Defendants insinuate that Plaintiffs should instead seek these materials directly from the Supreme Committee, a quasi-state entity in Qatar. But Qatar's public records request law is no FOIA: the requestor must declare that she will not use the information to damage the Qatari public interest, see Data Request, available at https://perma.cc/LS22-7WGU,  and "any person who discloses, makes available, or reveals to others" any information that "causes harm to the security or economy of [Qatar], its public interest, or any of its international relations," can be imprisoned for up to ten years. *See* Article 25, Law No. 9 of 2022, available at https://perma.cc/PN39-5SS7.

Although there is presently nothing for the Court to decide, Defendants note, for completeness, that Plaintiffs' spoliation theory rests on a fundamental misunderstanding of the facts and governing law. As an initial matter, the information on the Supreme Committee's servers has never been in Defendants' possession, custody, or control. Moreover, far from not being "forthcoming," Defendants repeatedly explained to Plaintiffs why their spoliation claims concerning the Qatar Supreme Committee's documents are meritless. *See* Ex. 20, Defs.' Letter of Oct. 13, 2025; Ex. 18, Defs.' Letter of Sep. 30, 2025; Ex. 12, Defs.' Letter of Aug. 8, 2025. The documents at issue are owned and maintained by the Supreme Committee for Delivery and Legacy, the Qatari governmental entity that administered the World Cup projects. Parties are under no obligation to preserve, access, or obtain third-party documents—much less the third-party documents of a foreign sovereign located in that sovereign's own territory. *See Goodman v. Praxair Servs., Inc.*, 632 F.Supp.2d 494, 511-18 (D. Md. 2009) (no duty to preserve documents of third-party consultants); *contra Molo Design*, 2022 WL 2135497 (S.D.N.Y. Mar. 29, 2022) (case cited by Plaintiffs concerns parent company's documents to which defendant retained access).[3] This is especially the case where the Programme Management Contract vests exclusive legal ownership and physical control of "Q22SC Data" in the Supreme Committee and forbids CHBV or its affiliates from using such Data without the Supreme Committee's agreement. Ex. 26, PMC Cont., sched. 1, cl. 68(b); *id.* cls. 10.3, 10.5(b), 11.2. Plaintiffs' insistence that Defendants could or should have copied that data in breach of the Contract and Qatari law has no legal basis.

Moreover, Plaintiffs have long known that the Supreme Committee may possess relevant materials. Defendants disclosed that fact in their Rule 26 initial disclosures and in multiple letters, and Plaintiffs' own Complaint identifies the Supreme Committee as the entity responsible for the projects. *See* Ex. 2, Defs.' Initial Disclosures (July 29, 2024) at 6–7 (identifying the Supreme Committee as a "third part[y] likely to have discoverable materials"; and noting that "certain documents and communications created during the course of [CHBV]'s work for the Supreme Committee were stored exclusively on servers maintained by the Supreme Committee"); Ex. 12, Defs.' Letter of Aug. 8, 2025, at 1; Ex. 14, Defs.' Letter of Aug. 27, 2025, at 3; Complaint, ECF No. 1 ¶¶ 23, 28, 50–51. Yet Plaintiffs have made no effort to seek third-party discovery from the Supreme Committee and instead attempt to convert their own inaction into a meritless spoliation claim.

If Plaintiffs choose to proceed with their requested Rule 30(b)(6) deposition, Defendants will designate an appropriate witness. However, Plaintiffs have made no showing that they are entitled to a "free" deposition outside the agreed limit, or to additional Rule 30(b)(6) depositions on other topics. The deposition should count toward Plaintiffs' limits, which the Court can expand later upon a showing of good cause.

---

[3] The Qatari law cited by Plaintiffs (*supra* n. 2) only underscores why mere "access" to third-party documents does not amount to possession, custody, and control.

      **D.**        **Defendants' Responses to Plaintiffs' Interrogatories and RFPs**

        1.        <u>Travel Information (Plaintiffs' RFP No. 15 and Interrogatory No. 7)</u>

      ***Plaintiffs' Position***

Plaintiffs' Interrogatory No. 8 and RFP No. 15 seek information related to travel by Defendants and their affiliates related to the World Cup Construction Project. Defendants' limited responses to these requests are deficient for two reasons.

First, Defendants refuse to provide any information related to travel between the United States and Defendants' Affiliate CHBV office in the Netherlands. But this is directly relevant to Plaintiffs' claims. Defendants have thus far minimized their role in the Venture. *See* Ex. 6, Defendants' Response to Plaintiffs' Interrogatory No. 2, discussed *supra*. Any travel between the United States and the Netherlands as part of the project is probative of Defendants' participation, as well as the extent to which wholly owned subsidiary CHBV acted as Defendants' agent on the project. If, for example, Defendant executives and employees were travelling to Amsterdam (or vice versa) monthly for meetings about the project, that fact is relevant to Defendants' participation in the venture.

Second, Defendants' answer regarding travel to and from Qatar is insufficient. The Interrogatory asks for the purpose of the trip, but Defendants state only that the trips were for "business." Plaintiffs seek an order compelling Defendants to respond to Interrogatory No. 7 in full and provide a complete answer as to the purpose of travel.

Plaintiffs respectfully request this Court order Defendants to respond in full to Plaintiffs' RFP No. 15 and Interrogatory No. 7 on travel, including Defendants' travel to and from CHBV and CHBV's travel to and from Defendants.

      ***Defendants' Position***

Plaintiffs' travel-related discovery requests are overbroad, speculative, and disproportionate to the needs of the case.

First, Defendants have already explained that no centralized travel records exist prior to 2018, and Defendants have already produced a list of all individuals who expensed travel to Doha International Airport within the agreed time period, including expense dates. Plaintiffs' continued demand for additional detail serves no legitimate purpose, especially where: (*i*) Defendants do not deny that personnel were present in Qatar during the relevant time period; and (*ii*) Defendants have already provided to Plaintiffs a list of over 400 individuals who billed time to the Project.

Second, Plaintiffs now contend that travel between the United States and the Netherlands is "probative" of Defendants' participation in an alleged forced labor venture in Qatar. That contention is unfounded. CHBV contracted for international projects in many countries. Thus, mere travel from the United States to the Netherlands is not probative of Defendants' alleged participation in a forced labor venture for stadium construction projects in Qatar. Nor have

Plaintiffs explained why such discovery will reveal participation by Defendants in the stadium construction projects, if any, that will not already be evidenced from emails, project documents, and other document discovery.

The speculative nature of the request belies Plaintiffs' true intent: to impose asymmetric discovery burdens on Defendants (even while Plaintiffs refuse to provide their own travel records, *see infra* § II.C.1), and to obtain impermissible jurisdictional discovery to resuscitate their dismissed claim against CHBV. The Court has already dismissed CHBV from the action for lack of personal jurisdiction, and in any event, under the theory of extraterritoriality adopted by the Court, TVPRA claims could never be brought against defendants not present in the United States. ECF No. 69, Motion to Dismiss Decision at 19, 26. *See Gordon & Howard Assocs., Inc. v. Lunareye, Inc.*, 2013 WL 5637678, at *4 (D. Colo. Oct. 15, 2013) ("The Court will not permit jurisdictional discovery if there is only a 'low probability' that additional discovery would reveal sufficient facts to alter the Court's conclusion that it lacks personal jurisdiction over Defendant."). The Court's prior ruling and its extraterritoriality analysis foreclose Plaintiffs' attempt to backdoor that issue through travel records.

The Court should deny Plaintiffs' motion to compel further responses to Interrogatory No. 7 and RFP No. 15.

### 2. Plaintiffs' Interrogatory No. 6

#### *Plaintiffs' Position*

Defendants refuse to respond to Plaintiffs' Interrogatory No. 6, which asks for any communications Defendants or their affiliates had about whether to withdraw from the World Cup project due to worker treatment issues. *See* Ex. 4, Plaintiffs' First Set of Interrogatories at 5. This information is directly relevant to Defendants' knowing "participation" in the Venture and should be provided.

Defendants claim they should not have to answer because any consideration of possible withdrawal would be contained in documents Defendants will produce. This answer is unsatisfactory for several reasons. First, under Fed. R. Civ. P. 33(d), a party claiming that document production obviates the need for an interrogatory response must provide access to the documents and "specify the records from which the answers may be derived" with "sufficient detail" to enable the receiving party to ascertain the answer. Defendants have failed to do any portion of this. Second, Plaintiffs' Interrogatory asks about oral as well as written communications, and any such oral communications that Defendants know about should be identified in their interrogatory response. Third, because Defendants have rejected a substantial fraction of Plaintiffs' proposed custodians on the grounds that their communications were destroyed pursuant to regular document retention policies, there is no guarantee that Plaintiffs will be able to obtain information about written conversations about withdrawal through RFPs.

Because Plaintiffs' Interrogatory seeks information that is directly relevant to whether Defendants knowingly benefited from a venture using forced labor, Plaintiffs respectfully requests this Court order Defendants to respond.

### *Defendants' Position*

Plaintiffs' Interrogatory No. 6 is improper.  It does not seek discrete factual information but instead asks Defendants to adopt Plaintiffs' legal premise—that Defendants were allegedly aware of "worker treatment issues" warranting withdrawal from the Project—and to analyze Defendants' own production to identify communications that might support Plaintiffs' disputed theory.  Rule 33 does not require a party to conduct its adversary's legal or factual analysis or to identify helpful documents that advance the opposing side's disputed claims.  That remains Plaintiffs' burden. *Olmert v. Nelson*, 60 F.R.D. 369, 370 (D.D.C. 1973) ("[N]o party may be compelled to do the interrogating party's investigation for him."); *Kainz v. Anheuser-Busch, Inc.*, 15 F.R.D. 242, 251 (N.D. Ill. 1954) ("[I]t seems plain that interrogatories should not be used as a device for compelling the interrogated party to prepare the interrogator's case for him.").

Defendants have already produced, or agreed to produce, all non-privileged documents and communications related to worker welfare or other work force issues related to the Project.  Ex. 5, Defs.' R&Os to Pls.' First Set of RFPs (Partial Set) at 10.  Plaintiffs are free to review those materials and draw their own conclusions.

Requiring Defendants to identify or reconstruct every alleged oral conversation about potential withdrawal—spanning a decade-long project and numerous current and former employees—would, even if possible, be extraordinarily burdensome and disproportionate.  Plaintiffs can explore those topics through depositions, as is the ordinary and far less burdensome method.

Finally, Plaintiffs' speculation about missing communications is both unfounded and misplaced. To the extent some records no longer exist, that reflects the routine operation of document-retention policies long before this lawsuit was filed—unsurprising given that Plaintiffs waited many years after the alleged events to assert their claims.  Defendants cannot be faulted for Plaintiffs' own delay.  The Court should therefore deny Plaintiffs' motion to compel any further response to Interrogatory No. 6.

**DEFENDANTS' LIST OF ISSUES FOR THE COURT**

### E.    Plaintiffs' Medical Expert Reports and Rule 35 Medical Exams

*Defendants' Position*

The Parties agree that Rule 35 independent medical examinations ("IMEs") are appropriate for an initial group of thirteen Plaintiffs.[4]  Plaintiffs, however, improperly object to producing medical expert reports in advance of the IMEs, and otherwise oppose Defendants' proposed schedule, including the possibility of conducting follow-up depositions after issuance of the IME reports.

The Court should order a procedure that allows the IMEs to proceed most efficiently, by: (*i*) extending the deadline for completion of IMEs to March 31, 2026; (*ii*) ordering Plaintiffs to provide Defendants with all responsive medical records and any medical expert reports as soon as possible, and in any event at least twenty-one (21) days before each scheduled IME; and (*iii*) allowing Defendants to conduct supplemental depositions of the Plaintiffs undergoing IMEs, in addition to the initial depositions the Parties have agreed to take concurrently with those examinations.

### 1.    Plaintiffs Should Complete IMEs by March 2026.

Due to Plaintiffs' scant production of medical records to date, their delay in seeking records from medical providers,[5] and their failure to timely commence the visa application process, the December 2025 deadline originally proposed by Defendants for completing IMEs is not feasible. While the Parties agree on an extension, they disagree on the revised date.  The Court should extend the deadline to March 31, 2026 and not any later.

Scheduling the IMEs for completion by March 31, 2026, is practical, fair, and consistent with the existing discovery schedule.  Plaintiffs will have ample time to obtain B-1 visas to travel to the United States.  While Plaintiffs assert that it may take "months at a minimum" to obtain travel visas, Ex. 21, Pls.' Letter of Oct. 17, 2025, at 5, Defendants' attorneys understand that there is currently a two-week wait time for visa interviews at the U.S. embassy in Manila, and visas are typically issued within five business days thereafter.[6]  Visa logistics therefore should pose no obstacle to completing IMEs by March 31, 2026.  Moreover, Plaintiffs have been aware that

---

[4] The Parties agree to IMEs for Plaintiffs E.A., F.C., R.C., W.C., B.D., M.D.L., J.J.G., R.L., L.L., Ron.O., A.S., R.S., and L.V.

[5] Defendants understand that Plaintiffs have, to date, not obtained any records from Qatari medical facilities, and have instead produced only the records in Plaintiffs' personal possession.

[6] *See, e.g.*, U.S. Department of State, "Global Visas Wait Times," October 22, 2025, https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/global-visa-wait-times.html (for U.S. embassy in Manila, "[n]ext available appointment" for B1/B2 visitor visa available in "<0.5 month").

Defendants were planning to schedule IMEs with certain plaintiffs since at least the Parties' conferral on August 28, 2025, and could have advanced the process of seeking visas at that time.

Delaying the IMEs beyond March would jeopardize the current case schedule. The Parties have agreed that fact discovery should close on May 29, 2026. ECF No. 75, at 10. To meet that deadline, the examiners must have sufficient time to prepare their reports, after which Defendants must review those reports and any follow-up depositions must be noticed and taken.

### 2. Plaintiffs Should Produce Any Reports by Medical Experts Before IMEs.

The Court should direct that any Plaintiff scheduled for an IME produce any medical expert report on which they intend to rely to support their claimed injury at least 21 days before the examination. A "district court's case-management arsenal" includes broad discretion to "adopt[] special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 595 n.13 (citing Fed. R. Civ. P. 16(c)).

Pre-IME medical expert disclosures are essential to ensure comprehensive examinations, and to ensure that Defendants engage the appropriate medical examiners. Plaintiffs' medical experts will presumably opine on the nature, cause, and persistence of each Plaintiff's alleged injury. But unless those opinions are disclosed before the IMEs, Defendants' examiners cannot adequately evaluate or test them. Defendants should not be forced to conduct medical examinations blind, only to have Plaintiffs' experts advance undisclosed theories of injury that require a second round of IMEs. Advance disclosure ensures that each examination is properly scoped to address the issues Plaintiffs actually intend to place at issue. To date, Plaintiffs have not disclosed any expert, underscoring the need for the Court's intervention so that the IMEs are productive.

That need is heightened because Plaintiffs' pleadings and production are practically devoid of details about the scope and nature of their alleged injuries. Plaintiffs have provided zero medical records for four of the thirteen IME Plaintiffs (L.V., R.S., L.L., and M.D.L.) and only one record each for six of the remaining nine (W.C., J.J.G., R.L., Ron.O., E.A., and B.D.). Without this information, Defendants cannot define the appropriate protocol or identify the right specialists. Plaintiffs should therefore be ordered to produce their medical records, including any reports to be used for litigation purposes, in advance of the IMEs.

### 3. Defendants Are Entitled to Supplemental Depositions Following IMEs.

Defendants are entitled to conduct limited supplemental depositions of the thirteen Plaintiffs following their IMEs to address new medical information revealed in those examinations. Although Defendants acceded to Plaintiffs' demand that Plaintiffs undergoing IMEs be deposed at the same time, Plaintiffs seek to foreclose Defendants from noticing a supplemental deposition for the limited purpose of seeking testimony concerning the results of the IMEs. Plaintiffs' argument that "the IMEs should be conducted at a time when Defendants feel confident they have the information they need to depose each Plaintiff," does not account for the reality that certain information will only become available *after* the IME is conducted. Ex. 21, Pls.' Letter of Oct. 17, 2025, at 6.

14

Courts "must allow additional [deposition] time consistent with Rule 26(b)(2) if needed to fairly examine the deponent." *Wooley v. Indigo Ag, Inc.*, 2023 WL 3481398, at *2 (D. Colo. May 16, 2023) (quoting *Martesnen v. Koch*, 301 F.R.D. 562, 585 (D. Colo. 2014)); *see also Lammle v. Ball Aerospace & Techs. Corp.*, 2013 WL 179200, at *1 (D. Colo. Jan. 17, 2013) (allowing continued deposition based upon new evidence that was not timely disclosed).  Information obtained through IMEs—such as evidence of pre-existing conditions or non-work-related causes—may necessitate additional questioning after the IME reports are received and analyzed.  Defendants therefore respectfully request leave to conduct supplemental, half-day depositions of those Plaintiffs as needed following completion of their IMEs.

### ***Plaintiffs' Position***

1.  <u>Timing of IMEs.</u>

Defendants claim that Plaintiffs are responsible for the delay in scheduling IMEs. This is meritless. Plaintiffs have requested their medical records from facilities where they were treated in Qatar and the Philippines and have provided these records to Defendants as they have received them. Moreover, Plaintiffs cannot commence the visa application process until their IMEs are scheduled, which has not happened due to the parties' outstanding dispute about whether depositions must take place at the same time as the IME.

In the spirit of compromise, Plaintiffs have agreed to apply for visas for thirteen (13) plaintiffs to facilitate their travel to the United States for IMEs. These thirteen (13) Plaintiffs have ongoing injuries as a result of their work on the Venture. However, the examinations need to be scheduled before Plaintiffs can submit U.S. visa applications, and in the current immigration environment it is not at all clear that Plaintiffs will be granted visas to travel here even if they apply. *See* Ex. 28, Declaration of Joy Athanasiou.

Plaintiffs have been conferring in good faith with Defendants about scheduling and logistics for IMEs. Plaintiffs request the Court extend the deadline for IMEs until May 15, 2025 to allow for scheduling and visa applications. This would provide sufficient time both for Plaintiffs to apply for visas for the thirteen (13) plaintiffs and to develop a backup plan for IMEs in the event that Plaintiffs' visa applications are rejected.

2.  <u>Defendants Have No Right to Plaintiffs' Medical Expert Reports Prior to the IMEs</u>.

Plaintiffs have already provided interrogatory responses that describe the nature of their injuries. Most of the thirteen (13) Plaintiffs have injuries that are not complex. *See e.g.* Ex. 11, Plfs.' Responses to Defendants' First Set of Interrogatories at 98-99, 225-6, 240-1 (hypertension) 168-9 (psoriasis); 83-4 (occupational eye injury).

Defendants' demand that Plaintiffs' medical experts examine them prior to Defendants' IMEs and provide their expert reports would result in unnecessary inefficiency. This Court has already set May 29, 2026 as the deadline for all expert reports, and nothing in the schedule contemplates a requirement for staggered medical experts. The most efficient use of time and resources would be

15

for Plaintiffs' medical experts to examine Plaintiffs on the same trip as Defendants' medical experts, if Plaintiffs are able to obtain visas.

Defendants' allegations about Plaintiffs' medical records are spurious. Plaintiffs have been providing their medical records to Defendants on an ongoing basis. Plaintiffs will produce all records within their possession, custody, or control to Defendants in advance of any scheduled IMEs.

3. <u>A Second Deposition of Plaintiffs is Not Warranted</u>.

Plaintiffs move for a protective order under Fed. R. Civ. P. 26(c) specifying that if the thirteen (13) Plaintiffs are able to secure visas for the examination, that a single deposition be taken on the same trip as the scheduled IME. A second deposition would be unduly burdensome and unnecessary. Defendants do not need to wait for the completion of a written report to depose Plaintiffs about Defendants' experts' IME findings. Defendants can confer with their experts after the IMEs to determine what, if any, deposition questions need to be asked of Plaintiffs as a result of the IMEs. *See Pierce v. Brovig*, 16 F.R.D. 569, 570 (S.D.N.Y. 1954) (to minimize burden, medical exam and deposition ordered to be conducted on "the same, or a consecutive, day"). Moreover, because Plaintiffs live and work in remote areas of the Philippines where reliable internet access is difficult, they would need to take time off from work to travel to a central location like Manila for a second supplemental deposition. This would be a significant hardship for no meaningful benefit.

 **F.** **Location and Mode of Plaintiffs' Depositions**

 ***Defendants' Position***

The Court should order Plaintiffs to appear in Denver, Colorado, for in-person depositions. Plaintiffs chose not to sue the labor brokers or employers abroad who allegedly caused their injuries, nor to pursue remedies available in the Philippines or Qatar. They instead brought U.S. federal claims against U.S. defendants who never employed them, in this District—where the only entity that actually worked on the Project has already been dismissed for lack of personal jurisdiction. Having chosen to pursue these claims in this forum, Plaintiffs must appear for both their depositions and to testify at trial and cannot raise objections based on inconvenience or cost (especially where those costs will not be incurred by Plaintiffs). In this District, "the general rule is that a Plaintiff may be deposed in the judicial district where the action is brought" having "effectively consented to participation in legal proceedings []here." *Peiker Acustic, Inc. v. Kennedy*, 2011 WL 1344238, at *2 (D. Colo. Apr. 8, 2011) (quoting *In re Outsidewall Tire Litigation,* 267 F.R.D. 466, 471 (E.D. Va. 2010)). Consistent with that rule, and to allow sufficient time to secure travel visas, Defendants have noticed Plaintiffs' depositions to commence in Denver beginning February 2, 2026, subject to agreement with Plaintiffs' counsel regarding the specific dates.

If the Court finds in-person depositions in Colorado unworkable, Defendants are willing to conduct depositions in person in Manila provided that Plaintiffs (or, more accurately, the litigation funder financing this litigation) bear the travel costs incurred by Defendants' counsel and any incremental costs associated with conducting the depositions abroad.

16

Plaintiffs' proposal for remote depositions is unworkable and prejudicial. This case involves 53 Plaintiffs in the Philippines—15 hours ahead of Denver and 13 hours ahead of New York. The extreme time difference, the number of witnesses to be deposed over many weeks, and the need for language interpretation makes remote depositions logistically impossible. Most, if not all, Plaintiffs live in remote areas with unreliable internet access, which makes stable, uninterrupted video testimony unrealistic. Moreover, defense counsel cannot be forced to choose between becoming nocturnal for weeks on end in order to depose witnesses through the night, or deposing Plaintiffs in the middle of *their* night, with the attendant impact on acuity and recall. The combination of the extreme time zone difference and the number of depositions to be conducted during a concentrated time period distinguishes this case from the authorities to which the Court referred the Parties at the July 17, 2025, hearing. *See* Ex. 1, July 17 Tr. 13:11-15; *see also Hernandez v. Hendrix Produce, Inc.*, 297 F.R.D. 538, 539 (S.D. Ga. 2014) (plaintiffs "mostly from Mexico"); *Sec. & Exch. Comm'n v. Aly*, 320 F.R.D. 116, 117 (S.D.N.Y. 2017) (one deposition). Accordingly, the Court should require depositions to occur in person, in Denver.

The incremental costs associated with litigating in this forum do not excuse Plaintiffs' obligation to appear in person for depositions, nor should they deprive Defendants of their due process rights. While Plaintiffs complain of the economic hardship associated with travel and deposition attendance, including a temporary loss in wages, that is the natural consequence of Plaintiffs' choice to bring suit here. In any event, third-party litigation funders can, within ethical limits, provide financial support to plaintiffs during the pendency of a funded litigation. Plaintiffs' concerns, then—which are more focused on enhancing the projected return on investment by those standing behind the lawsuit than on any actual financial hardship—do not override Defendants' interests in a fair and efficient procedure.

### *Plaintiffs' Position*

Plaintiffs move for a protective order under Fed. R. Civ. P. 26(c) holding that the depositions of Plaintiffs not undergoing medical exams shall not be compelled to go forward in Denver. Instead, these depositions should either proceed remotely (with Plaintiffs shouldering the cost of facilitating the videoconferencing system), or in-person in Manila if Defendants insist (but with each party bearing their own costs). Either of these solutions will reduce burden and cost for all parties.[7] Remote depositions are the most efficient solution here. Rule 30(b)(4) expressly permits remote depositions. And "the inconvenience, time, or expense involved in obtaining official permission or documentation to enter the United States may warrant a protective order" allowing a foreign party's deposition to take place remotely. *See Hoever v. Davis*, 2024 WL 5293777, at *1– 2 (M.D. Fla. Dec. 5, 2024). There is good cause for remote depositions here. First, applying for visas to enter the United States is a lengthy and costly process that, for a low-income Filipino migrant worker, has no guarantee of being granted. *See* Ex. 28, Declaration of Joy Athanasiou; *Hernandez v. Hendrix Produce, Inc.,* 297 F.R.D. 538, 539 (S.D. Ga. 2014) (ordering remote depositions of Mexican migrant worker plaintiffs, all but one of whom lacked immigration status

---

[7] The Philippines allows parties to take voluntary depositions pursuant to American procedure. *See* https://perma.cc/7YAJ-2YA5.

allowing them to freely return to the United States); *SEC v. Aly*, 320 F.R.D. 116, 119-120 (S.D.N.Y. 2017) (holding that the "potential burden on travel to each side plainly points to holding the deposition by videoconference," where the party being deposed was indigent, resided abroad, and did not have a U.S. visa). Defendants claim that *Hernandez* and *Aly* are distinguishable because of the time zone difference and number of plaintiffs in this case. The cases do not bear this attempt to distinguish them: *Hernandez* involved an action brought by multiple Mexican migrant worker plaintiffs, and *Aly* expressly considered and rejected the SEC's argument that the ten-hour time difference between New York and Karachi would make a video deposition infeasible. *See Aly*, 320 F.R.D. at 120.

Furthermore, many of the Plaintiffs work temporary or hourly jobs and would not get paid during the extended period it would take them to travel from their remote locations in the Philippines to the United States and back for a deposition. *See Mendoza v. Fly & Form Structures, Inc.*, 2024 WL 2924970 (N.D. Ga. 2024) (authorizing remote deposition of Plaintiff who lived and worked in Mexico, could not afford to travel, and did not have documentation to enter the United States). Third, it would be a significant expense to fly all Plaintiffs internationally to the United States. *See Delgado v. Magical Cruise Company, Ltd.*, 2017 WL 2346215 at *2 (M.D. Fla. 2017) (authorizing remote deposition of Plaintiff, an unemployed sailor from Peru, in light of economic hardship and visa considerations, and noting that "[d]epositions by remote means are not unusual, given the strides of technology."). To further minimize any burden on Defendants, Plaintiffs agree to be responsible for any additional costs associated with taking depositions remotely, such as the cost of bringing Plaintiffs to a central location in Manila, the fee for an appropriate videographer, and any rental cost for a suitable conference room and related connectivity infrastructure.

Defendants insist that, if the deposition is not taken in the United States, then Plaintiffs should be forced to pay Defendants' costs in traveling to Manila to take the deposition in person. But there is no basis for cost-shifting. "Modern videoconference technology provides an effective, efficient, and less costly method of conducting the deposition, and Defendant fails to show that conducting the deposition by remote means would be prejudicial." *MGI Digital Tech. S.A. v. Duplo U.S.A.*, 2023 WL 6814579, at *4 (C.D. Cal. Aug. 24, 2023).[8] Plaintiffs do not object to conducting in person depositions in Manila, but because remote depositions are a reasonable and cost-effective solution, any cost to Defendants of forgoing this option should be borne by them.[9]

---

[8] Defendants object because a deposition starting in the morning in Eastern Time would begin in the evening in the Philippines, which they claim would be infeasible for a seven (7) hour deposition. However, Plaintiffs would also be forced to adjust to a time difference if they came to the United States to do the deposition in person.

[9] A small number of Plaintiffs will be working outside of the Philippines in 2026. Plaintiffs will work with Defendants to schedule those depositions in a mutually convenient manner.

G.       **Plaintiffs' Discovery Responses**

1.       Documents Related to Travel Outside of Qatar (Defs.' RFP No. 1; Defs.'
Interrogatory No. 2).

### *Defendants' Position*

Plaintiffs should be required to produce all documents reflecting their travel to or from other countries during the relevant period, including passports, visas, tickets, itineraries, and related records.  *See* Ex. 9, Defs.' First Set of RFPs, No. 1; Ex. 10, Defs' First Set of Interrogs., No. 2. Such documents are directly relevant to Plaintiffs' assertions that they were forced to labor in Qatar because they will show: (*i*) whether Plaintiffs were physically present in Qatar during the alleged periods of forced labor; (*ii*) whether they had the freedom to leave Qatar during the alleged periods; and (*iii*) whether they later returned to Qatar or traveled to other countries to labor there, after their alleged forced labor in Qatar.  Although Plaintiffs have agreed to produce full passport scans, those scans may not include all relevant information, including work visas for Qatar and any other countries where Plaintiffs may have worked.

Plaintiffs' interrogatory responses confirm that several of the Plaintiffs traveled regularly between the Philippines and Qatar during the period of supposed forced labor.  Plaintiff E.I., for example, spent several weeks in the Philippines every November/December for four years in a row, each time returning to Qatar, belying any claim of trafficking.  Documents showing the travel habits of other Plaintiffs are similarly relevant to the claims and defenses.

### *Plaintiffs' Position*

Regarding travel documents, Plaintiffs are producing all passport documents showing all their travel during the relevant period. Plaintiffs have also provided their dates of travel to and from Qatar in their responses to Defendants' Interrogatory No. 2, and Plaintiffs who have retained years-old physical travel documents (tickets, itineraries, etc.) have produced them.

Defendants demand that Plaintiffs also produce all documents showing their travel to places *other than* Qatar for a period of over a decade. This information is irrelevant. Moreover, this information would be duplicative of information that has already been provided—since passports would already show such travel—and requiring Plaintiffs to search for and collect travel documents other than their passport that are probative of non-Qatari travel is unduly burdensome and disproportionate to the needs of the case.

2.       Formal and Informal Complaints (Defs.' Interrogatory No. 6).

### *Defendants' Position*

Plaintiffs should be required to produce all documents reflecting both formal and informal complaints regarding their alleged treatment in Qatar.  This includes "formal" communications to government bodies, supervisors, HSSE representatives, human resources personnel, worker welfare officers, independent monitors, worker hotlines, and any "informal" communications to

friends, family members, or coworkers as requested in Defendants' Interrogatory No. 6. Ex. 10, Defs.' First Set of Interrogs., No. 6 ("[S]tate whether complaints or grievances were filed with any person or entity, ***whether formal or informal*** and whether oral or in written or electronic form, in connection with such Plaintiff's employment in Qatar or any personal injury suffered therefrom . . . .").

Plaintiffs have nonetheless limited their proffered response to "formal" complaints, even though 34 of the 53 Plaintiffs admit they filed no such complaints or grievances other than this lawsuit. Ex. 11, Pls.' R&Os to Defs.' First Set of Interrogs., No. 6.  Whether Plaintiffs otherwise raised concerns informally and, if so, the contents and nature of those concerns, is directly relevant to the credibility of their claims and may identify third parties with discoverable information. Defendants are entitled to that discovery.

### *Plaintiffs' Position*

Defendants' Interrogatory No. 6 asks for "complaints or grievances...filed with any person or entity." Plaintiffs responded to Defendants' Interrogatory No. 6 by providing all instances in which a Plaintiff complained to a supervisor or organization or followed a formal complaint process. Plaintiffs' response comports with a plain reading of the phrase "filed with any person or entity." Defendants now demand that Plaintiffs supplement their interrogatory responses to include any instance where Plaintiffs complained in a more colloquial sense to any other person (such as a friend, acquaintance, or coworker) about their employment in Qatar. This type of communication, which cannot be fairly characterized as a complaint or grievance "filed" with a person, is outside the scope of Interrogatory No. 6. If Defendants believe that this information is necessary or relevant, they would need to serve a new interrogatory. Plaintiffs' position is that an interrogatory encompassing a passing complaint to a friend would be overbroad and unduly burdensome, as it would be difficult if not impossible for Plaintiffs to comprehensively recall such conversations.

### 3.    Identification of Litigation Funders (Defs.' RFP No. 23; Defs.' Interrogatory No. 10).

### *Defendants' Position*

Plaintiffs should be required to identify any third-party litigation funders financing this case and produce documents sufficient to show the amounts and terms of that funding.  *See* Ex. 9, Defs.' First Set of RFPs, No. 23; Ex. 10, Defs.' First Set of Interrogs., No. 10.  Plaintiffs' counsel have confirmed that Plaintiffs are not bearing any of the upfront costs of litigation, but have refused to disclose information about the source or terms of that funding.  Ex. 19, Pls.' Letter of Oct. 6, 2025, at 5.

This information is relevant because Plaintiffs have repeatedly invoked financial hardship to resist or limit discovery, and to oppose in-person depositions.  If Plaintiffs intend to continue relying on that argument, they must disclose any financial assistance they are receiving to pursue this litigation and the extent of that support.  *See IA Labs CA, LLC v. Nintendo Co., Ltd.*, 946 F.Supp.2d 429, 431–32 (D. Md. 2013) (rejecting hardship claim after discovery revealed litigation funding).

Disclosure of litigation funding is also necessary for transparency and case management reasons: to allow Defendants, their counsel, and the Court to assess potential conflicts of interest, evaluate Defendants' exposure to an award of attorneys' fees and costs, and ensure transparency regarding third-party control of the claims and the financial inducements offered to Plaintiffs to participate in this litigation. *See Mize v. Kai, Inc.*, 2018 WL 1035084, at *5–6 (D. Colo. Feb. 23, 2018) (ordering disclosure of litigation funding agreement and communications as relevant to plaintiff's credibility and third-party control of the litigation); *BCBSM, Inc. v. Walgreen Co.*, 2023 WL 3737724, at *6 (N.D. Ill. May 31, 2023) (compelling disclosure of litigation funding as relevant to damages and defendants' potential fee exposure).

### *Plaintiffs' Position*

As Defendants have been informed, Plaintiffs have contingency-fee arrangements with counsel in this case, under which Plaintiffs will pay no legal fees or expenses unless the claims are successful. *See* Ex. 19, Pls.' Letter of Dec. 6, 2025. Whether or not Plaintiffs' counsel have chosen to finance some or all of their fees or costs in this case have no relevance to the claims or defenses. *See, e.g., V5 Technologies v. Switch, Ltd.*, 334 F.R.D. 306, 311-2 (D. Nevada 2019) (reviewing authority and concluding that "[o]utside of special litigation contexts not at issue here," such as patent cases and cases involving the adequacy of class counsel, "courts across the country that have addressed the issue have held that litigation funding information is generally irrelevant to proving the claims and defenses in a case.") (internal citation omitted); *Pipkin v. Acumen*, No. 118CV00113HCNPMW, 2019 WL 6324633, at *1–2 (D. Utah Nov. 26, 2019) ("[I]nformation related to funding of the litigation is irrelevant to the claims and defenses of the case").

4. Counsel's Solicitations of Plaintiffs and the Identities of Anyone With Whom Plaintiff Discussed Joining the Lawsuit (Defs.' RFP No. 24; Defs.' Interrogatory No. 9).

### *Defendants' Position*

Plaintiffs should be required to produce non-privileged communications concerning the solicitation of Plaintiffs or other potential plaintiffs to join this or related U.S. actions. *See* Ex. 9, Defs.' First Set of RFPs, No. 24. With virtually no documentation to substantiate their allegations, Plaintiffs have placed credibility at the center of their case. It is therefore imperative that Defendants be permitted to test how these Plaintiffs came to participate in this U.S. litigation from remote areas in the Philippines and how their accounts of their alleged treatment in Qatar were initially elicited.

Such materials are directly relevant to credibility and bias because they may reveal whether Plaintiffs were influenced to describe their experiences in a particular manner, whether their accounts were coordinated or derived from common narratives promoted by third parties, and whether outside actors facilitated or encouraged participation in this suit. *See EEOC v. CRST Van Expedited, Inc.*, 2009 WL 136025, at *4 (N.D. Iowa Jan. 20, 2009) ("Representations made to prospective class members in order to induce their participation in the lawsuit [are] relevant to the issue of their credibility.").

21

Defendants' request is narrow and proportional, limited to pre-engagement and non-legal communications, and does not intrude on privileged matters. Such communications are not privileged to the extent they are public in nature or occurred before any attorney-client relationship was formed. *See Burge v. Teva Pharm. Indus., Ltd.*, 2025 WL 1504801, at *7 (D. Kan. May 27, 2025) ("Solicitations sent to the Named Plaintiffs before an attorney-client relationship was established are not privileged."); *Auscape Int'l v. Nat'l Geographic Soc'y*, 2002 WL 31250727, at *1 (E.D. La. Oct. 8, 2002). Discovery of these materials may also identify third parties who participated in or facilitated solicitation efforts—potential witnesses whose testimony may be necessary for authentication or rebuttal.

Plaintiffs should further be required to identify all persons with whom they communicated about joining this action, including in each case who initiated each communication. *See* Ex. 10, Defs.' First Set of Interrogs., No. 9. This includes both solicitations by counsel or their agents and also informal discussions with friends, family, or coworkers. Such information goes directly to credibility, the structure and scope of the alleged "venture," and Plaintiffs' motives—financial or otherwise—for participating in this litigation.

### *Plaintiffs' Position*

Defendants seek impermissible and burdensome discovery about all communications Plaintiffs or potential Plaintiffs had regarding whether to join this litigation. This information has no conceivable relevance, and the request is unduly burdensome.

Counsel's communications with prospective clients about their rights under the TVPRA have no bearing on whether Plaintiffs were subjected to forced labor years before. Defendants' claim amounts to speculation "that plaintiffs' counsel may have said something to the [plaintiffs] that would be useful to defense counsel in casting doubt on their credibility as a witness." *Minter v. Wells Fargo Bank, N.A.*, No. CV WMN-07-3442, 2010 WL 11549367, at *4–5 (D. Md. Aug. 13, 2010). This "makes no sense" and would amount to a "fishing expedition[]" designed to "harass" plaintiffs for "standing up for their rights." *Id.* (denying discovery of client solicitation letters).[10] Nor are Plaintiffs' communications with their family or friends about the pros and cons of joining this lawsuit relevant. Defendants seek with these discovery requests to create a side-show, placing Plaintiffs' counsel rather than Plaintiffs' claims at the center of the case.

Also, Defendants' requests are overbroad, as they cover not just communications involving the Plaintiffs, but also between Plaintiffs' counsel and any *potential plaintiffs* who did not end up joining this lawsuit. *See* Ex. 9, Defendants' First Requests for Production of Documents. It would

---

[10] Defendants' reliance on *EEOC v. CRST Van Expedited, Inc.*, 2009 WL 136025 (N.D. Iowa 2009), is misplaced. *CRST* involved a prospective class action, and Defendants argued that "the credibility of the individual class members will be critical to the jury's determination." *Id.* at *3. But this is not a class action where individual named plaintiffs may be awarded some additional fee for serving in that role. Plaintiffs' only remuneration is whatever they may recover at trial on their individual claims, and Defendants can already cross examine them about that fact. This discovery thus does not bear on Plaintiffs' credibility.

22

be highly burdensome for counsel to collect and produce all communications with potential plaintiffs who did not participate in this case, and such information has no conceivable relevance.

Finally, Defendants claim that all "pre-engagement" materials are non-privileged, but other than initial solicitation letters, counsel's communications with prospective clients even prior to formal engagement are privileged. *See Sandoval v. American Bldg. Maintenance Industries, Inc.*, 267 F.R.D. 257, 273 (D. Minn. 2007) (holding that "the attorney-client privilege attached to preliminary discussions about representation between a lawyer and prospective client, even if the client decides not to employ the lawyer.").

Respectfully submitted,

| | |
|---|---|
| /s/ *Jason Murray* | /s/ *William H. Taft V* |
| | |
| Sean Grimsley, Bar No. 36422 | Maura Kathleen Monaghan |
| Eric Olson, Bar No. 36414 | Mark W. Friedman |
| Jason Murray, Bar No. 43652 | William H. Taft V |
| Abigail Hinchcliff, Bar No. 47942 | James P. Schaefer |
| Isabel Broer, Bar No. 49997 | Justin R. Rassi |
| Samara Hoose, Bar No. 57375 | DEBEVOISE & PLIMPTON LLP |
| Meredith Wheeler, Bar No. 56352 | 66 Hudson Boulevard |
| Olson Grimsley Kawanabe Hinchcliff & | New York, NY 10001 |
| Murray LLC | 212-909-6000 |
| 700 17th Street, Suite 1600 | mkmonaghan@debevoise.com |
| Denver, CO 80202 | mwfriedman@debevoise.com |
| Telephone: (303) 535-9151 | whtaft@debevoise.com |
| eolson@olsongrimsley.com | jpschaefer@debevoise.com |
| sgrimsley@olsongrimsley.com | jrassi@debevoise.com |
| jmurray@olsongrimsley.com | |
| ahinchcliff@olsongrimsley.com | Habib Nasrullah |
| ibroer@olsongrimsley.com | Frederick R. Yarger |
| shoose@olsongrimsley.com | WHEELER TRIGG O'DONNELL LLP |
| mwheeler@olsongrimsley.com | 370 17th Street |
| | Suite 4500 |
| Eli J. Kay Oliphant | Denver, CO 80202-5647 |
| Ryan R. Sparacino | 303-244-1800 |
| Sparacino PLLC | nasrullah@wtotrial.com |
| 1920 L Street NW, Suite 835 | yarger@wtotrial.com |
| Washington, D.C. 20036 | |
| Telephone: (202) 629-3530 | *Attorneys for Defendants* |
| eli.kay-oliphant@sparacinopllc.com | |
| ryan.sparacino@sparacinopllc.com | |
| | |
| *Attorneys for Plaintiffs* | |

23

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 23-cv-02660-RMR-CYC

_____

F.C., et al.,

    Plaintiffs,

vs.

JACOBS SOLUTIONS, INC, et al.,

    Defendants.

_____

Proceedings before CYRUS Y. CHUNG, United States

Magistrate Judge, United States District Court for the

District of Colorado, commencing at 2:05 p.m., November 19,

2025, in the United States Courthouse, Denver, Colorado.

_____

WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

_____

APPEARANCES

SAMARA ROSE HOOSE, ELI J. KAY-OLIPHANT, JASON C.
MURRAY and MEREDITH WHEELER, Attorneys at Law,
appearing for the Plaintiff.

HABIB NASRULLAH, JUSTIN RASSI, DANYAAL WAHEED, and
WILLIAM TAFT, V, Attorneys at Law,
appearing for the Defendants.

_____

DISCOVERY CONFERENCE

2

P R O C E E D I N G S

(Whereupon, the within electronically recorded proceedings are herein transcribed, pursuant to order of counsel.)

COURTROOM CLERK:  All rise.  Court is in session.

THE COURT:  Please be seated.  Calling Case 23 CV 02660 F.C., et al., against Jacobs Solutions Incorporated, et al.  I'll take appearances of counsel, starting with the plaintiffs.

MR. MURRAY:  Good afternoon, Your Honor.  Jason Murray at Olson Grimsley for the plaintiffs.  I'm joined by my colleagues Samara Hoose; Meredith Wheeler; and in the gallery, Eric Olson and Sean Grimsley, all from the Olson Grimsley firm; and our co-counsel Eli K. Oliphant at Sparacino, PLLC.

THE COURT:  Good morning.  I'm not going to say everybody's name.  There are too many of you.

But, good morning, Mr. Murray.

For the defendant.

MR. TAFT:  Good afternoon, Your Honor.  Will Taft of the firm Debevoise & Plimpton for defendants.  I'm joined by Justin Rassi of my firm also.

MR. NASRULLAH:  Good afternoon, Your Honor.  Habib Nasrullah, Wheeler Trigg O'Donnell.  And I'll let my colleague introduce himself.

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

3

MR. WAHEED:  Good afternoon, Your Honor.  Danyaal Waheed for the defendants.

THE COURT:  Good afternoon to all of you as well, Mr. Taft, Mr. Waheed, and Mr. Nasrullah.  Good afternoon to all of you.  I don't mean to leave you out, Mr. Rassi, so good afternoon to you as well.

We are here for a discovery hearing.  I've received the parties' joint statement on the discovery issues.  I think the way that I want to take this is I'll go issue by issue.  I suspect, by the number of attorneys who are here, each one of you has your own specialty that you're going to be arguing today.  So rather than cycling through everybody on each side, I think it makes the most sense to go issue by issue, taking them in the order they were presented to me in the joint statement.

Any problem with that being the procedure, Mr. Murray?

MR. MURRAY:  No, Your Honor.

THE COURT:  Mr. Taft?

MR. TAFT:  No, Your Honor.

THE COURT:  Let's start then with Plaintiffs' Issue Number 1, which has to do with Request for Production Number 3.  And this one I'll hear from you first, Mr. Murray.

And I've read the statement.  You know, I

4

understand that the issue here is that the defendants are limiting this discovery request to stadium construction. You want it to be larger than that; you want it to be sort of the entire venture.

And let me focus you because if I just let everybody go on, we'll be here for four hours. Here's my real question.

Suppose I take your argument that, yes, the amended complaint pleads other infrastructure. At what point -- first question is, at what point does this become disproportionate? Because it is a sprawling enterprise, right? At some point, if you haven't found it, you're not going to find it.

So at what point does it become disproportional?

Number two, why did it take two months to get the list of what your clients were involved in, the other infrastructure projects that weren't the stadiums, why did it take two months to get that list to the defendants?

And third, how many other projects are there, I mean, were they involved in, other than stadium construction? You know, is that a large scope of things? Is it a small scope of things?

So that's where I would like to focus you.

MR. MURRAY: Thank you, Your Honor. And just one point of clarification.

5

This issue cuts across a number of the requests for production, I think, including RFPs 2, 3, and a few others, where they've limited their response to the stadium projects.

But in terms of Your Honor's specific questions, first on disproportionality, this is not disproportionate to the needs of the case.  It is a sprawling venture, but we are limiting our request to those projects where CH2M Hill had program management responsibility, pursuant to the program management contract.  So it's not every project that they have no obligations or responsibilities in Qatar in connection with the World Cup.

What we've asked them for in our conferrals is bounded by the scope of the program management contract that we didn't receive from them until about two months ago, which lists a group of specified projects that include, not only the stadiums, but a handful of other facilities.  So certain metro lines, a port, some hotel infrastructure, as well as several sort of fan cities adjacent to the stadiums.

So it's a bounded list of projects that's defined by the defendant's own contract in this case.  And so given that, in fact, it turns out about half of the plaintiffs in this case experience conditions of forced labor, not only on the stadium projects, but also on a number of these infrastructure projects.

6

THE COURT:  Do your clients span the entire breadth of the additional infrastructure projects that CH2M is involved in?

MR. MURRAY:  No, Your Honor, I don't believe so.

There are a number of projects that I don't recall any of our plaintiffs working on, but it is a number of them.  Several of the fan cities, the metro lines, the port city, the airport, and a few of the other specified projects in the program.

THE COURT:  Sorry, what's a fan city?  Oh, this is for the fans who are coming?

MR. MURRAY:  Yeah, sort of these cities that are adjacent to the stadiums that are sort of infrastructure for the teams and their fans while they're there.

THE COURT:  Okay.

MR. MURRAY:  And so I think we would be okay certainly limiting the scope of our request to those projects that are listed in the program management contract, which is something that we've discussed with them in the past.  But beyond that, we think that is proportional to the needs of the case, given the allegations in this case.

Your Honor's second question was --

THE COURT:  So -- I mean, what you're trying to find, right, is you're trying to find evidence of what it means to participate; you're trying to find evidence of

7

knowledge of forced labor. You know, if you get through 20 facilities, right, and you haven't found knowledge of forced labor in those 20 facilities, or those 20 projects, what makes you think that the 21st is going to be the one that is going to be the thing that's going to -- the straw that's going to break the camel's back here?

MR. MURRAY: Well, Your Honor, in fact, I think that we -- in the very limited production we've already received, we've received a large amount of evidence showing knowledge of forced labor across a number of projects.

THE COURT: So doesn't at some point that become cumulative? I mean, at some point -- what you want to show is that they know of forced labor within the scope of the venture, right? At some point, do you really need to keep getting that information?

MR. MURRAY: Well, two points, Your Honor.

Number one, I think it's still highly relevant to demonstrate that Plaintiff A was subject to forced labor conditions on a particular project within the venture, and they knew about forced labor on that particular project.

And point two is that this evidence is also directed towards demonstrating Defendant's participation in the venture and the fact that these other projects were part of the venture in the defendant's scope of operations.

THE COURT: Okay.

8

MR. MURRAY:  Your Honor's second question was about the timing.

Now, it took the defendants four months after this Court's motion to dismiss decision before we received the program management contract, despite repeated requests to the defendants for that information.  Once we got that information -- we have 52 plaintiffs that are spread all across the country, in the Philippines and in rural areas. And we've also been working with them to produce documents and answer other interrogatory responses that the defendants have asked from us.  Many of these people only have one day a week where we can communicate with them because they're on work the rest of the time and often hard to reach.

I mean, so it is a bit of a logistical operation for us to go to each of these plaintiffs and ask them questions about a dozen or two facilities and their work history and have them sort of confirm as to each of those.

THE COURT:  We're going to talk a bunch about logistics later when we talk about depositions, but yes.

MR. MURRAY:  Yes, Your Honor.  And so we acted diligently as soon as we got that information on September 18th.

THE COURT:  And I wasn't accusing you of anything less.  I was simply inquiring as to why that was.

MR. MURRAY:  I appreciate that, Your Honor.

9

And then the third issue in terms of that Your Honor asked about is how many other projects are we dealing with here? And I think -- I guess it depends how you define the projects in terms of is the Metro Line 1 project or a number of projects? I'm not entirely sure.

My sense is it's a few dozen projects that are encompassed within this venture obligation and a smaller subset of that that our plaintiffs actually worked on and were subject to forced labor on.

THE COURT: Anything else on this first issue, Mr. Murray?

MR. MURRAY: Not at this time. Thank you, Your Honor.

THE COURT: Mr. Taft, I don't know if it's you or someone else taking this one.

MR. TAFT: Your Honor, Will Taft for the defendants.

Just addressing Your Honor's three questions, refer Your Honor to Exhibit 25, which is the addendum to the contract between the Supreme Committee and CHM B.V. Qatar branch, which was the contracting partner, that's what was being referred to.

And this is not -- yes, there are some specific projects listed here, such as the New Doha International Airport, the Doha Port, a causeway between Qatar and

10

Bahrain. These are projects that are part of what's called Vision 2030, which is a massive redevelopment of the country of Qatar, of which the '22 FIFA World Cup was a part, but was not the largest part and was not -- this causeway was not being built for the World Cup. These -- the airport was not being built just for the World Cup.

This is a much broader reconstruction of the entire country.

THE COURT: As is somewhat common when countries host the World Cup or they host something else, like the Olympics, they tend to build out, not only exactly what they need for that event, but they tend to use the opportunity to build out other things as well.

MR. TAFT: And again, just, but programmatically, these are projects that were not within the Supreme Committee's responsibility for delivering. And that is key, because when Your Honor looked at the allegations, and when we looked at the allegations in the First Amended Complaint, these were based on allegations of what our clients were doing for our -- our -- for the Supreme Committee in connection with the development of the 12 stadiums.

THE COURT: So --

MR. TAFT: And when you were looking at, are they participating, what do they know, what are they responsible for, what are they doing, it was specifically in connection

11

with the 12 stadiums, because the allegations in the complaint only relate to actually five of those stadiums.

If their complaint is now -- the discovery in this case should be governed by the scope of the allegations in the complaint. These projects, which -- some of which they worked on, those are with -- those are not projects that our client was in fact responsible for execu- -- you know, coordinating with the Supreme Committee on the execution of.

You'll see in Exhibit 25 that these are monitoring responsibility. That means the Supreme Committee's role was monitoring the transportation infrastructure to make sure that it would not interfere with the delivery of the stadiums, but it's all about the stadium.

So this really is a -- they're effectively trying to amend their complaint through amended discovery responses.

Now, if they did amend their complaint to say, We are alleging that this venture included the Qatar-Bahrain Friendship Authority Bridge, that would be a different analysis. And indeed, there are parallel actions in this same courthouse where you've got groups of plaintiffs that are not alleging that they worked on the stadiums at all.

And those are subject to different motions to dismiss because they raise completely different issues with respect to whether they can allege participation and

12

knowledge, where our client and the allegations in the complaint are about what happened at the stadium by workers at the stadium.  So we do think that this is a massive and untimely attempt to expand beyond the claims that are in fact alleged here.

And it's not -- I mean, here we heard maybe two dozen projects.  There are fewer than two dozen things listed on this exhibit here.  I mean, some of them are transportation infrastructure.  This is not a limiting list. This is an invitation to blow out discovery into basically every project, major infrastructure project done in the country of Qatar over a 12-year period.

And we do feel like if they can't substantiate their claims based on the work that was being -- documents and discovery related to the stadiums, which are the only projects that are mentioned, specified in their complaint, then that's -- it's really fishing to go beyond that.

Just one last point is, we are -- have agreed to produce documents related to worker conditions and worker welfare and forced labor allegations in the country of Qatar.  So we are not limiting our production to the stadiums with respect to that issue, which is basically that's the knowledge of -- knowledge of what's going on in the broader economy when it comes to worker welfare, forced labor issues.  We are producing those documents.

13

What they want is, you know, schematics, everything related to any project in the country. So we do think it's a serious burden, some problem. And if they want to amend the complaint to include these projects, we can raise our legal defenses to why they would not satisfy Your Honor's test for pleading.

THE COURT: What does related infrastructure mean in the amended complaint if it's not referring to these infrastructure projects?

MR. TAFT: Related infrastructure, as I understand it, is you've got the stadium and then you've got a fan zone at the stadium. You might have a media center outside the stadium. It's not a bridge to Bahrain.

THE COURT: So when you are talking about --

MR. TAFT: And -- and -- sorry. And it's not specified in the complaint that what projects, if any of those related projects, the plaintiffs actually worked on.

THE COURT: So when you're talking about producing documents with respect to the stadium -- or stadia, I guess, does it include the related infrastructure that you just talked about, the fan city, those sorts of things that are adjacent to the stadium?

MR. TAFT: I -- if I could actually confer, because I don't want to misrepresent.

I believe, to the extent those are projects that

14

the Supreme Committee is responsible for delivering, that they are within the scope of what we've -- but if I may just --

THE COURT:  Yes.

So Mr. Rassi, just so you know, the microphones, the triangular thing there has a little button there that says "Push."  That will mute it for you instead of having to cover the actual microphone.

MR. RASSI:  Sorry, Your Honor.

THE COURT:  No problem.

MR. TAFT:  And Mr. Rassi was confirming that we -- the production includes documents within the perimeter around the stadium, and that would include a fan zone around the stadium.

THE COURT:  That was the fan city that Mr. Murray was talking about before?  That's sort of the place where the fans can congregate and engage in other activities that were related to the World Cup?

MR. TAFT:  I believe that that's what he was referring to; but, again, part of the problem that we have with this request is it is really open to the imagination about what related might encompass, so we were trying to be specific in our response.

THE COURT:  And because you all know this better than I do, when you say, the Supreme Committee didn't have

15

the responsibility for executing the infrastructure projects, what does that mean?

MR. TAFT:  So there -- the Supreme Committee was tasked with delivery -- and this is in the contract that's been produced -- delivery of certain infrastructure, but really primarily the stadiums for the World Cup.  And that's listed here in Exhibit 25, the Qatar 2022 responsibilities.  That's the Supreme Committee's responsibility for executing.  And then there are other projects where they are merely responsible for monitoring coordination.

So, you know, is the road that a different government entity is responsible for building -- it might be the highway department -- is that road going to the right place for where we're building the stadium?  That's a sort of coordinating function, but the Supreme Committee is not actually responsible for building that road.

And our client was not responsible for -- as a program manager to the Supreme Committee, was not responsible for building that -- coordinating -- building that road.  So it's a real -- it's a real difference between -- and if you think about the allegations in the complaint about them saying how we participated and why we were alleged to have knowledge, it really has to do with things that happened at the stadium on these specific projects.  And that does not hold true for these other

16

monitoring coordination projects.

THE COURT:  So these other monitoring -- as I remember the amended complaint, the allegation was that the venture is -- it sort of all runs through the Supreme Committee -- or the Supreme Committee has contractors, the contractors are engaging the plaintiffs for forced labor. And you're saying that in these infrastructure projects, that chain doesn't exist.  The Supreme Committee isn't engaging contractors on those particular -- on those projects?  It's some other arm, perhaps, of the Qatari government that's doing that?

MR. TAFT:  That is correct, Your Honor.

THE COURT:  Okay.  Unless you have anything else, Mr. Taft, I'll hear from Mr. Murray again.

MR. TAFT:  No.  Thank you.

MR. MURRAY:  Your Honor, just a few points on that.

First of all, on this issue about the Qatari Supreme Committee's role or responsibility, and more importantly, Defendant's role or responsibility, Defendant signed a contract that made them the program management consultant for the Qatar World Cup 2022 project.  And in their role as program management consultant, they had responsibilities for executing the stadium projects, as well as certain other training sites and things like that, as

17

seen in that exhibit we just looked at, as well as oversight and coordination and strategic planning responsibilities for this broader set of projects. That was an obligation they had in their contract with the Supreme Committee in order to ensure that the whole vision for Qatar 2022 World Cup went off. And those responsibilities in the contract specifically include things like putting together an overall strategic plan across all of these projects for things, like cost, health, safety, and environment, and other things.

And so I think there is, in fact, going to be a serious dispute as to the precise nature of the defendants' responsibilities on these related infrastructure projects, but there is no doubt --

THE COURT: I agree to that with respect to the defendants' responsibilities. But as I recall, the theory of the amended complaint was that it was the Supreme Committee would go out and contract with these companies, J.A.K. -- or I can't remember all the names, Raven Ready Mix, I think was one of them. No, they would go out and contract with these contractors who would engage in this labor practice of bringing your clients from overseas and then sort of trapping them here into forced labor practices.

If the Supreme Committee doesn't have that initial responsibility of getting the contractors in the first place, where is the venture?

18

MR. MURRAY:  Your Honor, I think the venture is that the Supreme Committee is still in this oversight and monitoring role for all of those projects, including for issues related to health and safety, and that CH2M Hill is contracting with the Supreme Committee to step into and support those roles in a chain where, even though CH2M Hill is not directly engaging these contractors, CH2M is overseeing this construction venture that includes those contractors.

THE COURT:  But doesn't the venture have to have a direct offender?  In that one, I don't even know who the direct offender is.  And certainly nothing in your complaint alleges that the direct forced labor offender here, the one who would be violating 1589(b), I think it is, right, the offender of that provision, right?  It doesn't say that it's the Qatari Highway Department.  I don't know what it's called, you know, whatever it is, right?  Everything in the complaint focuses on the Supreme Committee and the contractors, J.A.K., Ready Mix, those people being the direct offenders and everything is derivative of them.

So who -- you know, in the instance where the Supreme Committee is executing a monitoring responsibility, right, who's -- where is the direct offender there?

MR. MURRAY:  The direct offenders are the same, Your Honor.

19

So the way it works is that typically the plaintiffs would be hired by some kind of, you know, labor supply company like Raven Ready Mix and they would be under a two-year contract. And then they would be deployed by that contractor, more or less, where needed when needed.

And so many of our plaintiffs with the same direct employer, they'd be working on a stadium project for a few months, and then they'd be pushed over to Lusail City, or then they'd be pushed over to work on the Doha Airport, and then they'd be sent back to work on a different stadium. And it was one venture, one operation with the same contractors.

And even if the Supreme Committee's role in that construction chain was slightly different insofar as they had oversight, rather than direct execution responsibility, CH2M -- that was a venture that CH2M participated in, as alleged in the complaint and as demonstrated by their obligations under their contract with the Supreme Committee.

THE COURT: Suppose I change the scenario a little bit and, you know, when the Supreme Committee goes out and contracts with a contractor, they not only tell other parts of the Qatari government that were involved in FIFA-related construction, but they go over to, I don't know, Bahrain, or something like that and say, Yeah, we have these people over here, you can fly some of them over and build some stuff if

20

you want.

Do those people also become part of the venture at that point?

MR. MURRAY:  I think it would -- I'm not sure, Your Honor, because I'm not sure what the contract would be where CH2M, the defendant, has become a party to that venture.

I mean, I think here we have a contract that defines effectively what the scope of the venture is and what CH2M Hill's role in that venture is, and it includes these related infrastructure projects.

THE COURT:  And those related infrastructure projects are ones even for -- even ones where the Supreme Committee doesn't have the execution responsibility?

MR. MURRAY:  Correct.  They have sort of the overall design, monitoring, planning, and oversight responsibility, including for areas related to health, safety, and environment.  And we think that that is enough, Your Honor.

And then the only other thing I would add in terms of whether this is alleged in the complaint is directing the Court to paragraphs 5, 22, and 207 of the complaint, which both define the venture and make clear that the plaintiffs worked, not only on the stadiums, but also on one or more of these related infrastructure projects.

21

THE COURT: You're going to have to tell me what those paragraphs say, because as much time as I spent with the amended complaint, I don't have them memorized by chapter and verse.

MR. MURRAY: Understood, Your Honor.

So paragraph 22 of the complaint is where we define the venture to include, not only the stadiums, but also related infrastructure projects over which CH2M Hill had program management responsibility.

THE COURT: What -- okay. It doesn't mean what Mr. Taft was just telling me; that -- it's really -- it's a stadium and the little places around the stadium?

MR. MURRAY: No, Your Honor. So I think the complaint at several points mentions a few specific infrastructure projects, like the airport.

Now, the reason why we didn't enumerate every one of those infrastructure projects is because before we saw the contract, we didn't know which of them precisely fell within CH2M Hill's program management responsibilities and which did not.

THE COURT: Okay.

MR. MURRAY: Thank you, Your Honor.

THE COURT: Mr. Taft, I saw you whispering back and forth. I have a feeling you want to make a further record on this, I'll let you do it.

22

MR. TAFT:  Just one.  That the description of the Supreme Committee is having oversight responsibility for these other projects that are being executed by the public works authority or that we really dispute that.  It's not borne out by the contract at all.

What they have is an obligation to coordinate with those other authorities to ensure that they don't interfere with the delivery of the stadiums and the projects that the Supreme Court Committee does have execution authority for.

And as far as CH2M B.V., the contracting party, again, they are a consultant to the Supreme Committee. Their obligations on the airport or anything else are no broader than what the Supreme Committee's were, which again, were monitoring and not execution.  That's the one point.

THE COURT:  Is there any dispute that some of those monitoring responsibilities include worker welfare responsibilities?

MR. TAFT:  I think -- I don't think that that actually is correct.  I think the monitoring and the coordination has to do with the impact that those projects have, the interconnection between those projects and the projects that the Supreme Committee is responsible for executing.  And the Supreme Committee in terms of worker welfare was focused on the projects it was responsible for delivering.

23

THE COURT:  I obviously haven't read the entire thing, the entire contract.  I wouldn't try to do so right now.

Is there anything in my materials that tells me one way or the other?

MR. TAFT:  If I could just grab the contract.

THE COURT:  You may.

MR. TAFT:  So, Your Honor, I'm looking at the Scope of Services and specifically Section 2, which is Scope of Services, which groups competition venues, non-competition venues, and infrastructure.  This page is 55 and 57.

THE COURT:  What exhibit are we looking at?

MR. TAFT:  Is this -- I don't believe either side exhibited this, but we can certainly provide it to the Court.

And there, the difference between Qatar '22 Supreme Committee being directly responsible for the inception, planning, design, construction, handover, and operations of the competition venues is spelled out.

And I just contrast that -- that's in paragraph 11.  I contrast that to paragraph 15 and 19, which refer to Qatar '22 Supreme Committee being responsible for coordinating with third-party government and non-government entities responsible to deliver the infrastructure works

24

and/or other works in accordance with the FIFA requirements and regulations.

So the contract that we've provided does spell out that one is a coordination role with the entities that are not the Supreme Court Committee that are responsible for delivering the infrastructure.

THE COURT: But if coordination in -- I can't remember the exactly wording. Coordination in compliance with the FIFA regulations or something like that, what it -- what it said, does that not encompass any sort of worker safety kind of regulations?

MR. TAFT: With respect to what's happening on those other projects?

THE COURT: Correct, yeah.

MR. TAFT: What's happening on those other projects would be the responsibility of the government entity that is working -- working on that project. It's something that our clients, at least under their contract, are not -- that's not where they're -- where they're working, right? They're working through the Supreme Committee.

THE COURT: Mr. Murray, you don't have to move from where you are. Just tell me, do you dispute what Mr. Taft's saying about the contract?

MR. MURRAY: Yes, Your Honor, we do, particularly

25

because the limited discovery we received to date suggests that whatever limitations may have been in the contract -- and I think they can be interpreted several different ways -- both the Qatari Supreme Committee and the defendants at various points discussed and understood that defendants would be held accountable for the successful delivery of these other projects and had these assurance roles, including in health, safety, and environment.

So, you know, I think that based on the information we have now -- and again, that's a very limited subset of information -- we have seen a substantial amount of evidence that they, in fact and in practical reality, did have that responsibility.

THE COURT:  Okay.  So here's where I stand on this issue.

In terms of what the complaint pleads, I think it did plead, generally speaking, that there was related infrastructure that was being worked on by the plaintiffs. I don't think that it tried to limit it to the stadiums.

And one of the attacks on the amended complaint in the motion to dismiss at ECF Number 53 at page 10 was about the expansiveness of the venture definition.  In fact, that was one of the reasons why the defendants were seeking dismissal of the complaint.

So I think some inquiry outside the scope of the

26

stadiums is relevant.

One thing that gave me pause is the differing responsibilities of the Supreme Committee with respect to those infrastructure projects versus the stadiums. But the language that was quoted to me today -- and I did not have any copy of any particular contract today, and the argument wasn't made about the different responsibilities of the committee prior to today, I don't know one way or the other, and conceivably it could come under what Mr. Murray is advancing as his theory of relevance.

Having said that, I don't think that, as I mentioned earlier, a wide-ranging, comprehensive audit of everything that was done surrounding everything in Qatar -- in Qatar is proportional. And I think that proportionality here would be with respect to, yes, the stadiums, but the particular projects in which the plaintiffs were involved.

Because that goes to your theory, Mr. Murray, about needing to prove, for example, that there was forced labor in a particular project that your clients were involved in. But beyond that, if your clients weren't involved, then that rationale drops away. And I think by looking at those, you will either find out that there was knowledge or not.

And so for proportionality purposes, I will limit it to the particular other infrastructure projects in which

27

your clients were involved.

MR. MURRAY:  Thank you, Your Honor.

THE COURT:  That takes us to Issue Number 2.  That has to do with Requests for Production Numbers 2 and 3 and Interrogatory Number 2, which asks for the responsibilities that the defendants and their affiliates had on certain projects.

So my question for you on this, Mr. Murray, is why do you need every document?  There are certain categories of documents that Mr. Taft has already agreed to produce.  And what you need to show here, you show participation, as at least as I've articulated it.  Perhaps a circuit will say something differently if it gets to the circuit, I don't know.

But at least as the way I've articulated it, you show participation, either by showing knowledge that you're aiding a forced labor venture.  It seems like you're already getting discovery with respect to that.  Or you show the types of services that you're providing aren't simply generic in nature; that you're doing something customized for the venture.

So in addition to the categories that the defendants have already produced -- agreed to produce, which is bidding, contract negotiation, the financial aspect of CH B.V.'s involvement, as well as labor and worker issues, you

28

know, why wouldn't one additional category that says:  Tell me about the type of work, you know, the documents that tell me the type of work that CH2M is doing, why isn't that sufficient?

Why do you need every blueprint and every email going back and forth about logistics of a project?  What you're trying to prove is the type of work that CH2M is doing.  And so what do you need everything for?

MR. MURRAY:  Well, Your Honor, I agree with you, we don't need everything.  And that's why we've already agreed with the defendants that as to the files of CH B.V., the search will be for those limited categories.

Because we have no doubt that CH B.V. participated in the venture in any number of ways, and we don't need every blueprint.

The issue here, Your Honor, is that defendants have said, including in their brief in this discovery dispute, that the U.S. defendants had nothing to do with this project.  They've told this Court that the U.S. defendants' involvement was limited to signing a contract where the U.S. companies signed a contractual guarantee with the Supreme Committee, guaranteeing that B.V. will perform its obligations.

Now, we think that enough would be a level of participation, but we also know, with a certainty from the

29

limited discovery, the few thousand documents we've already received, that that is not an accurate representation of what the U.S. defendants' involvement was.

So we've seen evidence that the U.S. defendants in the United States were involved in public relations with respect to the project, were involved with government affairs and lobbying in the United States with respect to the project, were involved in design choices, sustainability choices, worker welfare issues.

And so as long as that is going to be a disputed issue in the case, and as long as the defendants are going to say, Blame the dismissed Defendant B.V. and not us, this is going to be an important issue for us to be able to show that the U.S. defendants were, in fact, controlling and directing this whole operation, soup to nuts.  And whether that shows their direct participation or whether it supports an agency or veil-piercing theory to hold them liable for B.V., we think that is all highly relevant here.

THE COURT:  Okay.  So, Mr. Taft, how -- not saying he's going to be successful in showing any of those things, but how is he supposed to show those things?

I mean, really, his theory is, yes, the contract might say one thing, but I can show, you know, through looking at the documents, through emails, through depositions, whatever it is, right, that, in fact, the U.S.

30

defendants and their personnel, they were -- their hands were in everything, right?  That's what he wants to show.

How is he supposed to do that without digging into the nitty-gritty?

MR. TAFT:  So I think what Mr. Murray's basically conveyed to the Court is, We're getting what we need to prove our -- you know, they think they're getting what they need.

THE COURT:  Yes, I beginning to think some of that is, he wants to express some confidence in his position and doesn't want to say, I don't have what I need yet because if he gets stuck with what he has, he doesn't want it to come back later and, you know, someone clutter from your side saying, Well, he conceded that he didn't have what he needed back then and so he hasn't proved the venture.

MR. TAFT:  But look at -- look at what we have produced.  We have produced a verified interrogatory response with over 400 names with job title and description of who billed time to the project, including most, obviously, employees of CHM B.V., Qatar branch, but also some employees of the U.S. defendants.  We've disclosed that.  That's how we --

THE COURT:  He wants to know what they did.

MR. TAFT:  He wants to know what they did.

So we've been reviewing over 200,000 emails,

31

including those agreed custodians, some of whom are employees of the U.S. entities, with the agreed search terms so that he can get up here and say, I've seen emails showing that these people were working on these. That's what he gets.

What I think we're trying to do is avoid a situation where they're getting every Gantt chart, every schematic, every budget proposal, you know, that was created over a course of 12 years, because that is not useful and it's completely disproportionate.

THE COURT: I don't think Mr. Murray's necessarily looking for every one of those things.

So where is the dividing line?

MR. TAFT: If -- if -- there's an interrogatory response here, Interrogatory 2, which they say: Tell us your responsibility, right? And the objection there was, well, these defendants, their responsibility is not -- they're not responsible because the contracting entity, as you know, is this subsidiary.

If there were an interrogatory -- and I'd be happy to work with him on it -- saying, explain what employees of your company did in connection with this project at a sort of reasonable general level, we can't say what every 400 people did. But if he's looking for the types of work that employees of the defendants did in furtherance of the

32

contracting party's execution, that is something that I think we could agree to and would not --

THE COURT:  I think that's what he's looking for.

MR. TAFT:  It looks like that's what he's looking for.  I don't think he really wants a thousand, you know, different toilet schematics and details that might be on somebody's email.  What he wants --

THE COURT:  I certainly hope that nobody had that thousand toilet schematics on their emails.

MR. TAFT:  Once -- once -- anyway.

I do think that there is a -- I don't think that they asked the right interrogatory.  I'm happy to work with them to get them.  If what they're worried about is us getting up and saying no employee of the defendant did have anything to do with this project, the documents show that we've already produced them, and the ROG responses we've already given show that, yes, some employees of the defendants were providing services through the B.V., through the contracting party for the Supreme Committee.

That shouldn't be disputed.  But if there's some narrative, I'd be happy to work with them, and I think that that would solve the issue.

THE COURT:  And then how do they get the documents that will flesh those out in terms of what those employees were doing without, again, getting everything?

33

I agree that it seems like a waste of time, both of your time and of their time, to, you know, look at a thousand toilet schematics, no one cares.  They care that looking at toilet schematics was part of the job, not what the schematics said, right?

So how can I limit it so that they are getting that category of documents?

MR. TAFT:  So, again, I think just based on the custodians that we have selected and the search terms, they actually are getting exactly what they need in terms of understanding what work was being done by these individuals and, by extension, by the companies in connection with the Supreme Committee contract.  They're going to be taking depositions, they're going to be talking to them.  It's a normal sort of way to find out what happened.

And as far as the documents, as I said, we've agreed to produce documents related to worker welfare and worker safety standards, the bidding, the contract.

This is -- you know, this gets at the relevant points for their theory of participation.  And so I think we actually are there.

THE COURT:  Okay.  Mr. Murray, why isn't that right?

MR. MURRAY:  Well, Your Honor, a couple of things.

First of all, they say that we haven't asked the

34

correct interrogatory.

Exhibit 4 is our interrogatories.  Our Interrogatory Number 3 says:  List each individual employed by you or your affiliates who performed work in any way related to the Qatar World Cup construction projects, the venture, as well as each individual's job title, formal employer, years of employment, locations of employment, and a description of the individual's role on the projects, along with the date the individual did the work.

And what we received from them was effectively a printout of a list of people who billed work to the project without a description of what that work actually was.

THE COURT:  It seems like Mr. Taft is willing to give you that description.

MR. MURRAY:  Music to my ears, Judge.

But in addition, a bigger problem with that is that that only includes people who billed time.

THE COURT:  Although I think he's about to stand up and say that you needs to rephrase your interrogatory in order to get it.  Is that what you're going to say, Mr. Taft?

MR. TAFT:  No.  I was going to say that I don't think it's reasonable or really possible to go and reconstruct what all 400 people, some of whom worked for a year and are no longer employed over a decade ago, did.

35

I do think it is possible to get a verified response as to the types of responsibility or work done by employees of our defendants.

THE COURT:  Okay.  Perhaps, I was overaggressive in stating your position.

MR. TAFT:  But I think it actually gets him what he needs, I really do.

THE COURT:  Okay.

MR. MURRAY:  And I would also say, you know, they -- their responses that we've gotten don't also include all the executives that worked on the project and that don't bill time.

And, you know, candidly, if we were confident we'd get an interrogatory response that was detailed and specific as to all the types of work that they did, that may address our problem.  But the concern that we've gotten is that all of the responses that we've gotten to interrogatories thus far have been perfunctory, at best.

And one of the issues we've raised on this issue is the response to our Interrogatory Number 2, which is to ask them what their responsibility and CH B.V.'s responsibility was on the World Cup construction projects.

And their response -- you know, to say in detail each of the responsibilities that you had.  And their response was one sentence, and it was:  CH B.V. was the

36

program management consultant.  And that's facially inadequate, and it doesn't address the role -- the many roles and responsibilities that the U.S. company had on the project.

And so we think we are entitled -- you know, we're not asking for every custodian under the sun.  The parties have agreed to search the files, I think, at this point to 14 custodians, for agreed search terms.

And so really the dispute is whether they can withhold on relevance grounds documents from the files of people they're already searching here in the United States showing their participation in the venture because it doesn't relate to certain discrete topics.  And we just don't see a basis for that, Your Honor.

THE COURT:  You agree that you don't need -- I don't -- because we started talking about toilets, I'm going to keep going down this route, right?

You don't need all of that, right?  What you really need is something showing that that's the type of thing that they were working on, right?

MR. MURRAY:  Certainly, Your Honor.  And showing the ubiquity of it and showing the level of detail that the U.S. companies was involved with and that they had their hands in all of this stuff, I think that is relevant.  If we could get some assurance that we were getting a detailed

37

description of all the different types of projects on which the U.S. company worked from the United States, that would go a long way, certainly.

THE COURT:  And I think the distinction that Mr. Taft was drawing was one between the U.S. company, which I think he views as their contractual responsibilities, and what you're going to say, which is that it's not just what's in the contract, it's what people are actually doing on the ground, it's what your employees and your executives are doing.

That's what you're after?

MR. MURRAY:  Correct.

THE COURT:  Okay.  Mr. Taft, any problem with providing that?

MR. TAFT:  At a -- at a reasonable level --

THE COURT:  At a reasonable level of generality?

MR. TAFT:  No, Your Honor.

THE COURT:  Okay, so that's what I will order.

So the defendants will respond to Interrogatory Number 2 by enumerating the various ways in which their employees and executives were involved -- what word shall I use here? -- in venture?  No.  Involving the construction of the World Cup stadium and related infrastructure?

MR. TAFT:  May I suggest, supporting the work under the program management consulting agreement?  Because

38

that's what they were doing.

THE COURT:  Is that fair?

MR. MURRAY:  That's fine with us.

THE COURT:  Okay. "In supporting the work under the program management consultant agreement."

So in terms of Interrogatory Number 2, at a reasonable level of generality, then they're not going to be able to track down what every single thing all 400 people did.  But to describe these sorts of responsibilities that those employees and executives had from the U.S.-based defendants, that is what is going to be necessary for Interrogatory Number 2.

And then in terms of the request for production, I am going to rely on the party's ability to figure that, Mr. Taft, you are not going to withhold a vast set of documents that are going to tell Mr. Murray what the employees were doing.  You will give him sufficient levels of detail so he can understand what the responsibilities of the custodians were, as well as how deep those responsibilities ran.

That might not require, you know, turning over multiple drafts of the same document, but he has to know that that person had the responsibility of reviewing those drafts and it was a bunch of work to do that, something like that.

MR. TAFT:  That sounds like a sufficient show

39

standard, which we can certainly (indiscernible).

MR. MURRAY:  Understood.  Thank you, Your Honor.

THE COURT:  Let's move to Issue Number 3, the spoliation issue.

MS. HOOSE:  Hi, Your Honor.  This is Samara Hoose for the plaintiffs.

THE COURT:  Good afternoon, Ms. Hoose.

Like I said, I don't know if I'm actually being more efficient by asking questions at the beginning, but I'm going to think that I am.

And here -- here's what I don't understand.  What authority is there for me to not count this additional 30(b)(6) deposition that we want against the deposition limit?

I understand that it might constitute good cause down the line for you to ask for an additional 30(b)(6) deposition.  It might or it might not.  And, you know, maybe you ask -- maybe it only takes 30 minutes to ask these questions, I have no idea.

But where do I get the authority to say, Yeah, that one doesn't count?  If I were to eventually find there to be spoliation, there would be some grounds for me to use sanctions there.

But right now, I have no idea.  So where is the authority for this?

40

MS. HOOSE:  Your Honor, under the 2000 amendment to Rule 30, it allows for a one-day deposition of seven hours for each person designated under Rule 30(b)(6), but that is subject to judicial discretion.  You pointed out the good-cause standard.

So judges can decide to limit the 30(b)(6) deposition to one day and seven hours.  They can decide to extend the time for various reasons.  And so you have discretion here.

We're just asking at the outset for you to allow us to take the separate 30(b)(6) on spoliation and not have it count against our seven-hour, one-day limit.

THE COURT:  How do I know that there's good cause? Good cause usually involves the diligence of the party that's seeking to modify the scheduling order, right?  And so, I don't know, you know, if it only takes 15 minutes and you're able to finish the other topics you want in six hours and 45 minutes, I don't even know -- I don't know if I need to grant that relief or not.

How do I know right now?  You know, it strikes me as more you get into it and, you know, you're getting stonewalled for three and a half hours and so you've wasted three and a half hours talking about some evidentiary issue.

And so then you come back to me and say, Look, I've only got, you know, three and a half hours left.  I got

41

a whole bunch of other things I need to ask about and I got stonewalled for three and a half hours, that's my good cause.

So why isn't that the time to come back to me and ask me for more time?

MS. HOOSE:  Your Honor, I can assure you at the outset right now that we will use seven hours of substantive 30(b)(6) deposition time.

I'd point you to a 2015 District of Colorado case. The cite is Arkansas River Power Authority vs. Babcock and Wilcox Power Generation Group, Incorporated.  This is Number 14-cv-00638-CMA-NYW, 2015 Westlaw 4031846 at 8, District of Colorado.

THE COURT:  You're going to have to pause for a second because --

MS. HOOSE:  And I do have copies of this case if you'd like.

THE COURT:  Yeah.  Why don't you give me a copy the copy of the case then and show it to counsel if you haven't done so already.

I don't recall this case being in the discovery statement, so I'm going to have to look at it.  This is kind of a fixed stack of paper.  There's no way I'm going to be able to read this while I'm up here.

MS. HOOSE:  Your Honor, I'm happy to summarize it

42

for you.  This is just one example of a case where the Court found good cause to extend the presumptive seven-hour limit for 30(b)(6) depositions.  And I quote from the case:  The Court decided since the amended complaint now pled eight claims, including one for fraud, spans more than 12 years, and has spawned significant document production, there was good cause for additional time over the initial seven hours.

Here, too, we have a 12-year discovery period and significant document production.  We'll need at least the full seven hours allotted.  And this is not the kind of thing that we wanted to come here and ask you for.

To be clear, we have tried repeatedly to avoid having to seek something like a 30(b)(6) deposition on the topic of spoliation.  We have asked defendants numerous times on meet and confers and correspondence that you've seen to give us the basic facts about these documents.  When was the last time you had access to these documents?  When was the access terminated?  What steps did you take to preserve these documents?

THE COURT:  I mean, it seems like you got answers on the first two and that's just not the last one.

MS. HOOSE:  Well, we actually -- aside from one letter response where they sort of implied that they had access to these documents after the pendency of this lawsuit, they have responded to all of our questioning by

43

saying -- and I quote:  I don't believe we're required to answer those questions.

There was a certain meet and confer where we asked time and again for them to give us information about this data, about whether they took any steps to preserve it.  And they time and again told us, I don't believe we have to answer those questions.

And so we don't want to be here risking a 30(b)(6) -- any of our 30(b)(6) time on the topic of spoliation.  We had hoped we could figure this out with counsel, but we've been unable to get any answers.

THE COURT:  Okay.  Anything further?  Or what page -- what cite am I looking at in this case?

MS. HOOSE:  One second, Your Honor.

THE COURT:  I think I see it.  I think it's star 8, the time limit for Rule 30(b)(6) deposition.

MS. HOOSE:  Yes, it's star 8.  Thank you.

THE COURT:  Thankfully, Judge Wang is good at organizing her opinions.  She's got headings for everything.

Okay.  Okay.

MS. HOOSE:  Anything else, Your Honor?

THE COURT:  No.  I'll give you a chance to respond after Mr. Taft speaks with me.

MS. HOOSE:  Thank you.

MR. TAFT:  Your Honor, we think this is premature.

44

They haven't showed good cause for additional time or the need for additional time.  So, again, we think if we get to a point where they need additional time for a 30(b)(6), we'll have more facts.  We'll know how long this deposition, which we haven't objected to giving, will take and how they have used everything else, whether -- you know, and at that point, we'll either agree, because we'll say, Okay, you're going to get additional time, or we'll bring it to Your Honor.

THE COURT:  Procedurally, like I said, that seems to be what makes the most sense to me.  What's the hangup here?  Why won't they answer the questions?

MR. TAFT:  The hangup is because there's a fundamental disagreement.  They're alleging that we had a duty to preserve documents that we didn't have possession, custody or control over --

THE COURT:  I know -- I know that's what the dispute is, right?  But what is the problem with letting them know, Yeah, we had access but we didn't control over it?  Here's the ways that we had access.  Here's the ways we didn't have control.  Go and make your argument about spoliation.

MR. TAFT:  Once they notice a 30(b)(6) seeking exactly that, then they've chosen how they want to proceed.

THE COURT:  Well, basically, they've chosen that

45

way to proceed because they can't get the answers from you, so if you give them the answers, right, then maybe they don't have to do that.  Why -- why are we wasting the time about this?

MR. TAFT:  Your Honor, we've -- we have engaged in good faith and back and forth with them on this --

THE COURT:  I'm not accusing anybody of bad faith. I'm just --

MR. TAFT:  -- at length and -- and when it became clear that they were dead set on getting sworn answers or sworn testimony on this issue, which we think is a complete sideshow, then we -- then we -- we decided to bring it to Your Honor.

THE COURT:  Don't move, Ms. Hoose.

Do you need sworn testimony on this issue if -- can you take counsel's representations as to what actually happened with respect to the server -- or it's not a server, whatever these documents on this Qatari computer?

MS. HOOSE:  Your Honor, if we are provided sufficient detail about what happened to these documents, where they were stored, who could access them, when the last access was, what steps they took to preserve any access to the documents --

THE COURT:  And he's going to say, We didn't take steps because we didn't have to, right?  Isn't that the

46

answer, Mr. Taft?

MR. TAFT:  That -- that's the answer.  And, again, these are -- these are discovery deposition-type questions.

THE COURT:  I know, but, you know, we could -- I'm just trying to head off something.  If -- if they get to seven hour -- or if they get -- if they take three hours and they talk about this, they're definitely going to come back to me and ask me for more time.  They're going --

MR. TAFT:  If they -- they --

THE COURT:  -- to ask you for more time.  I'm trying to head it off if I can.

MR. TAFT:  I think -- I think we -- the time to -- to head that off will be when they're facing the seven hours.  And I can assure you we're going to be reasonable and not -- we -- we didn't want to trouble the Court with this now and we won't want to trouble the Court with it down the road either.

THE COURT:  Okay.  I will take your word for that, Mr. Taft.  I mean the more detail you can provide, the quicker this is going to be head off, the less likely I'm going to be to find good cause down the line.  I'll look at it when it comes in, right?  But if -- if they're stuck spending two hours talking about document retention policies then, you know, they have other things they need to get to as well.

47

MR. TAFT:  I appreciate that.

THE COURT:  Okay.  Ms. Hoose, you can make a further record if you want.

MS. HOOSE:  That's all right.  Thank you, Your Honor.

THE COURT:  So I'm not going to take any action on the request for a separate 30(b)(6) deposition, specifically on spoliation.  I have no idea whether it's going to take ten minutes or two hours or five hours to get to the bottom of this and so I don't know how much additional time to -- to grant.  I don't know what the good cause is.

So until the factual scenario is -- is ripe, I'm not inclined to -- to take any action on this request. Having said that, as I mentioned, the more that -- the more specific that counsel can get about these practices, the more likely we're just -- like, we're going to have a legal argument as to whether there was a duty or not.  That seems to be where the parties want to go, rather than spending a bunch of time in depositions talking about this.

That's just my suggestion.  That is not an order.

That takes us to Issue Number 4 about travel information.

Who's taking this for the plaintiffs?

MS. HOOSE:  It's me, Your Honor.

THE COURT:  So, Ms. Hoose, something that I don't

48

understand, and it's because there was a lot of paper.  And I can't say that I keep track of everything.

But are you seeking the purpose of U.S. Defendant employees who went to Qatar, or are you seeking the purpose of CH B.V. employees who went to Qatar for travel?

MS. HOOSE:  We are seeking Defendants' travel to and from CH B.V. employees and CH B.V.'s travel to and from the defendants.  And so this would be travel to Qatar but also to each other, including other places.

THE COURT:  Now, that takes me to a different question, which is:  Why is travel records of U.S. Defendant employees going to the Netherlands?  I can't remember where CH B.V. is.  The Netherlands?  Why is that going to be any more -- why is that going to be any better than the communications and the documents that you're already getting?

How is this probative and not -- I mean, generally, in some sort of abstract way, I suppose the fact that they travel to the Netherlands to work on the Qatar project is going to be something that, in some way, could show participation.  But I don't understand how that's going to be any better than what you're already getting.

MS. HOOSE:  Your Honor, we've asked, not only for travel records, but also for the specific purpose of the travel.

49

And this goes to a key issue in the case that we previously mentioned, which is the U.S. entity's involvement in the projects and the relationship between the B.V. and the U.S. entity.

I stepped out of the room earlier, so I'll give you a little bit of background on this issue if you'd like.

THE COURT:  Okay.

MS. HOOSE:  But interrupt me if I'm going on for too long.

Their main argument is that because the B.V. entity is listed as the program management consultant in the contract, and today even they called the B.V. entity the contracting party, the B.V. entity is the only one that participated in the venture.

We know from the PMC contract, document production, other sources, that this is wrong.  The U.S. had a consulting -- or expert role.  The U.S. signed a contract guaranteeing the performance.

THE COURT:  Mr. Murray did go over some of this.

MS. HOOSE:  Yes.

But the extent of the U.S. participation and the relationship between the B.V. and U.S. entity will be a key issue at trial.

And so given there are three ways to show that the U.S. company participated in the venture, right, direct

50

involvement, an agency relationship with B.V., and veil-piercing between the U.S. entity and B.V., we think it's highly relevant that if employees from the U.S. and B.V. branches were flying to each other for the purposes of this project, that would tend to prove all three.

THE COURT:  Did you have to prove -- did you have to plead a veil-piercing theory?

MS. HOOSE:  I'll have to go back and check, Your Honor.

THE COURT:  I mean, I'm quite sure that there wasn't a veil-piercing theory in the complaint.

MS. HOOSE:  Nonetheless, direct involvement and an agency relationship are highly relevant, and this evidence will show, obviously, if U.S. employees and representatives were flying over for the purposes of training B.V. employees, supervising B.V. employees, or vice versa:  If B.V. employees were flying over to the U.S. for the purposes of training or working under the U.S. employees, all of this would tend to show an agency relationship and the U.S. entity's direct involvement in the venture.

THE COURT:  So, I mean -- but how is it going to be -- the fact that they're traveling, right, it's not remarkable that a subsidiary and a parent's employees are going to travel from one place to another.  That, in and of itself, is not particularly remarkable.

51

What you want to say is they're traveling over there because they're having meetings about Qatar and the people from the U.S., you know, the years of real puppeteers or whatever it is, and they are running B.V. and they're doing all -- they're directing all the activity.

But the fact that they're traveling there, you know, what you might get is a bunch of responses that say, We traveled there for purposes of talking about the project, right?

And how -- how does that help more than the documents that you're already getting?

It seems like what you want to do really is get the documents that illustrate, for example, communications between U.S. employees and B.V. employees saying, you know, I think that you should ignore these forced labor problems, or something like that, right?

Those are the kinds of things that you want to be able to get.  The fact that they've traveled to the Netherlands or that Netherlands employees traveled to the U.S., in and of itself, it's hard for me to understand how the probative value of that is any better than what you're already getting.

MS. HOOSE:  Well, Your Honor, again, we've asked for a travel so we can look at the travel patterns.  And I do think that this particular type of evidence would be

52

helpful to a jury to show them potentially just how frequently these trips were taking place, just how intermixed these entities were.

I mean, travel evidence is, to me, particularly compelling because it's not a one-off document. It should cover -- it sounds like they've limited this to 2018 forward -- for 2018 forward, anyone traveling related to the World Cup project. That could be particularly compelling to a jury, especially if the purpose of the travel was specifically laid out. And if the purpose of the travel is more specific than they've so far given us, which is just to say that this travel was for business purposes for the 12 people they've provided travel information for so far.

So again, if the purpose of this travel was for training under the U.S. employees, things like that would tend to show the nature of this relationship, I think, in a different way than simply communications back and forth.

THE COURT: And are we only talking about travel to the Netherlands? I mean, when I was reading through the joint statement, I thought it was asking about travel, either to Doha or to the Netherlands.

It seems like, from what you are arguing in front of me today, that the real dispute is about travel to the Netherlands. Is that what the dispute is about?

MS. HOOSE: The real dispute -- what we're really

53

seeking is all travel information related to work on the World Cup construction projects for --

THE COURT:  I know what you're seeking.  What am I deciding today?

MS. HOOSE:  Defendants' travel to and from B.V. locations not limited to the Netherlands and vice versa.

THE COURT:  Okay.  I mean, is the problem with their description to -- because I didn't -- I don't know if I have all the discovery responses.  If I did -- if I do, then I didn't read all of them.

So is the problem with their responses about the travel to Qatar?  Is it only about the responses for travel to the Netherlands?  Is it about both?  What's the problem with the defendants' responses?

MS. HOOSE:  There are two problems.

The first one is that they've only included travel from U.S. defendants to the airport in Qatar.  So we're seeking travel information to and from other places, like I described, between Defendants and the B.V. entity.

The second problem is that -- and I have the Supplemental Interrogatory Response 7, if you'd like to see it.  It's a table, and it lists the name of the person traveling, the date that they submitted their expense entry. And under the purpose of travel, it simply says, "business for all 12 people."

54

THE COURT:  And these are trips to Qatar?

MS. HOOSE:  Correct.  The Doha International Airport.

THE COURT:  Now, if you ask me why I traveled somewhere ten years ago, I probably couldn't tell you why I traveled to someplace.  If you ask me why I traveled to certain places over the course of ten years, I could probably tell you, generally speaking, what I was doing over the course of those ten years.

Even if they don't delineate what each particular trip was about, don't you get enough by -- you know, if Employee A says, you know, I traveled to Qatar ten times or between 2018 and 2022?  Here are the sorts of things that I did on those trips.

That gets you what you want, doesn't it?

MS. HOOSE:  Yes.

THE COURT:  At least in terms of the Qatar?

MS. HOOSE:  Yes, that gets us what we want.  We don't have that at this point.

THE COURT:  All right.  Let me hear from Mr. Taft or whoever else is speaking on the side.

MS. HOOSE:  Thank you.

MR. TAFT:  Your Honor, I think in light of where we got on the second issue today, where we're going to be providing a recently detailed interrogatory response about

what employees of the defendants were doing in connection
with -- I think that this honestly will add nothing to the
record in terms of useful information.  And what they're
seeking is, frankly, almost impossible to deliver.

The chart that we had showed trips to Qatar with
business.  That's because that's all we can really say about
that.  I mean, as hard as it is to say, why you or why I
took a trip ten years ago, they're asking for a verified
response about why a former employee took a trip.  That
information is not in the systems.  It is not reasonably
available to us to do that.

With respect to these trips to the Netherlands,
CHM2 B.V. is the company through which all international
projects of CH2M are governed.  The fact that there's a trip
to B.V. on a space doesn't really tell you anything about
the Qatar project.

And the burden, the incremental burden of going --
saying do you remember why you flew there in 2019, is,
again, in light of what we've already offered to produce in
the documents, completely out of proportion to what they
need.

THE COURT:  Can you get responses that say things
like, Ex-employee traveled to CH2 and B.V. approximate --
you know, some number of times, right, and these are the
sorts of responsibilities -- or these are the reasons

56

related to the Qatar project that employee X went?

MR. TAFT:  It's really -- I can't commit to that now, because we're talking about, you know, 60,000 employees.

THE COURT:  I'm not asking for 60,000 employees, and I don't think Ms. Hoose -- I don't think -- if she's asking me for 60,000 employees, I don't think -- that's not promotional.

I'm asking is there's some sort of subset of, you know -- I don't know who it is -- the top 20 people who travel back and forth between the U.S. and either the Netherlands or Qatar, right, and saying, This is the sort of thing that I did while I was there.  This is approximately -- when I'm saying approximately, I mean -- you know, when I was a prosecutor, I'd ask somebody on the stand, you know, are we talking about dozens or hundreds? So that sort of thing.

Is it possible to get something like that? Because, you know, I think they're entitled to inquire somewhat -- like I was mentioning earlier, I think that probably the communications are going to be more probative, but they want to show some sort of volume of connection to Qatar and the travel there, and they want to show some kind of agency theory.  Whether they're successful in doing it or not is entirely a different matter.

57

But, you know, having some sort of exemplar of these are people who went there and this is the kind of stuff that they did when they went there.

MR. TAFT:  I would submit that you've just given them three great questions for their deposition outlines for all of the executives that they're going to be deposing who are involved in the project.  Did you travel?  What did you do?

I mean, this is not -- the records in the systems are just not capable of producing a verifiable response.  If they give us a few names and you have current employees, we can do something.  But honestly, it's not going to be -- the idea that they're going to learn something from that that is not reflected in any of the emails, the 200,000 emails that we're reviewing and producing, is speculative, at best.

And again, I've been through this with the client in terms of how much information do we have about trips and travel?  It's mind-blowingly complicated.  And we did our best with the Qatar trips, and we don't really know more than what we've put in there.

THE COURT:  Okay.  Ms. Hoose, it seems to me, at least -- I'm not prosecuting your case.  I don't know how to prosecute your case, right? -- but that you're better off getting a specific delineation from a few key people than you are getting a sort of massive dump of, Here's a bunch of

58

people who traveled to the Netherlands.

Is there some way that you can narrow your request, such that it's administrable for Mr. Taft to respond to it? Because I don't see how he can track down all the data that you're asking for. Some of these people have quit. Some of them have moved on. It's been a long time. You know, travel records -- I don't know what they look like, right? But expense reports usually just say, Here's my per diem, here's the hotel that I stayed at. I traveled there for project X, right? And it doesn't tell you what you did while you were there. And they'd have to go back and ask all these people, What did you do on the trip? A bunch of them might say, I don't know. I stayed at some hotels, apparently.

So are there -- you know, in order to make the kind of case that you want to make, it doesn't seem to me that having every travel record of every person and having Mr. Taft try to track all those people down is the proportional way to do it.

So tell me if there's some smaller set of things that would get you sort of the flavor of what you need without trying to have him chase down 600, 1,000 people. I have no idea how many people it is.

MS. HOOSE: Your Honor, I don't have insight into the defendants' travel records, and so I can only give you

59

my best bet based on what I know.

I know that they've provided to us an interrogatory response based on expense reports.  These expense reports presumably bill time to this project.  I would imagine that they could expand this using this same type of data for people who billed time to this, traveled for this project between the U.S. and B.V. entities and entity locations and other places.

So Mr. Taft talked a lot about how it's really difficult to dig into what the exact business purpose was of these trips.  I can't speak to that because I don't have access to all of their information.

I would think they could probably do better than just saying "business" for all of them.  But at the very least, I would think they could use the same expense reports they've used to get us the current data we have and use those to get us more data about the travel that was taking place during this time related to this project.

They've already limited this from 2018 forward.  And again, we're looking for the relationship between the B.V. employees, the U.S. employees.  And I think a magnitude of travel during that period would be really helpful for us and really helpful for the jury to understand this relationship.

So I would ask that if we're going to limit this,

60

it would be to using the expense reports to try to uncover what travel was taking place related to this project, by whom, from where to where, from 2018 forward. And I would ask that they do better than just writing business for the purpose for every person's travel.

THE COURT: What makes you think that the expense reports are tied to a billing code or something like that?

MS. HOOSE: Your Honor, this is truly my best guess. I would have to confirm with them because, again, I don't have insight into their data.

THE COURT: Okay. I mean, because for better or for worse, the rest of the world, it's not billed like lawyers do. I mean, you might say, I worked on project X, and that's about it, right?

I don't even, I have no idea whether they can -- whether there are project codes assigned to the things that were going on in Qatar, whether they are different between CH2M B.V., and CH -- and the U.S.-based CH2M entities. I have no idea one way or the other. And all I have is Mr. Taft's representation. He's about to tell me one way or the other.

So I just, you know, that -- you know, if you have an executive, right, one of the problems that you're going to have is if you have an executive who traveled 300 times, right, in the space of four years between Colorado and the

61

Netherlands, and the expense report system doesn't tell you why that is and just helps, you know, I billed for my time because I'm an executive, you're going to have a real problem at trial, right, trying to use that for anything useful.

MS. HOOSE:  Right.

THE COURT:  You know, he's going to say, Well, I don't know.  I feel like 200 of those times might have been for other international projects.  And then you're back to where Mr. Taft was pushing back on me, which is why don't you just ask him at deposition what they were doing that for.

MS. HOOSE:  Your Honor, my response that they should look at the time bill is not entirely baseless.  They did in their response to us point out that they've provided an interrogatory response with employees who have billed time to the project.  So I presume there is some billing code that they're using.

THE COURT:  Sure, there might be a billing code. I don't know if it's tied to the expense system or not. That's what I have no idea about.

MS. HOOSE:  Your Honor, I don't know either.

Let me hear from -- I don't usually about to go back and forth, but now you've raised a question in my mind, Mr. Taft, do you have --

62

MR. TAFT:  I understand from Mr. Rassi that the way that we were able to get the information we were able to get, we had to search by airport code.  It is -- it just -- the systems are -- you know, they talk about the temporal change.  That's because there was no system for tracking this before 2018, or at least no coordinate system. And even afterwards, it's just been extremely difficult to even gather the limited information we've got, again, to do what they're asking.

If they had a list of short list of executives that they're interested in, that would be something to work with.  But again, that would be a further burden on us to actually go out and have those conversations with people they're going to be deposing anyway.

Across all of the information they're getting, this seems very much like the tail wagging the dog.

THE COURT:  What about the -- so there's no -- as far as you know, there's nowhere that's sorted by expense code or something like that?

MR. TAFT:  There's no way to figure out which trips were taken in connection with a particular project.

THE COURT:  Okay.  And in terms of trips to the Netherlands, I mean, I suspect that it's going to be at least five times more than the trips that are to Qatar.  Is it -- I'm just wondering if it's possible to sort it by, you

63

know, trips to the Netherlands.  I don't know what the
airport in the Netherlands is.

MR. TAFT:  Schiphol, I believe.

THE COURT:  Okay.  If you take that airport code
and run it through, is it the same exercise?

MR. TAFT:  The problem there is that, again, all
international projects done by the company were done through
B.V.  So that it's not going to sort -- it's not going to
tell us, did it have anything to do with the project of the
Supreme Committee.

Again, after when they're getting the narrative
response showing this is what employees of these U.S.
defendants were doing on the project and the documents, the
idea that they need to prove it, you know, by inference
through travel records, it's just the burden far, far
outweighs any incremental value here.  And we've tried and
we cannot do it.

THE COURT:  Can you tell -- I know I keep asking
you questions, is because I'm trying to figure out the
contours of things.

Is it possible to -- if in order to try to guide
Ms. Hoose into making a more specific inquiry, would it be
possible to figure out who the top 25 travelers to the
Netherlands were and when they traveled?

MR. TAFT:  I can try and find out the top 25 over

64

a certain period.  Again, and I can't make any commitment to you or Ms. Hoose standing here today that that's possible because, again, you know, the systems are such that that sort of query just doesn't seem well supported, but I will find out and I will try and engage with them.

THE COURT:  I think, Ms. Hoose, that's probably the best I can do.

MS. HOOSE:  Thank you, Your Honor.

THE COURT:  Okay.  So Defendants will use their best efforts to create a list of the top 25 travelers from the U.S.-based defendants to the Netherlands and provide that list of when they traveled to the Netherlands for that subset of travelers to the plaintiffs.

With that, that takes me to the last of the plaintiff's issues, which is about Interrogatory Number 6, which asks about communications about whether to withdraw from the World Cup due to worker treatment issues.

And I'm not quite sure -- so I don't understand how you expect the defendants to reconstruct every oral communication here.  I mean, it seems like something that is generally appropriately explored through depositions, right? You have your high-level executives and you say, Hey, I have some communications here about workers' rights issues.  Did you ever have a conversation about whether you should get out because it seemed too bad?

65

You know, I can hardly remember the conversations I had a couple of weeks ago. How do you expect them to reconstruct all the oral conversations over, you know, the period of whatever it is? I think it's January 2010 until, you know, 2022 or something like that. How do you expect them to be able to reconstruct that?

MS. HOOSE: Your Honor, we're just asking for a reasonable investigation. So if after a reasonable investigation, there are a high number of these conversations about withdrawing from the projects due to worker welfare, those are incredibly relevant conversations, and that should outweigh any burden argument.

And similarly, if --

THE COURT: What's a reasonable investigation here?

MS. HOOSE: A reasonable investigation would be talking to those at the company who were still involved in the projects, asking if they had any non-privileged communications they can recall about withdrawing.

I mean, this doesn't seem like the kind of conversation that you would have ten years ago and forget about. This is a massive project that Jacobs and CH2M were involved in. If there were serious conversations about withdrawing on the basis of worker welfare, this is something that someone in charge, someone who was working on

66

these projects actively, would seemingly remember.

THE COURT:  Is there a certain set of decision makers that you can limit that to?  Because, you know, the fact that, you know, some analyst sitting at their desk in Colorado is talking to the guy in the cubicle next to him, saying, like, I don't know, I don't feel good about this, right, that's probably not going to get you much, right?

You want to know whether executive level people are having these conversations, right?

MS. HOOSE:  Exactly.  I think we could work together to come up with a list of people we're interested in uncovering whether or not they had these kinds of conversations.

THE COURT:  Do you have any sense of how large that list would be?  If you say, you know, it's going to be 100 people, they're going to push back and say this is never going to happen.

MS. HOOSE:  I would have to defer, but I would throw out 25 at this point.

THE COURT:  Okay.  I'm not trying to bind you, Ms. Hoose.  I'm just trying to get a sense of the scope because I don't -- I don't know what the org charts of these companies look like.

MS. HOOSE:  Right.

I will just say, Your Honor, I think it needs to

67

be made clear on the record that if there were no such conversations, that's also highly relevant to our participation in the venture claim.  Because if there were lack of communications on withdrawing from the venture, despite knowledge of the TVPRA violations --

THE COURT:  Sure, it goes to reckless disregard.

MS. HOOSE:  Yes.

THE COURT:  I get it.

MS. HOOSE:  So if we can get a verified response saying as much after they've conferred with 25 executives or the People who are actively involved in and leading this project, I think that's sufficient for our purposes.

THE COURT:  Okay.  All right, let me hear from Mr. Taft.

MS. HOOSE:  Thank you, Your Honor.

THE COURT:  So, Mr. Taft, if Ms. Hoose can narrow this down to some list, and it may not be 25 people, it might be less than that, whatever it is, she's trying to get some kind of idea of are there high-level conversations happening?  There are conversations they're going to get in what you're already producing.  That seems less of an issue, right?

But she wants to know, is there something happening that they're talking about?  If she's able to -- if you all are able to limit it to some set of high-level

68

decision makers, it doesn't seem like a huge burden to talk to that set of people and say, Did you have any kind of conversations about this?  I can't -- I don't think I can order you to produce specifics:  I had a conversation on October 19th of 2018 at 7:56 p.m.  That seems unreasonable.

But whether they had those conversations or didn't have those conversations, it seems like something that ought to be obtainable with some amount of effort.  So tell me if I'm wrong about that.

MR. TAFT:  So if they gave us five names -- because there aren't many people who that conversation actually has any significance, you know, for the company. You've got a CEO.  You've got the project manager.  You know, these are the -- otherwise, you're just looking for a needle in a haystack.

And again, your instinct off the bat was entirely correct.  This is a document issue.  The documents get produced.  You know, worker welfare is obviously -- you know, every search term is like -- you know, those are going to come through and then they can ask the people involved in those conversations when they depose them:  What was that conversation about?  Or if there are no documents, did you ever have such a conversation?  And that's how they do it.

The idea that they are seeking a verified response from a corporate representative that no such discussions

69

ever happened is -- that is absolutely impossible. We cannot do an investigation or a reasonable investigation that says, yes, like no such discussions happened because that would require talking to all 60,000 employees.

If they gave us a list of five, said these are the senior decision makers, can you ask them if they recall any such discussions, that would be proportional and reasonable.

THE COURT: And I suspect that it would be your C-suite people. So that's going to be your CEO, CFO. I don't know how it's organized, right? The people with C and O in their name. And then perhaps maybe one level below that as to this project. That's going to be some kind of program manager, program director, that sort of level of person. That's my suspicion.

MR. TAFT: It would be hard to argue that that would be sort of impossible to do. So we could do that, that would be a reasonable request.

But again, the reason why we're here and objecting to this interrogatory is this idea that we need to go out and prove the negative, which is just not what discovery is for. They get the documents. They do their search. They do their investigation. If they want us to ask five questions to executives, we can do that.

THE COURT: I tend to agree with that, Ms. Hoose. I think that's really what you're interested in. You want

70

to know whether the relevant decision makers here are having those conversations or not having those conversations.

I mentioned the parameters of what I think it's going to be. It's going to be the executive type people, and it's going to be sort of one level below that, right? It's going to be the director type people, the people who have charge over the whole project.

So what I will order is that for that set of people, that the defendants produce a response indicating, again, at a reasonable level of generality, whether such conversations took place about whether to withdraw from the project due to welfare issues. It won't speak for the entire corporation. It'll speak for that set of people who are the decision makers with respect to this particular project.

Fair enough, Ms. Hoose?

MS. HOOSE: Yes, thank you, Your Honor.

THE COURT: Okay. And then in terms of the size of it, I'm going to direct the parties to confer. I just don't know. I mean, it might be five, it might be ten, it might be eight. I don't know. But you have the broad parameters of where I think it is. And if you're getting down to, you know, a team lead, you're probably at too low in the org chart. Fair enough?

MS. HOOSE: Yes, Your Honor.

71

THE COURT: Okay. Let's go to the defendant's issues. So the first one is about the IMEs. And so I'll hear from someone on the defendants' side about the scheduling, expert reports, and supplemental depositions regarding the IMEs.

MR. TAFT: Thank you, Your Honor.

THE COURT: Mr. Taft, you either drew the short straw of everybody else drew the short straw.

MR. TAFT: I really did. I really did.

On the IMEs, it's really, I think, two issues. One is, should the plaintiffs be required to produce their medical expert reports sufficiently in advance of the IMEs to be conducted here so that the defendants have an idea as to what they should be asking the examining doctor to focus on?

THE COURT: So I see the argument with respect to the medical records, right? Because your examining physician needs to be able to look at the records to be able to know where to focus their inquiries.

I have a hard time seeing it for their expert reports. Why do you need a report, right? Your doctor needs to know what the areas of inquiry are so that they can make the proper examination of the plaintiff, but why do you need a full Rule 26 report?

MR. TAFT: If there were proper medical records

72

that were produced, then I would probably agree, but the fact is that most of these plaintiffs have not produced medical records. The complaints are sort of described, you know, rather generically in interrogatory responses. And again, it's just not a sufficient basis to really target what our examiner should be focused on.

And then the inefficiency is that we do our IME, they submit a medical expert report a month later that, you know, has a completely, you know, different approach or different take, and here we are having to come to Your Honor for a second medical examination.

THE COURT: Nobody wants that.

MR. TAFT: And nobody wants that. And so if they're going to be doing their own medical expert reports for these plaintiffs -- and it's not many, I think it's 13 or so plaintiffs -- then I think it's a pretty straightforward request, given the logistics involved, to have it done first, produce it, and then we'll do the IME. So that's the request.

Again, if Your Honor disagrees, then we might be back here seeking, you know, with an argument of good cause that in light of the medical expert report, we actually need a further examination, which we're trying to avoid.

THE COURT: What makes you think that they have expert reports to turn over before the IMEs take place?

73

MR. TAFT: I'm not sure they do have them now, but they do refer in correspondence to the idea that they would either have their examinations happen simultaneously here or perhaps later.

THE COURT: So if their examinations are happening simultaneously with yours here, then what are you expecting them to produce?

MR. TAFT: We expect them to actually have their examinations done maybe in the Philippines now so that, you know, again, these are plaintiffs who suffered their injuries, alleged injuries, you know, five, six years ago. They had plenty of time to work on this since the complaint was filed. But get their medical examination now so that they can -- by the time they get here, our examiners can just look at them once.

THE COURT: How can I make them do that? How can I do that?

MR. TAFT: By moving forward the deadline for medical expert reports with respect to these 13 plaintiffs to three weeks before their scheduled IMEs.

THE COURT: Okay. And then -- is the problem -- in reading the amended complaint, some of them did seek medical attention or allegedly weren't allowed medical attention. Is some of the problem here that there are no medical records, because whatever they were -- whatever

74

injuries they were suffering, they didn't seek medical attention for them?

MR. TAFT: Many say that they did not seek medical attention. Others say that they received medical attention from a nurse or doctor or were sent to the hospital and got, you know, their hypertension treated or one had a case of tonsillitis.

THE COURT: So this noise here is because somebody has a device that is transmitting a radio signal too close to one of the microphones.

MR. TAFT: Okay. One, for example, got treated for tonsillitis. The problem is, as I understand it, and we've been talking to the plaintiffs, they've had limited success or no success getting their medical records from the Qatar hospitals where they were being treated for these.

So again, if there were better medical records, this could probably be avoided, but because the medical evidence is going to be from their side primarily in the form, I suspect, of a medical expert report, our request is to have it in advance of the IMEs.

THE COURT: All right. Let's find out what their evidence is going to be, because I don't know if that's going to be the case or not.

MR. TAFT: Okay. And I just very briefly on the second point.

75

THE COURT:  Yes.

MR. TAFT:  We've also requested that if after we get the IME, we're going to do the depositions of those witnesses when they're here in Colorado.  We've requested that if, based on the IMEs, there is good cause to have a further video deposition or further deposition that, you know, we would argue that we have good cause for that further deposition.  They are not willing to agree.  They say, No, no, you get one and done, which just, you know, again, we'd say, If we have good cause, we're going to have to come to Your Honor and say we have good cause for a further deposition.

THE COURT:  But why isn't this the flip side of the 30(b)(6)?

MR. TAFT:  It is.

So why are they -- you know, again, all we're asking is that they not require us to waive the right to argue good cause to seek a second deposition if that's necessary.

THE COURT:  I don't think you're waiving anything.

MR. TAFT:  Thank you.

MS. WHEELER:  Good afternoon, Your Honor.  Meredith Wheeler for plaintiffs.

THE COURT:  Thank you, Ms. Wheeler, because I can't remember who was sitting where.

76

MS. WHEELER:  As we said, it's hard to remember ten years ago and two hours ago for all of us.

THE COURT:  All right, so Ms. Wheeler, here's the issue, right?  The way that this normally happens, right, you have a normal, I don't know, an insurance case or something like that where someone says that I got hit by a car and I have terrible injuries.  They've got doctor records.  They turn them over.  The IME examiner takes a look at them and says, All right, looks like you've got a lumbar spinal fusion or something like that.  And they say, All right, I know where to look.  That's the issue.

How are they supposed to know where to look if some of these things don't have any medical records?  What are they supposed to rely on to say -- to tell their doctor, Here's what I want you to look at when you look at this patient?

MS. WHEELER:  Your Honor, first and foremost, they can rely on the interrogatory responses.  I can represent to Your Honor -- and I think Your Honor has a copy of those responses as an exhibit in this case -- the vast majority of the plaintiffs for whom defendants are seeking IMEs do not have complex injuries.  These are plaintiffs who have ongoing injuries as a result of their work in Qatar, but they have injuries such as hypertension.  There's no basis to believe that there is some sort of unknown, complicated

77

injury that's not been pled, that's not been answered in the interrogatory that would arise during the medical examination that would warrant this kind of unprecedented change to the scheduling order.  And that's what this is.

You know, this Court set a scheduling order back in July.  They are moving to amend that scheduling order effectively without showing good cause and entirely based on their speculation as to what may or may not take place.

The sole legal basis they cite in their papers on this is a footnote from the dissent in Twombly, Your Honor. There's no case law on point that remotely suggests that this could be an appropriate use of this Court's case management authority.

THE COURT:  I mean, that seems to be right. Though, if you come out with an expert report for someone who says, I have hypertension, and then it says, Actually, he developed, I don't know, some sort of long-term post-traumatic stress disorder that is affecting his ability to do a whole bunch of things in the future, they're going to have pretty good cause to make a client come back to the United States for an examination, don't you think?

MS. WHEELER:  Your Honor, I think if that happened in the course of our medical experts' evaluation, they can make that argument at that time.  At this point, based on what has been alleged and what has been stated in the

78

interrogatory responses, I don't think that there's any basis to think that there are unknown injuries that would be disclosed by our expert that have not been disclosed previously.

THE COURT:  Okay.  Why do we need to wait until May 15th to do the IMEs?

MS. WHEELER:  Your Honor, what I can say is that we certainly are open to some degree of compromise on this. We are not wedded to May 15th.

I think our primary concern is the fact that there is uncertainty about whether our plaintiffs will be able to secure visas.  If one or more is not able to secure visas in order to take an IME here in the United States, I think we would want sufficient time for there to be contingencies developed for however the examination would be to take place, whether in the Philippines or elsewhere.

THE COURT:  But surely you're going to know one way or the other -- but I mean, not surely.  There's nothing that's sure today when it comes to visas.  But why can't we set the March -- I think it was March 31st deadline that the defendants were looking for?  I mean, that's still four and a half months away, right?

If you get the process started, they schedule it, you start looking for visa applications, that still gives you, you know, by any timeline, it gives you three and a

79

half months.  I don't know if that's true or not, right?

But, you know, if we push it out further than that, then the argument is a good one, that we would end up probably pushing the discovery deadline, which if we don't have to do that, I don't really want to.

So why shouldn't we set the deadline that they set and then -- that they suggested?  And then if problems arise, right, we can take it that when they come.

MS. WHEELER:  I appreciate that, Your Honor.  You know, I think our position is just, given the number of overall plaintiffs that will need to be deposed in this case, in addition to depositions relating to Defendants' witnesses on top of IMEs, that we think that additional time is necessary into ideally May out of an abundance of caution.

I think if we could compromise on some time in April, I think our position is that that would afford both sides sufficient time to do the significant discovery that needs to be done in this case.

THE COURT:  In April?  I don't remember what all the deadlines are, but you've got expert deadlines that presumably are before May, with the May discovery deadline, right?  And if that's the case, you're really cutting it pretty close in April.  I think even March is sort of -- you've got March, and then you've got a couple of weeks to

80

write the expert reports to bring them over to the other side. It's -- that sort of kind of last minute as it is already, don't you think?

MS. WHEELER: Certainly, we would defer to whatever Your Honor thinks is best in terms of timeline and overall case management.

I did want to just briefly respond as to their position on a second deposition. What was represented is certainly news to Plaintiffs. I think our understanding had been that they were not willing to agree to deposing all plaintiffs while in the U.S. for the IMEs. They had sent deposition notices for all plaintiffs, including plaintiffs they are seeking IMEs for January and February. So I think that there had been some perhaps miscommunication as to that point.

I think that our position is, as Your Honor said, that this is premature. Both of the cases that they cite in their papers on this involve back patterns where something new comes up in a deposition and that provides good cause for a further deposition or an extension.

THE COURT: Maybe there is, maybe there is. I don't know. Right now, I just don't have the data. I mean, it seems like Mr. Taft was just wanting me to assure him he hasn't waived it. I told him he hasn't waived it, and so he can bring it up in the future if he needs to bring it up.

81

MS. WHEELER:  Certainly, but I think at this point, our -- what's important for us is, I think, for efficiency for all parties and just the expeditious resolution of these numerous depositions that we have, commitment for there to be a protective order such that plaintiffs are deposed on the same trip as their IMEs take place if they're able to get visas.

THE COURT:  That appears to be -- as I read the dispute letter, that point seemed to be a moot one.  Are you going to tell me that's a moot one?

MR. TAFT:  That's common ground.  We're happy to take the depositions when they're here.

THE COURT:  I don't think I need to do a protective order.  You have his representation on the record.

MS. WHEELER:  Certainly.  I appreciate that.

THE COURT:  Okay.  So --

MR. TAFT:  Your Honor, while I'm standing, I would ask that if they have identified -- if they're going to be doing their own medical examinations, either here or in advance, I would ask that as soon as they know the specialties of the doctors that they're going to be having do those examinations, if it's a psychiatrist, if it's a -- that they share that with us.

You know, they don't have to give us the -- I

82

don't think you're going to order them to produce the report, but at the very least, if they know the specialties that they're going to be using, then that information really is necessary for us to make sure that we have a --

THE COURT:  Comparable speciality.

MR. TAFT:  -- comparable --

THE COURT:  That seems fair.

MS. WHEELER:  We have no objection to that.

THE COURT:  All right.

MR. TAFT:  Thank you, Your Honor.

THE COURT:  So I don't -- anything else, Ms. Wheeler?

MS. WHEELER:  No, Your Honor.  Thank you.

THE COURT:  All right.  Mr. Taft, I already gave you an opportunity to speak.  I don't think I need to give you another one.

I think in terms of the requests on the IMEs, I will extend the deadline for IMEs to March 31st of 2026, as the defendants suggest.  Beyond that, I would need a motion -- either a joint motion or a motion from one side, telling me why there's good cause, because I think that will end up pushing the discovery deadline and the expert deadlines if we push the IME deadlines past March 31st.  And then you all can tell me what has been going on since then in your motion to modify the scheduling order.

83

In terms of the request for expert reports by agreement of the parties, instead, what will -- what Plaintiffs will turn over is the specialties of any experts that they have examining their clients.

And Ms. Wheeler, are you able to do that before the IMEs are scheduled?

MS. WHEELER:  I believe so, Your Honor.  I think we just need to notice as to the dates in order to apply for the visas.

THE COURT:  Okay.  So could you do it -- I mean, they're going to have to notice the IMEs three weeks before noticed IME.  Could you produce the specialties of whoever you're going to have examining that Plaintiff?

MS. WHEELER:  Yes, Your Honor.

THE COURT:  Fair enough, Mr. Taft?

MR. TAFT:  I think it works if the sequences --

THE COURT:  Sequences, you notice the IME?

MR. TAFT:  We notice the IME, but to notice the IME, we need to have the doctor with the specialty lined up. So -- and so if that's --

THE COURT:  Why don't we do this.  You get a series of dates, right --

MR. TAFT:  Yes.

THE COURT:  -- to them, and then they'll have to reserve it on their calendar.  The formal notice of IME can

84

come afterwards, but if you all agree on dates first, then 21 days prior to the date of the agreed-upon IME, they'll provide you the specialty of whoever they have examining that person, and then you can formally notice the IME to them.  Does that work?

MR. TAFT:  That works.  I'm sorry, I'll --

MR. NASRULLAH:  Can I --

THE COURT:  You may.

MR. NASRULLAH:  Your Honor, one of the --

THE COURT:  Why don't you find a microphone, Mr. Nasrullah.

MR. NASRULLAH:  Your Honor, one of the impediments we run into, you know, my firm does a fair amount of tort work, so we do the kinds of cases that you were describing, the insurance kind of case.

We have put a lot of time already into looking at these records and trying to find corresponding examiners, and it's hard to do.  And physicians in this state aren't really willing to do IMEs unless they fall close within the parameters of their specialty because they're pretty concerned and they're well aware of Daubert.

So the sooner we get the designations of those experts, the sooner we can get these busy doctors to commit to giving us dates to do these IMEs.

So if we -- Mr. Taft is right, if we try and get

85

dates for the IMEs, we may not have a specialist to do it. So as soon as possible, we would need to get -- they must have a sense of which of theirs -- the subset of plaintiffs they're going to be using experts on.  They must know that by now.

THE COURT:  It's a set of 13, so it's not a big set.

MR. NASRULLAH:  Yeah.

THE COURT:  They may use specialists for the other 40 plaintiffs, but 13 who are coming here for IMEs are -- that's a smaller set.

MR. NASRULLAH:  And I don't think it's a big ask. I think if we get that information, you know, as soon as possible.  I mean, I'm talking about now because it's hard to get doctors to commit to doing this.  There's a small group of physicians in this town that are willing to do legal medical work to begin with.  It may shock you, but not everyone wants to do it.

THE COURT:  It doesn't shock me.  A little known fact about me is that I used to do class action work, and part of that involved mass tort work, and part of my job as a young associate at a firm was to call a bunch of doctors who said no to me in order to serve as experts on cases, which I'm sure, yes --

MR. NASRULLAH:  Mr. Waheed --

86

THE COURT:  -- Mr. Waheed is doing that now.

MR. NASRULLAH:  -- is living through that right now.

And so I think if we're looking at 13 -- and you know what?  If they don't have experts and they're not going to be calling experts to, you know, produce reports on some of these 13, we may not do the examination.  We may not. They may be generic enough that we don't think --

THE COURT:  You can do it be cross-examination.

MR. NASRULLAH:  Yeah, exactly.

So what I think is they should give us -- if we think we're going to be doing these IMEs in February, for example, I think by the end of -- by the beginning of December, we need to know if we need to schedule these -- whatever subset it is of these 13 with specialists.

THE COURT:  Has the 13 been designated?  Do you all know who the 13 are?  Okay, you do.

MS. WHEELER:  Yes, Your Honor.

MR. NASRULLAH:  We do.

THE COURT:  Ms. Wheeler, can you do what Mr. Nasrullah is asking for?

I mean, it's not asking you to necessarily identify particular experts.  You're just identifying specialties, right?  I'm going to have a pulmonologist look at this person.  I'm going to have a cardiac cardiologist

87

look at this person, whoever it is.

MS. WHEELER:  I think I don't understand that to be sort of beyond what we had agreed to earlier.  So I have no, I think, issue with providing that.

THE COURT:  He's just trying to move up the timeframe.  He's asking for whether you can specify the specialties for each plaintiff by the end of the year.

MS. WHEELER:  Your Honor, I think we can certainly do this fairly expeditiously.  We're equally eager to get this scheduled, and given the visa timelines and the sort of chicken-egg problem of needing a date before the visas, we can get this information to opposing counsel.

THE COURT:  How soon?

MS. WHEELER:  How soon?

THE COURT:  There's nothing that lawyers love that makes lawyers work better than deadlines, and so that's why I'm asking.

MR. MURRAY:  We will endeavor to do it by the end of the month, if not sooner.

THE COURT:  Okay, so I'll give you until the middle of December then as a deadline.

MR. MURRAY:  Thank you, Your Honor.  We will try to do it much before then, but I would appreciate that.

THE COURT:  All right, so you will turn over the specialties, if any.  You know, some of them they might not

88

have anybody examine them.  The specialties of the experts that you will have examine the 13 plaintiffs who are scheduled for IMEs on or before December 15th.

That gives you two more weeks than what you wanted, Mr. Nasrullah.  It gives you two more weeks than what you asked for.  So I am really splitting the baby on that one.

December 15th, they'll turn over the list of specialties.  That should give you enough time to find experts who may be willing to conduct the IMEs before February, Mr. Nasrullah.

MR. NASRULLAH:  That will work, Your Honor.

THE COURT:  Okay.

Anything else I need to do on the IME issue?  I don't think I do.

Okay, let's move on to depositions.

MR. TAFT:  Your Honor, the plaintiffs have moved for a protective order shielding them from appearing for depositions that were noticed here in Colorado.  Their own authorities that they cite in their papers, Pierce v. Brovich (ph), which is a southern district of New York case from 1954, confirms that plaintiffs chose the form they should be deposed there.

There is a -- in that case, the plaintiff said, I was physically and financially unable to come to New York,

89

and the Court said, you know, this is where you've decided to sue.  There is a presumption.

THE COURT:  There are -- I agree, there's a presumption, but in this case they didn't have a bunch of choice of forum, even choosing this forum.  They still, you know, weren't able to get two defendants because of personal jurisdiction issues.  And the TVPRA exists only here in the United States.  They really had Colorado or Texas.  Those are their options.  They chose Colorado.

And, you know, the two cases that I brought out last time, the SEC vs. Albi (ph) case and the Hernandez case, they seem to address situations that are more analogous to what we're talking about today.

My real question is to try to figure out, because logistically I don't quite understand how this will all get done.  And the reason I don't understand that is, I mean, you do make a point -- a good point, that if you're taking the depositions of 40 -- I don't know if you're actually going to take the depositions of all 40 other plaintiffs, but maybe you do -- that the burden is significant.  And I don't -- you know, I don't know how you take a seven-hour deposition on a 13-hour timeline or time difference.  I just, I don't know how that happens.

MR. TAFT:  You don't --

THE COURT:  Some of my questions are going to be

90

for the plaintiffs on this one, but what I'm trying to figure out is I have a real hard time ordering 40 Filipino migrants to come to the United States for depositions.  At the same time, I also have a real hard time saying that you all have to stay up until 6 o'clock in the morning from doing depositions from 11 p.m. to 6 a.m. for an entire month.  So that both of those options seem difficult to me.

And what I'm looking for guidance on is what practical way can we do -- can we employ to get this done?  Because I understand that, you know, there's something that is lost sometimes in video conferencing depositions.  You know, the credibility of these plaintiffs is that's going to be important for your case, and so I understand that.  I understand the desire to want to do them in person, but at the same time, I understand that there is a significant burden to trying to do them all in person, whether it's here or in Manila.  Both of those things are difficult, so I'm trying to be practical here.

MR. TAFT:  I do appreciate that, and so are we, and we've offered a compromise, which is to fly ourselves to Manila to take these in person with the plaintiffs' counsel bearing the cost of getting us there and having us do that, and they've refused that.  So that -- I mean, that seems like one option.

Or it doesn't have to be all one, all the other,

91

right?  They have made no effort to get visas for these plaintiffs, as far as I'm aware.  They've known about our request for a long time.  If I may approach the plaintiffs, we have provided a declaration to the plaintiffs.

THE COURT:  Ms. Jeffries.

MR. TAFT:  Your Honor, there's no need to look at it now.  I do want to introduce it to the record because what it states is from a Philippine travel agent who specializes in obtaining visas.  The timeline is a couple weeks to get a visa, and there are appointments available in early December.

Now, so again, in terms of them saying it's completely impractical to get all of these plaintiffs here, I don't think that they have made that showing, and I think it would be fair to the extent some of them can be brought here.  Again, this is not an expense that the migrant laborers are going to bear.  The plaintiffs' counsel have confirmed that under the terms of their engagement, none of the costs associated with this case or the travel are going to be borne by the actual plaintiffs.

This is all about preserving the return on investment for plaintiffs' counsel and whoever else is holding an interest in this judgment.

THE COURT:  I don't know if we're going to go that far, but I understand the argument.

92

MR. TAFT:  Well, again, to the extent they're pleading that it's unfair -- and this was in Hernandez, for example, that was Legal Aid Georgia, right?  That was the -- that was the -- the plaintiff law firm in that.  They were not in a position where they were sort of getting funding.

I do think that it actually is a point of difference here from some of the other cases.  And again, the SEC case that Your Honor directed us to, that was a situation where it was the defendant who was overseas and being deposed, not the plaintiff.  And there they recognized, we're going to have to do these depositions if they're done remotely, in sort of two-hour blocks, you know, at the end of the night.  And that was even a less onerous change.

So again, we are willing to go to Manila to depose these individuals in person.

THE COURT:  Do you need to depose all 40 people in person?

MR. TAFT:  Unfortunately, I think we do based on the documents that we've seen so far.  They just -- you know, they say, you know, I felt like, you know, if I had asked for my passport back, they would have said no.  Right?  Like, that's not -- there's no -- there's no documentary evidence that I've seen that supports the claims --

THE COURT:  I get that if you need to --

93

MR. TAFT: -- beyond the fact that some of them worked for the employers they say they worked for.

THE COURT: No, I get that if you need to depose all 40 of them. Do you need to do all 40 in person? The reason I ask is, you know, trying to put together big cases in the past, after a few of them, you sort of get the flavor of what you're going to get out of an in-person deposition. You know, is there a solution here that is some of them being taken in person in Manila and then some of them being remote? Is there some kind of solution like that?

MR. TAFT: And, well, again, that's part of the problem. The allegations that these plaintiffs have made are basically verbatim the same. Their interrogatory responses about how they felt and what they experienced are also pretty cookie-cutter and basically the same.

There are serious credibility issues as to each one, and this is not a class action. These are individual claims that are being brought by individual plaintiffs, and, you know, that's the way it's been presented. This is trench warfare. We cannot sort of say, you know, well, we're going to assume that if that plaintiff, when they show up at trial, as they will have to do, that we can't be in a position where we just don't have any deposition testimony that relates to their story.

THE COURT: Well, I'm not asking you for any

94

deposition testimony; you know, some of them.

But what you're saying is you have no mechanism to distinguish between, you know, ten really important ones that I want to do in person and 30 of them that I think, you know, I want to get somebody on the record, I want to do it, but I can do it remotely?

MR. TAFT:  With a few exceptions.  Their allegations and interrogatory responses are sort of equally vague and ambiguous and nonspecific.  So it's kind of hard for me to pick out who I want to talk to.

THE COURT:  Okay.

Who's taking this from the plaintiff side?  Mr. Murray?  So, you know, how -- practically, how could this get done remotely?

MR. MURRAY:  Well, Your Honor, practically, I think the way it gets done is what we've offered, which is that we arrange to bring all of the plaintiffs from disparate areas in the Philippines to a central location like Manila, set up a conference room, set up the video conferencing setup, agree on a reasonable time that those depositions can occur that's convenient for the defendants in the United States.  If that means that our plaintiffs have to stay up late into the night, I don't think that's meaningfully different than them having to get used to American time zones if they fly to the United States, given

95

the time difference anyways.

I think it wouldn't be hard, for example, to have a deposition from starting at, you know, let's say 7:00 in the morning New York City time, which, you know, going to, say, 3 p.m. New York City time, which would effectively require the plaintiffs to take a deposition from, say, 8 p.m. to 4 a.m., which, of course, is, you know, a difficult thing. But if they spend a few days getting on that schedule beforehand is certainly not insurmountable and would be reasonable, I think, from the perspective of the defendants.

The real problem here is that it is far from certain, certainly with the medical exams, but also with the depositions, that we can get visas. And the declaration that Defense Counsel handed up to Your Honor just now talks in general terms about what the process looks like, but doesn't address at all how likely it is that these individuals will actually get visas.

And our declaration which is at Exhibit 28, says that last year only about 30 percent of Filipinos who applied for visas in the United States were rejected.

THE COURT: It was 28-point-something percent.

MR. MURRAY: Yes, Your Honor. And that now, under the current administration's more restrictive policies, we don't have the data yet, but anecdotally it appears that

96

that is going to be quite a bit higher.

THE COURT:  I mean, the only thing I think I can say from both this declaration and your declaration is I have no idea whether they'll get approved or not.  They may -- all of them might get approved, none of them, some of them, I have no idea.

MR. MURRAY:  Exactly, Your Honor.  And we think that, you know, combined with the cost and expense of applying for the visas, of flying 52 people to the United States, and the fact that those people would have to take lots of time off from their work.  And these are people who really do live paycheck to paycheck, often in transient work.  That's a real burden.

And if the burden were necessary for the purpose of prosecuting this case, that would be one thing.  But the case law we cited in our joint statement, the four cases addressing the circumstances of low-wage workers in foreign countries, all of which say it is an efficient and cost-effective solution to do remote depositions, cut in favor of that solution here.

I mean, I will say from personal experience, you know, I had an arbitration case during COVID.  We tried entirely virtually.  That included a number of witnesses testifying through translator remotely from Korea, and we made it work.  And it was not, I think, meaningfully more

97

complex from a technical standpoint, then testifying through translation in person.

THE COURT:  Yeah, but I mean, what kind of case did you have in arbitration?  Because the reason I ask that, you know, is that when you have technical witnesses and people like that, you know, when you're doing that over a remote deposition, what you're really trying to get is you're trying to get at the information, right?  But what they're trying to get at is not just the information, they're trying to get at what your clients are going to be like when they're on the stand, right?  And you don't get that same sense of doing that over a video.

And I don't disagree that the cases indicate that video depositions are a viable substitute in many cases, but there's -- even the cases that I cited nothing comes -- nothing is in the same sort of scope as this case in terms of the number of plaintiffs that are at issue.  You know, not -- even a ten-hour difference is better than a 13-hour time difference.  13 hours is pretty bad in terms of taking those depositions.

And then, you know, isn't the burden on your clients less if an attorney from the defense side goes over to Manila, because then your clients presumably only have to -- you know, they travel a day, they take the deposition, right, instead of trying to adjust their schedule to be up

98

late into the night so that they can take a remote deposition. Isn't that less burdensome on your clients?

MR. MURRAY: Well, Your Honor, as we've made clear, I think, in our statement, we are more than happy to carry out these depositions remotely -- or in person, rather, in Manila.

The question really is about cost. Defendants are trying to say they should be able to do the depositions in person remotely and that we should have to pay for them to travel out there and do that.

THE COURT: Isn't that what -- I think it's the Hernandez case that I cited. Isn't that what the judge decided there?

MR. MURRAY: Well, I think, Your Honor, the judge decided there that the depositions would take place remotely.

THE COURT: They decided they could take place remotely or they could take place in Mexico if, I think it's the plaintiff, contributed $1,000 to the cost of taking that deposition in Mexico. Because the rationale was, well, it's going to take $15,000 for you to travel to the United States to take this deposition. You're saving all that money. It takes $1,000 to do it in Mexico. You pay that.

MR. MURRAY: Well, Your Honor, I think this goes to sort of a separate point, which is, number one, we don't

99

know anything about what the defendants' cost would be to them of flying people --

THE COURT: I'm not saying that I'm going to give them carte blanche, you know, to take four lawyers to go over there, right? I'm not saying that. But some sort of reasonable cost for them to take those depositions in person in Manila. Why shouldn't I give them that?

MR. MURRAY: Your Honor, I think it's because experience has demonstrated that remote depositions are an effective alternative. You know, I think there's a number of cases that make that point clear, both during and after the COVID pandemic, that sort of lawyers, you know, technology providers, we've all gotten used to doing that and we know how to do that, and we've got video conferencing systems that can allow them to judge the credibility of the witnesses in realtime.

And so if they are asking for a substantial additional burden to bring those people to the United States, or asking us to bear what should be their costs when they're foregoing a reasonable alternative, we don't think that's appropriate here.

THE COURT: But that's what Hernandez ordered. It said you can choose, right? You can do it remotely or you can pay $1,000 and you can do it in Mexico.

MR. MURRAY: I'd have to go back to the case, Your

100

Honor.  I thought it was the -- in this situation, it would be us that would get to choose whether we do the depositions remotely or contribute and do them in person, but maybe I'm mistaken.  I'd have to go back and look at the case, Your Honor.

THE COURT:  Yeah, I'd have to go back and look at the case.

This is what happens when I try to sign into things from my bench computer, ask me for verification codes and my phones are all back in my office.  So I can't log in and see it right now.

MR. TAFT:  Your Honor, I have it in front of me.

THE COURT:  Okay.

MR. TAFT:  The order does say that Plaintiffs should rightly bear $1,000 of the expense of the remote deposition since it's their case and they would be spared the expense.

Alternatively, Plaintiffs may elect, upon Hendrick's, Defendant's consent, to contribute $1,000 towards the cost of defense counsel's travel to Mexico for live depositions.

THE COURT:  Right, so those are -- we're both right.  It's either $1,000 because you're saving a bunch of money from having to come, or it's $1,000 because that's the money it would take to take the deposition here.

101

MR. MURRAY:  And, Your Honor, the excerpt that was just read said that that was at Plaintiff's election, which I think here we've already offered to cover whatever incremental costs there would be of doing this deposition virtually, including covering the cost of bringing our people to Manila, covering the video conferencing costs, whatever additional IT costs, et cetera, that would be necessary there.  And so I think that is analogous to what the Court ordered in Hernandez.

THE COURT:  That's kind of what you would have to do anyways, right?

MR. MURRAY:  Well, ordinarily it would be the noticing party who would bear those costs, which would be them, but we've offered to bear those costs.

THE COURT:  Well, their notice is to have your clients come here to Denver.

MR. MURRAY:  Right.  And we've -- as an accommodation, we've said, look, actually it would be cheaper to them to do it remotely, but we're willing to bear whatever incremental costs there would be of doing the depositions remotely.

THE COURT:  And why -- you know, if they say, Look, I don't want to have to depose somebody who's up until 3 o'clock in the morning.  They're not going to remember anything.  I mean, I don't make it much past 11 o'clock

102

nowadays.  So what about that argument?

MR. MURRAY:  Well, I don't think, Your Honor, that it's any different than flying our people out to the United States where they would be deeply jet-lagged.

THE COURT:  Well, it is different than flying their people out to Manila.

MR. MURRAY:  Well, that is certainly true, Your Honor; but what they've noticed here is they've noticed the depositions of our people in the United States.  If they want to come out to Manila, again, we're happy to accommodate that and to bear the cost of bringing our people there for purposes of efficiency so we don't have to go to far-flung regions of Manila.  But I don't think there's authority that we should have to bear their cost for doing that.

THE COURT:  Why not?  Why can't they split costs to do that?

MR. MURRAY:  Well, Your Honor, because again, I go back to the fact that remote depositions are a reasonable alternative here and that there's a number of cases that have recognized that.

THE COURT:  And just because -- I mean, there's also -- you know, they have authority saying that presumptively depositions take place where -- you know, where the action is filed.  I think there's a good argument

103

as to why that doesn't have to take place here.

But isn't it just sort of my discretion to assign costs as I think appropriate to -- based on the situation in the case, I think what I wrote down was, based on cost, convenience, and efficiency, then I can take a look at, you know, where the depositions ought to take place.

And the rule appears to give me the discretion to divvy up costs as sort of I see fit.  So why can't I assign costs?

MR. MURRAY:  Your Honor, I think you can.  I think our position is that it wouldn't be appropriate here, given that there is a reasonable and cost-effective alternative. But if the Court is inclined to order some kind of cost shifting, what I would suggest is that the other side -- that defendants, first of all, let us know what they anticipate those costs would entail.  Also reflecting the fact that if the depositions were to occur here, which is what they've asked for, Defense Counsel would have to fly to Colorado and be put up in Colorado as well.

So there's -- you know, I would suggest that whatever they ask for would be the difference between what they would incur going to Manila and what they would have incurred to come here for the depositions in any event, and that they keep those costs reasonably confined and that we can talk with them about what those might be.

But I don't -- I'm very leery of a blank check in a case like this, Your Honor.

THE COURT:  I wouldn't do a blank check.  I mean, I don't think I would do it by expense.  I'd probably select a round number and say that's the amount that you're going to contribute to it.  I mean, that's what they did in Hernandez.  I mean, I get it, it's a different case because it was at Plaintiff's election, right?

But the round number here, you know, it's going to be some -- it would be some proportion of the cost of sending one attorney.  I'm not going to pay for -- have you all pay for five attorneys to fly out to Manila and then one attorney can go and be in person and the rest of the people can support from New York or Denver or wherever they're going to support from.  Or they can go on their own time if they want to have a whole bunch of people, but you need one person to take your deposition.  And so that's sort of what I would think on that point.

I'll hear from you in a second, Mr. Taft.

MR. MURRAY:  And, Your Honor, the only other thing I would say is -- and I think their deposition notices already contemplate this, but, you know, it would be, you know, one trip, we'd do a bunch of the depositions at a time.  It wouldn't be sort of flying back and forth for each deposition.

105

THE COURT:  That would be the idea.  It's the idea being -- the idea being that you take one flight there, you take a flight back.  Sorry, you're going to have to live in Manila for a month.  I mean, that's the idea.

MR. MURRAY:  Yes, Your Honor.  Thank you.

THE COURT:  Okay.  Mr. Taft.

MR. TAFT:  And that actually gets to what I was saying.  You know, 40 depositions, you know, 40 days.  I don't think it would be unreasonable to say, okay, one person's going to go over there for the first 20 days and then somebody for the next 20.  I don't think one flight around and a hotel is --

THE COURT:  You can handle it however you want in terms of the apportion of cost.  That's how I'm thinking about it.

MR. TAFT:  In terms of -- okay.

THE COURT:  I don't know how much -- what is the -- what do you think the incremental cost of going -- because otherwise somebody would have to come to Denver, right?

MR. TAFT:  Not necessarily.  We have very able local counsel in Denver who could assess the credibility.

THE COURT:  I think if the plaintiffs were coming here somebody's going to come from New York in order to depose them.  Wouldn't you think?

106

MR. TAFT:  I -- again, I'm --

THE COURT:  No offense to Mr. Nasrullah or to Mr. Waheed, but --

MR. TAFT:  I'm actually not -- I wouldn't jump to that conclusion, and I don't think that that actually is what we would do in that scenario if we had 40 depositions to take over the course of 40 days.

So again, the cost should be reasonable, but I do think considering that this is their protective order and they haven't really shown that their people can't come here, that they should bear the cost of getting us over there to do it in a reasonable way.

THE COURT:  What's the cost of staying in Manila for a month?  I have no idea how much it is.  I guess -- and the flight is --

MR. TAFT:  It sounds like I'm going to have to Google that to find out.

THE COURT:  It sounds like the flight would be -- the flights to Asia are usually somewhere between 1,000 and $2,000.  And then you have to stay in a hotel for, you know, 30 days at, I don't know, whatever it is.  Say it's $100 a night.  Well, I can't do that math off the top of my head.

MR. TAFT:  Yeah, I'm not sure -- and I'm not sure we have the right inputs, but it does sound like something that we might talk to counsel.

107

THE COURT: Okay. Mr. Murray, do you have a better idea than that?

MR. MURRAY: No, Your Honor. I think conceptually that makes sense. And if we end up having some depositions where we stack a couple a day, maybe, you know, we bring two or three people out and we can figure out what the cost of lodging and flights are. And then so maybe we can work that out, and if we have an issue, we can come back to the Court on that.

THE COURT: Okay. Then I'll direct the parties to confer about the cost. But the overall tenor of what I'm suggesting is the cost of being reimbursed is the approximate cost of sending a single attorney -- not their fees, right -- the cost of the flight, the hotel to Manila for the time it takes to take these depositions in person in Manila. That's what I'm suggesting.

Let me turn back, though, for just a second, Mr. Taft. What about the proposition that Mr. Murray was putting out there, if he can make his clients stay up until 3 o'clock in the morning so you can take a reasonable time deposition for New York? What's wrong with that?

MR. MURRAY: Well, then you have to convince the translator to also stay up till 3 o'clock in the morning.

THE COURT: Your translator's here, and you have a (indiscernible) sitting with you in the deposition room in

108

New York.  That person is on the same time schedule as you.

MR. TAFT:  If we have local counsel, which we will, handling documents for -- you know, at the deposition, they're up till 3 o'clock in the morning.  And, you know --

THE COURT:  You have local counsel in the Philippines?

MR. TAFT:  Yes.

THE COURT:  Oh, okay.

MR. TAFT:  Yes.  And, again, as I think you noted, either the person taking the deposition is going to be blurry eyed or the person who is giving the deposition is going to be blurry eyed, and neither are, frankly, adequate for a case of this magnitude where so much is riding on it.

THE COURT:  Okay.  So that's I think where I come down.  The depositions that will be taken in person, but they'll be taken in Manila in person.  The plaintiffs will bear the cost of a single attorney staying in Manila for the period of those depositions.

It's not going to be of multiple attorneys.  You may have multiple attorneys going back and forth, so I'm not talking about actual costs.  I'm talking about an approximate cost to send one attorney there, to fly there, to stay there, and then to come back.  That's the cost that I'm going to have the plaintiffs bear.  And the plaintiffs will confer with the defendants in terms of how much that

109

actually is.

Any further record to make on that, Mr. Murray?

MR. MURRAY:  No, Your Honor.

The only other thing I would say is -- and I just want to point out there.  I hope we can work it out -- there are a couple of plaintiffs who are not in the Philippines that will be on overseas jobs, for example, in, I think, New Zealand and Taiwan.

I would be hopeful that we could figure out a way to do those depositions remotely rather than flying folks out there as well, but I don't know what you guys think about that.

MR. TAFT:  Listen, I think the reality is that we're probably going to have to do something different for those guys.  I think it's two or three, and we'll continue to meet and confer on that.

THE COURT:  So this is with respect to the plaintiffs who are in the Philippines only then.

MR. MURRAY:  Thank you, Your Honor.

THE COURT:  Okay.  That takes us to Interrogatory -- no, oh, sorry, Issue Number 3 from the defense side, which has to do with the plaintiffs' travel outside Qatar.

MR. RASSI:  Thank you, Your Honor.  I think probably good to hear a different voice from our side so

110

I'll take this one.

THE COURT:  Mr. Taft is doing great.  I mean, his voice is probably getting tired, as is mine, because I look to both sides.

MR. RASSI:  Well, I'm hoping to do better and be quick.  On the travel outside of Qatar, Plaintiffs say two things.  They say, First of all, we've produced passports, that should tell you what we need.  We disagree because, first of all, they have not provided passports for every plaintiff.  To the extent that they've provided it, it is basically someone taking a mobile phone and taking a photo of that passport.

THE COURT:  What else would they give you?

MR. RASSI:  Well, they could give us a verified interrogatory response of all of their travel outside of Qatar.  And I'm coming to this, which is the main point.  We are very, very, very concerned about the credibility of these claims.  And I say that, for example, because I have reviewed every single document that plaintiffs have produced.  There is not a single document evidencing forced labor.  Quite the contrary.

What there is, is a plaintiff, for example, that has alleged their passport was confiscated, yet has gone home six times for Christmas during the time that they were alleged to have been employed in Qatar.  And so what we want

111

to explore is, in a case that is riding so much on Plaintiff's credibility, we would like to -- and there have been numerous complaints of passport confiscation, what we would like to do is explore whether or not they took any trips outside of either the Philippines or Qatar to third-party destinations.  Did they go on any work breaks in the Middle East?  Were they laboring in other countries in the Middle East that had similar conditions to Qatar?

And I think we're entitled to explore that as part of our defense.

THE COURT:  I don't understand that.  What was that supposed to mean?  I mean, if they took a trip to Taiwan or Korea or Japan, what does that have to do with the claims in this case?

MR. RASSI:  Because it may show that their passport was not in fact confiscated.  They were able to take that passport and go on a holiday.

THE COURT:  The time that they're in -- they're supposed to be in Qatar, I get that.  Anytime they're leaving Qatar, it undermines the idea that your passport was confiscated and so you couldn't leave, right?  It undermines that idea.

You know, their periods of employment run from different periods, right?  And so after the period of employment is done, are you looking for anything after that?

112

I get the return to Qatar, right?  If you're so afraid of Qatar, why'd you go back after that?  I get that.

MR. RASSI:  Six times.

THE COURT:  But if the period of employment is done, right, who cares whether they went to wherever it is, New Zealand, right, after the period of -- they're migrant workers, they're going to go somewhere else because that's what they do.

MR. RASSI:  It's less the period after and it's actually more the period before.  So what we've proposed is having a 1 January 2010 date, which is the date also that defendants have agreed to produce documents from.  So we're using that as a common starting date.

And the reason we say that's important is under the statute, one of the things is whether or not a reasonable person in the position of Plaintiffs would have considered themselves to be forced to labor by the acts that were alleged.  And I think what's important to assessing that question is, were they working in other parts of the Middle East during that time?  Were they working, for example, in another country that had a similar system of labor?  Were they working in a system that had different or similar conditions as Qatar?  That would inform what a person that was working in Qatar during the relevant period.

THE COURT:  You're getting real trial in the

113

middle of a trial there, right? Because if that's the way you're going to go down, right, you're going to have somebody testify, yes, I went to, I don't know, Saudi Arabia, right? Speaking randomly, Middle Eastern country, I have no idea what the working conditions are for each country.

But if you say, yeah, you went to Saudi Arabia in 2018 and then you went to Qatar in 2019, you're going to have somebody come in to explain similarities between the different systems in the different countries and explain why that makes a difference. That's going pretty far deep, don't you think?

MR. RASSI: It may be, but maybe the travel records will be simple and the travel records will say no, in fact, all they did was travel to Qatar and it would be the end of that inquiry. But we're entitled, I think, to explore that.

And we're also entitled to explore it for a different reason, which is that in the complaint, certain plaintiffs have alleged, I worked in Qatar, for example, from 2012 to 2014. But the documents, in fact, show that the same person was working in Qatar for that same employer since 2004. So why, for example, would allegations of forced labor only suddenly arise after someone has been working for that same employer for ten years?

114

And so what my clients would like to explore is: Were they traveling to any other countries?  When did they go to Qatar for the first time?  What other countries were they traveling to?  And I think we're entitled to explore that to get a sense of who these plaintiffs are, what they were doing in Qatar, why they traveled there, did they travel anywhere else during this time, especially in a case where they've raised so many -- they're using passport confiscation almost across every plaintiff.

THE COURT:  I remember that, yes.

MR. RASSI:  And so in that circumstance, you know, I don't think -- I think if we've gone down the path where Ms. Hoose is asking our clients to try and work out trips to Amsterdam, I think that we're also fairly entitled to look at what trips these individual plaintiffs and only these individual plaintiffs have taken.

I don't think there's anything more to add on that unless Your Honor had any questions.

THE COURT:  Why doesn't the passport itself give you that information?  You know, every time I go to a country, they stamp my passport.

MR. RASSI:  Because not everyone has a passport for the entire time in the relevant period.  Plus, I think that we would like to have a verified ROG response on the record so that we're able to explore that down the line as

115

well.

THE COURT:  Okay.

MR. RASSI:  I can also deal now with the formal and informal complaints if that would be convenient, or I can take them in turn.

THE COURT:  No, let's do it.

MR. RASSI:  This is really just a simple point. It seems to be the only difference is whether or not defendants are required to answer on an informal complaint versus a formal.  We think that's fairly encompassed within the existing interrogatory.

I don't think there seems to be a real disagreement around, you know, their willingness to answer that.  They seem willing to answer.  They seem to maybe just want us to spend another ROG on it.  We think it's already fairly encompassed within this.  They should answer it pursuant to Interrogatory Number 6.

THE COURT:  I don't read their response that way. I read their response to say, Look, the plaintiffs can't recall some conversation that they had with their bunkmate in 2017 about working here is terrible.  I hate working here.  I want to go home.  But they can't be expected to recall all of those kinds of conversations, and so what they've given you is the things that would stick out:  When did you formally complain about your conditions?

116

Are you looking for 2 o'clock in the morning conversations that somebody had seven years ago with their roommate about, I hate it here, I want to leave?

MR. RASSI:  I think that's probably taking it much further than what we're asking for, but perhaps --

THE COURT:  What are you asking?

MR. RASSI:  I mean, perhaps there is some sort of middle ground.  Who was the first person that you complained to informally?  When did that conversation roughly occur and what was it about?

Your Honor would be familiar with all kinds of cases from being an AUSA, particularly kind of assault cases where it's often he said/he said, you know, the two competing sides of the event, but there's no documentary evidence to bear out necessarily the substance of what is being complained about.

THE COURT:  That's why we have special rules for sex assault cases about first complainants.

MR. RASSI:  Exactly right, but one of the questions that's often asked is who was the first person you complained about?  And sometimes there might be third-party depositions of that person in order to be able to determine the veracity or corroboration of the evidence in question.

And I think here, you know, perhaps a middle ground is:  Who was the first person you complained to?

117

Identify their name.  Identify roughly when that conversation occurred.  I don't think they're going to be able to say 2 a.m. in November 2nd, 2014, and I don't think we're looking for that.

THE COURT:  But they may or may not know the name.

MR. RASSI:  They may or may not.  Well, they may or may not.

THE COURT:  Because they could say the guy that they worked with, you know, six or seven years ago.  Maybe they weren't that friendly.  They just, you know, happened to be in the same place at the same time.  They might know or they might not.  I don't know.

MR. RASSI:  I don't want to give these plaintiffs any less credit than they deserve.  They could well remember.  They might remember down to the day, down to the minute, down to the second, who it was, where it was, and how they felt it.  We don't know, and I don't wish to make any assumptions about them.  I think that they should answer that.  We're at least entitled to it.

I think in the same manner in which we're going to go and be making certain investigations today, I think that plaintiffs can go and make certain investigations of their clients and ask them:  Who was that person?  What did you say?  When did it happen?

THE COURT:  Okay.

118

MR. RASSI:  Thank you, Your Honor.

MS. WHEELER:  Just briefly, Your Honor.

THE COURT:  Yes.

MS. WHEELER:  As to travel, I think I'm a bit perplexed as to where the disagreement is at this point.  I think just to provide the full context from Plaintiffs' perspective.  Plaintiffs are providing where they have passports in their possession, full scans of those passports, which would reflect any stamps to or from Qatar or any other country during the relevant time period.  They're also producing any travel stubs, documents, itineraries that reflect their travel to and from Qatar.  So we're providing that relevant information.

I think any speculation that there is travel that wouldn't be encompassed in that is not borne out by the documents that they have in their possession.

THE COURT:  Some of it isn't total speculation, because, you know, your passport expires, right, at some point.  You get a new passport.  So it might not have everything, right?

If your passport -- if you got a new passport, for example, in the middle of your working period for some reason or another, it wouldn't have anything that's before.  I think what they're looking for is something outlining travel history for the entire period of their inquiry.

119

And, you know, in particular, the two things that I heard that were a little bit new to me was any travel history that your clients had to Qatar, right, before the period alleged in the complaint, right, going back to 2010.

And, you know, my passport doesn't go back to 2010, so you wouldn't be able to determine that from a scan of my passport.  And then -- yeah, and then I think that was the main sort of thing.

I don't quite get how a verified response is any better than what the passport says for the period the passport spans, but if it goes before that, and it will for some of them, and I think that's what needs to be understood.

MS. WHEELER:  Certainly, and I think, Your Honor, they do have verified interrogatory responses on those points, which is why they're bringing up these arguments.

As to their interrogatories on work history and on passport confiscation, all Plaintiffs have provided verified interrogatories that state all the places that they were working, some of which were outside of Qatar during the relevant time period, as well as the approximate dates of that employment.

They've also provided information about the approximate dates on which their passport was confiscated during each of their entries into Qatar.

120

THE COURT: Yeah, that's all the stuff that's going to shake out.

MS. WHEELER: Certainly.

THE COURT: And they're going to make summary judgment arguments or whatever it is, or maybe it's a trial argument, I don't know. But what travel history hasn't been turned over?

MS. WHEELER: I think that I have the same question, Your Honor. I think I'm a bit perplexed as to what information they don't have or that's not already been encompassed in our verified interrogatory responses that would be necessary.

THE COURT: All right, don't move, Mr. Rassi. What travel history don't you have?

MR. RASSI: And if Ms. Wheeler is representing that every Plaintiff has a passport for the entire period and a complete record of all travel for the entire period of every trip that they took, then that is one thing.

My review of the document suggests, one, that is inaccurate; and two, it's a smattering of travel stubs from a random selection of plaintiffs. It's not a comprehensive record.

THE COURT: I think what he's asking for is, even if you don't have your ticket from back then, right, and even if your passport expired or you had a different

121

passport back then, I want to know that.  Is that encompassed in what you've given over?

MS. WHEELER:  Your Honor, our position is that it is.  Any travel that would be outside of the period that plaintiffs were in Qatar to other countries, our position is that that is not relevant to the claims at issue in this case.

THE COURT:  That's a different response.  So tell me about that.

MS. WHEELER:  Travel to other places?

THE COURT:  Are you withholding travel history on the basis that it is not relevant?

MS. WHEELER:  Your Honor, we have not asked plaintiffs for, for example, travel stubs and itineraries to places other than Qatar in response to their RFPs.  We have provided verified interrogatory responses that detail the employment history of each plaintiff, including employment in countries other than Qatar, and details entries and exits into Qatar, including prior to the 2010 time period.

THE COURT:  Okay.  But not sort of -- what you're withholding, I guess, is, what, leisure travel to other countries?

I don't know --

MS. WHEELER:  Your Honor, I don't know that that's what they're requesting.

122

THE COURT: I think they're just requesting where did your clients go during that period. You know, whether it's Guam or Taiwan or Russia or anywhere else, right? Any place that is not the Philippines, where did they go during that period? You know, I might not be able to remember exact days, but I can remember what year I went to what country. I mean, presumably they can remember that much.

MS. WHEELER: Certainly, Your Honor. And I think that our position is that, you know, the information that's been provided is the information that's relevant to Plaintiffs' claims and defenses in this case.

THE COURT: It doesn't seem like a huge burden for you to go back and inquire whether they -- you know, tell me the different countries you've been to for the last 15 years. That doesn't seem like it's a huge burden to me. I mean, I can -- unless they're missing something. I know that it's difficult to get in touch with your clients. They're all in the Philippines. But if you send out that question, that's not something that I need to go back and look at records for, right?

I don't think they're looking for exact dates. If you say I went in the summer of 2020, right, that's probably going to be good enough for them. Right, Mr. Rassi?

MR. RASSI: Yes, but can I just give one more example of where this might shake out?

123

THE COURT: Okay.

MR. RASSI: Say a plaintiff says, I was in Qatar for two years, 2012 to 2014, and you have a flight going in in 2012, and you have a flight going out in 2014. That does not necessarily prove that someone was in Qatar from 2012 to 2014.

Had they, for example, taken employment in an adjacent country, Bahrain, in which time, for example, they were working on some other project there, I don't know. That's not going to be revealed in the kinds of travel records that Ms. Wheeler has agreed to produce.

We are quite worried about what is being held back that might show travel to third-party countries.

And I would also say that, do we need it down to the day, oh, you know, someone traveled to Bahrain in March 2014 for a day? No. But we should be at least be getting one, the country, and a general approximation of time. I went for a week for a holiday or I went for six weeks for a work trip. You know, I think that kind of information is relevant: Just country, approximate amount of time, approximate when and for purpose.

THE COURT: That doesn't seem unreasonable to me. Ms. Wheeler, is that something that you can do?

MS. WHEELER: Your Honor, certainly. I can represent that I think vanishingly few, if any of our

124

plaintiffs, would have this type of travel response, but we can certainly go back and ask if that would give some comfort to Opposing Counsel.

THE COURT: That's what he's looking for. I mean, it looks like what he wants is you to go back and say, Tell me all the different countries you've been to. Tell me approximately how long. Tell me when you went there, right?

Don't tell me just that you went to Qatar in 2018 and you left in 2020 if you went to some other country while you were there, because he's trying to undermine your clients' claims that they were stuck there because their passports got confiscated. He wants to say that, All right, you went to Saudi Arabia, you went to Bahrain, you went to wherever, you know, for Lebanon for a week, a month, whatever it is, right? He just wants to know what your travel -- what your client's travel history is. That seems fair enough to me.

MS. WHEELER: We can certainly supplement, Your Honor.

THE COURT: Okay.

MS. WHEELER: And Your Honor, as to our response on ROG 6, I think, just for clarity's sake, you know, we interpreted the term "filed" as referring to formal complaints. So our existing responses have any complaints filed with an entity like the Philippine Overseas Workers

125

Agency, or if there was a formal complaint with a supervisor.

We certainly -- I think in terms of what's relevant in this case, if there were more informal verbal complaints to a manager or supervisor, I think that that would be a sort of a fair supplement if that's something the Court would order.

I don't know that sort of more casual everyday complaints to a coworker, a family member, a friend is going to be realistic, both given the time that's elapsed and the potential volume of such complaints.

THE COURT:  I mean, what I think -- he's asking for the first person that they complained to.  I don't know if your clients are going to remember the first person. They might remember the most important person that they complained to, you know, whether it's their spouse or somebody else.

I think if you can get to, you know, in addition to the formal complaints, besides that, did you make -- who was the most important person that you complained to about your conditions of work during that time?  And approximately when did that happen?  Who is that person?  When did it happen?  I think that's what they're looking at.  Is that you think you can get that kind of information?

And the reason they're doing it is because they

126

want to say, Well, if you didn't complain to anybody else, if you didn't make a formal complaint and you didn't talk to anybody else, how bad was it really?  I don't know how much that gets them, but I think that's the argument they want to make.

MS. WHEELER:  Certainly, Your Honor.  And I think that if there was an informal complaint to a manager or a supervisor, I think that that would be something that is sort of fairly within the ambit of what they're asking about and would be analogous to the information that we've already provided.

So in the interest of providing full disclosure to their ROG as written, I think we would be happy to supplement to that effect, I think, given that those would be both within the scope of employment and sort of particularly relevant to those conditions.

THE COURT:  Is it your position that's something that's not within the scope of the employment?  You know, if they told their spouse or their kids or the parents about it, that that's not within the scope of the interrogatory.  Is that what your position is?

MS. WHEELER:  I think as written, that is our position because of the sort of term "filed," which we do read as delimiting it to a more formal or employment-based context.

127

THE COURT:  I'm actually going to look at -- I did look at it earlier, but I wasn't so focused on it. Interrogatory Number 6:  Whether complaints or grievances were filed with any person or entity, whether informal or formal, whether oral or in written form in connection with Plaintiffs' employment in Qatar and any personal injury suffered therefrom.  If so, to whom the complaint or grievance was lodged, the date of such complaint or grievance.

That does seem to read as though you are complaining to an employer because it's talking about lodging a complaint and it's talking about filing a complaint.  So that does make some sense to me.

All right.  Anything else, Ms. Wheeler?

MS. WHEELER:  No, Your Honor.  Thank you.

THE COURT:  Mr. Rassi?

MR. RASSI:  Your Honor, we do read it more broadly, especially the word "informal" and especially when read in context of Request for Production 9, which were served and filed together.

If I could -- I might go to the middle.

If I could just read Number 9.  Number 9 is:  Any documents, communications, records, legal submissions, or complaints reflecting that a plaintiff communicated concerns, formally or informally, and then you go dot, dot,

128

dot, with any other person or entity regarding their employment conditions, including with respect to the following subject matters:  Any employment misconduct, threats from any employer.

So if they're already asking plaintiffs about this for the purpose of fully responding to the request for production, and they've already got a corresponding interrogatory to the same or similar effect.

THE COURT:  You've got a (indiscernible) and generous problem there, right?  Your list there is employer, manager, supervisor, labor, broker, recruiter, recruitment agency, administrative authority, law enforcement officer, agency, judicial or quasi-judicial authority, governmental entity or agency, nonprofit organization.  And then any other person or entity, right?

Your list there is really talking about people who have some sort of sway in either the government or some sort of conditions.  You're talking about authority type people that you are reporting to there.  You know, there's no --

MR. RASSI:  Having drafted it, that was not the intent.  I can see why it could be read that way.  I will say that in a good faith effort to try and get the information that we're getting, that wasn't the intent.

Any other person, I mean, I could have added, I suppose, or any other human person --

129

THE COURT:  I don't think that's the issue.

MR. RASSI:  -- or any other living and breathing person or entity in corporeal form.  But I think that the fact is that Request for Production 9 read with Interrogatory Number 6, we're not asking for anything particularly burdensome, especially as I've narrated it today here on the stand:  If you just tell me the main person you complained to.

And it's not just about that.  You know, we do have 60 depositions.  We may want to seek third-party depositions of the main complainants.  You know, it might just be a handful that said to a spouse or a significant other or a friend in Qatar, and that was the main person they complained to.

And why I say that's particularly important in this case is, we were not their employer.  We have absolutely no information about these plaintiffs.  We don't know -- I don't know these plaintiffs any better than I do Your Honor, any better than I do Opposing Counsel.  I just don't know anything about them on a personal level, on an employment level.  Our clients know nothing about them.  And so they're just trying to get a picture of who these people are, how they came up with their complaints, how they found their way to a U.S. Court.

And in particular, you know, for their complaints,

130

who did they complain to?  Like, how am I going to find out or test that allegation unless I have some sort of understanding of who was the person they complained to, at least informally?

THE COURT:  No, I understand, but I just don't read Interrogatory Number 6 that way.  I understand -- and even though there's a request for production, right, that language doesn't even appear in Interrogatory Number 6.  I don't think there's any principle that requires them to interpret an interrogatory in light of a request for production.

It's not natural to say that you lodge a complaint with your friend.  It's just a very odd thing to say.  Or that you file a complaint with your mom, right?  It's just not what people say.  Or talking about the outcome of a complaint or a grievance.  There's no outcome when you complain to someone who's just your friend.  The outcome is that person listens to me and it was, I felt better.  Or maybe you felt worse because --

MR. RASSI:  Or that person makes a complaint on your behalf or that person takes it up with someone.

THE COURT:  It has some kind of authority, sure, right?  If they're making it to -- so I think it can be extended to the sorts of entities that you describe in the Request for Production Number 9.

131

Ms. Wheeler, I'm talking about not just a supervisor, but if you complained to an NGO, if you complained to a government authority, if you complained to the police, or if you made some sort of complaint that is capable of being lodged because you think that the person has some ability to do something about it, then that is the sort of complaint that I think is fairly captured by the interrogatory.  Is that clear enough?

MS. WHEELER:  Yes, Your Honor.  We can supplement accordingly.

THE COURT:  Okay.

MR. RASSI:  Thank you, Your Honor.

THE COURT:  So let me make a record of my ruling on those two in terms of travel outside Qatar.  The plaintiffs will supplement their response by inquiring into travel history over the period encompassed by the requests.

And then in terms of Interrogatory Number 6, the plaintiffs will supplement their response by inquiring into informal complaints lodged with any kind of authority figure, whether it is employment, non-governmental or governmental, about the conditions of their employment and any personal injuries suffered therefrom.

That takes us to, I think, the last two issues with respect to third-party litigation funding as well as solicitation letters.

Here's the short of it.  I haven't -- I've seen these in the context of class action litigation, but in class action litigation, you are testing the adequacy of the class representative.  I haven't seen these sorts of requests being granted outside of the context of class action litigation, and I didn't see any cases cited to me that were outside of the context of class actions.

So is there anything outside of the context of class actions that would compel them to turn over either litigation funding or solicitation letters?

MR. TAFT:  Yes, Your Honor.  The cite, Mize v. Kai from this Court, 2018, that we cite, is not a class action.

THE COURT:  No, it's not a class action, but that one's based on the plaintiff's affirmative misrepresentations that were made, and there's a showing of bad faith that was already in place before the order for litigation funding came up.

MR. TAFT:  And we don't have that, but what we do have is a situation where there are parties who may have interest in this claim, or funding this claim who are proceeding effectively anonymously in an environment where our client doesn't know, are they actually also doing business with the parties that have interest in this claim?  Has this been purchased by a hedge fund?  Has this been purchased by a private equity fund?

133

THE COURT: What does it matter?

MR. TAFT: Well, it matters to our clients who are a multinational corporation.

THE COURT: What does it matter to the claims or defenses in the case?

MR. TAFT: And it matters -- it matters to the claims and defenses to the extent there's going to be a claim.for attorney's fees. And that's been recognized that if there's a claim for fees that you have, it is relevant to know what the basis of the engagement is. So again, there's a claim there.

There's some that say, well, that only becomes relevant when you win. There's some that say, well, that's relevant at the outset. We think it's relevant at the outset, and it will inform discussions and our thinking about the overall case.

So I think, again, if they say we're not going to claim fees, then that's one thing; but if they say we're reserving the right to fees, then the terms of their economic deal with their clients is relevant to that claim.

And also, again, just basic questions of credibility, which is always relevant. And this also goes to the solicitation point, which I'm happy to address at the same time.

THE COURT: Address at the same time, yes.

134

MR. TAFT:  Again, understanding what Plaintiffs believe is in it for them, right?  Because again, the allegations at an individual level, they basically are all saying pretty much exactly the same thing using exactly the same words, and that's equally true of the ROG responses.

And so if there are solicitation materials which the authorities show are not privileged, but go to --

THE COURT:  I don't think it's a privilege issue. I just think that it only has come -- I didn't see any case law that came out outside of the context of class action.

Solicitation is important in class actions because you want to know whether the class representative is in it for themselves just to get the premium payment at the end of the day, or whether they are will actually fairly and adequately represent the class.  And their injury is relevant to that whether -- I mean, these people aren't representing a class, so . . .

MR. TAFT:  Right, but there is a credibility determination that if there are materials that are saying if you fit the following criteria, you may have a claim, right? And what we get is a complaint with 53 people saying, "I have the following criteria," and really nothing else about those people other than that they fit a certain criteria that has been -- that is going to be relevant to a basic credibility determination as to how is it that they found

out about this litigation and after years, sometimes after, you know, almost a decade of not having raised any complaints, they say, Aha, Colorado, that's where I should be bringing my claim, and this is what happened to me.  And it just so happens to be verbatim what happened to these 52 other people.  That is something where solicitation materials do go to credibility, and we think that it's a reasonable and frankly not very burdensome request.

THE COURT:  Okay.  I'll let you make a record if you want, Mr. Murray, but I tend not to agree on both of those points.  I tend to think that litigation funding here, we don't have the predicate that they had in Mize and Mize -- I don't know -- M-I-Z-E vs. Kai, because there's not the showing of bad faith.  I have no -- you know, there probably are litigation funders, maybe they're not, I don't know, but I don't think it's really the subject -- proper subject of discovery.

I also don't think that solicitation letters here -- I think they can test your client's dedication to the cause one way or the other by deposing them and cross-examining them.  I don't think your solicitation letters, if there were, any make any difference one way or the other, and so I'm inclined to deny both of those requests, but if you want to make a record, I would let you do so.

136

MR. MURRAY:  Nothing to add.  Thank you, Your Honor.

THE COURT:  So as to those two issues.  The issue with respect to Request for Production 23 and Interrogatory Number 10, as well as for Request for Production Number 24 and Interrogatory Number 9, I am not requiring responses to those requests.

I think that takes care of all the issues.  Mr Murray, anything else that I need to do today?

MR. MURRAY:  Nothing else from Plaintiffs, Your Honor.

THE COURT:  Mr. Taft?

MR. TAFT:  No, Your Honor.  And thanks to the Court for staying late, and of course the court reporter, it's very appreciated.

THE COURT:  Well, it's my courtroom deputy.  I don't get a court reporter because I am a (indiscernible) magistrate judge, but, you know, perhaps one will listen to this later and -- if you all order the transcript for today.

With that there being no further business, we'll be in recess.  Thank you all.

(WHEREUPON, the hearing concluded at 5:00 p.m.)

137

TRANSCRIBER'S CERTIFICATE

I certify that the foregoing is a correct transcript, to the best of my knowledge and belief (pursuant to the quality of the recording) from the record of proceedings in the above-entitled matter.


/s/Dyann Labo                     November 20, 2025

Signature of Transcriber                Date

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

# Defendants have filed Exhibit 4.8 – the PMC Contract – under Level 1 Restriction.